**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
------------------------------------------------------------------ X

| | |
|---|---|
| BLUEPRINT CAPITAL ADVISORS, LLC,    : | |
|    : | |
|          Plaintiff,    : | Civil Action No. |
|    : | |
|     v.    : | |
|    : | **COMPLAINT** |
| STATE OF NEW JERSEY, DEPARTMENT OF    : | |
| THE TREASURY, DIVISION OF    : | |
| INVESTMENT by TREASURER ELIZABETH    : | **Jury Trial Demanded** |
| MAHER MUOIO, BLACKROCK, INC.,    : | |
| BLACKROCK ALTERNATIVE ADVISORS,    : | |
| CLIFFWATER, LLC, TIMOTHY WALSH,    : | |
| SAMANTHA ROSENSTOCK, JASON    : | |
| MACDONALD, CHRISTOPHER    : | |
| MCDONOUGH, COREY AMON and DINI    : | |
| AJMANI, in their individual and professional    : | |
| capacities,    : | |
|    : | |
|          Defendants. | |

------------------------------------------------------------------ X

Plaintiff Blueprint Capital Advisors, LLC ("Blueprint" or "the Company"), by and through its undersigned counsel, Wigdor LLP, hereby alleges, as and for its Complaint against Defendants the State of New Jersey, Department of Treasury, Division of Investment by Treasurer Elizabeth Maher Muoio (the "DOI"), BlackRock, Inc., BlackRock Alternative Advisors (BlackRock, Inc. and BlackRock Alternative Advisors are together, "BlackRock"), Cliffwater, LLC ("Cliffwater"), Timothy Walsh, Samantha Rosenstock, Jason MacDonald, Christopher McDonough, Corey Amon and Dini Ajmani[1] (together, "Defendants") as follows:

## PRELIMINARY STATEMENT

1. Systemic discrimination and racism continue to permeate America's financial services industry. Although such racial resentment, suspicion, and destruction are most horribly

---

[1] Defendants the DOI, Rosenstock, MacDonald, McDonough, Amon and Ajmani are hereinafter collectively referred to as the "State Defendants."

illustrated by the burning of "Black Wall Street" almost 100 years ago, many of the white Americans who dominate the worlds of banking and investment today still, consciously and unconsciously, act to prevent Black Americans from achieving success on the same basis, terms, and level as their white colleagues.

2.     This constant additional burden borne by minority-owned firms such as Blueprint becomes just about impossible to overcome when officials at institutional investors, such as the State of New Jersey's Division of Investment (which manages investment of the state's pension funds), ratify and perpetuate such discrimination themselves by shunning Black firms and professionals.  Here, not only did New Jersey's DOI cast aside Black-owned Blueprint in favor of BlackRock, with its overwhelmingly white executive management and workforce, but the DOI and its vendor Cliffwater handed Blueprint's proprietary business plans and information to BlackRock so they could unlawfully coopt Blueprint's specialized program and business opportunity.

3.     Indeed, DOI officials admitted to Jacob Walthour Jr., Blueprint's co-founder and Chief Executive Officer (CEO), that the agency had an aversion to minority- and female-owned businesses, and that BlackRock was in fact setting up with New Jersey the same program as Blueprint had proposed.  When Blueprint's executives appealed to DOI to remedy the situation and called out this racial discrimination, New Jersey officials punished them with punitive terms on the other investment of other capital with Blueprint, which was transparently intended to force Blueprint to walk away.  The DOI's unlawful actions are disturbing not only for how they have harmed and continue to harm Blueprint, but because of the serious betrayal of public trust they reveal, particularly with regard to New Jersey's Black, minority, and female residents and taxpayers.

4.       The discrimination and unlawful acts against Blueprint are a case study in how some of the most powerful private and public entities in the country, including the State of New Jersey and Blackrock, have used institutional power to exploit and attempt to destroy a Black-owned business seeking to compete on a level playing field.  Democratic Governor Phil Murphy's Administration ("Murphy Administration") has outwardly expressed support for minority-owned businesses, while allowing New Jersey's DOI to blatantly retaliate against Blueprint and work in concert with Cliffwater and Blackrock to steal the materials and concepts behind the FAIR program, a lucrative and proprietary business idea that Blueprint created after years of painstaking research and development.  In fact, the Murphy Administration has not appointed a single African-American employee to the DOI since his inauguration twenty (20) months ago.

5.       The DOI and Cliffwater diverted the opportunity and information from Blueprint and handed it to Blackrock, the exponentially larger company, whose employees were all too eager to increase profits at the expense of a Black-owned firm.  BlackRock even replaced their African-American representative on the DOI relationship with a white employee before sealing the deal.

6.       Blueprint's FAIR program is aimed at using or structuring alternative investments through managed accounts or fund-of-one structures.  As part of the program, Blueprint uses negotiating techniques and criteria it has developed to obtain more favorable terms from alternative investment managers to negotiate a one percent (1.0%) management fee and a 10% performance fee (much more favorable than the typical terms offered to customers like DOI) and uses hurdles to cover or recover a portion of these fees.

7.      Blueprint spent years developing the concepts and business model supporting the FAIR program, as well as the underlying details related to the program, including the financial models and negotiating methods that would be used to achieve the promised results.  It also carefully guarded this information and maintained its confidentiality in order to provide Blueprint with a competitive advantage in the marketplace, an advantage that derives from being a first-mover and the reputational benefits of being a pioneering alternative investment firm.

8.      Blueprint approached the DOI touting the millions of dollars the FAIR program could save New Jersey's pension funds in fees through the Company's proprietary and confidential strategy.  The DOI immediately recognized the value add presented by the FAIR program and committed to investing hundreds of millions of dollars with Blueprint.  As a new investment advisor, securing a major public entity as an anchor investor would send a message to the industry that Blueprint and the FAIR program were serious players capable of competing with the most-established companies in the investment space.

9.      Under the guise of performing "due diligence" into Blueprint, the DOI, and its hand-selected consultant Cliffwater, demanded that Blueprint open its books and share hundreds of pages of research, financial models, vendor lists and investment strategies that comprised the FAIR program.  They were able to secure access to Blueprint's information by not only guaranteeing that the DOI would invest upwards of $500 million into the Company, providing both investment capital and "seed" money for Blueprint's operations, but also by guaranteeing that any information that Blueprint shared would be maintained in the strictest confidence.

10.     However, unbeknownst to Blueprint, while promising the Company that DOI intended to invest hundreds of millions of dollars of capital into the FAIR program, the DOI and Cliffwater were secretly working with BlackRock to exploit Blueprint, a Black-owned company,

and ensure that it would not reap the benefit of its innovations.  Instead, the DOI and Cliffwater sent Blueprint's confidential information about the FAIR program to BlackRock in order to allow BlackRock to create its own FAIR program.  The conspirators **did not even bother to change the purloined program's name**.

11.     After the DOI publicly announced its decision to implement the FAIR program with BlackRock in July 2016 (abruptly shunting Blueprint aside), Mr. Walthour met with the then-Director of the DOI, who conceded Defendants' discriminatory animus.  Indeed, the DOI official openly admitted that New Jersey was "**not a fan of investing with women- and minority-owned firms**," and "**If the [State Investment Council] knew Blueprint was a minority-owned firm, they would not approve**" of any investment.

12.     In response to this blatantly discriminatory and unlawful conduct, Blueprint repeatedly complained and raised objections with New Jersey through several channels that it had been the victim of unlawful discrimination because of its status as a business founded by African-Americans and a woman.  Blueprint started by bringing its complaints to individuals in the DOI, including Mr. McDonough and Mr. Byrne.  Blueprint has also made exhaustive attempts to discuss the claims and injustice with Murphy Administration officials utilizing its statewide network of contacts to bring the matter to the attention of Phil and Tammy Murphy and other high-ranking state officials.

13.     Those complaints fell on deaf ears.  Not only did New Jersey fail to take *any* remedial action in response to Blueprint's well-founded concerns, but they punished Blueprint by repeatedly rejecting Blueprint's investment ideas, making it impossible for the Company to grow and generate crucial revenue from its investment concepts and strategies.  As a further example, while it is customary to confirm receipt of investment recommendations and review

and comment on their application, the DOI does not acknowledge receipt or respond to emails or provide constructive feedback.  Moreover, while it is customary to meet with investment managers on an annual basis, the DOI staff has not visited Blueprint's offices to meet with staff and perform normal monitoring duties since 2016.

14.     In further gratuitous retaliation, after rejecting investment recommendations, the DOI refused to provide written feedback or guidance upon the request of Blueprint.  Instead, they informed Blueprint in writing that the DOI is under no obligation to provide Blueprint with written guidelines or objectives thereby ensuring that they could arbitrarily reject Blueprint's recommendations with no recourse.  Their refusal to provide any support for Blueprint demonstrates a desire to see the firm fail and further demonstrates the venom of these officials and confirms their discriminatory and retaliatory animus towards a Black-owned business whose management had the nerve to seek to defend its civil and contractual rights.

15.     The exploitation of and retaliation against Blueprint by the Defendants reveals that racial discrimination and malfeasance occurs even at the pinnacle of success and industries such as financial services.  The participation of public officials of the State along with BlackRock, one of the largest financial services companies in the world, as well as others, also shows that such conduct can be found in surprising places, including institutions which the public trusts will pursue its best interests.  In the words of at least one elected official to New Jersey's Treasurer, the treatment of Blueprint is "**a modern-day economic lynching that has left a stain in the eye of the State of New Jersey**."

16.     The harm inflicted on Blueprint is enormous, and at a minimum, runs into the tens of millions of dollars.  There simply is no way to undo the damage to Blueprint's reputation and its future prospects as a result of having the FAIR program stolen from it and suffering years of

retaliation after objecting to these unlawful acts.  The State's unwillingness to address the troubling history and documented allegations levied by Blueprint demeans their oath of office, undermines the public trust and has left Blueprint with no other option than to pursue justice in a court of law.

## NATURE OF THE CLAIMS

17.     This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' violations of 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), New Jersey Civil Rights Act, breaches of contract, breaches of the implied covenant of good faith and fair dealing, breaches of fiduciary duty, breaches of duty of confidentiality, as well as for unjust enrichment, unfair competition, and use of idea.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and Section 1983.

19.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in this district.

## PARTIES

21.     Plaintiff Blueprint Capital Advisors, LLC is a foreign, Delaware corporation, headquartered in Newark, New Jersey, with its principal place of business located at 45 Academy Street, Suite 205, Newark, New Jersey 07102.

22.     Defendant State of New Jersey, Department of the Treasury, Division of Investment is a government entity that makes investment decisions on behalf of New Jersey. The State of New Jersey Department of Treasury houses the Division of Investment, which oversees the $80 billion pension fund.  The DOI, in turn, manages investments on behalf of the public pension and retirement funds for New Jersey's current and retired employees.  The DOI, by virtue of the size of those public employee funds, is one of the largest money managers in the United States.

23.     Elizabeth Maher Muoio is the Treasurer of the State of New Jersey.

24.     Defendant BlackRock, Inc. is an American global investment management corporation based in New York City, with its principal place of business located at 55 East 52nd Street, New York, New York 10055.

25.      Defendant BlackRock Alternative Advisors is a Delaware corporation headquartered in New York City, with its principal place of business located at 55 East 52nd Street, New York, New York 10055.

26.     Defendant Cliffwater, LLC is a Delaware corporation, headquartered in Los Angeles, California, with its principal place of business located at 4640 Admiralty Way, Marina Del Rey, California 90292.

27.     Defendant Timothy Walsh is a former member of Blueprint's Board of Advisors and is currently a Managing Director at Owl Rock Capital LP.  Upon information and belief, Mr. Walsh is a resident of the state of Indiana.

28.      Defendant Samantha Rosenstock is the former Head of Investments at New Jersey's Division of Investment.  Upon information and belief, Ms. Rosenstock is a resident of New Jersey.

29.     Defendant Jason MacDonald is a former Senior Portfolio Manager at New Jersey's Division of Investment.  Upon information and belief, Mr. MacDonald is a resident of New Jersey.

30.     Defendant Christopher McDonough is the former Director of New Jersey's Division of Investment.  Upon information and belief, Mr. McDonough is a resident of Pennsylvania.

31.     Defendant Corey Amon is the current Director of New Jersey's Division of Investment.  Upon information and belief, Mr. Amon is a resident of New Jersey.

32.     Defendant Dini Ajmani is the New Jersey's Assistant Treasurer.  Upon information and belief, Ms. Ajmani is a resident of New Jersey.

## PROCEDURAL REQUIREMENTS

33.     Plaintiff filed a Notice of Claim with the State of New Jersey on January 24, 2020, providing New Jersey notice of the conduct complained of herein.  After the statutorily required six months from the filing of the Notice of Claim, Plaintiff will amend this Complaint to add New Jersey as a defendant to the tort claims alleged herein.

## FACTUAL ALLEGATIONS

I.     **BACKGROUND**

34.     Blueprint was launched by Jacob Walthour and his partner, Carrie Pickett, in 2015 to provide an investment vehicle focused on reducing the costs associated with alternative investment strategies.

35.     Before starting Blueprint, Mr. Walthour and Ms. Pickett had decades of experience working for some of the most prestigious firms in the financial services industry, including Cowen & Company, Cliffwater, Citadel Investment Group and Morgan Stanley.

36.     Mr. Walthour and Ms. Pickett started Blueprint after recognizing that existing hedge funds and other alternative investment strategies were rife with inefficiencies, resulting in higher fees to clients, and especially to investors in the public pension sector.

37.     Mr. Walthour and Ms. Pickett, both of whom are African-American, also recognized that there are shockingly few minority-owned alternative managers in the financial services industry, and in New Jersey in particular.  Even those that did exist faced numerous roadblocks due to institutional racism that continues to permeate the financial field, tilting the playing field substantially against them as compared to white-owned competitor funds.

38.     Mr. Walthour and Ms. Pickett believed that, by creating a value proposition that did not exist among their peers, they could set themselves apart and create a roadmap for future minority-owned businesses to gain a foothold in a profession and field historically dominated by white men.

39.     One of the primary inefficiencies that Blueprint focused upon was the standard-issue "2 and 20" hedge fund compensation structure, in which the hedge fund charged a two percent (2.0%) management fee for all of its total assets under management from the investor, in addition to a 20% performance fee charged against all profits.

40.     Through years of painstaking research, Blueprint designed and perfected a proprietary program, which it dubbed "FAIR," in April 2015.  This FAIR program was presented in detail to DOI in dozens of meetings and conference calls where collateral materials were provided to DOI officials.

41.     Blueprint's idea was to primarily target public pension funds and, using the proprietary FAIR program, offer them a structural alternative that would reduce fees and

preserve allocations to alternative investments which were at risk of being cut due in part to the high fees typically charged by the largest hedge funds and alternative managers.

42.     Blueprint's strategy involved using or structuring alternative investments through managed accounts or fund-of-one structures.  Blueprint had identified a universe of alternative investment managers to target for pitching the FAIR program (akin to a customer list), and intended to use the proprietary business strategy, fee modeling techniques, program fee structure, marketing strategy, term sheets, financial models and legal structure it had developed to negotiate more favorable terms of engagement in other areas from these investment managers. These alternative investment managers were identified based on Blueprint's analysis of financial historical data, investment results and investment strategy.

43.     Having identified a list of alternative investment managers, Blueprint used the proprietary techniques that were part of the FAIR program to set a one percent (1.0%) management fee and a 10% performance fee and use hurdles to cover or recover a portion of these fees.

44.     As a new company in the highly competitive field of hedge funds, and particularly as a minority-owned company, it was even more critical for Blueprint to differentiate its services from those of its competitors.  This was especially important given that Blueprint's better-known competitors are largely owned by white men, and therefore do not face the same institutional discrimination and bias that a minority- and woman-owned business such as Blueprint can expect to encounter.

45.     The FAIR program offered Blueprint a golden opportunity to stand out from the pack of managers using an old and dying business model.  Based on extensive research, particularly into public sector investors, Blueprint had identified a need for its services and a

competitive advantage for its up-and-coming fund.  Just as importantly, it determined that there

was no similar program to FAIR being offered in the investment space.  As the first-mover,

Blueprint had positioned itself to be seen as a cutting-edge firm that provided innovative ideas

and a business proposition that its competitors did not offer and could not match.  The only step

that remained was bringing on a prominent public investor to demonstrate confidence in and

"proof-of-concept" for the FAIR program, and, ultimately, for Blueprint itself.

## II.     BLUEPRINT APPROACHES THE NEW JERSEY DOI

46.     During the early stages of its research, Blueprint quickly identified the State of

New Jersey as a prime potential investor in the FAIR program.  Several industry publications had

reported the State Investment Council's ("SIC") displeasure with the level of fees being paid to

alternative managers and the DOI staff had to find a solution or risk losing their allocation and

potentially their jobs.

47.     By way of its value proposition, Blueprint felt it was uniquely positioned to break

through New Jersey's unfortunate and well-known history of blocking and refusing to allow

minority- and woman-owned firms an opportunity to provide investment management services to

the State.[2]

48.     Blueprint recognized that the FAIR program could produce tens of millions of

dollars in fee savings to the State, enhance portfolio performance, address the SIC's concerns

about the level of fees paid to alternative managers, and provide accolades to the DOI for

providing thought leadership and innovation.

---

[2]     New Jersey's historical failure to engage minority- and woman-owned investment
advisors has been perpetuated for so long and proven so intractable that, just last year, Governor
Phil Murphy signed into law a formal requirement that the DOI increase opportunities for
minority- and woman-owned investment firms.  See
https://www.pionline.com/article/20190131/ONLINE/190139959/n-j-law-gives-women-and-minorities-more-opportunity-to-manage-state-pension-funds.

49.     Accordingly, in May 2015, Mr. Walthour reached out to the then-Director of the DOI, Defendant McDonough, to introduce him to Blueprint's proprietary FAIR program and explain how the components of the FAIR program were uniquely designed to address New Jersey's investment needs.

50.     Upon learning about Blueprint's FAIR program, the DOI and its employees, including, *inter alia*, Defendant McDonough and Defendant MacDonald, were enthusiastic about Blueprint's ideas and made clear that the DOI was committed to making future investments with the Company.

51.     However, the DOI maintained that it needed to conduct its due diligence in order to ascertain the full benefits of the FAIR program and the ability of Blueprint to manage substantial assets.

52.     Ostensibly in furtherance of this due diligence, the DOI insisted that Blueprint share its proprietary research, business plans and various other components of the investment strategy underlying the FAIR program.

53.     Given the highly sensitive and confidential information underpinning the FAIR program, and the fact that the FAIR program was central to Blueprint's business strategy and competitive advantage, the Company naturally was hesitant about sharing such information, even with a potential investor.

54.     Blueprint therefore asked the DOI on several occasions to enter into a nondisclosure agreement with the Company that would, in writing, preclude the DOI and its employees from sharing Blueprint's confidential information with other parties.

55.     The DOI refused, with Defendant MacDonald claiming that having such a nondisclosure agreement approved would be "too time-consuming."

56.     Instead, Defendant McDonald and Defendant McDonough induced Blueprint to proceed without a formal, written confidentiality agreement in place to protect its trade secrets by citing that DOI investment officers were bound by confidentiality embedded within the New Jersey Conflicts of Interest Law (N.J.S.A. 52:13D-12 *et seq*.) and the Uniform Ethics Code which states:

> In the exercise of an employee's duties, an individual may be provided confidential information supplied by brokerage firms, banks, corporations or others with whom the Division transacts business. The information may or may not be designated as confidential, but the employee should treat all information that is not publicly available as confidential. In addition, investments under consideration, recent investment decisions, and non-public information about the portfolios under management (including individual investments) should be treated as confidential information. The employee may not disclose such information to any person outside the Division and should limit such disclosure within the Division only to those persons who need to know such information in keeping with their responsibilities within the Division. No employee, nor any other person through the employee, may use such confidential information for personal or financial advantage.

57.     Defendant McDonald and Defendant McDonough assured Blueprint that they were committed to investing approximately $500 million with the Company, and that their only remaining concern was making sure that the approval process was completed so that both parties could enter into a fruitful partnership.

58.     Defendants McDonald and McDonough further represented that the approval for Blueprint itself was a formality, given that the SIC had approved 100% of proposed investments in recent years, and further told the Company that pushing the DOI to approve the nondisclosure agreement would add a significant hurdle that could potentially impede such an investment.

59.     When Blueprint continued to insist that it needed some measure of protection to safeguard its confidential information, Defendant McDonough assured Blueprint that a formal nondisclosure agreement was unnecessary for these purposes, because, as mentioned above, New

Jersey employees are bound by the law to maintain confidentiality over any information that they receive as part of their official duties.  As a result, Defendant McDonough made clear that DOI employees could not lawfully share Blueprint's information even with other employees of New Jersey, except insofar as those employees needed to see such material for legitimate business reasons.

60.     In direct reliance upon these representations, Blueprint sent hundreds of pages of proprietary and confidential documents to New Jersey, as well as its external consultant, Cliffwater, who had been retained to assist with the due diligence process over the coming months.  The information produced by Blueprint pursuant to New Jersey's requests included research, ideas, models, structures, client lists, term sheets, concepts and other intellectual property developed and owned by Blueprint that it considered to be trade secrets and which it judiciously guarded through, among other things, nondisclosure agreements, employee confidentiality agreements, disclaimers and watermarks on documents.

61.     However, out of an abundance of caution, Blueprint ensured that the documents sent to the DOI and Cliffwater were all clearly marked "confidential" and indicated that they contained proprietary information that could not be used or disseminated without Blueprint's written consent.  Indeed, many of the critical documents were further watermarked to prevent disclosure.

62.     Additionally, Blueprint used language in all emails and embedded such information on documents stating:

> ***CONFIDENTIALITY AND SECURITY NOTICE****: This e-mail, including any attachments, may contain confidential and proprietary information and may be legally privileged or otherwise protected by law.  It is not an advertisement nor is it intended for public use or dissemination.  It may be read and used solely by the intended recipient(s), and any review, use or dissemination,*

*distribution or copying by others is strictly prohibited.  It may not
be used in whole or in part without written consent of this firm.*

### III.   THE NEGOTIATIONS BETWEEN BLUEPRINT AND THE DOI

63.     Based upon the reams of confidential and proprietary information provided by
Blueprint, the DOI represented that it was enthusiastic about the FAIR program and the
Company as well.  Indeed, the DOI assured Blueprint's representatives that its intention to invest
with the Company was such a guaranteed outcome that the thrust of the conversations shifted
from the DOI's intention to invest *with* Blueprint to DOI's desire to invest *in* Blueprint itself as
an entity and business.

64.     In other words, the DOI represented that it was enamored not only with the FAIR
program, but Blueprint's larger investment strategy, and sought to partner with the Company so
that it could enjoy greater returns on Blueprint's future endeavors.  To that end, the DOI and
Blueprint began discussing the fact that New Jersey would allocate assets in exchange for the
right to profit from Blueprint's successes through a revenue-sharing arrangement.

65.     In this way, the DOI would not simply earn a return from the capital it provided to
Blueprint to invest, but it would also share in the fees that Blueprint earned on its other
investments going forward.  In such an arrangement, the revenues generated by the managers are
generally used as working capital for the fund management company.

66.     After a series of discussions, the DOI represented that it would indeed agree to
share 10% of Blueprint's profits in exchange for a larger investment.

67.     Based upon the direct representations and nature of the requests made while
discussing the seeding arrangement with the DOI, Blueprint spent millions of dollars in
preparation of its business infrastructure.  Notably, during every step of this process, Blueprint
was in communication with the DOI, which assured the Company that the approval was merely a

formality and actively encouraged it to build up its staff and resources so that it could "hit the ground running" once the approval came through.

68.     By way of example only, at the request of Defendant MacDonald, Blueprint recruited key staff members for running the FAIR program in connection with New Jersey's investment, all of whom were discussed with, and even introduced to, the DOI's own staff.

69.     In addition, Blueprint signed a lease for an office in New York City in connection with the upcoming DOI partnership, committing substantial capital and assuming a significant long-term liability.  Blueprint also incurred significant legal and other expenses in setting up its innovative fund structure and documents.

70.     As part of its original business plans, Blueprint had always intended to partner with a large financial services firm or other asset managers to mitigate the inherent risk associated with starting the FAIR program.

71.     When Blueprint informed the DOI of this fact, Defendants McDonough and MacDonald both unequivocally instructed Blueprint not to form such a partnership with another firm.  Instead, they said that Blueprint should give the ownership share entirely to the DOI in exchange for a relationship with adequate revenues to cover past expenditures and future costs.

72.     Blueprint relied upon these representations made by senior officials at the DOI and elected to pursue the exclusive arrangement with the DOI based upon these representations.

73.     To substantiate his representations and further lull Blueprint with additional promises, Defendant McDonough arranged a meeting between Mr. Walthour and SIC Chair Mr. Byrne, in which New Jersey once again confirmed that it intended to engage in the exclusive investment arrangement with Blueprint.

74.     Based on these discussions and the representations made, Blueprint believed that the DOI had committed to seeding the Company and this also contributed to its comfort in sharing its proprietary information and trade secrets with New Jersey and Cliffwater.

75.     Over the next several months, the DOI repeatedly requested that Blueprint provide it and Cliffwater[3] with extensive proprietary and confidential business documents, including, *inter alia*, financial projections, business and headcount budgets, calculation methodologies and details of vendor relationships.  Much of the information requested and the requested format was atypical of normal institutional due diligence processes.

76.     Blueprint provided the information in direct reliance upon the DOI's assurances that a deal with Blueprint was a certainty, that such material and information was protected, and that it would be kept entirely confidential pursuant to legal obligations.

77.     During the second half of 2015, Blueprint and the DOI began exchanging term sheets that set forth the nature of the DOI's commitment, fees, ownership and revenue share.  A final term sheet dated December 15, 2015 (the "Initial DOI Agreement") was exchanged memorializing the initial proposal, which consisted of the following key elements of the deal and partnership terms:

- A minimum of $500,000,000 in capital commitments from DOI;

- DOI receiving 10% of the gross management fee revenue; and

- A management fee of 0.75% on committed capital contributions.

---

[3]     Cliffwater served as investment due diligence consultant to the DOI and was tasked with completing diligence on the FAIR mandate for DOI.  Consequently, the DOI forced Blueprint to work with Cliffwater and provide it with unfettered access to the Company's business plans, financial documents and other information, which it normally would not provide to third parties outside of a formal business relationship.

78.     Under the terms of the Initial DOI Agreement, Blueprint would have, even conservatively estimated, earned millions of dollars per year from the DOI's investment in fees. This, however, was a small fraction of the fee savings that the DOI expected under Blueprint's FAIR program.  According to Defendants McDonough and MacDonald, the SIC was set to initially approve this seeding arrangement in January 2016.

79.     However, Defendant McDonough reneged on this timeline, telling Mr. Walthour that the proposal was not addressed in January 2016 because "the agenda was too full to propose Blueprint's program."  Instead, Mr. McDonough requested that Blueprint continue to provide additional confidential and proprietary research documents, including financial projections, to the DOI and Cliffwater, ostensibly because he needed this information to confirm the fees generated from the DOI relationship.

## IV.     THE DOI CONSPIRES WITH BLACKROCK AND CLIFFWATER TO USURP BLUEPRINT'S TRADE SECRETS AND PROPRIETARY INFORMATION

80.     Throughout the first few months of 2016, the SIC continued to meet regularly, yet never discussed the final approval of Blueprint's FAIR program.  Blueprint, understandably, became concerned, because what had been represented to be a mere formality in an already settled business relationship was dragging on for months.

81.     Compounding the problem, Blueprint had advanced hundreds of thousands of dollars to prepare for what had been described as an imminent transaction, including, *inter alia*, the recruitment and hiring of key staff members, as Mr. McDonald had specifically requested.

82.     Troubled by the delay, Mr. Walthour sent Mr. McDonough a letter in April 2016 detailing his concerns about the lack of final approval and outlining Blueprint's preparedness.

83.     Defendant McDonough responded by informing Mr. Walthour that New Jersey was in the process of also negotiating to implement the FAIR program with BlackRock instead of Blueprint.

84.     Mr. Walthour expressed his absolute shock at this abrupt turn of events, and asked for an explanation.  Defendant McDonough at this time openly admitted that the discussions with BlackRock were to implement the very same proprietary FAIR program that Blueprint had spent years and millions of dollars developing, and which had been shared with DOI and Cliffwater on a strictly confidential basis.

85.     Tellingly, Defendant McDonough made no effort to conceal the fact that he and BlackRock were planning on moving forward with the same FAIR program that *Blueprint had developed*, and he put a fine point on it when he responded to Mr. Walthour's objections by cavalierly admitting that, "Just because the idea was yours, it doesn't mean we have to do it with you."

86.     In July 2016, the DOI formally announced that it was proceeding with a deal with BlackRock, and had decided that it would no longer engage in the FAIR program with Blueprint.

87.     Incredibly, the DOI's announcement shamelessly had not even changed the name of the program, trumpeting the fact that the investment with BlackRock "**will be part of the Division [of Investment]'s Fund Alignment and Incentive Reform ("FAIR") Program.**"

88.     In addition, the description of "the Division's" FAIR program aligned almost verbatim with information contained in the material provided by Blueprint to both the DOI and the SIC.  The core features of Blueprint's FAIR program, right down to the one percent (1.0%) management fee and the 10% performance fee, use of hurdles and implementation structures had

been carbon-copied from Blueprint's confidential materials without permission and misappropriated by the DOI and BlackRock.

89.     After the announcement of BlackRock, Mr. Walthour questioned Defendant McDonough on how he and Mr. Byrne could allow this to happen to a minority-owned firm.

90.     It was at this point that Defendant McDonough also admitted Defendants' discriminatory animus, conceding that New Jersey was "**not a fan of investing with women- and minority-owned firms**," confirming a long-feared suspicion among investment managers who were women and/or people of color.[4]

91.     Defendant McDonough also made statements to the effect that, "It will be difficult to get Blueprint approved," and that "**If the SIC knew Blueprint was a minority- owned firm, they would not approve**" Blueprint.

92.     Incredibly, Defendant McDonough did not even try to hide or rationalize New Jersey's discriminatory animus towards Black- and female-owned businesses.  Instead, he ratified such discrimination, telling Blueprint that, if the Company wanted to succeed with New Jersey in the future, it needed to scrub any reference to Blueprint's minority-owned status from reports.

93.     Defendant McDonough even tried to convince Mr. Walthour that BlackRock's abrupt substitution for Blueprint was ultimately good for the Company, and he hoped that once BlackRock was approved, that he "might be able to slide" Blueprint in without any questions because a minority-owned business would be subject to less scrutiny when it was not in as prominent an investment position.

---

[4]     In fact, the SIC had no women members, no minority members and had not welcomed a woman or minority appointee in over six years.  Additionally, until the approval of Blueprint by the SIC, a new minority-owned firm had not been approved by the SIC in over 10 years.

94.     Accordingly, the DOI made clear that its decision to move forward with BlackRock at Blueprint's expense was based largely on the race and ethnicity of the founding partners and the Company's status as a Black-owned business.

95.     As a direct result of the FAIR program that had originally been developed by Blueprint and misappropriated by Defendants, the DOI saved tens of millions of dollars of fees to date and BlackRock has earned millions of dollars from its ill-gotten relationship with the DOI.  In addition, as Blueprint had predicted, the FAIR program received attention from major industry publications and the DOI received nominations for industry awards.

## V.     BLUEPRINT'S INVESTIGATION INTO NEW JERSEY AND BLACKROCK'S UNLAWFUL CONDUCT

96.     Upon learning that years of sensitive and confidential work had been misappropriated, Blueprint immediately conducted its own investigation to determine how BlackRock had been able to independently create a program that was essentially identical to the FAIR program the Company had devised (and at the same time).

97.     Blueprint had spent years developing the concepts and business model supporting the FAIR program, as well as the underlying details related to the program, including not simply its name, but the financial models and negotiating methods and targets that would be used to achieve the promised results.

98.     Further, it had carefully guarded this information and maintained its confidentiality in order to provide Blueprint with a competitive advantage in the marketplace, derived from being a first-mover and the reputational benefits of being a pioneering alternative investment firm.  It was far too conspicuous and convenient a coincidence for BlackRock to have introduced an identical program to Blueprint's own.

99.     Nothing similar to the FAIR program existed at the time that Blueprint sought to bring it to the market.  The FAIR program's features were sufficiently unique that the DOI, BlackRock, and/or Cliffwater could not have simultaneously and timely engineered their own versions of the FAIR program without relying upon and misappropriating Blueprint's confidential information.

100.     Indeed, Blueprint learned that BlackRock had not, in fact, independently created its own version of the FAIR program.  Blueprint discovered that BlackRock, the State Defendants and Cliffwater conspired together to steal and/or misappropriate the Company's proprietary information, trade secrets and relationships in an effort to discriminatorily deny Blueprint the benefits of creating the FAIR program and doing business with DOI.

101.     Specifically, employees of BlackRock, Cliffwater, the DOI, and other organizations conspired to access and use Blueprint's confidential information and trade secrets to build a business that would compete directly with Blueprint and wholly supplant it in its opportunity with DOI.

102.     According to a representative of Cliffwater, during the relevant time period in which Blueprint was establishing its partnership with the DOI, BlackRock and Cliffwater were *simultaneously* in discussions about a commercial joint venture that would compete with Blueprint's business model.

103.     Both BlackRock and Cliffwater recognized Blueprint's first-mover advantage and that Blueprint was embarking upon a key relationship which would have raised the profile of Blueprint and the FAIR program in the alternative investment industry and created a formidable competitor for years to come.

104.    In order to prevent the rise of this Black- and woman-owned business, both the State Defendants and Cliffwater gave BlackRock access to Blueprint's confidential information and trade secrets.  Initially, the State Defendants and Cliffwater had obtained unfettered access to Blueprint's confidential information and trade secrets based upon the false assurances that this information was "required" to perform the due diligence for the investment that the DOI supposedly was committed to making into the Company, and that such information would remain confidential pursuant to New Jersey law.

105.    However, Blueprint learned that the State Defendants and Cliffwater had funneled its proprietary information to BlackRock employees, including but not limited to Donald Perrault, in exchange for employment consideration and employment assistance from Mr. Perrault and BlackRock.  Several DOI employees were preparing to leave their positions because they were asked to tender resignations by the new administration of Governor Phil Murphy, and it was a known fact that they were looking for employment elsewhere.

106.    BlackRock proceeded to use Blueprint's information, which was illicitly and fraudulently obtained, to create its own version of the FAIR program, which is substantially identical in all major material respects to the program devised by the Company.

107.    Importantly, BlackRock also understood that race played a role in the investment decisions at the DOI.  Shamefully, BlackRock made a blatantly discriminatory personnel move by removing a successful African-American account representative from its DOI relationship and inserting Mr. Perrault, a Boston-based white male employee, who BlackRock management surmised would be more successful with DOI because of his racial and ethnic alignment with the preferences of the white staff and leadership of the DOI.  In so doing, BlackRock was openly

24

playing its own version of the "race card" and unlawfully ratifying and catering to the discriminatory preferences of the decision-makers at its client, the New Jersey DOI.

108.   BlackRock's utter lack of concern for racial diversity, and particularly with regard to representation among its workforce and upper ranks from the African-American community, is simply stunning.  Just last year, BlackRock called for its portfolio companies to increase the gender diversity on their director boards.  However, it has made no such effort to address the lack of racial diversity that has historically permeated these boards of directors.  Indeed, the numbers underlying BlackRock's own leadership serves to underscore that this is an issue that BlackRock simply has no serious intention of addressing.

109.   Despite being the world's largest asset manager, with more than $6.5 trillion under management, African-Americans made up only **three percent** of its senior leadership.  Similarly, only **one out of the 16 (6.25%)** members of its Board of Directors is Black.  In an environment almost completely lacking in Black voices, it is perhaps unsurprising, though nevertheless still unacceptable, that BlackRock readily participated in such wanton discriminatory behavior towards a fledgling Black-owned business.

110.   This openly exploitative racial discriminatory strategy is reminiscent of the 1970's and 1980's, when corporate America used Black executives to cover Black-led clients and used female executives to cover female-led clients, thereby perpetuating the issue of racial discrimination and contributing to promotion, income and wealth disparities.

111.   According to representatives of Cliffwater and BlackRock, Defendant Walsh enjoyed a close personal relationship with Mr. Perrault, and Mr. Perrault's access to billions of dollars in DOI mandates, including the FAIR program, was largely due to his relationship with Defendants Walsh and McDonough.

112. In fact, Defendant Walsh had previously served as an advisor to Blueprint and had full access to the Company's information and proprietary business information, including to the FAIR program. Defendant Walsh worked with Cliffwater and BlackRock to steal Blueprint's proprietary information and to assist BlackRock in developing their copy of the FAIR program.

113. BlackRock and Cliffwater's "win at all costs" strategy patently disregarded the Investment Advisors Act of 1940's (the "Act") requirement to disclose conflicts of interest.

114. Under the Act's duty of loyalty, an investment advisor must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment advisor, consciously or unconsciously, to render advice which is not disinterested, such that a client can provide informed consent regarding the conflict.

115. By failing to disclose BlackRock's longstanding financial relationship with Cliffwater and the ongoing discussions between the firms about future business collaborations, BlackRock and Cliffwater both clearly violated the Act's provisions. This further illustrates the impropriety of these dealings by BlackRock and Cliffwater vis-à-vis the DOI.

116. Having learned this new information, Blueprint set up a meeting with Mr. Byrne at his offices in Princeton, New Jersey. Blueprint informed Mr. Byrne of what it had learned in its preliminary investigation and requested that the SIC take action to remedy this unlawful discriminatory conduct. In response, Mr. Byrne admitted that the circumstances surrounding the DOI's engagement with BlackRock at Blueprint's expense appeared suspicious. He then promised to look into the matter further.

117. Upon information and belief, however, no further or formal action was taken in response to Blueprint's complaints to Mr. Byrne and Mr. McDonough about the racial injustice perpetrated by DOI and its staff and officers, and aided and abetted by BlackRock. Nor is there

any indication that they looked into or took action regarding the improper relationship between Cliffwater and BlackRock.  Instead, Mr. Byrne offered that he would instruct the DOI to resume discussions with the Company about making an investment with Blueprint.  Mr. McDonough and the DOI staff became incensed that their illegitimate activities were exposed by the Company, and, worse, that Mr. Byrne was ordering a "new look" at an investment in Blueprint based upon the claims made and evidence presented by Mr. Walthour and the Company.

## VI.    THE DOI RETALIATES AGAINST BLUEPRINT FOR ASSERTING ITS RIGHTS AND IDENTIFYING RACIAL DISCRIMINATION

118.    After substantial negotiations between the parties, Defendant McDonough offered Blueprint a new, substantially reduced proposal for investment by DOI with the Company (the "Amended DOI Agreement"):

- A minimum of $300,000,000 in capital commitments from DOI;

- DOI receiving 10% of the gross management fee revenue; and

- A management fee averaging 0.29% for Blueprint with respect to invested capital contributions.

119.    Despite no prior discussion of such a term, the new proposal based Blueprint's management fee on the capital that was actually *invested*, rather than the capital committed, as the parties had originally discussed.  These terms were punitive and retaliatory, were much less favorable than those previously offered to Blueprint (or those typically offered to other firms such as BlackRock), and greatly reduced Blueprint's potential revenues.

120.    Given the greatly curtailed and conditional opportunity for Blueprint to earn a management fee in this transaction, continuing to provide 10% of its management fee revenue to the DOI was simply untenable, and would significantly hamper Blueprint's ability to meet its revenue projections.

121.    However, Defendant McDonough insisted on the revenue share, even after Blueprint pointed out that multiple terms were outside the norm of what was customary in the market and therefore appeared to be discriminatory and retaliatory.  Defendant McDonough knew that, after Blueprint had invested millions of dollars in hiring new employees and building up the infrastructure necessary to move forward with the Initial DOI Agreement – all with New Jersey's knowledge, promises and active encouragement, the Company was facing potential financial ruin without an investment from the DOI.  Defendant McDonough decided to twist the knife.

122.    In order to worsen the punitive nature of its offer to Blueprint (and in an apparent attempt to force Blueprint to abandon discussions with the DOI entirely), the DOI demanded onerous terms along with the Amended DOI Agreement that would have severely limited Blueprint's ability to invest the funds in accordance with its investment strategy.  Specifically, Blueprint was required to obtain the DOI's approval before making *any* investments, a process that would serve to unnecessarily impede Blueprint's ability to react to rapidly changing market conditions and also provided the DOI with continued leverage over and ability to interfere with the Company.

123.    Incredibly, New Jersey not only recognized the power it had over the Company's future, but used it as a cudgel in the parties' negotiations.  At one point, when Blueprint pushed back on the terms of the Amended DOI Agreement, Defendant McDonough admitted that the DOI, "would not make it easy for Blueprint."  He further threatened to refuse to bring the proposal to the SIC unless Blueprint agreed to the reduced fees and the provision of a 10% management fee revenue share to the DOI.  He also threatened that any efforts to change the

terms (including further complaints to Mr. Byrne) would result in indefinite delays and potentially prevent the Amended DOI Agreement from ever being approved.

124.    Previously, the State had spent over a year insisting that it was absolutely committed to partnering with Blueprint on innovative terms presented by Blueprint.  The DOI had pushed Blueprint to tremendously build up its infrastructure to allow the parties to "hit the ground running" once Blueprint was approved by DOI, and went so far as to represent that approval purportedly was assured and imminent.

125.    Based on these affirmative representations by New Jersey, which turned out to be intentionally and knowingly false and misleading, Blueprint had incurred long-term liabilities (leases and vendor contracts) and short-term financial obligations, including in the form of salaries to investment and operational professionals.  Any meaningful delay would make it impossible for Blueprint to operate, a fact of which Defendant McDonough and the DOI was fully aware.

126.    Defendant McDonough also knew of the catastrophic damage to Blueprint's reputation that would come from the loss of its anchor investor.  It had already become public knowledge that Blueprint's FAIR program would be seeded by the DOI, because the DOI communicated directly with other institutions to which Blueprint had marketed the program.

127.    Further, as described above, the DOI had repeatedly told Blueprint not to engage with any other seed investors because New Jersey was committed to partnering with the Company and providing the necessary capital.  Therefore, to lose the investment, even the reduced investment represented by the Amended DOI Agreement, would have been calamitous for Blueprint.

128.     As Defendant McDonough predicted, Blueprint had no choice but to accept the Amended DOI Agreement to mitigate the already significant financial damage to its business.[5] The net result of Mr. McDonough's punitive negotiations was that Blueprint, a Black-owned asset management firm, has the lowest fee of any alternative manager, including those similarly situated, and has had terms inserted into its contract that no other manager it knows of has agreed to or has even, to Plaintiff's knowledge, been asked to agree to in the history of the DOI's alternative investment program.

129.     These facts are just further evidence of the racially disparate and punitive treatment endured by the Company at the will of the State Defendants.

## VII.     THE DOI IMPEDES BLUEPRINT'S INVESTMENT STRATEGY

130.     Since the closing, Blueprint has received less than **fifteen (15) percent of the management fees** it would have earned had the State Defendants, Cliffwater and BlackRock not conspired to usurp Blueprint's strategies and investment with the DOI, with the difference being well over ten million dollars.

131.     This dismal compensation to Blueprint is the direct result of language that the State Defendants put in place that makes it extremely difficult to ever earn the stated fees.  As explained above, the State Defendants had inserted clauses into the Amended DOI Agreement that allowed it to review each investment and to unilaterally decline to fund a given investment for any reason, or for no reason at all.

---

[5]     In fact, Blueprint was required to bring other external investors on board and sell 30% of the enterprise on distressed terms to make up for the shortfall in revenue represented by the terms of the Amended DOI Agreement.  This sale was necessary to save the Company after Defendants' exploitative and discriminatory misappropriation and retaliation, and give Blueprint a chance to claw out of the hole that had been dug for it by Defendants.

132.    Even the threat of declining potential investments afforded the State Defendants enormous, overweening leverage over Blueprint, which DOI and its officials repeatedly used to punish the Company whenever it would raise complaints of discrimination regarding how it was treated compared to its predominantly non-minority- and male-owed competitors.

133.    After SIC's approval and before the document closing, Blueprint met with Defendant McDonough on multiple occasions to discuss possible investment ideas and to garner the DOI's approval.  In the process, Blueprint expended additional resources to research and present multiple ideas to the DOI and delivered a model portfolio, including information regarding specific managers, which was approved by Defendant McDonough in May 2018.

134.    As a further example of the DOI's discriminatory and retaliatory behavior, its employees continued to create significant hurdles to Blueprint's ability to service DOI, transparently designed to punish Blueprint and attempt to force it to abandon any further relationship with New Jersey.

135.    For example, after Blueprint began complaining about the unlawful discrimination it experienced, Defendant McDonough raised issues regarding a particular manager who had served on Blueprint's board of advisors and had been proposed by Blueprint. Defendant McDonough had previously approved Blueprint's proposal of the manager and never provided any explanation for his sudden change of heart.  His decision rendered months of research useless, and Blueprint had to spend substantial resources on researching additional managers.

136.    Similarly, the DOI further retaliated against Blueprint by claiming that there purportedly were regulations that prevented Blueprint from deploying the capital that had been committed, and that the Company could not earn fees for its work until it raised more capital.

These regulations had never been discussed in the nearly two years Blueprint and the DOI had previously been in negotiations.  Blueprint later learned that two other white-owned investment advisors, Owl Rock Capital ("Owl Rock") and Crayhill Capital ("Crayhill"), had in fact received management fees from the DOI on the basis of the *committed capital*, despite being similarly situated to the Company.

137.    By allowing Owl Rock[6] and Crayhill to earn fees at the inception of their relationship with the DOI, New Jersey gave them a significant competitive advantage over Blueprint, which was not allowed to earn such fees.

138.    In fact, Owl Rock, like Blueprint, was also a newly formed asset manager, having been founded in 2016.  Despite its lack of track record, Owl Rock received an initial $600 million mandate, the largest mandate ever awarded by the DOI to a brand-new firm with no operating history, no attributable investment track record, and a collection of people who had no history of having worked together.   This conclusively demonstrates that the DOI's reliance on supposed regulations limiting the investment opportunities available to firms without a fully demonstrable history and track record of having raised capital was merely pretext for unlawful discrimination.  Once again, the white, non-minority firm won out.

139.    The unsustainably low fees paid to Blueprint are unjustified and are transparently discriminatory and/or retaliatory in nature.

140.    First, the Blueprint fee is the lowest fee ***ever*** paid to a manager in the history of the DOI's alternative investment program.

---

[6]    Blueprint has subsequently learned that Owl Rock has been treated in a substantially favorable manner, especially when compared with the Company, further demonstrating DOI's discriminatory and retaliatory animus.  By way of example only, Owl Rock, which Mr. Walsh was heavily involved with at DOI and, glaringly and troublingly, later joined as an employee, was subjected to a much more expeditious approval process, and also received extremely favorable terms as compared to Blueprint.

141.    Second, according to information on the DOI's own website, it has **never** attempted to implement the structure of the fee schedule imposed on Blueprint, particularly the 10% revenue share.

142.    Third, the DOI's very own approval memo reveals that BlackRock is being paid $1.5 million annually for its services related to FAIR, whereas Blueprint has only received $700,000 for over four years of work (and despite providing the DOI with the FAIR program, which has led to tens of millions of dollars in fee savings).

143.    In contrast, BlackRock's total fees received from the DOI are conservatively estimated to be in excess of $5 million per year, and, upon information and belief, the DOI received "relationship pricing" from BlackRock or that BlackRock is in violation of "most-favored-nation" clauses in other client contracts.

144.    Indeed, even absent the discriminatory and retaliatory roadblocks put in place to make it functionally impossible for Blueprint to *ever* receive approval for its investments, the most that Blueprint could *ever* hope to earn is a mere fraction of what is currently being paid to BlackRock and others with fund of funds mandates.  The fees are not just below market, but are punitive, and the fees proposed represented a retaliatory attempt to force Blueprint to resign the mandate and suffer financial ruin.  Blueprint, however, has persisted.

## VIII.   THE DOI CONTINUES TO DISCRIMINATE AND RETALIATE AGAINST BLUEPRINT AFTER SIC APPROVAL

145.    After almost two years of hostile and retaliatory treatment, the Company was forced to agree to the terms of the Amended DOI Agreement, and the Blueprint strategy was approved by the SIC in January 2017.

146.    However, the DOI's discriminatory and retaliatory treatment continued unabated.

147.    By way of example only, in response to Blueprint's complaints of discrimination, Defendant Rosenstock, the then-Head of Alternative Investments for the DOI, who was ostensibly responsible for managing the relationship with Blueprint, led an effort to overrule the SIC's decision and prevent the Company from managing DOI's assets.

148.    Defendant McDonough himself admitted to Blueprint that there were several internal meetings where Defendant Rosenstock argued against moving forward with Blueprint, and he acknowledged that Ms. Rosenstock's antipathy towards Blueprint shocked him.

149.    Upon information and belief, Defendant Rosenstock and two of her subordinates developed a strategy to prevent the contracts between the DOI and Blueprint from being executed.  This was specifically disclosed by Defendant McDonough to Mr. Walthour and is further evidenced by the amount of time it took for New Jersey to close on the Amended DOI Agreement.

150.    The extended contracting period is unlike anything in the history of the DOI, according to information on the DOI's own website regarding such processes.  After SIC approved the terms of the Amended DOI Agreement, Blueprint proceeded to have all legal documentation reviewed by the DOI in order to close on the transaction.

151.    Based upon data collected from the DOI website, DOI transactions with comparable funds typically close approximately 3.5 months after SIC approval.  However, Blueprint was continually and deliberately denied the opportunity to proceed with its investment strategy because of deliberate delays in documentation.

152.    When Blueprint repeatedly asked for an explanation for the delay, the DOI responded that the severe delay supposedly was due to a lack of legal resources on the DOI's part to complete its review.  However, a similar proposal from Crayhill, a company that was not

founded by African-Americans, received its SIC approval on the same date as Blueprint and subsequently closed on that transaction on or before May 1, 2017, despite beginning the approval process a mere three months earlier.

153.    Similarly, the due diligence process for Owl Rock also took approximately three months, despite the fact that this process was shepherded by Defendants McDonald and McDonough, both of whom were responsible for conducting the due diligence on Blueprint, which took *19 months*.  Owl Rock's legal documents were reviewed and executed in less than 60 days, whereas Blueprint's legal documents took 16 months to review and execute.  Taken together, the due diligence process and closing process for Owl Rock took approximately four months while Blueprint waited two and a half years or *close to 30 months* for their final approval.

154.    Moreover, at least 12 investments approved by the SIC after it approved Blueprint were closed well before Blueprint's legal review commenced.  In fact, Blueprint's closing was not completed until June 2018, *16 months* after SIC approval, a record amount of time.

## IX.    **BLUEPRINT'S COMPLAINTS OF DISCRIMINATION AND THE DOI'S SUBSEQUENT RETALIATION**

155.    In the face of such ongoing discrimination and retaliation, Blueprint continued to raise complaints of the unlawful treatment it was targeted for because of its status as a business founded by African-Americans and a woman (and in retaliation for its legally protected complaints about it).

156.    Blueprint began by bringing its complaints to individuals in the DOI, including Mr. McDonough.  When those complaints fell on deaf ears, Blueprint began turning to other government officials in New Jersey, including Hester Agudosi, the Head of Diversity for New Jersey, and to Terry Tucker, the Chief of Staff to Lieutenant Governor Sheila Oliver, Deputy

Joseph Kelly and Reverend Derrick Greene who serves as Governor Murphy's liaison to the

Black community, among others.  Reverend Greene admitted that the DOI has serious issues

related to race and vendor selection and when he tried to address these issues, the Treasury

Department attempted to silence his complaints by complaining to the State Ethics Department.

157.    As an example of the shocking level of racism that still exists in the DOI,

Reverend Greene told Mr. Walthour about a situation in which the Murphy Administration

attempted to hire a Latin-American investment officer.  In response, the DOI's entire staff

threatened to quit *en masse*.  Tellingly, the Murphy Administration caved to the demands of the

DOI staff and refused to hire the Latin-American investment officer.

158.    Despite the fact that numerous governmental agencies were aware of the

discriminatory animus that permeated the DOI up through the present day, the State refused to

take any action to remedy the discrimination to which Blueprint had been subjected by the State

Defendants.  Instead, the DOI continued to systematically retaliate against Blueprint in a

transparent attempt to destroy its reputation and make it impossible for it to succeed as an

ongoing venture.

159.    For example, on May 30, 2018, Mr. Walthour met with Mr. McDonough to

discuss the way in which Blueprint had been treated to that point and the extensive delays in

processing paperwork.  During this meeting, Defendant McDonough incredibly admitted that

Defendant Rosenstock had taken it upon herself to deliberately delay Blueprint's legal review

and prevent its closing.

160.    For weeks after Blueprint's initial complaints of discrimination, Defendant

Rosenstock had failed to appear at meetings scheduled with Blueprint and had refused to respond

to e-mails and telephone calls.  Even though Defendant Rosenstock, as the Head of Alternative

Investments for the DOI, was ostensibly responsible for managing the relationship with Blueprint, the Company found that she had all but disappeared (when it came to communicating with them, that is). Her effective withdrawal from the relationship, despite the implications for the State and the Company, made the situation horrifying and confirmed Blueprint's worst fears regarding the animus it was facing.

161.   While she was ignoring Blueprint entirely, Defendant Rosenstock apparently was working behind the scenes to irreparably damage the Company's reputation and business prospects. Indeed, according to Defendant McDonough, even after Defendant Rosenstock was specifically told that she was not to have anything further to do with the Blueprint transaction because of her increasingly aggressive behavior and comments, she worked with two other DOI staff members assigned to the Blueprint relationship to continue her efforts to prevent the Blueprint transaction from closing.

162.   Defendant Rosenstock also repeatedly defamed Blueprint to the members of the investment community by spreading false and malicious rumors about the Company and, unconscionably, contacted certain of Blueprint's prospective clients in an attempt to convince them not to invest in or with Blueprint.

163.   Defendant Rosenstock's defamatory conduct often had its intended effect. By way of example only, after the DOI, BlackRock and Cliffwater had unlawfully usurped Blueprint's FAIR program for BlackRock's use, the Company entered into advanced discussions with a large public trust fund to secure an investment. However, during the due diligence process, Defendant Rosenstock made negative comments about Blueprint to an investment officer at the large public fund about Blueprint's ability to invest and its supposed negative reputation in the industry in general and within the DOI in particular, all of which were untrue.

37

Shortly thereafter, the large public fund abruptly ended its due diligence of Blueprint. Importantly, just as they had with the DOI, Cliffwater and BlackRock conspired to usurp the opportunity that had been Blueprint's, with Cliffwater immediately recommending that the same large public fund invest with BlackRock instead of Blueprint. This once again highlights the discriminatory and unlawful conspiracy that existed between the DOI, BlackRock, and Cliffwater, with the three companies working together to steal business opportunities from a Black-owned business and funneling them to BlackRock.

164.    Another investor substantially reduced his financial commitment to Blueprint based upon Defendant Rosenstock informing the investor that Blueprint's contract with the DOI would never close, making clear that the DOI was going to continue to retaliate against Blueprint by "stringing it along" and ensuring that it never got a legitimate opportunity to invest with the DOI.

165.    Similarly, a vendor also curtailed the services it provided to Blueprint based upon negative communications from Ms. Rosenstock, as well as the resulting assumption by the vendor that it would not be compensated adequately in the future for services to Blueprint being provided in advance.

166.    By virtue of these blatantly unlawful actions, Defendant Rosenstock and her subordinates seriously harmed Blueprint and its relationships with other prospective clients who were expecting the DOI to close before committing assets to Blueprint, as well as with vendors who could not be compensated on a timely basis. Some of these investors lost confidence in Blueprint and suspended or ended their own due diligence after repeated delays.

167.    Defendant McDonough even told Blueprint that during the contracting process, the DOI's staff, under the direction of Defendant Rosenstock, had inserted "triggers" in the

document that were onerous and outside the bounds of the standard terms offered in the industry. The triggers being added would allow the DOI to abandon the relationship if the triggers were tripped, leaving Blueprint with no way of knowing whether the DOI would continue to invest with it over the long term as it could not predict when or if such "triggers" would be avoided.

168.     Blueprint complained that it was being treated disparately from other managers, and that this was another attempt by staff to get Blueprint to abandon the hope of doing business with the DOI and cease its operations.  Defendant McDonough indicated that even he thought it was going too far.

169.     Blueprint demanded that Defendant McDonough and the DOI take immediate steps to address the aggressively unprofessional and unlawfully discriminatory and retaliatory behavior.  According to Defendant McDonough, Defendant Rosenstock failed to explain her animus towards the Company and its principals.  However, Mr. McDonough warned Mr. Walthour that, "If you keep trying to have a relationship with her it will only get worse."

170.     If *any* contact by Blueprint would only induce Defendant Rosenstock to engage in further spiteful and tortious conduct, her actions were obviously not motivated by a legitimate business reason, but rather by discriminatory and retaliatory animus against Blueprint.

171.     Defendant McDonough ultimately apologized for Defendant Rosenstock's outrageous behavior and agreed to speak with clients that had been tainted by Defendant Rosenstock.  Further, Defendant McDonough eventually agreed that Blueprint's confidential information would not be shared with Ms. Rosenstock in the future.

172.     Crucially, upon information and belief, the Murphy Administration was forced to intervene and terminate Defendant Rosenstock days after she deliberately interfered in the contracting process with Blueprint covertly through subordinates.  This shocking behavior, even

against her own self-interest, and termination of Defendant Rosenstock only serves to confirm that New Jersey recognized that Defendant Rosenstock's actions were wholly unjustified and unlawful.

173.    The Company hoped that, after the termination of Defendant Rosenstock, its relationship with the DOI would improve and that Blueprint could finally move forward with making investments and earning fees on those investments.  Unfortunately, however, the animus toward Blueprint went beyond one "bad apple" and even increased in intensity, and it became apparent that the DOI blamed Blueprint because the Company's complaints of disparate treatment led to Defendant Rosenstock's termination.  This fact was confirmed to Blueprint by New Jersey's Assistant Treasurer, Dini Ajmani, who told the Company that the DOI staff indeed blamed Blueprint for Ms. Rosenstock's termination and that they were somehow justified in doing so.

174.    As a result of the retaliatory animus towards Blueprint throughout the DOI, Blueprint was not permitted to make its first investment until a full 24 months after the SIC had approved the terms of the Amended DOI Agreement.  Moreover, only three investments have been approved in the 36 months since SIC approval.  This glaringly low pace of approvals is in marked contrast to the number of approvals given to other managers.

175.    The DOI's refusal to approve investments proposed by Blueprint is a direct function of the Company's complaints of discrimination.

176.    Defendant Ajmani and other New Jersey employees have been instructing Defendant Amon not to approve Blueprint's investment ideas.  They specifically told Blueprint that unless Blueprint stopped complaining about discrimination, the DOI would stop approving their investments.

177.    Furthermore, they informed Blueprint that if the Company continued to complain, New Jersey would begin redeeming its investments, further undercutting Blueprint's financial stability.

178.    Because Blueprint has refused to be silenced and has continued to voice its complaints, Defendant Amon has forced the DOI to refuse to approve Blueprint's legitimate and profitable investment decisions, solely to retaliate against the Company.

## X.    DOI'S OFFICIALS AND DOI POLICIES FOSTERED DISCRIMINATION AGAINST BLUEPRINT

179.    The DOI's practices and policies have had a disproportionately negative impact on businesses owned by women and minority business owners, and especially on African–American- and Latino-owned firms.  By way of example only, the DOI has over 250 investments with asset management firms and funds since 2007, yet it only invested in **six (6)** funds managed by African–American- and Latino-owned firms as of March 31, 2020, meaning less than **three percent** of the total investments went to minority-owned firms.  This is due in large part to the fact that the DOI has not employed an African-American in an investment role in over a decade, and the 14-member SIC has had one Black appointee in 12 years.

180.    This stark data strongly supports the claims of disparate treatment and disparate impact resulting from the DOI's historical opposition to investing with African-American-owned funds.  In fact, this animus was so prevalent and recognized that New Jersey recently enacted legislation requiring the DOI to use minority-owned managers in asset management and brokerage.  Despite the passage of this legislation in January 2019, as of May 1, 2020 the DOI had not hired a single African-American- or Latino-owned asset management firm.

181.    The DOI's resistance to comply with the law underscores the ingrained nature of the discriminatory animus and resistance to and suspicion of minority-owned firms at the highest levels of the DOI.

182.    Unfortunately, the situation has not improved, despite the Murphy Administration's professed support.  For example, throughout 2018 and 2019, Mr. Walthour met with Assistant Treasurer Ajmani to discuss the disparate treatment that Blueprint had experienced.

183.    Incredibly, Ms. Ajmani (a Murphy appointee) claimed that investing in and with minority-owned firms and funds was "a violation of New Jersey's fiduciary responsibility."  She further claimed that the law supported her position, even though there clearly is no such legal precedent or directive.  This mystifying and hateful perspective explains why no Black or Latino managers have been approved during the Murphy administration's first 30 months in office, and further demonstrates the racist behavior driving the treatment of Blueprint and other woman- and minority-owned firms.

184.    To be perfectly clear, at no time has Blueprint ever maintained that requirements should be waived for it or that it be afforded some advantage or preference in working with the DOI.  Rather, Blueprint seeks only to be permitted to do business on the same footing as other firms (some of whom, as can be conclusively shown, in fact do receive preferential treatment based upon personal connections and on other dubious grounds—such as providing employment opportunities for officials).

185.    The discriminatory animus that permeates the DOI has extended to its own employment practices.   It is well-known that the DOI has not had an African-American or Latino investment officer in over 10 years.

186.    The DOI's organization is devoid of diversity, which has resulted in a culture steeped in discriminatory behavior and practices.  As discussed above, Mr. Walthour learned from a senior Murphy official that DOI staff had threatened to quit when the Murphy Administration was close to hiring a Latino senior employee for the DOI.  Incredibly, the Murphy Administration capitulated to the DOI's nakedly racist conduct, and that Latino professional was not hired.

187.    On another occasion, Ms. Ajmani attempted to defend the DOI's unlawful behavior and New Jersey's failure to address it by claiming that, "Jake, they [the DOI staff] say you are political."  This followed a conference call in which an internal lawyer for the DOI, Rubin Weiner, echoed this sentiment.  He said that New Jersey's regulations exist to stop "small, political" firms such as, purportedly, Blueprint from doing business with the DOI.

188.    It is clear from these statements that the DOI believes that a prominent African-American man who has achieved success at the highest levels of finance and engages in charitable activities and activism, particularly for the benefit of the Black community, is too outspoken, or "uppity" for New Jersey's liking.  Needless to say, it strains credulity that white executives and business owners are scolded or disfavored by DOI's officials for being "political" if they engage in charitable giving and activities, or are known to make political contributions.

189.    Such statements by the DOI's officials are blatantly discriminatory and are deeply insulting to a Black man with decades of experience, accomplishments and a strong reputation in the financial industry.  The label – "political" – would never have been given to a white person in Mr. Walthour's position or used as an excuse for an obviously targeted refusal to do business and even sabotage the firm.  Such conduct and attitudes, which continue to be wielded against Blueprint up to the present day, must be called out as the racism that it is.

XI.    **THE MURPHY ADMINISTRATION'S REFUSAL TO ADDRESS**
       **DISCRIMINATION AND RETALIATION**

190.    Blueprint brought its complaints to individuals in the State Treasury, including

Ms. Ajmani.  When those complaints fell on deaf ears, Blueprint began turning to other

government officials in New Jersey, including Governor Murphy, First Lady Tammy Murphy,

Derrick Greene (Special Advisor), Hester Agudosi (Head of Diversity for New Jersey), Terry

Tucker (Chief of Staff to Lieutenant Governor), Joe Kelly (Deputy Chief of Staff), Matt Platkin

(Chief Counsel) and Adam Alonso (Deputy Chief of Staff), among others.

191.    On a phone call with Ms. Ajmani, Mr. Walthour discussed some of the allegations

related to Blueprint and other transactions at the DOI.  Although she claimed that Mr.

Walthour's allegations warranted an investigation, no such investigation was ever done.  Instead

of authorizing the investigation that she personally acknowledged was warranted, Ms. Ajmani

went to great lengths to convince others in the Murphy Administration to ignore Blueprint's

complaints.  Others in the Murphy Administration similarly refused to take action in response to

Blueprint's complaints of discrimination.

192.    In recognition that ethical conflicts and paralysis in the Treasury and Murphy

Administration could delay addressing the claims and means of mitigating the Company's

damages, Blueprint sought out other prominent members of the African-American community to

plead its case regarding the racial discrimination it has experienced.  One such individual was

Senator Ronald Rice, leader of the Black Legislative Caucus and an outspoken member on issues

related to economic injustice.

193.    In September 2019, Senator Rice wrote to New Jersey's Treasurer, Elizabeth

Maher Muoio, on behalf of Blueprint, and explained:

> What happened to Blueprint and Mr. Walthour, over the course of the last four years, appears to be a modern-day lynching and is a stain and a black eye on the State of New Jersey. . . I believe the neglect of his request to be heard and meet face to face never would have happened if Mr. Walthour were not African American.

194.   Despite these efforts and the revelation (and even repeated admission) of its wrongdoing and racial animus, the DOI continues to retaliate against the Company in its contractual terms and interference with Blueprint's operations to this day.

195.   The DOI has repeatedly and unreasonably rejected profitable investment opportunities brought to it by Blueprint, without offering any explanation for its actions.  This has the effect of further reducing Blueprint's revenues and prospects, even apart from the oppressive and unlawfully motivated terms that have been imposed upon it by the State Defendants.

196.   Yet, the DOI has freely invested in substantially similar and even less favorable opportunities brought to it by other investment firms, including at higher fee rates.

197.   As a result of the DOI's blatantly retaliatory conduct, Blueprint has suffered tens of millions of dollars in lost business, and the harm to the Company's prospects is irreparable.

## **FIRST CAUSE OF ACTION**
### **(Discrimination in Violation of Section 1981)**
### ***Against all Defendants***

198.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

199.   By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying it equal terms and conditions of contract, impeding its ability to make investment decisions, and interfering with Blueprint's business relationships because Blueprint is a minority-owned company.

200.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

201.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**
***Against the State Defendants***

202.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

203.    By the actions detailed above, among others, the State Defendants have retaliated against Plaintiff based on its protected activities in violation of Section 1981, including, most recently, by denying it the equal terms and conditions of contract, impeding its ability to make investment decisions, and interfering with Blueprint's business relationships in response to the Company's complaints of discrimination.

204.    As a direct and proximate result of the State Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

205.    The State Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Discrimination in Violation of Section 1983)
### *Against the State Defendants*

206.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

207.    By the actions detailed above, among others, the State Defendants are state actors who acted under the color of New Jersey law to deny Plaintiff the opportunity to engage in business relationships with New Jersey free of unlawful discrimination.

208.    Specifically, the State Defendants discriminated against Blueprint on the basis of the race and/or gender of its founders in violation of Section 1983 by, *inter alia*, conspiring with the remaining Defendants to steal Blueprint's confidential and proprietary information to ensure that a minority- and woman-owned company would not be given the opportunity to enter into a favorable and lucrative business relationship with the DOI and could be replaced by a non-minority- or non-woman-owned firm.  The State Defendants further discriminated against Blueprint by subjecting it to discriminatory terms and conditions of its contractual relationship with the DOI, impeding its ability to make investments, interfering with Blueprint's business relationships, and delaying and/or denying approvals for necessary business decisions.

209.    As a direct and proximate result of the State Defendants' unlawful and discriminatory conduct in violation of Section 1983, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

210.    The State Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Section 1983)
### *Against the State Defendants*

211.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

212.    By the actions detailed above, among others, the State Defendants have retaliated against Plaintiff based on its protected activities in violation of Section 1981, including, most recently, by denying it the equal terms and conditions of contract, impeding its ability to make investment decisions, and interfering with Blueprint's business relationships, in response to the Company's complaints of discrimination.

213.    As a direct and proximate result of the State Defendants' unlawful and retaliatory conduct in violation of Section 1983, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

214.    The State Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1983, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the New Jersey Civil Rights Act)
### *Against the State Defendants*

215.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

216.    The New Jersey Constitution guarantees all of its citizens, including Blueprint, the right to be free from unlawful discrimination.

217.    By the actions detailed above, among others, the State Defendants are state actors who acted under the color of New Jersey law to deny Plaintiff the opportunity to engage in business relationships with New Jersey free of unlawful discrimination.

218.    Specifically, the State Defendants discriminated against Blueprint on the basis of the race of its founders in violation of the New Jersey Constitution by, *inter alia*, conspiring with the remaining Defendants to steal Blueprint's confidential and proprietary information to ensure that a minority- and woman-owned company would not be given the opportunity to enter into a favorable and lucrative business relationship with the DOI and could be replaced by a non-minority- or non-woman-owned firm.  The State Defendants further discriminated against Blueprint by subjecting it to discriminatory terms and conditions of its contractual relationship with the DOI, impeding its ability to make investments, interfering with Blueprint's business relationships, and delaying and/or denying approvals for necessary business decisions.

219.    As a direct and proximate result of the State Defendants' unlawful and discriminatory conduct in violation of the New Jersey Civil Rights Act, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

220.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the New Jersey Civil Rights Act)
### *Against the State Defendants*

221.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

222.     The New Jersey Constitution guarantees all of its citizens, including Blueprint, the right to be free from unlawful discrimination

223.     By the actions detailed above, among others, the State Defendants have retaliated against Plaintiff based on its protected activities in violation of the New Jersey Civil Rights Act, including, most recently, by denying it the equal terms and conditions of contract, impeding its ability to make investment decisions, and interfering with Blueprint's business relationships in response to the Company's complaints of discrimination.

224.     As a direct and proximate result of the State Defendants' unlawful and retaliatory conduct in violation of the New Jersey Civil Rights Act, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

225.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New Jersey Civil Rights Act, for which Plaintiff is entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)
### *Against Cliffwater and BlackRock*

226.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

227.     Defendants the DOI, MacDonald, and McDonough promised Plaintiff that the DOI would seed Blueprint by providing it with a minimum of $500,000,000 in capital commitments from the DOI and a management fee of 0.75% for Blueprint with respect to committed capital contributions, in exchange for Plaintiff providing and implementing its proprietary FAIR program for New Jersey's benefit.  Defendants the DOI, MacDonald, and

McDonough told Blueprint that acquiring approval for the terms of this seeding arrangement would be a "formality."

228.    Defendants DOI, MacDonald, and McDonough made these promises with the express intention of convincing Plaintiff to share its confidential and proprietary information with the DOI and Cliffwater, its hand-picked consultant.  They also promised Plaintiff that any information it shared with the DOI or Cliffwater would remain confidential and would not be shared with any outside parties.

229.    As a result, Plaintiff provided the DOI and Cliffwater with proprietary information related to its FAIR program.

230.    Defendants Cliffwater and BlackRock misappropriated Plaintiff's confidential and proprietary information related to the FAIR program, and have realized millions of dollars of profit and savings from the use of Plaintiff's proprietary information and, as a result, were enriched at Plaintiff's expense.

231.    Permitting Defendants Cliffwater and BlackRock to retain the monies they received due to their misappropriation of Plaintiff's proprietary information would violate notions of good conscience and equity and, therefore, Defendants the DOI, Cliffwater, and BlackRock should be required to remit those monies.

## EIGHTH CAUSE OF ACTION
### (Use of Idea)
### *Against Defendants Cliffwater and BlackRock*

232.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

233.    Plaintiff's FAIR program was a novel and original idea that Plaintiff took steps to maintain its confidence.

234.    Plaintiff provided proprietary information related to its FAIR program to Defendants DOI and Cliffwater as part of confidential contractual negotiations, due diligence, as well as negotiations related to an agreement for Plaintiff to implement its proprietary and confidential FAIR program for the State Defendants' benefit.

235.    Defendants Cliffwater and BlackRock used Plaintiff's confidential and proprietary information related to the FAIR program to realize millions of dollars of profit, and, as a result, were enriched at Plaintiff's expense.

236.    As a result of their use of information related to Plaintiff's FAIR program, Defendants were unjustly enriched and should be required to remit monies they gained from the use of confidential information related to Plaintiff's FAIR program.

**NINTH CAUSE OF ACTION**
**(Unfair Competition)**
***Against Defendants Cliffwater and BlackRock***

237.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

238.    Plaintiff used its confidential and proprietary information to create the FAIR program.

239.    Defendants the DOI and Cliffwater misappropriated information related to Plaintiff's FAIR program by providing confidential, proprietary information related to the FAIR program to BlackRock.

240.    The DOI had convinced Plaintiff to share this information based on its false promises that it, and Cliffwater, would maintain the confidentiality of any information shared by Blueprint.

241.     Instead, the State Defendants and Cliffwater improperly shared Blueprint's confidential and proprietary information concerning the FAIR program with BlackRock. Defendants then used Plaintiff's confidential and proprietary information related to the FAIR program to realize millions of dollars of profit and cost savings, and, as a result, were enriched at Plaintiff's expense.

242.     As a result of their misappropriation of Blueprint's FAIR program, Defendants Cliffwater and BlackRock have unjustly profited from the use of Plaintiff's trade secrets, and should be required to remit profits they gained from the use of information related to Plaintiff's FAIR program.

### TENTH CAUSE OF ACTION
**(Breach of Fiduciary Duty)**
***Against Defendant Cliffwater***

243.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

244.     Plaintiff used its confidential and proprietary information to create the FAIR program.

245.     Plaintiff provided proprietary information related to its FAIR program to the DOI and Cliffwater as part of confidential negotiations related to an agreement for Plaintiff to provide and implement the FAIR program for the State Defendants' benefit.

246.     The DOI and Cliffwater agreed to keep the proprietary information related to Plaintiff's FAIR program confidential as part of their contractual negotiations, and due diligence, with Blueprint.  As a result, they owed a fiduciary duty to Plaintiff to maintain their proprietary information in confidence.

247.    Cliffwater breached the fiduciary duty it owed to Plaintiff by disclosing confidential, proprietary information related to the FAIR program to BlackRock.

248.    As a direct and proximate result of Cliffwater's breach of their fiduciary duty owed to Plaintiff, Plaintiff has suffered, and continues to suffer, economic harm for which it is entitled to an award of damages to the greatest extent permitted under law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in its favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New Jersey;

B.    Injunctive relief to the extent necessary to reverse the Defendants' unlawful actions and the harm associated with them, including, but not limited to, a return of all of Plaintiff's confidential information, formal credit to be afforded to Plaintiff with regard to BlackRock's FAIR program with DOI, and adjustment of the discriminatory and retaliatory terms of Plaintiff's contracts with the State/DOI;

C.    An award of damages against Defendants in an amount to be determined at trial, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

E.    An award of punitive and/or liquidated damages;

F.    Prejudgment interest on all amounts due;

G.    An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 23, 2020
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
       Tanvir H. Rahman
       Lawrence M. Pearson
       (to be admitted *pro hac vice*)
       Renan F. Varghese
       (to be admitted *pro hac vice*)
       Taylor J. Crabill
       (to be admitted *pro hac vice*)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
trahman@wigdorlaw.com
lpearson@wigdorlaw.com
rvarghese@wigdorlaw.com
tcrabill@wigdorlaw.com

*Counsel for Plaintiff*