**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------- X

BLUEPRINT CAPITAL ADVISORS, LLC,  :

                         :

                     Plaintiff,  :

         v.  :

                         :

PHILIP MURPHY, in his official capacity as  :
Governor of the State of New Jersey, STATE  :
OF NEW JERSEY DIVISION OF  :
INVESTMENT, BLACKROCK, INC.,  :
BLACKROCK ALTERNATIVE  :
ADVISORS, CLIFFWATER, LLC,  :
TIMOTHY WALSH, OWL ROCK  :
CAPITAL CORPORATION, SAMANTHA  :
ROSENSTOCK, JASON MACDONALD,  :
CHRISTOPHER MCDONOUGH, COREY  :
AMON, DINI AJMANI, DERRICK  :
GREENE, GEORGE HELMY, and  :
MATTHEW PLATKIN in their individual  :
and professional capacities,  :

                         :

                  Defendants.  :

---------------------------------------------------------- X

Hon. Kevin McNulty, U.S.D.J.
Hon. Edward S. Kiel, U.S.M.J.

CA No.: 2:20-cv-07663-KM-ESK

**<u>AMENDED COMPLAINT</u>**


**<u>Jury Trial Demanded</u>**

        Plaintiff Blueprint Capital Advisors, LLC ("BCA," "the Company," or "Plaintiff"),

by and through its undersigned counsel, Brown Rudnick, LLP and the Constitutional

Litigation Advocacy Group, P.C., hereby alleges, as and for its Amended Complaint against

Philip Murphy, in his capacity as Governor of the State of New Jersey, the State of New

Jersey, Department of Treasury, Division of Investment (the "DOI"), BlackRock, Inc.,

BlackRock Alternative Advisors (BlackRock, Inc. and BlackRock Alternative Advisors are

together, "BlackRock"), Cliffwater, LLC ("Cliffwater"), Timothy Walsh, Owl Rock Capital

Corporation ("Owl Rock"), Samantha Rosenstock, Jason MacDonald, Christopher

McDonough, Corey Amon, Dini Ajmani, Derrick Greene, George Helmy, and Matthew
Platkin[1] (together, "defendants") as follows:

**PRELIMINARY STATEMENT**

1.      *"Even slaves stood up for themselves. Why are we so scared?"*  That quote is not
the creation of a litigator's rhetorical pen.  It is not the product of a litigant trying to convince a
judge or jury.  It is not an emotional negotiation tactic to secure some commercial ask.  It is a
private, contemporaneous, and brutally honest response between two African-American
business partners who can no longer bear blatant, aggressive, and unapologetic racist abuse
from their state government.

2.      That business is plaintiff, BCA.  That government is the State of New Jersey.
And that racist abuse began in 2015 when the New Jersey Division of Investment ("DOI")
fraudulently misappropriated a proprietary investment program BCA had developed and used it
to launch the exact same program with BlackRock in 2016.

3.      And the DOI continued this racist abuse of BCA thereafter.  First, it ignored
BCA to discourage it from attempting to ever manage DOI funds.  Second, when BCA
persisted, the DOI dragged out for 18-months due diligence and contract phases that every other
fund completed in 3-5 months.  Third, it insisted on contract terms that were orders of
magnitudes worse than the minimum industry standards and materially disparate from the terms
the DOI had and was using with its other funds.  Fourth, even when the contract was signed, it
simply refused to approve virtually any investment from which BCA could actually earn fees.
Fifth, whenever BCA deigned to challenge the process or complain, the DOI retaliated by

---

[1]      Defendants the DOI, Rosenstock, MacDonald, McDonough, Amon, Ajmani, Murphy, Greene, and Platkin,
are hereinafter collectively referred to as the "DOI Defendants."

stalling the process, renegotiating the terms, rejecting investments, and disparaging BCA in the market.

4.     Although this abuse began in the DOI before Governor Phillip Murphy took office, today responsibility for the DOI's ongoing racist abuse of BCA rests squarely with Governor Murphy himself.  Governor Murphy, like the rest of the New Jersey state government, knows that, as one of his closest advisors and his administration's liaison to the African-American community explained, "we have a real problem in that division" with racism. Indeed, his former DOI head has admitted that the division was "not a fan of investing with women- and minority-owned firms," and that its investment council "would not approve" a significant deal with such a firm.  The ease and comfort with which the former DOI head made this admission reflects how institutionally this malignant truth has metastasized.

5.     Nevertheless, Governor Murphy has taken no meaningful steps to address that problem.  Worse, he has stood by, and continues to stand-by, while that DOI continues to try to destroy the only African-American asset management firm in New Jersey, BCA.  He has done nothing about this ongoing abuse even though the leader of the state's Black caucus, told his administration in writing that "[w]hat happened to Blueprint and Mr. Walthour, over the course of the last four years, appears to be a modern-day lynching and is a stain and a black eye on the State of New Jersey."

6.     Much worse, when BCA sought the support of the African-American community and leaders after Murphy ignored BCA, the Governor, his chief of staff, and his counsel organized a smear campaign against BCA and Walthour to discredit his public claims and protect the Governor.  In addition, Murphy's hand-picked assistant state treasurer instructed the

DOI to freeze BCA out of all further communication or interaction with the DOI.  This final effort to destroy BCA continues aggressively to this day.

7.     The egregious five-year pattern of blatant discrimination against BCA has inflicted tens of millions of dollars in damages, and continues more aggressively today.  BCA brings this action to secure damages for enormous harm it has suffered, and, equally important, for injunctive relief compelling Governor Murphy and the DOI to cease and desist from further retaliation and institute measures to prevent discrimination in the future.

## NATURE OF THE CLAIMS

8.     This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress defendants' violations of 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1983 ("Section 1983"), New Jersey Civil Rights Act, racketeering in violation of 18 U.S.C. § 1962 and N.J.S.A. 2C:41-2, violation of the Fifth Amendment Takings Clause, breaches of contract, fiduciary duty, duty of confidentiality, as well as claims for unfair competition, civil conspiracy, fraud, commercial disparagement, tortious interference with prospective economic advantage, aiding and abetting racketeering, and aiding and abetting fraud.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Sections 1981 and 1983 and racketeering in violation of 18 U.S.C. § 1962.  The Court also has jurisdiction pursuant to 28 U.S.C. §§ 2201-2202 to grant declaratory and injunctive relief.

10.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action, including the unlawful practices and actions alleged herein, occurred in this District.

## PARTIES

12.     Plaintiff Blueprint Capital Advisors, LLC, is a foreign, Delaware corporation, headquartered in Newark, New Jersey, with its principal place of business located at 45 Academy Street, Suite 205, Newark, New Jersey 07102.

13.     Defendant Philip Murphy is the Governor of the State of New Jersey.  Governor Murphy directs and controls defendant the State of New Jersey, Department of the Treasury, Division of Investment.

14.     Defendant State of New Jersey, Department of the Treasury, Division of Investment is a government entity that makes investment decisions on behalf of New Jersey's pension systems. The State of New Jersey Department of Treasury houses the Division of Investment, which oversees the $80 billion pension fund. The DOI, in turn, manages investments on behalf of the public pension and retirement funds for New Jersey's current and retired employees. The DOI, by virtue of the size of those public employee funds, is one of the largest money managers in the United States.

15.     Defendant BlackRock, Inc., is an American global investment management corporation based in New York City, with its principal place of business located at 55 East 52nd Street, New York, New York 10055.

16.     Defendant BlackRock Alternative Advisors is a Delaware corporation headquartered in New York City, with its principal place of business located at 55 East 52nd Street, New York, New York 10055.

17.     Defendant Cliffwater, LLC, is a Delaware corporation, headquartered in Los Angeles, California, with its principal place of business located at 4640 Admiralty Way, Marina Del Rey, California 90292.

18.     Defendant Timothy Walsh is a former member of BCA's Board of Advisors and is currently a Managing Director at Owl Rock Capital LP. Upon information and belief, Mr. Walsh is a resident of the state of Indiana.

19.     Capital Corporation is a Maryland corporation headquartered in New York city, with its principal place of business at 399 Park Avenue, 38th Floor, New York, New York 10022.

20.     Defendant Samantha Rosenstock is the former Head of Investments at New Jersey's Division of Investment. Upon information and belief, Ms. Rosenstock is a resident of New Jersey.

21.     Defendant Jason MacDonald is a former Senior Portfolio Manager at New Jersey's Division of Investment. Upon information and belief, Mr. MacDonald is a resident of New Jersey.

22.     Defendant Christopher McDonough is the former Director of New Jersey's Division of Investment. Upon information and belief, Mr. McDonough is a resident of Pennsylvania.

23.     Defendant Corey Amon is the current Director of New Jersey's Division of Investment. Upon information and belief, Mr. Amon is a resident of New Jersey.

24.     Defendant Dini Ajmani is the New Jersey Assistant Treasurer. Upon information and belief, Ms. Ajmani is a resident of New Jersey.

25.     Defendant Derrick Greene is the owner and operator of Greene Consultants LLC, a campaign consulting firm that provided $2 million in services to Murphy's election campaign,

is the current Senior Advisor to the Office of the Governor for the State of New Jersey for Diversity, Race, and Urban Planning, operating out of the Secretary of State's office.  Upon information and belief, Mr. Greene is a resident of New Jersey.

26.    Defendant George Helmy is the Chief of Staff to the Office of the Governor for the State of New Jersey.  Upon information and belief, Mr. Helmy is a resident of New Jersey.

27.    Defendant Matthew Platkin is a Partner at the law firm Lowenstein Sandler, a former senior member of the Murphy election campaign, and most recently the former Chief Counsel to Office of the Governor of the State of New Jersey.  Upon information and belief, Mr. Platkin is a resident of New Jersey.

## PROCEDURAL REQUIREMENTS

28.    Plaintiff filed a Notice of Claim with the State of New Jersey on January 24, 2020, providing New Jersey notice of the conduct complained of herein.

## FACTUAL ALLEGATIONS

### I.    BCA and Its FAIR Program and Business Plan

29.    Jacob Walthour and Carrie Pickett founded BCA in 2015 after decades at prestigious financial services firms, including Morgan Stanley, Citadel Investment Group, Cowen & Company, and Cliffwater.   This experience included investment consulting for the DOI, which Walthour did for approximately two years while at Cliffwater.

30.    When Walthour and Pickett started BCA, public pension funds were in distress nationwide.  Still suffering lasting effects from the 2008 financial crisis, many of these pensions were underfunded, constrained by low interest rates, and saddled with external investment managers charging high fees but delivering poor returns.  In many states, pension benefits were being reduced or at risk of reduction.  This dynamic generated widespread criticism from pensioners, unions, and politicians, and many public pension funds were allocating fewer funds

to external investment managers.  This, however, further constrained the ability of pensions to maintain and grow their assets.  Walthour and Pickett believed that the better response was smarter selection, management, and compensation of external investment managers.  Providing this solution was the *raison d'etre* of BCA.

31.     To do so, Walthour, Pickett, and others at BCA conducted exhaustive market research and analysis at a great cost of time, money, and resources.  This included extensive analysis of the history and rational for the standard 2% and 20% hedge fund fee structure; the correlation between fees charged, investment performance, fund size, fee structure, and investment models; and the supply of, and demand for, capital and fund management both historically and contemporaneously.  This process also included extensive market surveys, interviews, and analysis of asset managers, particularly smaller regional funds that pensions had traditionally ignored, as well as pension funds.

32.     This work provided Walthour and Pickett with a virtual Ph.D on the current state of alternative asset management and pension fund investment.  Based on this knowledge and still further analysis, BCA developed a unique investment model tailored for public pensions that would dramatically lower their asset management expenses and improve their returns.  They called this model FAIR Alternative Management or the FAIR program.

33.     One of the FAIR program's core principles was that current market conditions no longer justified or required the traditional fee structures that were entrenched at large, brand name, funds.  This was particularly so with respect to the public pension funds.  The hedge fund industry had matured; more capital was available; more fund managers existed; competition was greater; investing capital profitably was more challenging; and this challenge increased the larger a fund grew.

34.     Based on their analysis, BCA determined that smaller, less well known, often regional asset managers were better suited to profitably manage pension fund investments and could do so under far more economical fee structures set by market realities instead of industry custom and habit.  Among other things, public pension funds could utilize their significant supply of capital to negotiate better fee structures with smaller funds.  Those smaller funds, in turn, would be better suited to investment programs specifically tailored to the objectives of one or a small group of pensions.  Based on their analysis, the FAIR program targeted a fee structure of approximately a 1% management fee on committed capital, with a 3% return hurdle to vest, a 10% share of profit, event "triggers" to protect the investor, and longer investment periods.  This was a dramatically lower and safer fee structure than the standard 2% & 20% fee structure that was ubiquitous in the industry and drowning pension funds.

35.     Of course, investments in these smaller funds also posed unique challenges and risks.  For example, it would take a greater number of such funds to manage the same pool of capital that one behemoth Wall Street firm could easily do alone.  These funds were also generally less established and well-known, and overall had much greater deviations in experience, success, capabilities, and risk.  Therefore, due diligence, selection, and oversight of these funds would require expertise and work that BCA would provide.

36.     Of course, these funds would also need to be convinced to accept something other than the customary industry fee structure.  And BCA developed empirical, data driven criteria and models to (a) identify the funds suited for public pension fund investment; (b) negotiate fee structures that were better for pensions while also commercially attractive to the investment managers; and (c) negotiate longer investment periods with appropriate protections in the event of nonperformance.  They also identified unique and significant vendor costs savings that could

be provided to funds managing FAIR assets.  Using these models and criteria, BCA identified an

initial pool of fund manager candidates, and already had begun discussions with many.

37.     BCA also developed a "co-op" style fund model to help, among other things,

overcome inevitable pension fund resistance to novelty and change.  Under this model, several

different pension funds would together invest in the FAIR investment platform.  That platform

would then deploy the capital to the fund managers for particular investment programs, and BCA

would provide ongoing oversight, cost management, investment analysis, and directional

guidance and feedback.

38.     BCA created a detailed business plan for implementing the FAIR program and

growing the business.  Critical to that plan was a quick, successful launch that would secure a

valuable "first mover" advantage and drive BCA growth.  Realizing the competitive value of its

proprietary FAIR program data, analysis, investment models, and business plan, BCA also took

extensive steps to protect that proprietary information.  BCA did not describe the program on its

website.  It had employees, consultants, vendors, and third-parties associated with the program

sign non-disclosure and confidentiality agreements.  Documents were watermarked, clearly

labeled as confidential and proprietary, and kept secure.  BCA also began taking steps to secure

internet domains and copyright protection for the FAIR business mark.

## II.     <u>New Jersey's Pension Fund Crisis</u>

39.     The state pension fund at the top of BCA's target list for launch was Walthour's

and BCA's home state of New Jersey.  And for more than the obvious hometown reason.

40.     At the time, New Jersey's pension funds were in financial crisis.  Then governor

Chris Christie was threatening to dramatically reduce benefits because the pensions were

underfunded and underperforming.  Both the governor and the DOI were being accused publicly

of contributing to the depletion of the pension system via systemic "pay-to-play" practices

whereby outside investments were doled out to large Wall Street firms and other managers who made large political contributions or were otherwise politically connected.  Indeed, in early 2015, investigative journalists and newspapers in New Jersey published numerous reports about the corrupt "pay-to-play" culture at the DOI, as well as DOI's public misrepresentations and active concealment of the enormous fees New Jersey pensions were paying outside fund managers for poor investment performance.  The issue had become so politically significant in early 2015 that New Jersey's legislature scheduled public hearings into outside investment management of pension funds and corruption and malfeasance at the DOI.[2]

41.     New Jersey's pension fund crisis and its corresponding public and political firestorm was a perfect opportunity for BCA.  It was at the right place, at the right time, with the right solution.

III.     **The Fraudulent Misappropriation of the FAIR Program and Business Plan**

A.     **The Systemically Racist and Corrupt DOI**

42.     Capitalizing on that opportunity, however, would not be easy.  Although BCA had something the DOI, and more importantly New Jersey's public pensioners, badly needed, its solution would need to overcome the DOI's entrenched institutional corruption, systemic bias, and outright racism.  Indeed, in 2019, New Jersey acknowledged the DOI's notorious history of excluding minority-owned firms from investment management, and belatedly enacted a putative statutory mandate to increase investment management by such firms.[3]

---

[2]     Today, the DOI continues to struggle with poor investment performance, and has the dubious distinction of being the second least funded pension system in the country despite being one of the wealthiest states.  Remarkably, confidence in the DOI is so lacking, the state's first responder (Police and Fire Employees) pension have been separated by statute from the DOI.

[3]     *See*  https://www.pionline.com/article/20190131/ONLINE/190139959/n-j-law-gives-women-and-minorities-more-opportunity-to-manage-state-pension-funds

43.     That statutory mandate was necessary because, although the DOI was created to

protect public worker pensions, it had long ago become an entrenched, insular, and exclusionary

"old-boys" network of political patronage, bureaucratic "pay to play," and *quid pro quo* schemes.

The members of this "old-boys" network were overwhelmingly white, with predominately

uniform backgrounds, and shared the mutual expectation and understanding that those they took

care of, would later take care of them.  Among those in this network, are the defendants here,

McDonough, MacDonald, and Walsh.

44.     The political appointees and government bureaucrats controlling these

investments used their positions and control over investment decisions to accumulate

administrative currency and later secure lucrative opportunities from their patrons on Wall Street

and in the private sector.  Like gambling at Rick's Café in the movie Casablanca, this was and

continues to be a notorious open "secret" among New Jersey's privileged political insiders and

their patrons on Wall Street, including BlackRock and former Goldman Sachs partner, Governor

Murphy.

45.     Indeed, when BCA created the FAIR program, the DOI's State Investment

Council ("SIC") membership contained no women or minorities, had not had a single such

member in over six years, and had not approved an investment mandate for a new minority-

owned firm in over 10 years.  It also has not had a minority investment officer in over 10 years.

46.     And although Governor Murphy paid lip service to addressing the extreme

institutional racism at the DOI with the enactment of the 2019 statute, as of May 1, 2020, the

DOI had failed to hire one.  To the contrary, when the current administration attempted to

appoint a Hispanic to a senior DOI office, large swaths of the DOI staff threatened to resign.  A

member of the "old- boys" network himself, Governor Murphy acquiesced, even though his

administration's liaison to the black community has told him and others, "we have a real problem in that division" with racism.

47.     Representative of that problem, is defendant Ajmani, who worked on Governor Murphy's campaign and was rewarded with a position as Assistant Treasurer.  She has repeatedly and persistently opposed the hiring of African-American fund managers and staff, including BCA; has repeatedly used as the specious justification for her opposition that such hiring would be "unethical" (presumably because African-American fund managers by definition are not otherwise capable of managing investments); and has aggressively defended her turf and position by threatening or filing ethics complaints against anyone advocating for such hiring.

**B.      The Scheme to Misappropriate BCA's Proprietary FAIR Program**

48.     BCA, a new asset management company, founded by a Black male and Black female financial professionals, located in Newark, New Jersey, clearly fell into the "not one of us" category among this closed club.  However, it was not deterred.  Reaching out first to MacDonald in the spring of 2015, over lunch at PJ Clarke's in midtown Manhattan, Walthour briefed him on BCA's FAIR program and business plan generally with a PowerPoint overview to assist.  Realizing the great potential and perfect timing, MacDonald directed Walthour to McDonough directly.  McDonough, briefed by MacDonald, responded immediately.

49.     McDonough worked to induce reliance and trust from BCA from the start.  On May 27, 2015, Walthour emailed McDonough the same presentation he had shown to MacDonald, and Walthour and McDonough met on or about June 5, 2015 in Trenton, New Jersey to discuss the opportunity.  At that meeting, Walthour again presented in broad strokes BCA's FAIR program and business plan aided by the same basic PowerPoint.  He explained how the FAIR program would work and the enormous time, research, and analysis that had been

devoted to developing the program.  Most important to McDonough, Walthour explained that the FAIR program was ready now – a "turnkey" solution to the DOI's (and McDonough's) high-profile problem.

50.    From the start, McDonough expressed an unequivocal and enthusiastic interest in the FAIR program and business plan, and BCA the firm.  He expressed the unreserved view that this was the perfect solution at the perfect time (for the DOI and him personally), that the DOI wanted to pursue the program with its creator BCA as Walthour was proposing, and that they wanted to get it implemented by year-end.  But that was not all.  McDonough further represented that he loved the concept so much, he wanted the DOI to not just be the anchor investor in the investment platform, but also be a 10% owner in the platform itself alongside BCA.

51.    During these early discussions, and for months to follow, McDonough and MacDonald assured BCA that they personally were committed to investing approximately $500 million with the Company, and that securing the SIC's approval for the BCA mandate was a formality as the FAIR program was badly needed and the SIC had approved 100% of proposed investments in recent history.  Accordingly, McDonough directed Walthour to immediately begin preparing a term sheet, and further informed him that the DOI would direct its outside consultant Cliffwater to immediately begin the formal due diligence required under New Jersey law.  He instructed BCA to begin providing that due diligence as quickly as possible, which BCA began doing by the end of June.

52.    Among those who would be intimately involved in Cliffwater's due diligence investigation was Daniel Stern.  Prior to joining Cliffwater, Stern had been a director at BlackRock in its Fund of Funds division, a direct competitor and target of BCA's FAIR program.  Stern remained in regular contact with his former firm, solicited and attempted to

broker transactions with them, and consulted on matters for them.  At set forth more fully below, during the period while Cliffwater was ostensibly acting as the DOI's due diligence consultant regarding BCA, Stern was actively pursuing BlackRock to do the same deal as a joint venture with Cliffwater.

53.     From almost the start, McDonough and Walthour discussed the need for BCA to immediately prepare for a year-end launch.  And BCA immediately began doing just that.  In early July, BCA began building out its investment platform and infrastructure necessary to launch the FAIR program and business plan.  It prepared the legal, operational, advisory, transactional and other infrastructures the business would require; began interviewing and hiring personnel to fill those positions; and secured office space in Manhattan for those personnel to work.  By the first week of August, BCA had retained outside counsel Greenburg Trauig; established an advisory board, including defendant Walsh; completed their CIO and COO searches and identified their preferred candidates; hired necessary investment professionals; and identified and begun discussions with industry vendors to provide middle and back office operations as well as due diligence on investments.

54.     One part of the business plan that McDonough did not want BCA to begin implementing, however, was the plan to partner with a large financial institution.  McDonough expressed his strong preference that BCA not pursue a partner at that time, relaying that he wanted New Jersey to be BCA's exclusive anchor investor and partner at inception so that they could share exclusively the positive publicity and "first mover" credit.  Given McDonough's apparent firm commitment and enthusiasm, and strong opposition to a financial institution joining at that time, Walthour agreed to exclusivity with the DOI.

55.     Walthour, however, had been misled.  In truth, McDonough had no intention of doing the FAIR program with BCA unless he had no other choice.  He knew, as he would admit to Walthour almost a year later, that the DOI would not want to have money managed by a firm founded and run by a Black male and female.  This was simply not the kind of firm the DOI had entertained doing business with since he joined the DOI.   BCA was not "one of us."  Not part of the club and could not make a contribution to the club in the way of job opportunities or assistance for departing staff members that larger firms routinely provided.  And certainly BCA was not part of the old-line, "old-boy" political and Wall Street establishment upon which the network of patronage and "pay-to-play" was based.

56.     McDonough knew the racial barriers to approving BCA, but nevertheless made representations to induce BCA into exclusive partnership with the DOI.  He encouraged BCA to forego other risk mitigating alternatives to self-funding, and to commit substantial resources that would leave BCA vulnerable and defenseless if and when no deal materialized.  Most important, McDonough induced BCA to open its kimono, share all of its proprietary FAIR program and business plan information, and hand DOI all the keys necessary to execute the program and plan with a different partner who was "one of us," and a member of the exclusive "old-boy" and "pay-to-play" network of financial services professionals.

57.     Defendant Walsh too was involved from the start.  Walsh was a close personal friend of McDonough and MacDonald from his time at DOI where he supervised both.  He resided with MacDonald for extended periods when he returned to New Jersey to pursue employment and investment opportunities, including during the 2015-2016 period at issue here.  Walsh also knew Walthour, and presented himself to Walthour as someone who was excited about the innovation that he and Pickett had created and who could advise BCA in its

negotiations with the DOI.   Based on those representations, Walthour added Walsh to BCA's advisory board, and involved him in every aspect of business planning, vendor selection, employee hiring, due diligence, and discussions with the DOI.

58.     What Walsh did not tell Walthour was that based on his experience and discussions with McDonough and MacDonald and others, he knew there was no chance of the DOI ever consummating the contemplated deal with BCA.  Walsh fully understood, but concealed from and misrepresented to Walthour, that the DOI would work with BCA only as long as necessary to divert the FAIR program and business plan to an established "old-boy" Wall Street firm.  Moreover, he had full knowledge of BlackRock's activities with the DOI through his relationship with BlackRock representative Donald Perrault, McDonough, and MacDonald. Walsh nevertheless supported the false narrative BCA had been fed through McDonough because his access to the deal intelligence and due diligence secured his membership in the "old-boys" club and his continued loyalty to the "club" positioned him to trade on that valuable asset later.

59.     At the time, Walsh had reached the end of his post-DOI mandatory "cooling-off" period, had left his job at real estate organization GAW Capital, and planned to begin cashing in on his DOI relationships, particularly McDonough and MacDonald, by brokering deals between the DOI and the usual suspects of "old-boy" Wall Street firms and people that the DOI chose to deal with.  Walsh knew that BlackRock, with whom he also had a close relationship and had awarded billions in assets through, among others, account representative, Donald Perrault, would be a natural fit to execute BCA's FAIR program and would value those who could assist it in securing that opportunity.

60.     Moreover, simultaneously with his work with BCA, Walsh was illegally working as an undisclosed third-party marketer to former Blackstone senior managing director, Douglas Ostrover, who had left Blackstone in 2015 and started the investment firm Owl Rock.  Owl Rock wanted New Jersey to be one of the firm's anchor investors, and had secretly retained Walsh to facilitate that investment, which was being quarterbacked at DOI by Walsh's friend (and housemate during this period) MacDonald.  Indeed, according to his LinkedIn profile, in 2015 Walsh had not just been retained, but was fully employed by Owl Rock although this was never publicly disclosed until months later because it violated New Jersey law and or pension regulations, as did McDonough's and MacDonald's failure to disclose his efforts to secure the $600 million DOI investment for Owl Rock during this period, and it would make it more difficult for his close friend and housemate MacDonald to approve a $600 million investment to his new firm.

61.     Unaware of any of this, Walthour and BCA believed incorrectly that progress on the anticipated deal was continuing apace and on schedule throughout the summer, fall, and early winter.  During this period, McDonough and Cliffwater on his behalf requested and were provided unusually broad and unprecedented access to BCA's proprietary FAIR program materials.  This included not just the topline conclusions comprising the program and business plan itself, but all the underlying proprietary research that led to that program and plan, and the proprietary research on how to execute the plan, including the criteria developed to identify fund managers, the preliminary lists of fund managers who met that criteria, the initial list of pensions to target for investment, and the detailed plans to slash vendor costs.  In short, DOI and Cliffwater were given the benefit of a virtual Ph.D. education in the FAIR program and business plan as part of the purported due diligence process into a deal with BCA.

62.     Walsh was also intimately involved in this process from both sides, consulting with Walthour on the one hand while at the same time regularly meeting and discussing the matter with McDonough, MacDonald, Rosenstock, Stern, and others from Cliffwater as well, all of whom could contribute to him securing a $600 million anchor investment in Owl Rock and attracting even more investments thereafter.

63.     Early on in the due diligence process, Walthour requested that the DOI execute a non-disclosure agreement to ensure the confidentiality of the materials BCA was providing. McDonough and MacDonald, however, informed Walthour that signing an NDA would dramatically slow down the process as the agreement would need to be reviewed and approved by counsel and others at the DOI.  McDonough represented to Walthour that no such agreement was necessary because DOI employees were already statutorily bound to maintain all the information they received confidential under New Jersey Conflicts of Interest Law (N.J.S.A. 52:13D-12 et seq.) and the Uniform Ethics Code which states:

> In the exercise of an employee's duties, an individual may be provided confidential information supplied by brokerage firms, banks, corporations or others with whom the Division transacts business. The information may or may not be designated as confidential, but the employee should treat all information that is not publicly available as confidential. In addition, investments under consideration, recent investment decisions, and non-public information about the portfolios under management (including individual investments) should be treated as confidential information. The employee may not disclose such information to any person outside the Division and should limit such disclosure within the Division only to those persons who need to know such information in keeping with their responsibilities within the Division. No employee, nor any other person through the employee, may use such confidential information for personal or financial advantage.

64.     He also represented that Cliffwater likewise was contractually bound to confidentiality with respect to information it received in its capacity as the DOI's statutory outside consultant and that this confidentiality extended to BCA as a third-party beneficiary.

Moreover, Cliffwater explicitly represented to BCA that all materials it received from BCA would be treated confidentially.

65.     Although BCA accepted these representations and considered them binding, it nevertheless prominently marked "confidential" on documents provided in due diligence and indicated that those documents contained proprietary information that could not be used or disseminated without BCA's written consent.  Particularly sensitive documents were watermarked.  In addition, BCA included notifications in its emails transmitting such documents and particular documents themselves stating:

> ***CONFIDENTIALITY AND SECURITY NOTICE****: This e-mail, including any attachments, may contain confidential and proprietary information and may be legally privileged or otherwise protected by law. It is not an advertisement nor is it intended for public use or dissemination. It may be read and used solely by the intended  recipient(s),  and  any  review, use  or dissemination, distribution or copying by others is strictly prohibited. It may not be used in whole or in part without written consent of this firm.*

66.     Relying on McDonough's and MacDonald's representations, and BCA's own precautions, BCA continued to provide DOI and Cliffwater unfettered access to its proprietary FAIR program and business plan as well as the financial projections, business and headcounts budgets, calculation formulas and various critical methodologies, raw underlying data and analysis, criteria for selecting fund managers, lists of pre-targeted fund managers, lists of targeted investors, and critical vendor pricing models and other information.  The highly intrusive due diligence investigation exceeded by orders of magnitude what Walthour and Pickett had ever seen before in their 25 year careers and what the DOI had otherwise done for similarly situated investments.

67.     After initially exchanging terms sheets in June at McDonough's instruction, the parties came to agreement on basic terms in short order, including the following:

- minimum of $500,000,000 in capital commitments from DOI;

- 10% DOI share of the gross management fee revenue; and

- management fee of 0.75% on committed capital contributions.

68.    The due diligence efforts intensified exponentially toward the end of the year as BCA assumed the parties were pressing to an anticipated January deal.  In fact, throughout this period, McDonough and MacDonald falsely assured BCA that they were on-track to present and secure SIC approval of the investment mandate at the January 27, 2016 SIC meetings.

69.    However, as Cliffwater and the DOI finished their download and education on BCA's FAIR program and business plan, their actions began to evidence a different intent.  For example, McDonough inexplicably deflected repeated requests from Walthour for customary "meet and greets" between BCA as a fund manager being proposed to the SIC and the SIC members.  Instead, after repeated requests from Walthour, McDonough agreed only to set up a meeting in October with the chair of the committee, Thomas Byrne, who had been recently appointed after the prior chair left to work on Governor Christie's presidential campaign.  But McDonough continued to avoid introductions to other members of the committee.  McDonough sought to avoid these introductions because he had no intention of presenting BCA to the SIC, knew it would not be well received, and feared it might contaminate his efforts to go forward with the FAIR program with a different firm.

70.    On December 11, 2015, noticing that the pace of communications had slowed, Walthour followed-up with the DOI and Cliffwater to ask whether they needed anything further from BCA in advance of the SIC meeting.  McDonough replied that they had "everything they needed, absent terms," even though they had been working on a term sheet since June and had exchanged another revised version of the term sheet just a few days before on December 7, 2015.

71.     On December 15, 2015, McDonough sent back "comments" to the long existent draft term sheet.  BCA was shocked by the revisions which gutted the terms that were previously discussed and agreed, and inserted terms utterly inconsistent with those prior discussions, industry standards, and basic commercial fairness and reasonableness.  There was also a marked change in tone in McDonough's communication.  Gone was the solicitous, enthusiastic, and eager tone of partnership, replaced by that of an aggressive and adversarial counter-party seemingly intent on demoralizing BCA's principals, disrespecting their work, and devaluing their business in such a way as to force the firm to abandon the negotiations, thereby scuttling a deal.

72.     Around this same time, the DOI informed BCA for the first time (in the more than six months of negotiations with the DOI) that BCA was required to undergo an ethics review due to Walthour's role as a former consultant at Cliffwater and the involvement of Walsh on BCA's advisory board, despite the fact that Walthour and Walsh were both well outside their ethics related time restrictions, and Walsh had no discretionary role in BCA's business.  Nevertheless, McDonough would later inform BCA that the ethics committee mandated that Walsh be removed from BCA's advisory board and BCA complied.

73.     In fact, no ethics review was ever required or conducted and no such ethics mandate was ever issued.  In response to Walthour's subsequent inquiries for a copy of the aforementioned ethics mandate, members of the DOI represented to Walthour, in 2019, that none existed.  Rather, the entire process was ginned up by McDonough and the DOI as a pretext to stall so McDonough, MacDonald, Walsh, and Cliffwater had more time to find a replacement.  By contrast, no ethics issues were raised, no ethics review was conducted, and no ethics problems were identified in connection with the DOI's far more significant mandate to Owl

Rock, despite the fact that Walsh was employed by Owl Rock in a senior (and discretionary) role at the time of the DOI's approval.

74.     Echoing the DOI's systemic bias, at or about the same time, on cue, DOI employee, Samantha Rosenstock, who then served as the head of Alternative Investments, began raising internally a phalanx of pretextual issues and objections to the BCA investment, including explicitly that DOI should instead pursue the opportunity with an established old-boy Wall Street firm instead, which McDonough later admitted was because she was potentially looking for a job and BlackRock could be more helpful to her given the firm's vast reach and relationships.  She did so internally while duplicitously assuring Walthour -- just like McDouough and MacDonald -- of the DOI's absolute commitment to advancing "rising minority stars" in fund management and her and the department's commitment to proceeding with BCA.  None of these assurances or messages were true.

75.     As was always intended, when McDonough, MacDonald, and Rosenstock had extracted what they needed to pursue the FAIR program without BCA, they immediately began searching for a replacement firm, working with Cliffwater and Walsh to do so, all while saying otherwise to BCA to ensure it remained their captive asset, did not go public about the abuse, or take the program to another anchor investor and become the "first mover."

76.     Consistent with this intent, during this same period, the DOI ignored BCA's repeated requests to see and comment on Cliffwater's due diligence analysis of BCA and the FAIR program and business plan.  For example, on January 5, 2016, just weeks before he had been told that the BCA investment would be presented to the SIC committee for approval, Walthour called Cliffwater to inquire about the lack of communication leading up to the scheduled committee meetings and again ask if there was anything BCA could do to move

forward.  It was then for the first time that anyone disclosed, seemingly inadvertently, that Cliffwater was reaching out to others "who do this" to consider as well.

77.     Walthour replied that BCA had performed many months of market research, interviewed dozens of plan sponsors, and not found a remotely similar business model, and certainly not one supported by the amount of proprietary due diligence, analysis, and planning. In response, Cliffwater suggested that other options included New Jersey and Cliffwater doing the plan themselves.  It did not disclose that Stern was actively pursuing BlackRock to be part of the deal.  Alarmed, Walthour responded that he did not see how the DOI's limited resources would permit it to do the program itself even with a consultant like Cliffwater.  More important, Walthour strongly expressed his objection to them proceeding with a concept that BCA had developed, based on proprietary information BCA had shared as part of an agreed joint venture intended to be a "first mover," and which had been shared based on assurances that the information would be kept confidential.

78.     Cliffwater, McDonough, and McDonald all attempted to allay Walthour's concerns, falsely assuring Walthour that the DOI was not deviating from their agreed upon plan and had not and would not share BCA's proprietary information with any other firm, nor use it to do a deal without BCA.  Indeed, BCA had created a complete roll-out plan including media opportunities and communications with the investment manager community, and McDonough assured BCA that it was still his intent to follow the 120-day plan.  These representations were materially false and misleading because, in fact, using BCA's proprietary information to implement the FAIR program with another firm was exactly the plan they were pursuing at the time.

79.     As part of this deception, BCA was denied access to the presentation materials prepared for the SIC meeting at the end of January.  To the contrary, McDonough instead directed BCA to continue to provide all its materials to Cliffwater to prepare the presentation materials.  Thereafter, McDonough refused to share the presentation materials Cliffwater had purportedly prepared, other than to summarize what he described as the main "high level" points, none of which had to do with BCA.

80.     In the complex and fluid situation in which the DOI was operating, McDonough was not certain precisely what path he would take to ultimately redirect the FAIR program opportunity to a different firm, or when that firm might be located.  Accordingly, before that issue was resolved he wanted to avoid any record that the committee was aware the FAIR program had been introduced by a minority founded and run firm, and to focus it on benefits of the FAIR program as an investment model alone.  For that purpose, he had the audacity to ask BCA to provide generic education materials so that he could brief the SIC on the merits of FAIR, but not use materials identifying BCA.

81.     Unaware and unsuspecting of this reality, Walthour continued reaching out to DOI and Cliffwater as the SIC meeting approached without receiving any meaningful responses. Ultimately, Walthour was left to do nothing but to send a January 26, 2016 email to McDonough wishing him luck in the next day's investment presentation Walthour still thought was scheduled to happen the next day.  He got no response and heard nothing after the SIC meetings concluded. When he inquired about what had transpired, McDonough misrepresented to him that the purportedly scheduled presentation had not occurred because the agenda was too crowded. McDonough informed Walthour that the next SIC meeting was in March.

### C.    The BlackRock Handoff

82.    Unbeknownst to BCA, during the month immediately preceding the purported SIC meeting, the DOI, Cliffwater, and Walsh were actively preparing for a search to replace BCA.  This process began in earnest after the January 2016 SIC meeting.

83.    During the months following the January 2016 SIC meeting, BCA heard virtually nothing from the DOI or Cliffwater, except for limited requests for information about hedge funds and managed accounts generally, as well as requests for specific details about the FAIR program and business plan, including the BCA criteria for identifying potential account managers and an updated list of those they had already identified.

84.    For example, in and around February 3 and 4, 2016, McDonough asked Walthour to provide information about hedge funds operating in New Jersey and then information about their returns and cost performance, which Walthour provided.  On March 1, 2016, McDonough asked Walthour for a "basic primer" and background materials on managed accounts.  And on April 6, 2016, Walthour sent the DOI and Cliffwater, including Stern, an updated list of managers with whom BCA had already negotiated proposed terms for the anticipated launch of the FAIR program.

85.    Although Walthour still mistakenly believed this information was being used to secure SIC approval of the agreed upon BCA mandate, in truth the DOI and Cliffwater were further bleeding BCA of proprietary information to be used to implement the FAIR program with a different fund.  Beginning in and around January and February, Cliffwater and the DOI had begun soliciting proposals from other firms to implement the FAIR program, with significant support and assistance from Walsh.  The leading candidate in that process was BlackRock, especially as MacDonald and other DOI staffers were preparing to exit the DOI with an administration transition underway,  and they sought currency with the super-connected and

influential BlackRock.  Walsh first mentioned this to Walthour on a phone call in April 2016

wherein he causally related that "NJ is negotiating with someone very, very big" to do the FAIR

program.  Of course, Walsh knew the firm was BlackRock, but failed to disclose the fact to

Walthour and said just enough to deflect suspicion from him when the opportunity was diverted.

86.     Cliffwater's Stern was a former BlackRock Fund of Funds director, maintained

close ties with his prior firm, and was actively seeking to broker deals between his clients and his

former firm, including a joint venture based on the FAIR program, which would benefit him

directly.  Stern's efforts to generate business from BlackRock were particularly important during

this period as Cliffwater was experiencing significant financial difficulties and was at risk of

failure.  Several of its most lucrative pension accounts had terminated its services and efforts to

develop an asset management business were unwound due to dismally poor performance.

87.     Walthour received a call from a senior asset management marketer around this

time who reported that "I just had lunch with Daniel and you need to be careful.  He is not your

friend, Jake" because Stern had been disparaging BCA despite the fact he ostensibly supported a

deal between DOI and BCA.  Shortly thereafter, Walthour invited Stern to lunch at the Monkey

Bar in midtown Manhattan.  Over lunch Stern arrogantly admitted that, "New Jersey doesn't

need you.  We can do this.  If we can just get BlackRock to return a damn phone call, we

wouldn't be having this conversation."

88.     Walsh, in turn, had a close personal and business relationship with BlackRock

account representative Donald Perrault, who he worked with extensively while he was still at the

DOI.  Walsh was secretly working for Owl Rock attempting to expedite its efforts to secure a

$600 million anchor investment from the DOI for its first fund launch.  Walsh was expediting

that effort through his close relationship with his (then housemate) MacDonald who was overseeing the due diligence and consideration of the proposed Owl Rock investment.

89.     For Walsh, the confluence of events was potentially life changing.  By assisting MacDonald and the DOI in securing BlackRock to implement the FAIR program, Walsh hoped to enhance his ability to successfully deliver the DOI investment in Owl Rock, provide an opportunity for Stern and Cliffwater to work with BlackRock on its own FAIR program, and secure in exchange investments and investment recommendations from BlackRock and Cliffwater, which he would all ultimately accomplish.

90.     During this period, neither Walsh nor Owl Rock disclosed, as they were legally required to, Walsh's employment with or work before the DOI on behalf of Owl Rock.  Nor did Walsh disclose his work adverse to BCA with whom he was still an advisor.   Nevertheless, Walsh kept Owl Rock apprised of every move, and his actions to broker a deal between the DOI and BlackRock using BCA's FAIR program, was with the knowledge and direction of Owl Rock which sought to leverage the deal that Walsh was facilitating to negotiate an unprecedented $600 million anchor investment from the DOI.

91.     Stern, Walsh, Rosenstock, and McDonough had a thorough and intimate knowledge of BCA's FAIR program from their deep involvement in the "due diligence" investigation that BCA had gone through.  They used this knowledge to backchannel to BlackRock the details of the FAIR program, its origins, and its proprietary models to ensure that BlackRock had the inside track to be selected to replace BCA in an intentionally rigged search. From these discussions, BlackRock understood that the DOI had an investment model another firm had presented to them that they wished to pursue with a different firm; the essential

proprietary elements of that program; and the identity, background, and reasons the DOI did not want to proceed with BCA.

92.     BlackRock was fully aware of the racist exploitation that was being perpetrated and that it was being offered the lucrative opportunity to participate in and benefit from.  This was apparent from the background provided to it about the opportunity from Stern and Walsh, and certainly from the detailed proprietary information funneled to it.  And it did not hesitate to participate in this shameful racist exploitation nonetheless.

93.     This was no surprise because BlackRock has no genuine concern for such issues. Although BlackRock, like all corporations, proclaims publicly that it is committed to combating systemic racism and bias, its actions are limited to publicity campaigns that do not adversely affect its bottom-line.  Indeed, while BlackRock issues wonderfully worded public statements, donates small fractions of its massive income and assets to appropriate causes, and otherwise fastidiously checks all necessary public relations boxes, African-Americans make up just 3% of its senior leadership and 6% of its board membership.

94.     More telling, when managing the lucrative investment relationship with the DOI, it replaced a superlative African-American account representative with a white account representative, Walsh's close friend Perrault, because it well knew and decided to pander to the DOI's severe and notorious institutional racism.  Even more telling still, it did not hesitate to use that relationship to exploit for its own benefit the proprietary sweat equity of a newly founded African-American firm when the DOI offered it the opportunity to do so.  And most telling of all, while denying it ever intended to benefit from the racist abuse and unfair treatment of BCA when it agreed to manage this investment, it has taken no steps to remedy the wrong from which

it has and continues to greatly benefit from when those wrongs became public and later when this case was filed.

95.     It was not until April 2016 that Walthour was informed by Walsh that the DOI intended to allocate BCA's anticipated investment to "a very large," Wall Street fund manager instead.  The fund was later identified by others as BlackRock.  Walthour was further informed that Stern at Cliffwater and Walsh were working to broker the deal with BlackRock, which was described as a "joint venture."

96.     In response, on April 23, 2016, Walthour emailed McDonough requesting a meeting to discuss the status of their deal.  McDonough stalled, responding that he wanted to talk to MacDonald first and would get back to Walthour when he had done so and schedule a meeting at that time.

97.     Having not heard anything five days later, Walthour sent a "smoke-out" letter to McDonough on April 28, 2016, declaring that BCA had honored its side of the bargain and was ready to proceed with the FAIR program with DOI:

> We are ready to manage capital.  There is no doubt that the benefit of time has helped us prepare and we are in a stronger position than we were when we first began our discussions in June 2015 -- almost 12 months ago. ***Initially contemplating working with a "big brother" operating partner, through your guidance we decided to remain independent and embarked on a 9-month buildout of the organization.  It has been tiring and expensive but we did it***!  We believe the team is best in class, the selected service providers are best in class and we are positioned to attract best in class sub-advisors and investors.
>
> What we are poised to do together is unique and the sooner we move forward the greater the odds that we capture "first mover advantage" and mutually profit from the unique business model.  It is our hope that within 24-36 months the NJ share is meaningful and further contributes to reducing the fees associated with implementing the alternatives program.

98.     The next day, McDonough and MacDonald called Walthour and informed him that the DOI intended to invest the funds that were to be allocated to BCA with BlackRock

30

instead.  McDonough would later attempt to excuse the betrayal by explicitly explaining, in utter contradiction to his previous months-long assurances, that the DOI was "not a fan of investing with women- and minority-owned firms," that it would "be difficult to get Blueprint approved" for that reason, and that "[i]f the SIC knew Blueprint was a minority- owned firm, they would not approve."

99.     Walthour was further informed by then Cliffwater Managing Director, Pete Kelioutis, that Stern and Cliffwater  were working to broker the deal with BlackRock, which was described as a "joint venture."  Kelioutis further informed Walthour that he received a surprise call from McDonough "out of the blue" to instruct him that BlackRock would receive the FAIR investment and to adjust their work accordingly.  Kelioutis further explained that Walsh, MacDonald, McDonough, and Perrault were "drinking buddies" and had brokered the deal.

100.     Over the course of the next several months, McDonough, MacDonald, Cliffwater, and Walsh worked with BlackRock to implement BCA's FAIR program and business plan as a BlackRock platform.  During this process, BlackRock learned in detail the nature and scope of BCA's proprietary commercial information that formed the basis for the FAIR program, and appropriated it for its program.  BlackRock even reached out to one of BCA's key vendors to see if they could negotiate use of their services and deepen their understanding of BCA's program, which further evidence their knowledge that the program originated with BCA and had access to their proprietary information.

101.     On or about July 28, 2016, the DOI publicly announced its proposed BlackRock investment, which was identical to the program BCA had developed, shared with the DOI, and had been assured they would pursue together and would remain confidential.  Remarkably, the DOI and BlackRock did not even change the name, announcing the managed fund program

would be called the "FAIR" program and it also adopted the same unique program characteristics.

102.     On August 5, 2016, the SIC approved BlackRock's FAIR program, with an initial $500 million investment and authority to invest an additional $500 million. At the same meeting, the SIC approved a $600 million commitment to Owl Rock, which had only been formed a few months earlier and had completed the due diligence and approval processes in record time for a new fund. Less than two weeks later, Owl Rock announced Walsh had been hired as a managing director responsible for securing outside limited partner investments. It did not disclose when he had been hired or that he had been working for them as an undisclosed third party marketer throughout Owl Rocks discussions with DOI.

## IV.     BCA Is Left for Dead, but Fights to Survive.

103.     The radio silence BCA had experienced in the first four months of 2016 while the DOI, Cliffwater, and Walsh worked to replace BCA became even worse after McDonough admitted that the DOI was going to allocate BCA's funds to BlackRock. Having extracted what it needed, denied BCA "first mover" status, sabotaged BCA's ability to partner elsewhere, and induced BCA to make substantial infrastructure investments and financial commitments, the DOI left BCA for dead. BCA had served its purpose and was expected to realize it was not welcome at the DOI.

104.     Although BCA was not prepared to quit, it would be exceedingly difficult for it to survive without some anchor investment from the DOI. Based on McDonough's misrepresentations and lies, his instruction to build out for a launch and not pursue other partners, BCA had informed the entire market that it intended to launch with the DOI as its anchor investor. It had made this a centerpiece of every investor solicitation it had, and it was the expectation for every investor who had made a conditional investment commitment. If BCA

never secured a DOI investment, its market credibility and credibility with other interested or committed investors would be destroyed.  BCA's only immediate means of salvaging its business was an alternative DOI investment.

105.    Accordingly, with no choice and despite the egregious wrong that the DOI and McDonough had perpetrated, beginning immediately after his April 2016 conversation with McDonough and MacDonald, Walthour persistently, politely and professionally continued to pursue the DOI with regular overtures to McDonough about renewing their discussions and pursuing other opportunities.  These overtures were callously ignored.  McDonough fully understood the dire state that he had left BCA, its founders, its employees, and all their families by lying to, and exploiting, BCA for his own enrichment and advancement.  And the palpable indifference, hostility, and disregard McDonough would consistently exhibit going forward in response to Walthour's persistent and polite pleas for an opportunity to save his firm was a reflection of the deep-seated contempt in which he and the DOI held minorities, particularly BCA who had not accepted its fate and continued to press the DOI to rectify the injustice it had suffered.

106.    For example, in early May 2016, Walthour politely and professionally requested a meeting with McDonough, but was told he was gone for the rest of the month on vacation and would return after Memorial Day.  After Memorial Day, Walthour followed up again but was told there was nothing to discuss but to "stay tuned."  After hearing nothing further for over another month, Walthour again politely and professionally reached out and proposed an alternative investment idea, but he was again ignored.

107.    The message was clear.  BCA needed to understand its place, understand it had no standing with DOI, and understand it would not be dealt with.  But Walthour refused to accept

the unacceptable and persisted over the summer.  Finally, McDonough responded by bluntly and candidly stating that there was nothing he or the DOI thought BCA could do irrespective of how attractive their investment ideas were or how low their costs:  "From my perspective, fees are not going to be the reason we do or do not get something done.  It is about finding areas where you have something to offer where we have a need."  In sum, to the DOI there was not a single DOI "need" for which BCA "had something to offer."

108.    Remarkably, the DOI's view that there was no "need" for which BCA "had something to offer" extended to the FAIR program it had built.  When the approval of the BlackRock FAIR program was announced in July 2016, Walthour again politely and professionally suggested to McDonough that BCA could participate in the investment program (it developed) and that there were advantages to it doing so.  He was ignored.  He followed up a week later.  He was ignored again.

### A.    BCA Appeals For a Remedy

109.    No matter how clear McDonough and the DOI made their view that BCA was an unacceptable "other" to them, BCA refused to accept that obviously racist and unfair message.  Instead, Walthour requested another meeting with SIC Chairman Byrne.  After Byrne heard what had happened to BCA, he acknowledged that this "doesn't smell right" and indicated he would "look into it."

110.    Walthour also reached out to New Jersey Senator Cory Booker, New Jersey's first Black Senator and an advocate for minority businesses.  Senator Booker's State Director and now Governor Murphy's Chief of Staff, George Helmy, immediately got involved.  Walthour sent Helmy emails with pertinent information detailing the injustice that BCA had experienced.  The culmination of Walthour's e-mails and phone calls with Helmy was a meeting in Princeton

between Helmy and Byrne.  Helmy reported to Walthour following the meeting that he and Tom Byrne agreed that "this has to get fixed."

111.    But Byrne's intervention was met with pretext.  Although McDonough assured Byrne that he would make sure BCA received an opportunity to manage DOI funds, he had no intention of providing any realistic opportunity.  To the contrary, he and the DOI staff would simply use the opportunity to heap further abuse on Walthour and BCA and teach the "uppity" firm its place.  In an August 25, 2016 meeting precipitated by Byrne, McDonough begrudgingly offered to give BCA another investment opportunity, noting that he might be able to "squeeze Blueprint through" under the radar after large BlackRock and Owl Rock investments.   But in the same breath told him, "we are not going to make this easy on you."  He also made clear that if Walthour complained to Byrne or anyone else again, McDonough would ensure that BCA was never presented to the SIC for any approval.

### B.    The DOI Teaches "Uppity" BCA Its Place.

112.    As he had plainly signaled in their August 25th meeting, and consistent with the BCA treatment to that time, McDonough never intended to present a real opportunity to BCA. Rather, the plan was to drive BCA away with an interminable series of delays, hoop jumps, manufactured legal and administrative issues, and minutia.  For example, right out of the box, McDonough raised a perceived roadblock to even beginning:  the DOI's regulatory limit on investments constituting more than 20% of a funds invested capital.  This perceived roadblock was based on a never before articulated construction of the regulations that ignored the other assets in the actual fund into which BCA would invest the DOI and other investor's funds from its platform.

113.    When Walthour argued that McDonough's construction was inconsistent with the plain language of the statute, McDonough misrepresented that the State Attorney General's

Officer shared his view, when, in fact, they had never taken any such view, he had never asked

them for their view, he did not himself believe his proffered view, and the DOI had never before

taken that view.  Indeed, during the seven months in which he enthusiastically and

unconditionally touted the DOI's commitment to investing in and co-owning the BCA

investment platform, not once did he even raise this issue, let alone this interpretation.

114.    For almost a month thereafter, McDonough ignored Walthour's responses and

follow-ups.  Then in response to another Walthour follow-up, McDonough switched to a new set

of pretextual hurdles, providing a host of detailed questions concerning BCA's projected non-

investment related costs (*i.e.* general administrative overhead) along with a detailed electronic

template through which he instructed BCA to respond for hypothetical investments of various

sizes.  He also instructed BCA to provide a new due diligence questionnaire and updates of the

due diligence documents they had previously sent to Cliffwater during the prior year's due

diligence.  Although these requests were made in bad faith and clearly designed to burden BCA,

stall progress, and encourage BCA to disengage, five days later Walthour submitted the

requested materials without complaint.

115.    Approximately a month later, McDonough abruptly cancelled a meeting with

Walthour and Cliffwater that was supposed to begin moving the process forward, and this

cancellation was preceded and followed by the DOI staff repeatedly canceling calls and

meetings, many times after Walthour had already traveled to Trenton.

116.    After Walthour persistently and professionally followed-up to reschedule these

necessary meetings, McDonough agreed to meet on December 7, 2016, months after the process

was supposed to have begun and almost 18-months after he had first met with BCA and assured

them that the DOI wanted to invest and partner with them.  During that meeting, McDonough

again raised the regulatory 20% limit as a roadblock to proceeding, and asked BCA to establish that it had enough other investors who had funded or would fund so that his construction of the regulation would be satisfied.  In addition to his bad faith construction of the regulatory requirement, McDonough's position was antithetical to the entire premise of the investment from 18-months earlier in which McDonough insisted that the DOI would be the only initial anchor investor on whom the additional investors would rely in funding their investments.

117.    Then, a week later, McDonough sent Walthour new deal terms, which included an utterly non-market, non-commercial fee structure.  Those bad faith terms included a fee rate grossly below what was paid anywhere else in the market and what the DOI was paying in any similarly situated deals.  Among other things, McDonough proposed that (a) the fees would be 40% below the lowest fees otherwise charged in the industry, previously offered to BCA, and provided to every other similarly situated DOI investment manager; (b) even worse, the fees would only be earned on DOI capital that BCA had actually invested and not DOI capital BCA committed for investment; and (c) worse still, even if the DOI never authorized BCA to invest a penny (and thus prevented BCA from earning any fees under (b)), the DOI nevertheless would be entitled to 10% of the investment platform's gross revenues.  These terms were utterly unreasonable, unlike anything customary in the industry, and materially and adversely different than the terms the DOI had on every other similarly situated investment.

118.    When confronted with the grossly below market fee rate, McDonough offered the disingenuous and false claim that this was the same fee structure that managers like BlackRock were being paid in similar investment structures.  This was demonstrably untrue.  To the extent any DOI investment with BlackRock included a fee rate in this range, McDonough knew that it was a relationship pricing tied to other economics and the enormous amount of money the DOI

had allocated to BlackRock.  Any such relationship pricing had no correlation to the deal

McDonough was proposing for BCA.  Indeed, were McDonough's claim true, BlackRock would

be in violation of every one of its most favored nation clauses in its innumerable investment

management contracts.  McDonough knew this was a disingenuous claim and that the fee

structure was disparate and not commercially reasonable, and he knew Walthour knew this, but

he did not care because his goal was to force BCA to abandon its pursuit of a DOI contract.

119.    But BCA was determined not to be run out of town and, in non-metaphorical

sense, run out of business by blatant racial bias, hostility, disregard, and disrespect.  In addition,

as a practical matter, the DOI had successfully disabled BCA's ability for alternative self-help.

It had severely impaired its market credibility, which would only get worse and solidify if BCA

was chased away.  It had induced it to assume substantial financial commitments.  And it had

usurped its chance to be a "first mover" with the unique investment model it had developed.

Consequently, BCA was determined to proceed no matter what and force McDonough and the

DOI to deal with it even if they did not want to do so.

120.    On January 25, 2017, McDonough presented and the SIC approved a dramatically

scaled down and less lucrative mandate for an investment with BCA, over 19 months after

McDonough had first met with Walthour and expressed his commitment to invest with BCA by

the end of 2015.

### C.    The DOI Defendants' Discriminatory Refusal to Contract with BCA.

121.    BCA prayed that the discrimination, hostility, and abuse would subside in the

wake of the SIC approval, and that the parties could promptly proceed to contract and

investment.  But this would turn out not to be.  The discrimination, hostility, and abuse just

intensified.  In the almost 4 years since the SIC approved BCA's mandate, BCA has effectively

been denied a meaningful opportunity to actually invest DOI money and receive compensation for doing so.

122.     Historically and during the period in question, other funds, like BlackRock and Owl Rock, quickly proceeded from SIC approval, to contract closing, and to investment within a few months.  According to the DOI website, comparable funds typically close approximately 3.5 months after SIC approval.  In the case of Owl Rock, the timeline from approval though contract was approximately three months.  BlackRock was the same.  And the SIC approved the investment mandate for fund manager Crayhill, another startup fund in which DOI was the anchor investor, on the same day as BCA approval and it contractually closed on May 1, 2017.

123.     In contrast, it would take **18 months** for the DOI to approve and execute its contract with BCA after the SIC approved the investment mandate.  This extended period does not include the almost year and a half during 2015 and 2016 where the DOI and Cliffwater conducted highly intrusive due diligence into BCA.  This **18-month** period was patently pretextual and discriminatory.  McDonough and the DOI staff buried BCA in a blizzard of repetitive and immaterial due diligence, legal, and other administrative and bureaucratic requests, re-requests, follow-up requests, corrected requests, decisions, and changed decisions -- all typically punctuated by long periods of unexplained silent delay.  These endless administrative machinations are unprecedented and unparalleled in DOI history and utterly disparate in comparison to the many other funds that the SIC approved after BCA and were operational within months.

124.     For example, instead of closing on the mandate as soon as possible after the January SIC approval, McDonough and the DOI initially refused to even begin preparing contractual documents until BCA had secured investments from other investors on the renewed

bad faith pretext that its failure to do so would prohibit the DOI from allocating funds under the regulatory 20% limit.  This was a demonstrably bad faith, non-commercial position to take, and one that the DOI had never taken with any other fund.

125.    Indeed, it was directly contrary to the language of the applicable regs which explicitly provided that "*investment made through* separate accounts, funds-of-funds . . . cannot comprise more than 20 percent of *any one investment manager's total assets."*  (emphasis added).  This regulatory language plainly differentiates between the separate account or fund of funds by which "investments [are] made through" (BCA) and the "investment manager" actually responsible for investing those funds (the fund BCA selects).  It is the latter's "total assets" to which the 20% limit plainly applies, not the Fund of Funds or, in this case, BCA.  The regulation cannot reasonably be read any other way.  And certainly it could have been read to permit the investment, and had been historically, but in this instance the DOI applied a selective construction in order to block BCA's ability to proceed.  It did so even though it raised no such issue when it was enthusiastically assuring BCA in 2015 that it was committed to investing by year end in order to secure access to BCA's proprietary FAIR information.

126.    Contrary to this pretextual obstruction, in the normal course of the market, and in the normal course of DOI investments, the mandate is contractually executed with appropriate provisos for conditions precedent to performance, and then the commitment of the anchor client, in this case DOI, is used to trigger the previously secured commitments of the other interested investors.  Indeed, from the beginning, the *raison d'etre* of the BCA/DOI discussions was that DOI would be the anchor investor.  This expectation was the predicate upon which BCA had gone out and solicited other investors.  The DOI's stalling, obstructing, and refusing to proceed to contract unless other non-anchor investors invested first is nonsensical and intended to make,

as a practical matter, it impossible for BCA to ever actually successfully launch its approved mandate.

127.    Nevertheless, in February and March 2017, immediately after the SIC had approved the BCA mandate and in response to BCA's requests to contractually close the relationship, McDonough refused to "dedicate resources to the legal process" until BCA had demonstrated it had the requisite investors committed.  This stalling tactic was repeated for months.

128.    Six months later, on September 21, 2017, BCA had proceeded to prepare legal documents itself, and had somehow managed to execute investment commitments from the Chicago Police Union, which was not the intended anchor investor for the fund.  Walthour reported on the development, explained that the Chicago Police Union's counsel had carefully reviewed and negotiated the agreements, and begged McDonough to "expedite" the now 8-month old (dormant) DOI contractual review process.  He pointed out the obvious in noting that now that another sophisticated investor with sophisticated counsel had already reviewed, negotiated, and executed investing documents, it should he easier for the DOI to complete its review.  He also explained the harm the delays were inflicting on BCA's credibility and ability to secure new investors, and reported that BCA had numerous high-conviction investment opportunities lined-up and ready to go as soon as the DOI could close on the contract.

129.    Nevertheless, McDonough again refused to proceed until BCA demonstrated that other investors had already committed capital to an entity that the DOI was refusing to form: "might make sense for you to provide a fundraising update to Jessie.  We have a full pipeline currently and where this will fall in terms of priorities will depend on where you are on

fundraising." This was patently untrue. In fact, 12 investments approved by the SIC after BCA were legally reviewed before BCA's contract.

130.     During this period, the DOI also repeatedly made information requests that were pretextual and served no legitimate purpose. For example, in March 2018, requests were made for Sarbanes-Oxley documents even though the DOI knew that neither BCA nor any similarly situated funds were required to or did maintain and file such documents. DOI also asked for BCA's detailed financial and accounting records, even though these records had nothing to do with the investment vehicles in which the DOI and BCA would be involved and were not sought from any other similarly situated fund with whom DOI invested.

131.     In addition to these prolonged pretextual delays, and the reinforcing collateral impairment they caused, BCA's credibility and reputation was further damaged by direct attacks by the DOI, particularly Rosenstock, widely disseminated to other market participants, including potential investors with whom BCA was actively in discussions. Among other attacks, Rosenstock regularly communicated to many market participants throughout 2018 that the BCA mandate would never be approved. Among others, she communicated this claim in 2018 to the Bank of New York, Connecticut Trust Funds, the State of Maryland, and the State of New York. Walsh personally reneged on a previously agreed investment in BCA because he said he had heard the same from Rosenstock. Stern also widely reported to Cliffwater's clients during this period that "Blueprint should not be taken seriously," had ongoing problems with New Jersey, and those problems were because BCA was a "bad actor."

132.     This defamatory and tortious misconduct had its intended effect. By way of example only, after BCA had begun advanced discussions with a large public trust, Rosenstock told the investment officer that the DOI would never invest in BCA and that Walthour and BCA

had a negative reputation in the industry and within the DOI.  The public trust fund promptly

terminated its due diligence.  Cliffwater then immediately recommended that the trust fund

invest with BlackRock instead.  Another BCA investor substantially reduced his investment after

Rosenstock reported that the DOI would never close a contract with BCA and was only

"stringing it along."  Similarly, a vendor also curtailed its service contract with BCA after

Rosenstock reported the same and warned about BCA's ability to pay for the services the vendor

was providing in advance.

133.    Although McDonough, Rosenstock and others at the DOI expected their

obstruction to drive BCA away, Walthour refused to allow BCA to be excluded.  A year after the

SIC had approved the mandate, Walthour emailed McDonough yet again (as always politely and

professionally), "[i]ts hard to believe a year has expired since our approval.  We are eager to start

investing and assisting in market value-added diversifying investments."  The response to this

polite and professional overture was another round of detailed regulatory quibbles and

information requests.

134.    Then on January 29, 2018, in an in-person meeting, Walthour once again

provided a menu of alternative solutions to address all of the DOI's regulatory and contractual

roadblocks.  Although not agreeing to these solutions, McDonough sought to scapegoat all

responsibility for BCA's plainly abusive treatment on Rosenstock, who he described as hostile to

BCA.  McDonough relayed that Rosenstock had been instructed to have no more involvement

with the BCA mandate in an effort to resolve the problem, but that she had continued to interfere

through surrogates.  McDonough reported that they intended to again instruct her to stay out of

the BCA process.  A little over a month later, Rosenstock was fired.

135.    Although Rosenstock was central to the DOI's blatant discriminatory treatment of BCA, her misconduct was representative of, and not an exception to, the DOI's systemic prejudice against BCA that McDonough had previously acknowledged and for which he attempted to disclaim personal responsibility.  But the undeniable fact is that McDonough was the head of the DOI, directly oversaw the entire BCA investment process, could not have been unaware of the abuse and disparate treatment, and could have stopped that abuse at any time.  Contrary to his effort to deflect blame elsewhere, the facts compel the conclusion that this racist bias was systemic throughout the DOI and the ultimate responsibility (within the DOI) of McDonough.

136.    Indeed, despite Rosenstock's departure, the abusive treatment continued, with McDonough and the DOI continuing to raise pretextual hurdles to closing the contract, particularly by continually revising their construction of the 20% regulatory investment limit.  For example, in the spring of 2018, on the seeming threshold of finally closing the contract, the DOI and its counsel manufactured a new regulatory metric, "assets under management," that actually is found nowhere in the regulations.  Nevertheless, this new 11th hour surprise ground the process to a halt just as it was about to close.

137.    On March 1, 2018, Walthour, McDonough, and DOI's counsel exchanged multiple emails on this point, and, among other things, Walthour called out the last minute material changed as inconsistent with the explicit regulatory language and clearly intended to delay the closing and jeopardize BCA ability to ever manage DOI funds:

> Perhaps we can also lean on you Jim to better understand why the "assets under management" language needs to be in this agreement.  We have removed it to be consistent with the regs.  The regs clearly use the term "assets."  Is there a legal basis for this or some other legal objective that NJ is trying to accomplish with its insertion?  Many thanks in advance for your insights.

138.     Walthour was never given a response to his question.  Instead, McDonough

informed Walthour that he intended to present the issue to the Investment Policy Committee

("IPC") in yet another administrative machination.  Faced with yet another delay, Walthour

politely and professionally responded:

> Thanks. A couple of questions. What is the earliest we can expect to resolve this? Can Blueprint submit a memo detailing its position on this issue?
> This policy is discriminatory in my view and prohibits 98% of women and minority owned firms from having the opportunity to manage assets for the State of NJ. As a matter of public policy it should be addressed on a broader basis and we would be happy to help get support among the appropriate people.

139.     Walthour also raised the issue to Byrne:

> The continued maltreatment of Blueprint by certain staff has been shameful and unprofessional. Out of respect for Chris and recognition of his difficult position I held back in hopes that this would resolve and we could all move forward professionally and in the best interest of the fund. At this stage I am not sure.
> Our issues aside, this issue of the regs is about equal opportunity, fairness and public policy. I hope it is appropriate for you to hear me out on these.

140.     At the time, Walthour's co-founder Pickett expressed fear that even these

extremely measured emails might prompt serious retaliation. Understandably, Walthour

responded by making clear that they had been left with no choice and that "[e]ven slaves stood

up for themselves":

> Carrie,
> I understand your concern. The email is true and Tom has been a friend. Their conduct is a slap in the face to you, me and Tom. Chris is not demonstrating a willingness to make a decision and we cannot chance that he presents OUR case to the IPC. I need to make sure that WE are heard. If my relationship with Chris ends then it ends. I  have been fair and supportive. They have fucked us. We just delivered a good idea. In the end, I'm trying to save our  firm and not protect the irrational people occupying those seats. **Even slaves stood up for themselves. Why are we so scared?** We feed mouths and educate children of our employees. I owe this to them to not let us get screwed over. If they win we are done. Trust me.

141.     Certain that McDonough intended to just present his adverse construction of the

regulations, Walthour pressed aggressively for the opportunity to present BCA's interpretation of

the regulations.  And he did so.  Nevertheless, McDonough reported that "the IPC directed us to continue to interpret the SIC regulation as we have been.  I'm sorry it did not come out as you would have hoped.  I would like to continue to work together to finalize the legal documentation, so we are in a position to fund once your asset level allows."  This was in direct contradiction to his previous statements that ultimately the interpretation of the regulations was his decision.  Kelioutis, who attended the meeting by teleconference, would later tell Walthour that the issue was never even really discussed in the IPC meeting.

142.    When BCA nevertheless indicated it intended to proceed, the DOI delayed exchanging the final drafts of the contracts for weeks, and then incredibly circulated "final" drafts that changed material contractual terms that the DOI had previously insisted be included, and which had consequently been incorporated into the contracts with other committed investors.  Walthour complained to the DOI staff and lawyers without response.  After still further silence and delay, he emailed McDonough:

> I hope you had a great vacation.  I would like to catch up today.  Our inability to close is starting to hurt our marketing efforts, harm our credibility with the manager community and drive up our legal costs significantly.  As a potential owner of a portion of the economics, I am sure you understand why we are pressing to close.  It's hard to believe but we started this process on December 13th.
> There are a couple of business issues to review.  First, the GP commit issue remains outstanding.  Our counsel has indicated that the amount is not a legal issue.  This is consistent with Rubin's view expressed to us a few months back.  We would like to understand the AG's position and address it in the interest of moving forward.  Second, the issue of negative consent was raised.  We cannot agree to the proposed change.  You specifically asked for this and it is now in our docs with a wide number of potential clients.  It also has a significant impact on our regulatory filings which would not be good for the marketability of our business.  Negative consent is a part of other transactions NJ has done so we would not be setting precedent or doing anything out of the ordinary.
>
> I am in DC but will make time to talk whenever it works for you."

143.    Weeks passed and still no closing was scheduled, causing Walthour to again email McDonough, "it feels like we are just dragging on.  We sent legal opinion comments some

time ago. . . . There likely are no issues between us.  Any insights you can give would be helpful."  Yet another month would pass before the closing took place.

144.    Having absorbed all of the DOI contractual demands over the 18-months since SIC approval, the contract ultimately fulfilled McDonough's 2016 promise that the DOI was going "to make it hard for you."  Thirty-four months had passed.  Not only was it virtually impossible to sustain the business over an 18-month delay, the unprecedented, disparate, and punitive contract terms would continue to impede BCA as it finally launched.  The fees had been reduced by 60% to far below market. The contract required DOI approval for any investment. Funds not invested earned no fees.  And the DOI was entitled to a perpetual 10% share of gross revenues even if it never authorized the investment of a single dime.

145.    These terms were unprecedented and grossly disparate.  Indeed, Owl Rock and Crayhill who were very similarly situated funds to BCA and proceeded from SIC approval to investment within a few months, were paid market fee rates on committed capital as was standard, and not 40% discounted rates on invested capital, which was reserved exclusively for BCA.  And neither were required to share a percentage of their revenue in perpetuity.

146.    McDonough knew BCA's terms were disparate, discriminatory, and uncommercial, but neither he nor the DOI considered BCA a "legitimate" market participant meriting commercial treatment.  Indeed, this was precisely the message he wanted to send:  the "uppity" firm was not welcome, would not be accepted, and should simply move on. Nevertheless, BCA refused to be forced out and looked to begin investing under the contract.

**V.    The DOI's Discriminatory Refusal to Perform Its Contract and Retaliation.**

147.    Even after DOI and BCA finally executed the disparate, discriminatory contract, for the last 30 months the DOI has taken every step possible to frustrate BCA's performance. McDonough, his successor Cory Amon, and the DOI staff have abused the right they had

imposed on BCA to approve every investment by ignoring or summarily rejecting virtually every investment proposed over this 30-month period.

148.    The DOI has systematically rejected virtually every BCA investment proposal despite the fact that even before contract closing Walthour met with McDonough on multiple occasions to discuss some of these very investments, and McDonough never raised any difficulty or objection to any.  To the contrary, in May 2018, McDonough approved of a proposed model portfolio including many of these or comparable investments and fund managers without challenge.

149.    Further reflecting its bad faith, the DOI has persistently refused to even discuss the reasons for these rejections or the criteria by which they are evaluating the investments.  It has also refused multiple requests to provide guidance on the investments it wants to target.  The DOI has ignored numerous oral and written requests for meetings or calls to discuss these essential issues.  Even worse, after Walthour raised this abusive treatment with the Governor's office and then African-American community leaders, the DOI cutoff all communications of any kind and has utterly froze BCA out.

150.    For example, BCA formally proposed investing $75 million in fund Capital Springs in July 2018, after having presented substantial investment analysis and due diligence to the DOI on the investment along with others during the 18-month period it took to close the contract.  From July 2018 through November 2018, the DOI constructed roadblock after roadblock to approval.  When the investment was initially proposed in July, the DOI objected to the fund manager's standard investment fee structure.  Then when BCA successfully (and surprisingly) managed to negotiate the change to the fee structure that the DOI had requested, the

DOI thereafter again rejected even that structure and insisted on yet another even more onerous structure.

151.    In the midst of this summer period, McDonough announced he would be leaving the DOI at the end of July.  Walthour immediately emailed McDonough's designated replacement, Corey Amon:  "I would like to talk sooner rather than later.  We have a lot of risk here and are now backed into a corner with significant expenses, liabilities, and professional credibility at stake.  We are in current due diligence with multiple institutions and we need to [k]now if this relationship is going to materialize for obvious reasons.  I will make myself available when it works for you. Thank you and my sincerest apologies that this has ended up in your lap."  His overture was ignored.

152.    Walthour followed-up again at the end of the month, again complaining that the DOI was making it impossible for BCA to perform the contract successfully and that this was a continuation of abuse that had begun three years earlier.  In his email, he politely and professionally explained the usurpation of the FAIR program, the obstruction of the contract execution, the unreasonable restrictions on investments, the repeatedly changed terms, McDonough's blame for such abuses on the staff, and the staff's independent disparagement of BCA to the market and specific investors.  He also explained that BCA had suffered significant harm as a result of this abuse and would continue to do so if it did not cease.  He asked simply that Amon ensure that BCA be treated fairly, consistent with the treatment of other funds, and be given a fair opportunity to succeed.

153.    He followed-up with another email addressing yet another newly minted construction of the regulatory "asset" limitation again being revived to block an investment:

> I have conducted a review of the memos (specifically, IPC memo B dated March 9, 2018) and email correspondence between NJ DOI, Gibbons, and Blueprint.  The term

"discretionary assets under management" cannot be found in our records, nor do any BP professionals recall any mention of the term in correspondence, discussions, or document negotiation.  The debate, memorialized by score of emails, memos, and our responses to specific questions, clearly frames the debate to be the use of the term "assets" or the use of the term "assets under management."   To modify the language . . . to now read "discretionary assets under management" puts these firms at a much steeper disadvantage and is emphatically inconsistent with Governor Murphy's commitment to fairness and equal opportunity . . . To attempt to exclude other client assets from consideration that are classified identically to your own doesn't make logical sense and I am certain that we agree that this was never the intent of any interpretation made by the IPC.

154.    Walthour went on to request "that we be allowed to move forward with the express intent to comply with the terms outlined in the legal documents" which were "carefully negotiated" and for which there "is not a good faith basis to try to change now."

155.    Although Walthour prevailed in convincing Amon that BCA had sufficient assets to proceed with the Capital Spring investment, BCA was immediately faced with yet another condition from the DOI: a refusal to allow standard market fee splitting with the fund, despite the fact that Capital Spring was a premium fund manager, a leader in the space, had no trouble finding other investors, and had already granted the DOI the largest fee discount it had ever provided.

156.    Based on the DOI's systematic discriminatory withholding of investment approval and thus denial of fess to BCA, in October 2018, Walthour requested that the fee arrangement be modified "to achieve an appropriate level of economic fairness":

> We have done our part throughout to support this relationship. Now we are addressing another set of employee-related delays and what appears to be a mandate change. We presented a number of actionable investment ideas in 2018, precleared each with the former Director and negotiated attractive economic terms on your behalf. Nevertheless, the Department has not acted upon any of these opportunities and after all this time, we have received zero in fees from the mandate. In summary, our mandate has been modified; the process by which we are expected to deploy capital has changed; the approval and documentation process has been subject to considerable delays and extensions; and key personnel at the Department have changed. The result has been that Blueprint has had to extend itself financially to accommodate an arrangement that we strongly believe is uneconomic, off-market and fundamentally inequitable. Accordingly, as noted

> above, we propose to change our fee arrangement to 0.75% committed capital, effective immediately. It is our understanding that Alternative Investment Modification Procedures govern such changes and that notification is all that is necessary with the SIC. Hopefully, we mutually agree that Blueprint deserves to be compensated for three years of work and value brought to the Department as creator of the FAIR program. Further, that this change is a matter of formality.

The request was ignored for almost two months, then summarily rejected without explanation.

157.    On October 26, 2018, Walthour again urgently wrote Amon to report that the lack of investment from DOI was endangering BCA's ability to survive: "it is important that I speak to one or both of you today. We have had two inquiries about the status of our relationship and the lack of investment funding – one a client and the other a press inquiry to our PR firm."

158.    The response incredibly was to blame BCA for the delays, prompting Walthour to write on November 13, 2018, "I am sorry to imply that this had been delayed on the part of BCA for as long as two months deserves a response. Below are the dates of emails, calls and meetings with your staff. We would be happy to provide details if necessary, for who was involved." The list identified **28** separate communications from BCA attempting to move this investment forward between July and November 2018. Thereafter, BCA was forced to retain counsel to raise the issue with officials in Trenton.

159.    Amon ultimately relented on the Capital Springs investment in response to the audit trail by Walthour which so clearly evidenced the DOI's disparate and abusive treatment in connection with the proposed investment that they reluctantly relented and thereafter simply ignored or summarily rejected proposals.

160.    In early 2019, BCA sent the DOI another investment proposal, this time for Cordiant, a manager invested in agricultural related debts. Without conducting any due diligence, the DOI summarily rejected the proposed investment on the putative basis that

members of the DOI had read negative articles about agricultural related investments, and thus the strategy was not of interest.

161.    However, the rationale to reject Cordiant was merely a pretext to frustrate BCA's performance of its investment agreement with the DOI, preclude BCA from investing the DOI's committed capital, and earning returns on that capital.  Indeed, just days after rejecting BCA's proposed investment in Cordiant, on January 31, 2019, the DOI announced a $100 million commitment in Homestead Capital, an agricultural fund focused on investing and operating farms throughout the Mountain West, Delta, Midwest and Pacific regions of the U.S.

162.    Upon reading the DOI's announcement of its investment in Homestead, Walthour immediately wrote to Amon on February 6, 2019, politely and respectfully informing Amon that the putative basis for rejecting BCA's Cordiant investment was contradicted by the DOI's January 31, 2019 disclosure.  Its pretextual basis revealed, the DOI was left with no choice but to conduct due diligence on the Cordiant proposal.  Following that due diligence, on July 19, 2019, the DOI executed a notice to procced with a $50 million investment in Cordiant, more than eight months after the initial proposal, and again because the sloppy communications by the DOI had left the entity exposed to claims of disparate treatment.

163.    On November 13, 2019, BCA sent an investment proposal for Higgins Hollis Park.  For two months, the DOI ignored the proposal before again summarily rejecting the proposal with no substantive discussion sought or reasons given.

164.    In December 2019, BCA submitted for approval an investment proposal for Neuberger Berman Specialty Finance Fund, which was summarily rejected, with no substantive reason given, and without any communication or discussion with BCA before rejection.

165.     On January 10, 2020, BCA sent DOI an investment proposal for Healthcare Royalty Partners.  On February 24, 2020, DOI summarily rejected the investment proposal without any communication, due diligence or stated reason.  After getting no response, BCA followed up at least 4 separate times without any response from the DOI.

166.     On February 25, BCA proposed an investment in Chenavari.  The DOI ignored this investment entirely.  A month later, in response to Walthour's email seeking guidance and feedback on the Chenavari investment proposal and other submitted investment proposals, DOI responded only, "[i]f a proposed investment has not been accepted within ten days of its presentation to the Division, Blueprint may deem the investment to be rejected."

167.     On June 4, 2020, BCA proposed an investment in a COVID-19 related recovery fund NJ Restart and Recovery Fund focused on assisting minority communities most impacted by the pandemic.  The DOI ignored the proposal.  The proposal was sent to Governor Murphy, his Chief of Staff George Helmy, the Head of Diversity Hestor Agudosi, Derek Greene, and Dini Ajmani directly given the Governor's public pronouncements about the need to provide aid to struggling New Jersey businesses impacted by the pandemic.  As of November 2020, BCA did not receive a single reply.

168.     On September 15, 2020, BCA proposed an investment in Longford Litigation Finance and asked for a response on the NJ Restart and Recovery Fund. Both the proposal and requested response were ignored.

169.     On November 11, 2020, BCA proposed an investment in AIR AM Life Fund and again, asked for a response to the NJ Restart and Recovery Fund proposal as well as the Longford Litigation Finance investment proposal.  The DOI failed to respond to any of these proposals.

170.     But the disparate treatment and abuse did not end there.  The DOI further retaliated against BCA by subjecting it to punitive and burdensome audits that had no rationale basis and were not imposed on any other manager in the State.  On March 23, 2020, days after Governor Murphy shut down all non-essential businesses and ordered that non-essential workers shelter in place to prevent the further spread of coronavirus, Daniel Stern of Cliffwater, at the direction of the DOI, informed Walthour that the DOI would be conducting an "update" "due diligence review" on BCA and requested information on a number of topics, including the names of managers approved by BCA in due diligence and in its pipeline.  In response, Walthour wrote to the DOI, copying Governor Murphy and other members of the Governor's staff and implored: "[W]e are in the middle of a health care pandemic, market meltdown and GOVERNOR MURPHY mandated business closure and travel restrictions. You and NJ should be focused on the performance of NJ's investments under our watch which is conspicuously absent from your request and not some "general update."  Undeterred, Amon responded to Walthour that the request was "entirely consistent with normal business practices" and the information requested "should be easily accessible in electronic form by virtually any institutional quality investment advisor or general partner."

171.     But there was nothing "normal" about this audit.  First, it came days after the Governor declared a state of emergency and shut down all non-essential businesses.  Second, there was no reason why the DOI would need to update its due diligence on BCA less than a year after execution of its mandate and less than a year after the completion of a three-year due diligence investigation which exceeded by orders of magnitude what Walthour and Pickett had ever before seen or what the DOI had otherwise done for similarly situated investments.  Third, the information sought was not typically sought during routine audits which do not typically

require the disclosure by fund of funds of managers.  Fourth, and most egregious, the DOI

designated Cliffwater to conduct the investigation, including review of BCA's confidential

information and business plans, despite the history of Cliffwater's prior misappropriation of

BCA's confidential information and BCA's public complaints regarding the same.  Ultimately,

in response to Walthour's request, the DOI agreed to reassign responsibility of the audit to

another consultant, but refused to forego or delay the punitive and retaliatory due diligence

update.

172.    The DOI went one step further.   In or around July 2020, the DOI, including

defendant Amon, began been contacting Blueprint's other investors for the purpose of tortiously

interfering with the Company's business relationships. From conversations with relevant parties,

BCA learned that the DOI employees contacted the New England Pension Consultants and the

Chicago Police Pension Fund ("Chicago Police") in a transparent and retaliatory attempt to have

Chicago Police pull out of its investment with BCA. This, in turn, could be used to provide the

DOI with a pretext or cover to withdraw its investments from Blueprint as well, effectively

crippling the Company.

173.    This racist, discriminatory, and bad faith abuse is ongoing and unabated with the

full knowledge of the Governor, Chief of Staff, Treasurer Muoio, SIC Chair Deepak Raj, and

Adam Liebowitz, all  of whom have been copied on correspondence but refuse to take action or

investigate the allegations.

## VI.    GOVERNOR MURPHY'S ENDORSEMENT OF THE DOI'S ABUSE

174.    The systemic racial discrimination and abuse at the DOI is a long-running, open

secret in the New Jersey Government, and its abuse of BCA is too.  BCA has reported its abusive

treatment to numerous government officials, including Governor Murphy, First Lady Tammy

Murphy, Hester Agudosi (Head of Diversity for New Jersey), Terry Tucker (Chief of Staff to Lieutenant Governor), Joe Kelly (Deputy Chief of Staff), Matt Platkin (Chief Counsel) and Adam Alonso (Deputy Chief of Staff),  Dini Ajmani (Asst. Treasurer), and Reverend Derrick Greene (Governor Murphy's administrative liaison to the Black community), among others. None of these overtures resulted in a single, even modestly, meaningful or effective response, least of all from Governor Murphy or his staff.

175.    Religious, community, and business leaders have likewise brought the abusive treatment of BCA to Murphy's attention.  For example, Senator Ronald Rice, Chair of the New Jersey Caucus of Black Legislators has called for an investigation with written findings.  Pastor David Jefferson, a prominent member of the Black clergy community and President of the National Action Network has called for an investigation.  The national leadership of the NAACP, National Urban League and National Action Network have contacted the Governor about the historical and ongoing abuse of BCA.

176.    Indeed, none other than Reverend Derrek Greene, a consultant to Governor Murphy's campaign, and the administration's liaison to the African-American Community and senior advisor on diversity, confirmed three times to Walthour (including two in-person meetings in the presence of others and one phone call) that the administration was well aware of the racial problem at the DOI.  He reported that the DOI "staff" was a problem in the investment division and that they refused to abide by any policy directives to diversify the pool of funds and advisors given opportunities with DOI.  Greene reported to Walthour that when he inquired about BCA's treatment, Ajmani had the ethics department deter him from continuing.  He also explained that another minority owned firm had likewise had an opportunity they brought to the Treasury Department usurped and given to a non-minority firm.  And he reported that when he assisted a

qualified Latino executive in trying to get a job at DOI, the associated staff all threatened to quit.

His blunt conclusion was, "we have a real problem in that division" with racism.

177.    Nevertheless, Governor Murphy and his staff ignored the problem generally and

specifically as to BCA.  For example, right after Governor Murphy had signed the statutory

mandate to diversify DOI asset managers, BCA appealed personally and directly to him on a call

to intervene to stop BCA's abuse.  On February 4, 2019, Keith Thomas followed up in writing to

that call:

> Thank you for your call today and I appreciate your attention to our firm Blueprint
> Capital Advisors.  In light of the challenges our firm has faced in attempting to
> implement our mandate with the Division of Investment, we are encouraged by the
> signing of Senate Bill No. 374. In my view, Blueprint should be the poster child for the
> good work your administration is doing to increase the involvement of minority-owned
> investment managers.
>
> *As a veteran of Wall Street, you understand the issues and I am seeking your counsel and
> support*.  We have been attempting to resolve a number of issues with the staff of the
> Division of Investment which have prevented us from implementing our mandate.  We
> recently retained Angelo Genova after an iterative and exhaustive dialogue with staff and
> his efforts continue.  To be clear, our goal is simple – to develop and maintain a mutually
> profitable partnership with the Division that benefits the beneficiaries of the fund.

Although Governor Murphy committed to follow up through his then deputy chief-of-staff,

months lapsed with no response and no change.

178.    Eight months later, on October 17, 2019, Walthour met with Governor Murphy's

staff, including Chief of Staff George Helmy and Assistant Treasurer, Ajmani.  Helmy excused

himself from the meeting before introductions, attempting to avoid being confronted with his

prior work calling out the abuse of BCA on behalf of Senator Booker, and his current role in an

administration determined to ignore it.   Ajmani likewise attempted to distance herself from the

abuse she oversaw, feigning that she had never met, and did not know, Walthour, when the two

had previously met for lunch to discuss specific issues with the DOI and its treatment of BCA.

179.     During the October meeting, Walthour laid out in detail the history of overt discrimination and retaliation BCA had and was continuing to experience and asked the Governor's staff to take the steps necessary to stop this abuse, remedy the harm to BCA, and exorcise the DOI of its institutional racism.  In response, Governor Murphy and his staff committed to do so and asked Walthour to "give us two weeks."

180.     Then nothing happened.  A month later, Walthour followed-up with the Governor's office to inquire about the promised action, noting that there had been no communications, actions, or attempts to schedule any follow-on action.  He was again met with silence.  But less than a month later, the response did come when BCA's request to adjust its fee arrangement to comport with the reality of the mandate as implemented by the DOI and to address the allegations of disparate treatment was rejected.

181.     The Governor's office ignored BCA's appeal because they were already well aware of the DOI's abuse and were not willing to confront it because doing so would not be politically expedient for various reasons.  First, Governor Murphy was a card-carrying member and beneficiary of the very old-boys network at the root of the DOI's institutional bias and corruption, as were many of his biggest supporters.

182.     Second, as a card-carrying member, he had unsurprisingly elected to leave all the prior administration's staff and leaders at the DOI when he assumed office, and did not want to have to defend that failure.

183.     Third, one of the few new appointments he did make to oversee DOI, defendant Ajmani, was strenuously opposed to the new statutory mandate generally and "uppity" BCA in particular.  Ajmani had told people repeatedly that it would be "unethical" to hire African-American firms to increase diversity (revealing she did not even allow for the possibility that an

African-American firm could manage investments).  Indeed, this was her response when Walthour raised with her the abuse BCA was experiencing, and she then then tried to diminish the abuse by offensively telling Walthour that BCA's difficulties were only because he was "political."  That is to say, he was "uppity," did not know his place, and had deigned to object and seek relief for the abuse he and his firm were being subjected to instead of simply accepting what he got.

184.    Ajmani aggressively protected her fiefdom from interference, and would file or threaten to file ethics complaints against anyone who challenged her position on BCA or institutional bias at the DOI.  And she knew how to file complaints.  As a consultant to Governor Murphy's campaign, she was one of four women to file complaints against Platkin alleging he had created a toxic and misogynistic work environment at the campaign.  Ajmami, however, did not go public with her complaint, and was rewarded with the Assistant Treasurer position. Platkin was not publicly accused and was awarded the counsel to the Governor post.  And neither Governor Murphy, nor Platkin had any appetite for confronting Ajmani.

185.    Worse, not only did the Governor's office fail to meaningfully investigate, intervene, or take any steps to stop the patently illegal discrimination against BCA, his office closed ranks and began working with the DOI and Ajmani to attack Walthour after he publicly reported BCA's abuse to, and sought the support of, the African-American community and its religious and political leaders.  One of those leaders, Senator Ronald Rice, the leader of the Black Legislative Caucus and an outspoken member on issues related to economic injustice, wrote New Jersey's Treasurer, Elizabeth Maher Muoio in September 2019 and described the DOI's treatment of BCA as a "modern day lynching":

> What happened to Blueprint and Mr. Walthour, over the course
> of the last four years, appears to be a modern-day lynching and is

a stain and a black eye on the State of New Jersey. . . I believe the neglect of his request to be heard and meet face to face never would have happened if Mr. Walthour were not African American.

186.     In response to Walthour's exercise of his constitutionally protected and entirely justified community appeal, the Governor's chief of staff, Helmy, and general counsel, Platkin, with his approval and direction, placed his political expediency ahead of justice and the public interest and joined in "lynching" Walthour and BCA.  Platkin and Helmy informed Ajami that the Governor would not intervene in the DOI abuse, and wanted, instead, a public smear campaign designed to discredit BCA and Walthour personally.  The DOI would also freeze out BCA and attempt to precipitate its failure and discredit of it and Walthour.

187.     There is no question that Governor Murphy knew and authorized this attack given it was high-profile, its potential for political fallout, and his admission when Platkin later left the administration that, "for the past 5 years, Matt has been by my side counseling me on every single consequential decision I've made."

188.     Governor Murphy's public face for this attack was Derek Greene, the well-funded campaign consultant and gubernatorial aid with a history of doing the dirty work of politicians in Maryland, the Caribbean, and New Jersey.  They thought it would be wise to use a Black man to lynch a Black man thereby avoiding the appearance of it being done by Murphy, Helmy, Platkin or Muoio, all of whom are white.

189.     Thus, in response to what they knew were truthful public accounts by Walthour of BCA's discriminatory treatment, Platkin, Greene, and others on behalf of the Governor, disparaged Walthour, and tried to discredit his true claims, to the same community audiences to which he had appealed.  Among other things, Greene and Platkin widely misrepresented that BCA's claims were baseless and were found as such after a formal investigation, both of which

60

were claims they knew to be untrue.   Greene and Platkin also communicated to these audiences

that Walthour had a bad professional reputation and frequently filed meritless lawsuits, both of

which were claims they likewise knew were untrue.  And Platkin called Walthour's then lawyer,

and inappropriately attempted to discredit and disparage Walthour, subtly encourage/threatene

the lawyer into dropping the engagement, and discourage him from any legal action, especially

against the Governor.

190.    Greene, likewise, spoke to influential public officials and pastors to similarly

discredit Walthour and BCA.   As part of this effort, Greene coordinated with senior officials in

the Treasury and DOI, including the Treasurer and DOI Director, as well as external parties such

as Pastor Steffie Bartley, whom he had his political consulting firm retain, to develop materially

false and misleading talking points about Walthour and BCA and their discrimination

allegations.  Greene did so despite knowing and admitting those claims were true and that his

disparaging counter-narrative was false.

191.    Among other things, this smear campaign directed by the Governor and his staff,

falsely claimed that BCA had not been successful because it "could not handle the business of

the DOI and that the firm didn't have the resources to manage the current relationship."  Greene

communicated these false and misleading claims on a public conference call with African-

American leaders and both he and Bartley widely disseminated them to elected officials,

including Mayor Ras Baraka and Councilwoman Mildred Crump.  Greene and Bartley also sent

text blasts making the false and defamatory claims that Walthour had been removed as Chair of

the Ebony Media Holdings for insider trading, even though they knew these claims were false

and had been told they were false.

192.     As part of the same retaliation, Ajmani and Helmy instructed Amon to summarily reject all future BCA investment proposals, and Helmy told BCA's former counsel that if BCA continued to complain about its discriminatory treatment, that they would direct the DOI to redeem its investment and put BCA out of business.  And since that instruction and threat became known to BCA, the DOI has, in fact, summarily rejected or simply ignored every BCA investment proposal and cut off all communications with BCA.

193.     Finally, the Governor and his office instructed Rubin Weiner to not comply with lawful Blueprint OPRA to conceal their involvement in these illegal acts.

194.     This now State-sponsored retaliation is ongoing and will continue without judicial relief.

195.     42 U.S.C. § 1981(a) guarantees, among other things, "[a]ll persons ... the same right ... to make and enforce contracts ... as is enjoyed by white citizens."  The guarantee that each person is entitled to the "same right ... as is enjoyed by white citizens" directs our attention to the counterfactual—what would have happened if BCA had been white? This focus fits naturally with the ordinary rule that a plaintiff must prove but-for causation. If the defendant would have responded the same way to BCA even if he had been white, an ordinary speaker of English would say that the plaintiff received the "same" legally protected right as a white person. Conversely, if the defendant would have responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right as a white person.  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015, 206 L. Ed. 2d 356 (2020).  The detailed narrative set forth above makes it clear that BCA did not receive the same rights as a white person would have had.

## CAUSES OF ACTION

## COUNT ONE

Permanent Injunction Pursuant to 42 U.S.C § 1983 and § 1981
(*Against Governor Murphy, Corey Amon, Dini Ajmani, and George Helmy*)

196.    BCA repeats and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

197.    Defendants Murphy, Amon, Ajmani, and Helmy are state actors who acted under the color of New Jersey law to deny BCA the opportunity to engage in business relationships with New Jersey free of unlawful discrimination in violation of 42 U.S.C § 1981.

198.    As set forth herein, defendants the DOI, Amon, and Ajmani, each of which are directed and controlled by defendant Murphy and his chief of staff, defendant Helmy, have, and continue to, wrongfully and unlawfully discriminate and retaliate against BCA, in violation of 42 U.S.C. 1981, 1983 by, *inter alia*, (i) misappropriating BCA's proprietary FAIR program and other confidential information; (ii) denying BCA equal terms and conditions of contract; (ii) impeding BCA's ability to perform under that contract; (iii) interfering with BCA's ability to operate its business; (iv) and interfering with BCA's existing and prospective contractual business relationships.

199.    Defendants have, and continue to, engage in this unlawful conduct because BCA is a Black-owned company which the DOI and defendants have historically and systemically excluded, and in retaliatory animus to BCA's efforts to defend its civil and contractual rights.

200.    BCA has repeatedly demanded that defendants terminate their unlawful discriminatory and retaliatory conduct through e-mails, phone calls, and in person meetings including directly and indirectly to defendants Murphy, Helmy, Anon, and Ajmani, to Governor

Murphy's former general counsel, defendant Matthew Platkin, and by Notice of Claim filed with the State of New Jersey on January 24, 2020.

201.    Nevertheless, defendants' wrongful conduct persists, and unless and until enjoined and restrained by order of this Court will continue to impede BCA's ability to operate its business and cause great and irreparable injury to BCA.

202.    BCA has no adequate remedy at law for the ongoing discrimination which has entirely impeded BCA's ability to operate its business as an award of monetary damages would not provide an adequate remedy.

203.    Moreover, pursuant to 42 U.S.C. § 1988(b), BCA is entitled to recover the attorney's fees and costs incurred to enjoin the unlawful discriminatory and retaliatory conduct.

## COUNT TWO

Violation of the Fifth Amendment Takings Clause
(*Against DOI* )

204.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

205.    BCA had a property right in its proprietary FAIR program which constitutes a trade secret.  As set forth herein, BCA spent years researching and developing the proprietary FAIR program, including, among other components: (i) a reduced, aligned fee structure comprised of approximately a 1% management fee on committed capital, with a 3% return hurdle to vest, a 10% share of profit, event "triggers" to protect the investor, and longer investment periods;  (ii) a list of targeted funds best suited for pension fund investment that had undergone due diligence by BCA; (iii) researched negotiation tactics to incentivize targeted funds to accept the reduced fee structure; and (iv) expense reduction techniques to preserve profitability despite the reduced fee structure.

206.    BCA carefully guarded the confidentiality of its proprietary FAIR program in order to provide BCA with a competitive advantage in the marketplace that derives from exclusive access to the data and being a "first-mover" and pioneer alternative investment firm, by among other things, withholding description of the program on its website, watermarking its documents, clearly marking them confidential and proprietary, and having employees, consultants, vendors, and third-parties associated with the program sign non-disclosure and confidentiality agreements.

207.    Moreover, prior to disclosing the details of its proprietary FAIR program to the DOI and its consultant, Cliffwater, for putative due diligence, BCA requested that the DOI execute a non-disclosure agreement to ensure the confidentiality of the materials BCA was providing.  The DOI through McDonough, however, informed BCA that no such agreement was necessary because DOI employees, and its consultants, were already statutorily bound to maintain all the information they received confidential.

208.    Through the actions detailed herein, the DOI deprived BCA of the economic benefit derived from the FAIR program by taking and misappropriating BCA's trade secrets, and using those trade secrets without BCA's permission for the benefit of the DOI and third parties, thereby depriving BCA of the competitive advantage arising from having exclusive access to its trade secret and being a first-mover and pioneering investment firm.

209.    BCA was not compensated for this unauthorized taking of its trade secrets by the DOI and is entitled to just compensation.

## COUNT THREE

Breach of Contract
(*Against the DOI*)

210.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

211.    BCA and the DOI entered into an investor agreement dated May 7, 2018, which is a valid and binding contract.

212.    BCA has performed its obligations under the investor agreement.

213.    As set forth herein, the DOI materially breached the investor agreement by, *inter alia,* impeding BCA's ability to make investments, delaying and/or denying approvals for investments, including declining to respond to investment opportunities presented by BCA and summarily rejecting others without any basis or on a pretextual basis.

214.    As a direct and proximate result of defendants' breach of the contract, BCA has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages, in an amount to be determined at trial.

## COUNT FOUR

Discrimination and Retaliation in Violation of Section 1981
(*Against McDonough, Amon, Ajmani, Helmy in their individual capacities*)

215.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

216.    As set forth herein, defendants McDonough, Amon, Ajmani, and Helmy have discriminated and retaliated against BCA in violation of Section 1981 by, *inter alia*, subjecting BCA to discriminatory terms and conditions in its contractual relationship with the DOI and

discriminating and retaliating against BCA in the performance of that contract,  including, among other things: (i) failing to maintain confidentiality of BCA's proprietary information and trade secrets and misappropriating and exploiting that information; (ii) denying BCA equal terms and conditions of contract; (iii) delaying and impeding approval of BCA's investment agreement with the DOI; (iv) impeding BCA's ability to make investments, delaying and/or denying approvals for investment, including declining to respond to investment opportunities presented by BCA and summarily rejecting other proposals without any basis or on a pretextual basis; (v) subjecting BCA to punitive information requests and audits; (v) denying BCA's requests to modify its fee arrangement; and (vii) repeatedly threatening that if BCA continue to try to enforce its contractual and civil rights the DOI would not approve any of BCA's investments and would redeem its investments.

217.    Defendants have, and continue to, engage in this unlawful conduct because BCA is a Black-owned company which the DOI and defendants have historically and systemically excluded, and in retaliatory animus to BCA's efforts to defend its civil and contractual rights.

218.    As a direct and but for cause of defendants unlawful and discriminatory conduct in violation of Section 1981, BCA has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

219.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which BCA is entitled to an award of punitive damages.

## COUNT FIVE

Violation of 42 U.S.C. § 1983
(*Against McDonough, Amon, Ajmani, and Helmy in their individual capacities*)

220.    BCA repeats and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

221.    Defendants McDonough, Amon, Ajmani, and Helmy are state actors who acted under the color of New Jersey law to deny BCA the opportunity to engage in business relationships with New Jersey free of unlawful discrimination in violation of Sections 1981 and 1983.

222.    As set forth herein, defendants McDonough, Amon, Ajmani, and Helmy have, and continue to, wrongfully and unlawfully discriminate and retaliate against BCA, in violation of 42 U.S.C. §§ 1981 and 1983 by, *inter alia*, (i) failing to maintain confidentiality of BCA's proprietary information and trade secrets and misappropriating and exploiting that information; (ii) denying BCA equal terms and conditions of contract; (iii) delaying and impeding approval of BCA's investment agreement with the DOI; (iv) impeding BCA's ability to make investments, delaying and/or denying approvals for investment, including declining to respond to investment opportunities presented by BCA and summarily rejecting other proposals without any basis or on a pretextual basis; (v) subjecting BCA to punitive information requests and audits; (vi) denying BCA's requests to modify its fee arrangement; (vii) repeatedly threatening that if BCA continue to try to enforce its contractual and civil rights the DOI would not approve any of BCA's investments and would redeem its investments; (viii) interfering with BCA's ability to operate its business; and (ix) and interfering with BCA's existing and prospective contractual business relationships.

223.    Defendants have, and continue to, engage in this unlawful conduct because BCA is a Black-owned company which the DOI and defendants have historically and systemically excluded, and in retaliatory animus to BCA's efforts to defend its civil and contractual rights.

224.    As a direct result of defendants' unlawful and discriminatory conduct in violation of Sections 1981 and 1983, BCA has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

225.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Sections 1981 and 1983, for which BCA is entitled to an award of punitive damages.

## COUNT SIX

Violation of 42 U.S.C. §1985
(*Against Cliffwater and BlackRock*)

226.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

227.    BCA, and its principals, are citizens of the United States.

228.    As set forth herein, defendants BlackRock and Cliffwater conspired with the DOI Defendants to deprive BCA of equal protection and equal privileges under the laws in violation of Sections 1981 and 1983.

229.    As set forth herein, BlackRock and Cliffwater conspired, and continue to conspire with the DOI Defendants to deprive BCA of equal terms of contract.  Specifically, Cliffwater aided and abetted the DOI in its punitive due diligence process designed to delay and impede the execution of BCA's mandate with the DOI.  Moreover, even following the execution of the BCA investment agreement in May 2018, Cliffwater continues to conspire with the DOI in its performance of that contract, including most recently in March 2020 subjecting BCA to punitive audits that serve no legitimate purpose than to discriminate and retaliate against a Black-owned investment firm.

230.     BlackRock likewise conspired and continues to conspire with the DOI Defendants in its Sections 1981 and 1983.  Among other things, BlackRock misappropriated, and to this day has continued to profit from, the FAIR program, despite its knowledge that the DOI had the investment model from another fund, had presented to BlackRock that they wished to pursue the misappropriated model with a different firm; the essential proprietary elements of that program; and the identity, background, and reasons the DOI did not want to proceed with BCA. BlackRock did not hesitate to leverage its DOI relationship to exploit for its own benefit the proprietary sweat equity of a newly founded African-American firm when the DOI offered it the opportunity to do so.  And most telling of all, while denying it ever intended to benefit from the racist abuse and unfair treatment of BCA when it agreed to manage this investment, it has taken no steps to remedy the wrong from which it has and continues to greatly benefit from to this day and divert opportunities away from BCA.

231.     BlackRock's and Cliffwater's actions, as well as those of the other defendants, were motivated by racial animus against BCA, an African-American and minority-owned firm.

232.     As a direct and but for cause of BlackRock's and Cliffwater's wrongdoing, BCA sustained and continues to sustain substantial damages, in an amount to be determined at trial, for which BlackRock is jointly and severally liable to BCA.

## COUNT SEVEN

Discrimination In Violation of the New Jersey Civil Rights Act
(*Against McDonough, Amon, Ajmani, and Helmy in their individual capacities*)

233.     BCA hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

234.     The New Jersey Constitution guarantees all of its citizens, including BCA, the right to be free from unlawful discrimination.

235.     As set forth herein, defendants denied BCA the opportunity to engage in business relationships with New Jersey free of unlawful discrimination.

236.     Specifically, defendants discriminated against BCA on the basis of the race of its founders in violation of the New Jersey Constitution by, *inter alia*, ) failing to maintain confidentiality of BCA's proprietary information and trade secrets and misappropriating and exploiting that information; (ii) denying BCA equal terms and conditions of contract; (iii) delaying and impeding approval of BCA's investment agreement with the DOI; (iv) impeding BCA's ability to make investments, delaying and/or denying approvals for investment, including declining to respond to investment opportunities presented by BCA and summarily rejecting other proposals without any basis or on a pretextual basis; (v) subjecting BCA to punitive information requests and audits; (vi) denying BCA's requests to modify its fee arrangement; (vii) repeatedly threatening that if BCA continue to try to enforce its contractual and civil rights the DOI would not approve any of BCA's investments and would redeem its investments; (viii) interfering with BCA's ability to operate its business; and (ix) and interfering with BCA's existing and prospective contractual business relationships.

237.     Defendants have, and continue to, engage in this unlawful conduct because BCA is a Black-owned company which the DOI and defendants have historically and systemically excluded.

238.     As a direct result of the defendants' unlawful and discriminatory conduct in violation of the New Jersey Civil Rights Act, BCA has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

239.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New Jersey Civil Rights Act, for which BCA is entitled to an award of punitive damages.

**COUNT EIGHT**

Retaliation in Violation of the New Jersey Civil Rights Act
(*Against McDonough, Amon, Ajmani, and Helmy in their individual capacities*)

240.    BCA hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

241.    The New Jersey Constitution guarantees all of its citizens, including BCA, the right to be free from unlawful discrimination

242.    By the actions detailed herein, in response to BCA's efforts to enforce its contractual and civil rights, defendants have retaliated against BCA based on its protected activities in violation of the New Jersey Civil Rights Act, by among other things, denying BCA the equal terms and conditions of contract, impeding BCA's ability to make investment decisions by delaying and denying investment approvals, denying BCA's requests to rectify the fee structure in its agreement, subjecting BCA to punitive audits and information requests, interfering with BCA's ability to operate its business, and interfering with BCA's relationship with existing and prospective counterparties.

243.    Defendants have, and continue to, engage in this unlawful conduct because BCA is a Black-owned company which the DOI and defendants have historically and systemically excluded and in retaliatory animus to BCA's efforts to defend its civil and contractual rights.

244.    As a direct result of defendants' unlawful and retaliatory conduct in violation of the New Jersey Civil Rights Act, BCA has suffered, and continues to suffer, monetary and/or economic harm, for which it is entitled to an award of damages.

245.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New Jersey Civil Rights Act, for which BCA is entitled to an award of punitive damages.

## COUNT NINE

### Racketeering Violation of 18 U.S.C. § 1962(c)
*(Against the DOI, McDonough, Rosenstock, Dini Ajmani, BlackRock and Walsh)*

246.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

247.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

248.    Each of defendants DOI, McDonough, Rosenstock, Ajmani, Walsh and BlackRock (hereinafter the "RICO Defendants"), at all relevant times, is and has been a "person" within the definition of 18 U.S.C. § 1961(3), because each defendant is an "individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

249.    The RICO Defendants comprise an association, associations and/or are associated-in-fact Enterprise (the "Enterprise").  The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an ongoing basis in furtherance of the scheme and efforts to conceal the scheme, each of which caused direct injury to BCA.  The Enterprise was operated, managed, and controlled by the DOI, McDonough, Rosenstock, Walsh, Ajmani, and BlackRock.

250.     The conduct, acts, and omissions of the RICO Defendants set forth above were an integral part of the overall pattern and practices described herein, including using the facilities of United States interstate commerce to reap vast profits from the scheme to defraud and misappropriate trade secrets and proprietary information, thereby causing enormous harm to BCA.

251.     Through the conduct and the acts and omissions set forth above, the RICO Defendants knowingly and intentionally:

(a)  used the mails in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1341, which is incorporated as "racketeering activity" under 18 U.S.C. § 1961(1), directly injuring BCA;

(b) used the wires in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343, which is incorporated as "racketeering activity" under 18 U.S.C. § 1961(1), directly injuring BCA; and

(c) misappropriation of trade secrets and proprietary information and trade theft in violation of 18 U.S.C. § 1832(a), which is incorporated as "racketeering activity" under 18 U.S.C. 1961(1), directly injuring BCA.

252.     The Enterprise engaged in at least two acts of racketeering and therefore constitute a pattern within the meaning of 18 U.S.C. 1961(5).  As set forth herein, this pattern consisted of the repeated, continuous acts that had the same or similar purpose, result, participants, victims or methods.

253.     It was the purpose of the Enterprise to enrich themselves and their preferred business partners through a scheme to defraud and induce minority-owned firms and individuals to share their trade secrets, ideas, and business relationships which the Enterprise then stole,

misappropriated, redirected, and implemented with preferred non-minority investment firms, through a central "old-boys" network of political patronage, bureaucratic "pay to play," and *quid pro quo* schemes.  The members of this "old-boys" network were overwhelmingly white, with predominately uniform backgrounds, and shared the mutual expectation and understanding that those they took care of, would later take care of them. This scheme provided substantial financial benefit to the members of the Enterprise and caused actual harm to BCA and other victims.

254.    The Enterprise Members have been implementing this scheme since at least 2010. Immediately after Walsh began working at the DOI, in or around 2010, he had BlackRock's black representative to the DOI replaced with Donald Perrault, with whom Walsh (and McDonough) had a close personal and business relationship, and who Walsh knew would be perceived by others in the DOI as "one of us."  Worse, Walsh, working with Perrault and others at BlackRock, misappropriated a $100 million evergreen deal between the state of New Jersey and BlackRock that was developed, facilitated, and negotiated by the former black BlackRock representative to the DOI and redirected to Perrault due to his status in the network.

255.    Similarly, in the summer of 2017, Powell Capital Markets ("Powell"), a Black-owned financial services company, was advising the incoming Governor Murphy administration on how to maximize the budget relief potential of a restructure of the State of New Jersey's tobacco bonds. Upon review of the state's debt situation, Powell developed an idea to refinance what remained of $3.6 billion of bonds issued in 2007 by the state's Tobacco Settlement Financing Corporation which was expected to immediately save the state an estimated $250 million.

256.    Nevertheless, the DOI, including defendants Adjmani and the director, defendant McDonough, misappropriated Powell's idea and proceeded to culminate the investment through

another financial institution.  Indeed, in state bond transactions, it is common practice for the

State to reward municipal firms that provide information and concepts in advance of other firms

with a significant position in the resulting transaction. During the advising period, Powell

requested to be included in the Designation Policy, the manner in which the State determines

who economically benefits from a bond sale, as a co-manager.

257.   Despite the New Jersey Small Business Enterprise ("NJSBE") policy which was

established with the goal of awarding 25% of state contracting and purchase order dollars to

small businesses, the common financial practice of municipal finance, and Powell's

contributions, the DOI ignored these facts and excluded Powell from the transaction on the basis

of his race.  Further, in response to inquiries from Powell's representative, Mr. Erick Torain, who

spearheaded the proprietary idea for the tobacco deal, the DOI denied that the idea came from

Powell or Mr. Torain.

258.   Pursuant to and in furtherance of this scheme, the RICO Defendants committed

multiple related acts of mail fraud, wire fraud, and trade secret theft, by engaging in the

following acts between 2015-present:

(a) using the mails and wires between to fraudulently induce BCA and Powell Capital
    Markets, among others, to share trade secrets and propriety information and ideas;

(b) using the mails and wires to perpetuate sham negotiations for the purpose of
    obtaining their targets proprietary ideas and trade secrets;

(c) misappropriation and theft of BCA's and Powell Capital Markets' trade secrets
    and proprietary ideas;

(d) using the mails and wires to disseminate the misappropriated trade secrets and
    proprietary information to its preferred non-minority business partners;

(e) using the mails and wires to compensate its preferred non-minority partners for fees earned through the misappropriated programs, trade secrets, ideas, and information;

(f) using the mails and wires to misappropriate the evergreen deal from a minority member of BlackRock's team that facilitated the deal and the relationship in favor of Donald Perrault who was part of the "old-boys" network of political patronage, and bureaucratic "pay to play," *quid pro quo* schemes; and

(g) use of the mails and wires to publicly disclose information concerning the misappropriated programs, trade secrets, ideas, and information;

259.   Beginning no later than 2010, in furtherance of and for the purpose of executing and attempting to execute the described scheme and artifices to defraud, each of the RICO Defendants, on numerous occasions, used and caused to be used mail and wire communications in interstate and foreign commerce and the U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, *inter alia*, for the purposes of: (i) communicating with one another in furtherance of the scheme to defraud and misappropriate, steal, and exploit BCA's and other minority-owned companies' trade secrets and proprietary ideas; (ii) communicating with the Enterprise's target companies in furtherance of the scheme to defraud, including the transmission of trade secrets; (iii)  disseminating those ideas to their preferred non-minority companies; and (iv) wiring monies to compensate its preferred non-minority companies for carrying out its scheme.  Such actions constitute fraudulent wire and mail communications in violation of 18 U.S.C. § 1961(1), 18 U.S.C. § 1341, and 18 U.S.C. § 1343, and caused direct injury to BCA's business.

260.     Moreover, in 2016, in furtherance of and for the purpose of executing and attempting to execute the described scheme, each of the RICO Defendants, on numerous occasions and without the authorization of BCA, misappropriated BCA's and other minority-owned companies' trade secrets and propriety ideas, and transmitted those ideas to its preferred non-minority companies in furtherance of its scheme and for use in interstate commerce to their own economic benefit. Such actions constitute trade secret theft in violation of 18 U.S.C. § 1961(1) and 18 U.S.C. § 1832(a), and caused direct injury to BCA's business.  BCA first learned of the misappropriation of its trade secrets in July 2016 when the DOI issued a public statement disclosing that it would be proceeding with the misappropriated FAIR program with BlackRock and the specific details of that program which were identical to BCA's proprietary program.

261.     The repeated violations by the RICO Defendants set forth herein extended over a period of years and involved distinct and independent criminal acts. These acts were related to each other by virtue of (a) common participants; (b) common types of victims; and (c) the common purpose and common result from the concerted theft of trade secrets and proprietary ideas and opportunities from minority companies and the illegal misappropriation and exploitation of those ideas and those opportunities with non-minority-owned firms for the benefit of the Enterprise and their preferred business partners.

262.     Each of the RICO Defendants were active participants in the Enterprise and all of them knowingly and intentionally violated or aided violations of 18 U.S.C. § 1962(c), by directly or indirectly conducting or participating in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

263.     The RICO Defendants' motive in directing and operating the Enterprise was to fraudulently enrich themselves and their preferred non-minority business partners.

264.     As a direct and proximate consequence of the RICO Defendants' conduct alleged herein, BCA has been injured in its business and property, causing damages in an amount to be determined at trial.

265.     Because of Defendants' violations of 18 U.S.C. § 1962(c), defendants DOI, McDonough, Rosenstock, Walsh, Ajmani, and BlackRock are jointly and severally  liable to BCA for treble damages in the amount of three times the damages sustained by BCA, in addition to the cost of this lawsuit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964.

### COUNT TEN

Racketeering in Violation of 18 U.S.C. § 1962(d)
(*Against the DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock*)

266.     BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

267.     18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

268.     Beginning no later than 2010, the RICO Defendants and all members of the Enterprise agreed to facilitate the scheme described herein to manage, operate, conduct, and participate in the conduct of the affairs of the Enterprise and conspired to do the same within the meaning of  18 U.S.C. § 1962(d).

269.     Each of the RICO Defendants being persons intimately involved in transactions carried on by and the affairs of the Enterprise—which was engaged in, and the activities of which affected, trade and commerce—unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).

270.    Part of the conspiracy was that each of the RICO Defendants personally committed or agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the Enterprise through the pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) described above.

271.    In furtherance of the conspiracy and to effect the objects thereof, the RICO defendants committed and caused to be committed a series of overt acts, including:

(a)    using the mails and wires to fraudulently induce BCA, Powell Capital Markets, and other targets to share trade secrets and proprietary information and ideas;

(b) engaging BCA in an effort to obtain BCA's confidential and proprietary trade secret, the FAIR plan;

(c)    using the mails and wires to perpetuate sham negotiations for the purpose of obtaining their targets' proprietary ideas and trade secrets; communicating with BCA in an effort to perpetuate illegitimate negotiations for the purpose of obtaining BCA's ideas and trade secrets;

(d)    misappropriation and theft of BCA's and Powell Capital Markets', and other target's trade secrets and proprietary ideas; disseminating the FAIR plan misappropriated from BCA to its preferred non-minority companies;

(e)    using the mails and wires to disseminate the misappropriated trade secrets and proprietary information to its preferred non-minority business partners; charging its preferred non-minority companies for receipt and operation of the FAIR Plan;

(f)    using the mails and wires to compensate its preferred non-minority partners for fees earned through the misappropriated programs, trade secrets, ideas, and information; and using the media to misrepresent its misappropriation and use of the FAIR plan;

(f)     use of the mails and wires to publicly disclose information concerning the

misappropriated programs, trade secrets, ideas, and information;

272.    As a direct and proximate consequence of the RICO Defendants' conduct alleged

herein, BCA has been injured in its business and property, causing BCA to suffer damages in an

amount to be proven at trial.

273.    Because of the RICO Defendants' violations of 18 U.S.C. § 1962(d), the RICO

Defendants are jointly and severally liable to BCA for treble damages in the amount of three

times the damages sustained by BCA, in addition to the cost of this lawsuit, including reasonable

attorneys' fees, pursuant to 18 U.S.C. § 1964.

## COUNT ELEVEN

Racketeering in Violation of N.J.S.A. 2C:41-2(c)
(*Against the DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock*)

274.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of

the preceding paragraphs, as though fully set forth herein.

275.    N.J.S.A. 2C:41-2(c) makes it unlawful "for any person employed by or associated

with any enterprise engaged in or activities of which affect trade or commerce to conduct or

participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt." N.J.S.A. 2C:41-2(c)

276.    Each of the defendants DOI, McDonough, Rosenstock, Ajmani, Walsh, and

BlackRock (hereinafter the "RICO Defendants"), at all relevant times, is and has been a "person"

within the definition of N.J.S.A. 2C:41-2(c) because each defendant is an individual or entity

"holding or capable of holding a legal or beneficial interest in property." N.J.S.A. 2C:41-1(b).

277.    The RICO Defendants comprise an association, associations, and/or are an

associated-in-fact Enterprise (the "Enterprise"). The Enterprise has an existence beyond that

which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme and efforts to conceal the scheme, each of which caused direct injury to BCA. The Enterprise was operated, managed, and controlled by the DOI, McDonough, Rosenstock, Dini Ajmani, Walsh and BlackRock.

278.    The conduct, acts, and omissions of the RICO Defendants set forth above were an integral part of the overall pattern and practices described herein, including using the facilities of United States interstate commerce to reap vast profits from their scheme to defraud and misappropriate trade secrets and proprietary information, thereby causing enormous harm to BCA.

279.    Through the conduct and the acts and omissions set forth above, the RICO Defendants knowingly and intentionally:

    (a) used the mails in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1341, which is incorporated as "racketeering activity" under the New Jersey RICO statute pursuant to N.J.S.A. 2C:41-1(a)(2), directly injuring BCA;

    (b) used the wires in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343, which is incorporated as "racketeering activity" under New Jersey RICO statute pursuant to N.J.S.A. 2C:41-1(a)(2), directly injuring BCA; and

    (c) misappropriation of trade secrets and proprietary information and trade theft in violation of 18 U.S.C. § 1832(a), which is incorporated as "racketeering activity"

under New Jersey RICO statute pursuant to N.J.S.A. 2C:41-1(a)(2), directly injuring BCA.

280.    The Enterprise engaged in at least two acts of racketeering and therefore constitute a pattern within the meaning of N.J.S.A. 2C:41-1(d). As set forth herein, this pattern consisted of the repeated, continuous acts that had the same or similar purpose, result, participants, victims or methods.

281.    It was the purpose of the Enterprise to enrich themselves and their preferred business partners through a scheme to defraud and induce minority-owned firms and individuals to share their trade secrets, ideas, and business relationships which the Enterprise then stole, misappropriated, redirected, and implemented with preferred non-minority investment firms, through a central "old-boys" network of political patronage, bureaucratic "pay to play," and *quid pro quo* schemes.  The members of this "old-boys" network were overwhelmingly white, with predominately uniform backgrounds, and shared the mutual expectation and understanding that those they took care of, would later take care of them. This scheme provided substantial financial benefit to the members of the Enterprise and caused actual harm to BCA.

282.    The Enterprise Members have been implementing this scheme since at least 2010. Immediately after Walsh began working at the DOI, in or around 2010, he had BlackRock's black representative to the DOI replaced with Donald Perrault, with whom Walsh (and McDonough) had a close personal and business relationship, and who Walsh knew would be perceived by others in the DOI as "one of us."  Worse, Walsh, working with Perrault and others at BlackRock, misappropriated a $100 million evergreen deal between the state of New Jersey and BlackRock that was developed, facilitated, and negotiated by the former black BlackRock representative to the DOI and redirected to Perrault due to his status in the network.

283.     Similarly, in the summer of 2017, Powell Capital Markets ("Powell"), a Black-owned financial services company, was advising the incoming Governor Murphy administration on how to maximize the budget relief potential of a restructure of the State of New Jersey's tobacco bonds. Upon review of the state's debt situation, Powell developed an idea to refinance what remained of $3.6 billion of bonds issued in 2007 by the state's Tobacco Settlement Financing Corporation which was expected to immediately save the state an estimated $250 million.

284.     Nevertheless, the DOI, including defendants Adjmani and the director, defendant McDonough, misappropriated Powell's idea and proceeded to culminate the investment through another financial institution.  Indeed, in state bond transactions, it is common practice for the State to reward municipal firms that provide information and concepts in advance of other firms with a significant position in the resulting transaction. During the advising period, Powell requested to be included in the Designation Policy, the manner in which the State determines who economically benefits from a bond sale, as a co-manager.

285.     Despite the New Jersey Small Business Enterprise ("NJSBE") policy which was established with the goal of awarding 25% of state contracting and purchase order dollars to small businesses, the common financial practice of municipal finance, and Powell's contributions, the DOI ignored these facts and excluded Powell from the transaction on the basis of his race.  Further, in response to inquiries from Powell's representative, Mr. Erick Torain, who spearheaded the proprietary idea for the tobacco deal, the DOI denied that the idea came from Powell or Mr. Torain.

286.     This scheme to defraud provided substantial financial benefit to the members of the Enterprise and caused actual harm to BCA.  Pursuant to and in furtherance of this scheme,

the RICO Defendants committed multiple related acts of mail fraud, wire fraud, and trade secret theft, by engaging in the following:

    (a) using the mails and wires to fraudulently induce BCA, Powell Capital Markets, and other targets, to share trade secrets and propriety information and ideas;

    (b) using the mails and wires to perpetuate sham negotiations for the purpose of obtaining their targets proprietary ideas and trade secrets;

    (c) misappropriation and theft of BCA's and Powell Capital Markets trade secrets and proprietary ideas;

    (d) using the mails and wires to disseminate the misappropriated trade secrets and proprietary information to its preferred non-minority business partners;

    (e) using the mails and wires to compensate its preferred non-minority partners for fees earned through the misappropriated programs, trade secrets, ideas, and information;

    (f) using the mails and wires to misappropriate the evergreen deal from a minority member of BlackRock's team that facilitated the deal and the relationship in favor of Donald Perrault who was part of the "old-boys" network of political patronage, and bureaucratic "pay to play," *quid pro quo* schemes; and

    (g) use of the mails and wires to publicly disclose information concerning the misappropriated programs, trade secrets, ideas, and information.

287.    Beginning no later than 2010, in furtherance of and for the purpose of executing and attempting to execute the described scheme and artifices to defraud, each of the RICO Defendants, on numerous occasions, used and caused to be used mail and wire communications in interstate and foreign commerce and the U.S. mails, by both making and causing to be made

wire communications and mailings.  These wire communications and mailings were made, *inter alia*, for the purposes of: (i) communicating with one another in furtherance of the scheme to defraud and misappropriate, steal, and exploit BCA's and other minority-owned companies' trade secrets and proprietary ideas; (ii) communicating with the Enterprise's target companies in furtherance of the scheme to defraud, including the transmission of trade secrets; (iii)  disseminating those ideas to their preferred non-minority companies; and (iv) wiring monies to compensate its preferred non-minority companies for carrying out its scheme.  Such actions constitute fraudulent wire and mail communications in violation of N.J.S.A. 2C:41-1(a)(2), and caused direct injury to BCA's business.

288.    Moreover, in 2016,  and in furtherance of and for the purpose of executing and attempting to execute the described scheme, each of the RICO Defendants, on numerous occasions and without the authorization of BCA, misappropriated BCA's and other minority-owned companies' ideas, and transmitted those ideas to its preferred non-minority-owned companies in furtherance of its scheme and for use in interstate commerce to their own economic benefit. Such actions constitute trade secret theft in violation of N.J.S.A. 2C:41-1(a)(2) and N.J.S.A. 56:15-2 and caused direct injury to BCA's business. BCA first learned of the misappropriation of its trade secrets in July 2016 when the DOI issued a public statement disclosing that it would be proceeding with the misappropriated FAIR program with BlackRock.

289.    The repeated violations by the RICO Defendants set forth herein extended over a period of years and involved distinct and independent criminal acts. These acts were related to each other by virtue of (a) common participants; (b) common types of victims; and (c) the common purpose and common result of concerted theft of trade secrets, proprietary ideas and opportunities from minority companies and the illegal misappropriation and exploitation of those

ideas and those opportunities with non-minority-owned firms for the benefit of the Enterprise and their preferred business partners.

290.    Each of the RICO Defendants were active participants in the Enterprise and all of them knowingly and intentionally violated or aided violations N.J.S.A. 2C:41-2(c),  by directly or indirectly conducting or participating in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

291.    The RICO Defendants' motive in creating and operating the Enterprise was to fraudulently enrich themselves and their preferred non-minority-owned business partners.

292.    As a direct and proximate consequence of the conduct of the RICO Defendants' conduct alleged herein, BCA has been injured in its business and property, causing damages in an amount to be proven at trial.

293.    As a result of defendants' violations of N.J.S.A. 2C:41-2(c), defendants are jointly and severally liable to BCA for treble damages in the amount of three times the damages sustained by BCA, in addition to the cost of this lawsuit, including reasonable attorneys' fees, pursuant to N.J.S.A. 2C:41-4(c).

## COUNT TWELVE

Racketeering in Violation of N.J.S.A. 2C:41-2(d)
(*Against the DOI, McDonough, Rosenstock, Ajmani, Walsh and BlackRock*)

294.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

295.    Beginning no later than May 2010, the RICO Defendants and all members of the Enterprise agreed to facilitate the scheme described herein to manage, operate, conduct, and participate in the conduct of the affairs of the Enterprise and conspired to do the same within the

meaning of N.J. STAT. ANN. 2C:5-2 through a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-2(D).

296.     Each of the RICO Defendants and Enterprise Members being person intimately involved in the transactions carried on by and the affairs of the Enterprise – which was engaged in, and the activities of which affected, trade and commerce – unlawfully and willfully conspired, confederated, and agreed with each other to violate N.J. STAT. ANN. 2C:41-2(C), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, all in violation of N.J. STAT. ANN. 2C:41-2(d).

297.     Part of the conspiracy was that each defendant personally committed or agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the Enterprise through the pattern of racketeering in violation of N.J. STAT. ANN. 2C:41-2(c) described above.

298.     These violations of N.J. STAT. ANN. 2C:41-2(c) caused BCA to suffer direct injury to its business and property, caused by the Enterprise's wrongful actions described herein. BCA, therefore, is entitled to recover from defendants the amount in which they have been damaged, to be trebled in accordance with N.J. STAT. ANN. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## COUNT THIRTEEN

Aiding And Abetting Racketeering In Violation of N.J.S.A. 2C:41-2(c) and (d)
(*Against Cliffwater and Owl Rock*)

299.     BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

300.     Defendants Cliffwater and Owl Rock aided and abetted the Enterprise in executing its fraudulent scheme and racketeering acts in violation of N.J. STAT. ANN. 2C:41-2(c) and (d) alleged herein, including pursuing a common plan and design, and actively participated in, aided and encouraging the other Enterprise members in executing a pattern of racketeering activity as defined in N.J. STAT. ANN. 2C:41-1 and in violating numerous provisions of the New Jersey RICO Act as alleged herein including, among other acts:

(a) defendant Cliffwater made a series of material misrepresentations and omissions in connection with the scheme to the defraud, including misrepresentations and omissions concerning the DOI's intention to partner with BCA on its proprietary FAIR program to induce BCA to disclose its trade secrets to the DOI and Cliffwater under the guise of "due diligence," and misrepresentations and omissions concerning maintaining the confidentiality of the trade secrets BCA shared with the DOI;

(b) Moreover, even following the execution of the BCA investment agreement in May 2018, Cliffwater continues to conspire with the DOI in its performance of that contract, including most recently in March 2020 subjecting BCA to punitive audits that serve no legitimate purpose than to discriminate and retaliate against a Black-owned investment firm.

(c) defendant Owl Rock directed and supported Walsh's misappropriation of BCA's proprietary FAIR program for BlackRock, the DOI, and Cliffwater, in exchange for a $600 million commitment anchor investment from the DOI (the largest investment in a startup fund by the DOI and approved in record time) and additional investments by BlackRock and Cliffwater.

301.    Defendants Cliffwater and Owl Rock willingly, and substantially participated in the Enterprise's fraudulent scheme with knowledge of the numerous violations of the New Jersey RICO Act and the underlying pattern of racketeering activity perpetrated by the Enterprise.

302.    Defendants Cliffwater and Owl Rock aided and abetted the RICO violations for personal gain and in furtherance of their own financial advantage. By misappropriating and exploiting BCA's trade secret, proprietary ideas and research as their own, defendants reaped the fees and investment returns BCA would have received as a partner in the FAIR program.

303.    BCA was injured as a direct and proximate result of defendant's aiding and abetting the Enterprise's violations of the New Jersey RICO Act alleged herein, in an amount to be proven at trial.

304.    Accordingly, defendants Cliffwater and Owl Rock are jointly and severally liable for the damages sustained as a result the RICO violations.

## COUNT FOURTEEN

Fraud
(*Against McDonough, MacDonald, Rosenstock, Amon, Cliffwater, and Walsh*)

305.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

306.    As set forth herein, defendants McDonough, MacDonald, and Rosenstock acting in their individual capacities, and defendants Cliffwater and Walsh made a series of materially false representations and omissions concerning the DOI's intention to do the FAIR program with BCA and their commitments to keep information about the proprietary model confidential, each of which was designed to induce BCA to disclose its trade secret and proprietary ideas and research.

307.    Defendants McDonough, Rosenstock and Amon, acting in their individual capacities, also made a series of material misrepresentations and omissions concerning the DOI's intentions to negotiate its investment agreement with BCA in good faith and to perform under that agreement, including by not withholding  investment approval without reasonable basis.

308.    Defendants made those misleading statements and omissions knowing they were false and with the intent that BCA would rely on them in disclosing their trade secret and proprietary research to the DOI and Cliffwater and in foregoing other investment relationships with other potential anchor investors.

309.    BCA reasonably relied upon the representations and omissions made by the defendants.

310.    As a result of defendants' fraud and deceit, BCA has sustained and will continue to sustain substantial damages, including but not limited to those damages sustained from the exploitation of its proprietary model and the fact that it no long has exclusive access to the data and status as a first-mover and pioneer alternative investment firm.

311.    By reason of the foregoing, defendants McDonough, MacDonald, Rosenstock, Amon, and Cliffwater, are jointly and severally liable to BCA in a sum to be determined at trial.

### COUNT FIFTEEN

Aiding and Abetting Fraud
(*Against BlackRock and Owl Rock*)

312.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

313.    As set forth in Count Fourteen, defendants McDonough, MacDonald, Rosenstock, Amon, Cliffwater, and Walsh made a series of material misrepresentations and omissions to induce BCA to disclose its trade secret and proprietary FAIR program which the DOI then

misappropriated and exploited for its own personal gain to the exclusion of BCA, and to forego investment opportunities with other anchor partners.

314. Defendant BlackRock knew or reasonably should have known that the FAIR program that it contracted to perform for the DOI in July 2016 was misappropriated from BCA because, among other reasons, the DOI provided BlackRock with BCA's proprietary presentations and materials.

315. As set forth herein, defendant BlackRock assisted defendants McDonough, MacDonald, Rosenstock and Cliffwater by, among other things, misappropriating BCA's trade secrets and confidential information and exploiting BCA's proprietary FAIR program as its own and contracting with the DOI to implement that program.

316. Defendant Owl Rock likewise aided and abetted defendants' fraud through its direction and support  of Walsh's misappropriation of BCA's proprietary FAIR program for BlackRock, the DOI, and Cliffwater, in exchange for a $600 million anchor investment from the DOI (the largest investment in a startup fund by the DOI and approved in record time) and additional investments by BlackRock and Cliffwater.

317. As a result of BlackRock's and Owl Rock's aiding and abetting of defendants McDonough, MacDonald, Rosenstock and Cliffwater's fraud and deceit, BCA has sustained and will continue to sustain substantial damages, in an amount to be proven at trial.  BlackRock is jointly and severally liable to BCA for such damages.

318. In addition, because BlackRock's actions were committed knowingly, willfully, and in conscious disregard of the rights of BCA, BCA is entitled to recover punitive damages in an amount to be determined at trial.

**COUNT SIXTEEN**

Unfair Competition
(*Against BlackRock, Cliffwater, and Owl Rock*)

319.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of

the preceding paragraphs, as though fully set forth herein.

320.    BCA created the proprietary FAIR program in which it had a protectable interest.

321.    Defendants the DOI, Cliffwater, and Walsh (at the direction and control of Owl

Rock) misappropriated information the FAIR program by providing confidential, proprietary

information related to the FAIR program to BlackRock.

322.    The DOI, Cliffwater, and Owl Rock through its agent Walsh who was acting at

Owl Rock's direction and control, induced BCA to share this information based on its false

promises that the DOI intended to pursue the program with BCA and that the DOI, and

Cliffwater, would maintain the confidentiality of any information shared by BCA.

323.    Instead, the DOI, Cliffwater, and Walsh improperly shared BCA's confidential

and proprietary information concerning the FAIR program with BlackRock, without

compensating BCA.  BlackRock and Cliffwater then used BCA's confidential and proprietary

information to realize millions of dollars of profits and cost savings, and as a result were

enriched at BCA's expense.  Walsh and Owl Rock traded on this information and the deal Walsh

facilitated between BlackRock and the DOI to negotiate an unprecedented $600 million anchor

investment from the DOI.

324.    Defendant BlackRock appropriated the FAIR program despite knowing that the

DOI had the investment model from another fund, had presented to BlackRock that they wished

to pursue the misappropriated model with a different firm; the essential proprietary elements of

that program; and the identity, background, and reasons the DOI did not want to proceed with BCA.

325.    As a result of the misappropriation of BCA's FAIR program, defendants Cliffwater, BlackRock, and Owl Rock, have unjustly profited and continue to profit from the use of BCA's trade secrets, and should be required to remit profits they gained.

### COUNT SEVENTEEN

Breach of Contract
(*Against Cliffwater*)

326.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

327.    Defendant Cliffwater contracted with the DOI to serve as an external consultant and assist with the due diligence review of BCA's FAIR program and potential partnerships between BCA and the DOI.  BCA was a third-party beneficiary of the contractual agreement between the DOI and Cliffwater, which required, among other things, that Cliffwater maintain the confidentiality of the information provided by BCA to the DOI.

328.    BCA provided proprietary information related to its FAIR program to the DOI and Cliffwater as part of confidential negotiations and due diligence for BCA to provide and implement the FAIR program for the DOI's benefit.

329.    Cliffwater breached its contractual duties to the DOI by disclosing confidential, proprietary information related to the FAIR program to BlackRock.

330.    As a direct and proximate result of Cliffwater's breach of its contractual obligations to the DOI to which BCA was an intended third party beneficiary, BCA has suffered, and continues to suffer, economic harm for which it is entitled to an award of damages, in an amount to be determined at trial.

**COUNT EIGHTEEN**

Breach of Contract
(*Against Walsh*)

331.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

332.    Defendant Walsh contracted with BCA to serve as a member of BCA's advisory board.  Walsh owed BCA a duty of confidentiality associated with his agreement to serve as a member of the advisory board.

333.    At all times, BCA performed its own obligations pursuant to its agreement with Walsh.

334.    BCA provided proprietary information related to its FAIR program to Walsh as part of his duties as member of its advisory board.

335.    Walsh breached his duties to BCA by, among other things, disclosing proprietary confidential information related to the FAIR program to BlackRock.

336.    As a direct and proximate result of Walsh's breach of his contractual obligations to BCA pursuant to his advisory board agreement, BCA has suffered, and continues to suffer, economic harm for which it is entitled to an award of damages, in an amount to be determined at trial.

**COUNT NINETEEN**

Breach of Fiduciary Duty
(*Against Walsh*)

337.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

338.    As an advisor to BCA, defendant Walsh was a fiduciary and owed duties of care and loyalty to BCA

339.    As set forth herein, Walsh breached his fiduciary duties to BCA by subordinating BCA's interests to those of his own by, *inter alia*,  (i) concealing from and misrepresenting to BCA, that the DOI would work with BCA only as long as necessary to divert the FAIR program and business plan to an established old-boy Wall Street firm; (ii) misappropriating BCA's confidential information and sharing it with BlackRock; and (iii) aiding and abetting the DOI and Cliffwater in their search for a replacement fund.

340.    As a result of the foregoing breaches of Walsh's fiduciary duties, BCA has sustained and will continue to sustain substantial damages, in an amount to be proven at trial.

341.    In addition, by reason of the fact that Walsh's fiduciary transgressions were intentional, deliberate, made in bad faith and in wanton disregard of its duties, BCA is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

### COUNT TWENTY

Tortious Interference with Prospective Economic Advantage
(*Against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Greene and Platkin in their individual capacities*)

342.    BCA hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

343.    BCA had business relationships and prospective business relationships with many third-parties, including, but not limited to (i) actual and potential business investors such as Chicago Police, Bank of New York, Connecticut Trust Funds, the State of Maryland, the State of New York, and Walsh; (ii) actual and potential managers; (iii) actual and potential business partners, including back office administrators; and (iv) actual and potential employees.

344.     Each of the defendants knew of BCA's actual and potential contractual and business relationships with these third-parties because, among other reasons, BCA disclosed this information to each defendant.

345.     Defendants intentionally and maliciously interfered with plaintiffs' relationships with these third parties by, among other things, (i) falsely representing that they would serve as BCA's anchor investor and then failing to honor this commitment; (ii) communicating to market participants that BCA's mandate with the DOI would never close; (iii) delaying or denying investment approvals without any reasonable basis; (iv) disparaging BCA, including claiming that BCA had not been successful because it "could not handle the business of the DOI and that the firm didn't have the resources to manage the current relationship"; and (v)  attempted to convince other BCA investors to redeem their funds, including Chicago Police, so that the DOI could do the same.

346.     BCA had a reasonable expectation that each of the aforementioned business relationships would result in BCA obtaining the benefit of these business opportunities. However, defendants' wrongful actions directly caused BCA to lose or alter the business relationships described herein, to BCA's economic detriment.  Each of the defendants was aware of, and intended to cause, this detrimental impact on BCA's prospective relations.

347.     As a direct and proximate cause of defendants' intentional interference with BCA's actual and prospective relationships with third parties, BCA's business was damaged, and BCA sustained monetary damages in an amount to be determined at trial.

348.     In addition, by reason of the fact that defendants' interference was intentional, deliberate, made in bad faith and in wanton disregard of its duties, BCA is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

## COUNT TWENTY-ONE

Commercial Disparagement
(*Against Rosenstock, Green, Platkin, and Cliffwater*)

349.    BCA hereby repeats and re-alleges each and every allegation in each of the

preceding paragraphs, as though fully set forth herein.

350.    As set forth herein, defendants knowingly and intentionally published false and

injurious statements about BCA's business and property, including statements about BCA's

ability to operate their business including, among others:

- In or around March 2019, Platkin misrepresented that BCA's allegations concerning
  the misappropriation of its proprietary FAIR program and the discriminatory and
  retaliatory treatment it received were untrue and had been found baseless after a
  formal investigation, when in fact no formal investigation had been conducted and
  Platkin was merely implying that there were other bases for the DOI's refusal to do
  business with BCA.

- Greene misrepresented that BCA had not been successful because it "could not
  handle the business of the DOI and that the firm didn't have the resources to manage
  the current relationship."

- Greene misrepresented in text blasts that Walthour had been removed as Chair of the
  Ebony Media Holdings for insider trading;

- Rosenstock communicated to BCA's potential investors that BCA's New Jersey
  mandate would never be approved; and

- Daniel Stern of Cliffwater misrepresented to BCA's prospective investors and others
  that "BCA should not be taken seriously" and had ongoing problems with New Jersey
  that indicated it was a bad actor.

351.    Defendants communicated these falsehoods to third parties and understood and

intended that these false statements would have the effect of preventing others from doing

business with BCA and interfering with BCA's business relationships.

352.     Defendants false statements directly harmed BCA's business in numerous specific ways including without limitation, lost business opportunities, increased costs of capital and operations, and reduced enterprise value.

353.     Defendants' wrongful disparagement of BCA has caused BCA to suffer resulting monetary damages in an amount to be determined at trial.

354.     In addition, by reason of the fact that defendants' interference was intentional, deliberate, made in bad faith and in wanton disregard of its duties, BCA is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

355.     Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

356.     Because defendants have engaged in conduct of a fraudulent and malicious nature, BCA is entitled to reputational and punitive damages.

## COUNT TWENTY-TWO

Civil Conspiracy
*(Against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Cliffwater, Walsh, and Owl Rock)*

357.     BCA hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

358.     As set forth herein, defendants, together with the others, conspired with respect to Counts 14, 15, 16, 19, 20, and 21, to deprive BCA of its constitutional rights and to commit unlawful acts.

359.     Defendants' acts and declarations were taken in the furtherance of the conspiracy to deprive the BCAs of their constitutional rights.

360.     Each of the individual defendants is liable for every act and declaration of each and all of the conspirators, done or made in the pursuance of the conspiracy.

361.     As a result of the aforementioned acts, BCA sustained special damages resulting from defendants' conspiratorial conduct.

362.     As a direct and proximate result of the operation and execution of the conspiracy, BCA sustained and continues to sustain substantial damages, in an amount to be determined at trial, for which the defendants are jointly and severally liable to BCA.

363.     In addition, because defendants' actions were committed knowingly, willfully, and in conscious disregard of the rights of BCA, BCA is entitled to recover punitive damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, BCA prays that the Court enter judgment in its favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of defendants complained of herein violate the laws of the United States and the State of New Jersey;

B.     Injunctive relief to the extent necessary to reverse the defendants' unlawful actions and the harm associated with them, including, but not limited to, a return of all of BCA's confidential information, formal credit to be afforded to BCA with regard to BlackRock's FAIR program with DOI, and adjustment of the discriminatory and retaliatory terms of BCA's contracts with the DOI and enjoinment of the discriminatory and retaliatory conduct against BCAs in the performance of that agreement;

C.     An award of damages against defendants in an amount to be determined at trial, to compensate BCA for all monetary and/or economic damages;

D.      An award of damages against defendants in an amount to be determined at trial, plus prejudgment interest, to compensate BCA for all non-monetary and/or compensatory damages;

E.      An award of punitive and/or liquidated damages;

F.      An award or treble damages pursuant to 18 U.S.C. §1964 and N.J.S.A. 2C:41-4(c) in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that BCA incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  November 23, 2020
New York, New York

Respectfully submitted,

**BROWN RUDNICK LLP**

By: *Lauren Tabaksblat*

Lauren Tabaksblat
(Bar No. 03732208)
Michael J. Bowe
(admitted *pro hac vice*)

7 Times Square
New York, New York 10036
Telephone: 212.209-4800
Facsimile:  212 209-4801
mbowe@brownrudnick.com
ltabaksblat@brownrudnick.com

Rebecca M. Lecaroz (*pro hac vice*
forthcoming)
One Financial Center
Boston, Massachusetts 02111
rlecaroz@brownrudnick.com

Jay Alan Sekulow (admitted *pro hac vice*)
Stuart J. Roth (admitted *pro hac vice*)
Jordan A. Sekulow
(*pro hac vice* forthcoming)
Benjamin P. Sisney
(*pro hac vice* forthcoming)
Constitutional Litigation and Advocacy
Group, P.C.
1701 Pennsylvania Ave, NW,
Suite 200
Washington, DC  20006
(202)248-5407
jsekulow@claglaw.com
sroth@claglaw.com

Counsel for *Plaintiff*