## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLUEPRINT CAPITAL ADVISORS, LLC, | : |
| | : |
| Plaintiff, | : **Civil Action No. 2:20-cv-07663 (JXN) (ESK)** |
| | : |
| v. | : |
| | : |
| PHILIP MURPHY, in his official capacity as Governor of the State of New Jersey, STATE OF NEW JERSEY DIVISION OF INVESTMENT, BLACKROCK, INC., BLACKROCK ALTERNATIVE ADVISORS, CLIFFWATER, LLC, TIMOTHY WALSH, OWL ROCK CAPITAL CORPORATION, SAMANTHA ROSENSTOCK, JASON MACDONALD, CHRISTOPHER MCDONOUGH, COREY AMON, DINI AJMANI, DERRICK GREENE, GEORGE HELMY, and MATTHEW PLATKIN, in their individual and professional capacities, | : **OPINION** |
| | : |
| Defendants. | : |

**NEALS**, District Judge:

**THIS MATTER** comes before the Court on the following: Plaintiff Blueprint Capital

Advisors, LLC's ("Plaintiff" or "BCA") Appeals of the Magistrate Judge decision (ECF Nos. 115,

170); Defendant Timothy Walsh's Motion to Dismiss or to Compel Arbitration; (ECF No. 123);

Defendants BlackRock, Inc.'s and BlackRock Alternative Advisors' Motion to Dismiss the

Amended Complaint ("BlackRock Defendants") (ECF No. 125); Defendant Cliffwater, LLC's

Motion to Dismiss the Amended Complaint (ECF No. 126); the Motion to Dismiss the Amended

Complaint filed on behalf of Defendants Philip Murphy, State of New Jersey Division of

Investment ("DOI"), Jason MacDonald, Christopher McDonough, Corey Amon, Dini Ajmani, Derrick Greene, George Helmy, and Matthew Platkin (collectively, the "State Defendants") (ECF No. 128); Defendant Owl Rock Capital Corporation's Motion to Dismiss the Amended Complaint (ECF No. 129), and Defendant Samantha Rosenstock's Motion to Dismiss the Amended Complaint (ECF No. 130). Plaintiff BCA filed its opposition to the various motions (ECF Nos. 138, 139). Defendants in turn filed their respective replies, Rosenstock (ECF No. 142); Cliffwater (ECF No. 143); Owl Rock (ECF No. 144); State Defendants (ECF No. 145); BlackRock Defendants (ECF No. 146); and Walsh (ECF No. 147). The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental subject matter jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). After carefully considering the parties' written and oral arguments, for the reasons that follow, the Defendants' motions to dismiss ("MTD") are **GRANTED in part and DENIED in part**, and Plaintiff's Appeals (ECF Nos. 115, 170) are **DENIED AS MOOT** based on the Court's rulings on Defendants' motions.

## I.    BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff is a Delaware corporation, headquartered in Newark, New Jersey.[2] Plaintiff filed a 102 page Amended Complaint seeking "declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' violations of 42 U.S.C. § 1981 ("§ 1981"); 42 U.S.C. § 1983 ("§ 1983"); 42 U.S.C. § 1985 ("§ 1985"); New Jersey Civil Rights Act; racketeering in violation of 18 U.S.C. § 1962 and N.J.S.A. 2C:41-2; violation of the Fifth Amendment Takings

---

[1] The factual background derives from Plaintiff's Amended Complaint. *See* Am. Compl., ECF No. 78. When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[2] BCA describes itself as the "only African-American asset management firm in New Jersey." Am. Compl., ECF No. 78 ¶ 5; *see generally* Am. Compl.

Clause; breaches of contract, fiduciary duty, duty of confidentiality; unfair competition; civil conspiracy; fraud; commercial disparagement; tortious interference with prospective economic advantage; aiding and abetting racketeering; and aiding and abetting fraud." Am. Compl., ECF No. 78 ¶ 8.

Defendant Philip Murphy is the Governor of the State of New Jersey. *Id.* ¶ 13. Defendant State of New Jersey, Department of the Treasury, Division of Investment is a government entity that makes investment decisions on behalf of New Jersey's pension systems. The State of New Jersey Department of Treasury houses the Division of Investment, which oversees the $80 billion pension fund. The DOI, in turn, manages investments on behalf of the public pension and retirement funds for New Jersey's current and retired employees. The DOI, by virtue of the size of those public employee funds, is one of the largest money managers in the United States. *Id.* ¶ 14. Defendant BlackRock, Inc., is an American global investment management corporation based in New York, New York. *Id.* ¶ 15. Defendant BlackRock Alternative Advisors is a Delaware corporation headquartered in New York City, with its principal place of business located in New York, New York. *Id.* ¶ 16. Defendant Cliffwater, LLC, is a Delaware corporation, headquartered in Los Angeles, California, with its principal place of business in Marina Del Rey, California. *Id.* ¶ 17. Defendant Timothy Walsh is a former member of BCA's Board of Advisors and is currently a Managing Director at Owl Rock Capital LP. Upon information and belief, Mr. Walsh is a resident of the state of Indiana. *Id.* ¶ 18. Capital Corporation is a Maryland corporation headquartered in New York City, with its principal place of business in New York, New York. *Id.* ¶ 19. Defendant Samantha Rosenstock is the former Head of Investments at New Jersey's Division of Investment. Upon information and belief, Ms. Rosenstock is a resident of New Jersey. *Id.* ¶ 20. Defendant Jason MacDonald is a former Senior Portfolio Manager at New Jersey's Division of Investment.

Upon information and belief, Mr. MacDonald is a resident of New Jersey. *Id.* ¶ 21. Defendant Christopher McDonough is the former Director of New Jersey's Division of Investment. Upon information and belief, Mr. McDonough is a resident of Pennsylvania. *Id.* ¶ 22. Defendant Corey Amon is the current Director of New Jersey's Division of Investment. Upon information and belief, Mr. Amon is a resident of New Jersey. *Id.* ¶ 23. Defendant Dini Ajmani is the New Jersey Assistant Treasurer. Upon information and belief, Ms. Ajmani is a resident of New Jersey. *Id.* ¶ 24. Defendant Derrick Greene is the owner and operator of Greene Consultants LLC, a campaign consulting firm and the current Senior Advisor to the Office of the Governor for the State of New Jersey for Diversity, Race, and Urban Planning, operating out of the Secretary of State's office. Upon information and belief, Mr. Greene is a resident of New Jersey. *Id.* ¶ 25. Defendant George Helmy is the Chief of Staff to the Office of the Governor for the State of New Jersey. Upon information and belief, Mr. Helmy is a resident of New Jersey. *Id.* ¶ 26. Defendant Matthew Platkin is a Partner at the law firm Lowenstein Sandler, a former senior member of the Murphy election campaign, and most recently the former Chief Counsel to Office of the Governor of the State of New Jersey. Upon information and belief, Mr. Platkin is a resident of New Jersey. *Id.* ¶ 27.[3]

Plaintiff's principals, Jacob Walthour and Carrie Pickett founded BCA in 2015, after decades at prestigious financial services firms, including Morgan Stanley, Citadel Investment Group, Cowen & Company, and Defendant Cliffwater. Am. Compl., ECF No. 78 ¶ 29. Walthour and Pickett engaged in extensive research on public pension funds following the 2008 financial crisis and developed the FAIR program.[4] *Id.* ¶¶ 29-31. Realizing the competitive value of its

---

[3] Defendant Platkin left his position on the Governor's staff in October 2020. He subsequently took office as the Acting Attorney General for the State of New Jersey on February 14, 2022.

[4] Plaintiff described the FAIR Program as a "unique investment model tailored for public pensions that would dramatically lower their asset management expenses and improve their returns." Am. Compl., ECF No. 78 ¶¶ 32-34. Based on their analysis, BCA determined that smaller, less well known, often regional asset managers were better suited to profitably manage pension fund investments and could do so under far more economical fee

proprietary FAIR program, BCA took extensive steps to protect that proprietary information by not describing it on its website; non-disclosure agreements with employees, consultants, vendors, and third-parties; watermarking documents as confidential; and by taking steps to secure copyright protection for the FAIR business mark. *Id.* ¶¶ 31-32.

Plaintiff asserts that the DOI[5] fraudulently misappropriated the FAIR program through a series of actions beginning in 2015 and culminating in the DOI launching the FAIR program with an alternative asset manager, Defendant BlackRock in 2016. *Id.* ¶ 2.

In the spring of 2015, Walthour reached out to Defendant Jason MacDonald, senior asset manager at the DOI, who directed Walthour to then-DOI director, Defendant Christopher McDonough. *Id.* ¶ 48. McDonough, briefed by MacDonald, worked to induce reliance and trust from BCA from the start. *Id.* ¶ 49. Throughout the summer of 2015, Walthour emailed McDonough presentations and materials on the FAIR program and met with McDonough and MacDonald on multiple occasions. *Id.* ¶¶ 49-53. During those meetings, Walthour presented BCA's FAIR program, explained how the FAIR program would work and the enormous time that had been devoted to developing the program. *Id.* ¶ 49. In response, McDonough misrepresented that the DOI wanted to pursue the program with its creator BCA proposing, and that they wanted to implement it by year-end. *Id.* ¶ 50. McDonough further represented that he wanted the DOI to be the anchor investor and a 10% owner in the platform. *Id.* Throughout these discussions,

---

structures set by market realities instead of industry custom and habit. Among other things, public pension funds could utilize their significant supply of capital to negotiate better fee structures with smaller funds. Those smaller funds, in turn, would be better suited to investment programs specifically tailored to the objectives of one or a small group of pensions. Based on their analysis, the FAIR program targeted a fee structure of approximately a 1% management fee on committed capital, with a 3% return hurdle to vest, a 10% share of profit, event "triggers" to protect the investor, and longer investment periods. This was a dramatically lower and safer fee structure than the standard 2% & 20% fee structure that was ubiquitous in the industry and drowning pension funds. *Id.* ¶ 34.

[5] At times, Plaintiff refers to a subgroup "DOI Defendants" within its Am. Compl., which consists of the DOI, Rosenstock, MacDonald, McDonough, Amon, Ajmani, Murphy, Greene, and Platkin. Am. Compl. at 2, n.1.

McDonough and MacDonald assured BCA that they personally were committed to investing $500 million with BCA, and that securing the SIC's approval for the BCA mandate was a formality as the FAIR program was badly needed and the SIC had approved 100% of proposed investments in recent history. *Id.* ¶ 51. Accordingly, McDonough directed BCA to begin preparing a term sheet, and further informed BCA that the DOI would direct its outside consultant, Cliffwater, to immediately begin the formal due diligence required under New Jersey law. *Id.* McDonough instructed BCA to provide that due diligence as quickly as possible, which BCA began doing by the end of June. *Id.*

From almost the start, McDonough and Walthour discussed the need for BCA to immediately prepare for a year-end launch. *Id.* ¶ 53. In reliance on the DOI's and McDonough's representations, by early July, BCA began building out its investment platform and infrastructure necessary to launch the FAIR program and business plan with the DOI by year-end. *Id.* It prepared the legal, operational, advisory, transactional and other infrastructures the business would require; began interviewing and hiring personnel; and secured office space in Manhattan for those personnel to work. *Id.* By the first week of August, BCA had retained outside counsel; established an advisory board, which included defendant Walsh; completed their CIO and COO searches and identified their preferred candidates; hired necessary investment professionals; and identified and began discussions with industry vendors to provide middle and back-office operations as well as due diligence on investments. *Id.*

McDonough did not want BCA to partner with a large financial institution. *Id.* ¶ 54. McDonough directed BCA not to pursue a partner at that time, misrepresenting that New Jersey would be BCA's exclusive anchor investor and partner at inception so that they could share exclusively the positive publicity and "first mover" credit. *Id.* In reliance on McDonough's

representations, Walthour agreed to exclusivity with the DOI. *Id.*

McDonough had no intention of doing the FAIR program with BCA, he would admit to Walthour almost a year later, that the DOI would not want to have money managed by a firm founded and run by Black owners. *Id.* Nevertheless, McDonough directed BCA to forego other risk mitigating alternatives to self-funding, and to commit substantial resources that would leave BCA vulnerable if and when no deal materialized. *Id.* ¶ 56. McDonough induced BCA to share its proprietary FAIR program and to execute the program and plan with a different partner who was a member of the exclusive "old-boy" and "pay-to-play" network. *Id.*

In 2019, Governor Murphy acknowledged the DOI's notorious history of excluding minority-owned firms, and enacted a statutory mandate to increase investment management by such firms.[6] *Id.* ¶ 42. The political appointees and government bureaucrats controlling these investments used their positions and control over investment decisions to accumulate administrative currency and later secure lucrative opportunities from their patrons on Wall Street and the private sector. *Id.* ¶ 44.

Defendant Derrek Greene, a consultant to Governor Murphy's campaign, who joined his administration as a senior diversity advisor, confirmed to BCA on three occasions that the administration was aware of the racial problem at the DOI and the fact that the DOI "staff" refused to abide by any policy directives to diversify the pool of funds and advisors. *Id.* ¶ 176. Defendant Ajmani, as Assistant Treasurer, was adamantly opposed to hiring Black-fund managers and staff, including BCA, and repeatedly used a specious justification for her opposition that such hiring

---

[6] Plaintiff acknowledges that alleged "abuse" began in the DOI before Governor Murphy took office, but alleges that Governor Murphy failed to act to stop it. *See e.g.* Am. Compl. ¶ 4. Plaintiff alleges that former Governor Chris Christie and the DOI were being publicly accused of contributing to the depletion of the pension fund system via systemic "pay to play" practices and "backroom" deals, with outside investments doled out to large Wall Street firms and other politically connected managers, and investigative journalists in New Jersey published numerous reports about the corrupt culture at the DOI, as well as the DOI's public misrepresentations and concealments of the enormous fees New Jersey pension funds were paying fund managers for poor investment performance. *Id.* ¶¶ 39-40.

would be "unethical," presumably because minority fund managers are not capable of managing investments. *Id.* ¶¶ 47, 183-184. When Greene inquired about the treatment of BCA specifically, Ajmani had the ethics committee deter him from continuing. *Id.*

BCA contacted Governor Murphy to stop this abuse and remedy the harm to BCA. *Id.* ¶¶ 174, 177-180. After BCA publicly reported its abuse, Plaintiff alleges that at Governor Murphy's direction, Helmy, Greene, and Platkin disseminated to every constituent critical to BCA's business knowingly false claims that (i) BCA's claims were investigated and found baseless (*id.* ¶¶ 186-189); (ii) BCA had not been successful because it "could not handle the business of the DOI and the firm didn't have the resources to manage the current relationship" (*id.* ¶¶ 190-91); (iii) Walthour had a bad professional reputation and frequently filed meritless lawsuits (*id.* ¶ 189); and (iv) Walthour had been removed as Chair of the Ebony Media Holdings for insider trading (*id.* ¶ 191). As part of the same retaliation, Ajmani and Helmy instructed the current director of the DOI, Defendant Amon[7], to summarily reject all future BCA investment proposals, and Helmy told BCA's former counsel that if BCA continued to complain about its discriminatory treatment, that they would direct the DOI to redeem its investment and put BCA out of business. *Id.* ¶¶ 147-148, 186, 192. Since that threat, the DOI has, summarily rejected or simply ignored every BCA proposal and cut off all communications with BCA. *Id.* ¶¶ 147-173.

Among those involved in Cliffwater's diligence investigation was Daniel Stern. *Id.* ¶ 52. Prior to joining Cliffwater, Stern had been a director at BlackRock, a direct competitor and target of BCA's FAIR program. *Id.* During the period while Cliffwater was ostensibly acting as the DOI's diligence consultant regarding BCA, Stern was actively pursuing BlackRock to do the same deal as a joint venture with Cliffwater. *Id.*

---

[7] The DOI Director as of the date of the filing of the Am. Compl.

The DOI also targeted BlackRock through its former director, Defendant Walsh. *Id.* ¶¶ 57-59, 69, 82-102.  Walsh was a close friend of McDonough and MacDonald from his time at DOI where he supervised both. *Id.* ¶ 57.  Walsh also knew Walthour and presented himself to Walthour as someone who was excited about the innovation that BCA had created and could advise BCA in its negotiations with the DOI. *Id.*  Based on those representations, BCA added Walsh to its advisory board, and involved him in every aspect of discussions with the DOI. *Id.*  Walsh knew there was no chance of the DOI ever consummating the contemplated deal with BCA. *Id.* ¶ 58.  Walsh fully understood, but concealed from and misrepresented to Walthour, that the DOI would work with BCA only as long as necessary to divert the FAIR program to an established "old-boy" Wall Street firm. *Id.*

Walsh knew that BlackRock, with whom he also had a close relationship and had awarded billions in assets through, among others, account representative, Donald Perrault, would be a natural fit to execute BCA's FAIR program and would value those who could assist it in securing that opportunity. *Id.* ¶ 59. Moreover, simultaneously with his work with BCA, Walsh was working as an undisclosed third-party marketer to the investment firm Owl Rock. *Id.* ¶ 60.  Owl Rock wanted New Jersey to be one of the firm's anchor investors, and had secretly retained Walsh to facilitate that investment, which was being "quarterbacked at DOI by Walsh's friend (and housemate during this period) MacDonald." *Id.*

Unaware, BCA incorrectly believed that progress on the anticipated deal was on schedule throughout the summer, fall, and early winter. *Id.* ¶ 61.  During this period, McDonough, and Cliffwater on his behalf, requested and were provided unusually broad and unprecedented access to BCA's proprietary FAIR program materials. *Id.*  This included all the underlying proprietary research on how to execute the plan, including the criteria to identify fund managers, the

preliminary lists of managers who met that criteria, the initial list of pensions to target for investment, and the detailed plans to slash vendor costs. *Id.* Walsh was also involved in this process from both sides, consulting with BCA while at the same time regularly meeting and discussing the matter with McDonough, MacDonald, Rosenstock, and Stern, all of whom would be vital to his plans to secure employment at Owl Rock. [8] *Id.* ¶ 62.

McDonough and MacDonald rejected BCA's request that the DOI execute a non-disclosure agreement to protect the confidentiality of its materials, misrepresenting to BCA that it would dramatically slow down the process, as the agreement would need counsel approval and others at the DOI, and that it was not necessary because DOI employees, and their outside consultants, were statutorily bound to maintain the confidentiality under New Jersey laws. [9] *Id.* ¶¶ 63-66.

The due diligence efforts intensified exponentially toward the end of the year as BCA assumed the parties were pressing to an anticipated January deal. *Id.* ¶ 68. Throughout this period, McDonough and MacDonald falsely assured BCA that they were on-track to present and secure SIC approval of the investment mandate at the January 27, 2016 SIC meeting. *Id.* The DOI informed BCA for the first time in the more than six months of negotiations that BCA was required to undergo an ethics review due to Walthour's role as a former consultant at Cliffwater and Walsh's involvement on BCA's advisory board, despite the fact that Walthour and Walsh were both well outside their ethics related time restrictions, and Walsh had no discretionary role in BCA's business. *Id.* ¶ 72. Moreover, DOI employee, Samantha Rosenstock, who then served as the head of Alternative Investments, internally began raising pretextual objections to the BCA investment,

---

[8] Plaintiff alleges that according to his LinkedIn profile, in 2015 Walsh was employed by Owl Rock although this was never publicly disclosed until months later because it violated New Jersey law. Am. Compl. ¶ 60.

[9] Plaintiff alleges that although BCA accepted these representations and considered them binding, it nevertheless prominently marked "confidential" on documents provided in due diligence and indicated that those documents contained proprietary information. Am. Compl. ¶ 65.

including explicitly that DOI should instead pursue the opportunity with an established Wall Street firm, which McDonough admitted was because she was potentially looking for a job and BlackRock could be more helpful to her given the firm's vast reach and relationships.  *Id.* ¶ 74. She did so internally while duplicitously assuring Walthour of the DOI's commitment to advancing "rising minority stars" and the department's commitment to proceeding with BCA.  *Id.*  None of these assurances or messages were true.  *Id.*

When McDonough, MacDonald, and Rosenstock had extracted what they needed to pursue the FAIR program without BCA, they immediately began searching for a replacement firm, working with Cliffwater and Walsh.  *Id.* ¶¶ 69, 75-79, 82, 91.  Stern, Walsh, Rosenstock, MacDonald, and McDonough now had intimate knowledge of BCA's FAIR program from their "due diligence" investigation (*id.* ¶ 91), and would "backchannel" to BlackRock the details of the FAIR program to ensure that BlackRock had the inside track to be selected to replace BCA in an intentionally rigged search.  *Id.*  From these discussions, BlackRock understood the DOI had an investment model that another firm had presented to them that they wished to pursue with a different firm; the essential proprietary elements of that program; and the identity, background, and reasons the DOI did not want to proceed with BCA. *Id.*  BlackRock was fully aware of the racist exploitation that was being perpetrated and that it was being offered the lucrative opportunity to participate in and benefit from.  *Id.* ¶¶ 92-93. This was apparent from the background provided to it about the opportunity from Stern and Walsh, and from the detailed proprietary information funneled to it. *Id.* ¶ 92.

It was not until April 2016, that BCA was informed by Walsh that the DOI intended to allocate BCA's anticipated investment to "a very large" Wall Street fund manager instead.  *Id.* ¶ 95.  On April 29, 2016, McDonough and MacDonald called Walthour and informed him that the

DOI intended to invest the funds that were to be allocated to BCA with BlackRock instead, and McDonough would later explicitly explain, that the DOI was "not a fan of investing with women and minority-owned firms," that it would "be difficult to get Blueprint approved" for that reason, and that "[i]f the SIC knew Blueprint was a minority-owned firm, they would not approve." *Id.* ¶ 98. Walthour was further informed by then Cliffwater Managing Director, Pete Kelioutis, that Stern and Cliffwater were working to broker the deal with BlackRock, as a "joint venture." *Id.* ¶ 99. Kelioutis further informed Walthour that he was told to insert BlackRock by McDonough in a surprise phone call "out of the blue." *Id.* When asked how BlackRock replaced BCA, Kelioutis explained: "Perrault is the "drinking buddy" of Walsh and McDonough." *Id.*

Between April and July 2016, McDonough, MacDonald, Cliffwater, and Walsh worked with BlackRock to implement BCA's FAIR program as a BlackRock platform. *Id.* ¶ 100. During this process, BlackRock learned in detail the nature and scope of BCA's proprietary commercial information, and appropriated it for its program. *Id.* BlackRock reached out to one of BCA's key vendors to see if they could negotiate use of their services and deepen their understanding of BCA's program. *Id.*

On July 28, 2016, the DOI publicly announced its proposed BlackRock investment, which was identical to the program BCA had developed, shared with the DOI, and had been assured they would pursue together and would remain confidential. *Id.* ¶ 101. The DOI and BlackRock announced the managed fund program under the same "FAIR" program. *Id.* On August 5, 2016, the SIC approved BlackRock's FAIR program, with an initial $500 million investment and authority to invest an additional $500 million. *Id.* ¶ 102. At the same meeting, the SIC approved a $600 million commitment to Owl Rock, which had only been formed a few months earlier and had completed the due diligence and approval processes in record time for a new fund. *Id.* Less

12

than two weeks later, Owl Rock announced Walsh had been hired as a managing director responsible for securing outside limited partner investments.  *Id.*

Based on the DOI's misrepresentations, its instruction to build out for a launch and not pursue other partners, BCA had informed the entire market that it intended to launch with the DOI as its anchor investor.  *Id.* ¶ 104.  It had made this a centerpiece of every investor solicitation, and it was the expectation for every investor who had made a conditional investment commitment.  *Id.*  If BCA never secured a DOI investment, its market credibility would be destroyed.  *Id.*  BCA's only immediate means of salvaging its business was an alternative DOI investment.  *Id.*  Accordingly, despite the egregious wrong that the DOI and McDonough had perpetrated, throughout the summer of 2016, BCA continued to pursue the DOI with regular overtures to McDonough about renewing their discussions and pursuing other opportunities.  *Id.* ¶¶ 105-106.  These overtures were largely ignored, and when McDonough did finally respond, he advised BCA that it "had nothing to offer DOI."  *Id.* ¶¶ 105-108.

McDonough agreed to a meeting with BCA in August 2016.  *Id.* ¶¶ 109-111.  McDonough never intended to present a real opportunity to BCA and planned to drive BCA away with an interminable series of delays and manufactured legal and administrative issues.  *Id.* ¶ 111-112.  McDonough raised a perceived roadblock to even beginning:  the DOI's regulatory limit on investments constituting more than 20% of a funds invested capital.  *Id.* ¶ 112.  This perceived roadblock was based on a never before articulated construction of the regulations that ignored the other assets in the actual fund into which BCA would invest the DOI and other investor's funds from its platform.  *Id.* ¶ 112-113. Moreover, during this period the DOI continued its prior practice of ignoring BCA's outreach and initiatives.  *Id.* ¶¶ 114-116.  And when the DOI finally acquiesced to meetings, they often canceled them at the last minute.  *Id.* ¶ 116.  McDonough and DOI also

implemented intrusive and extensive diligence hurdles (*id.* ¶ 114), and unilaterally changed the terms of the proposed agreement with BCA and introduced new "take it or leave it terms" that were entirely inconsistent with market standards. *Id.* ¶¶ 117-119. Among other things, McDonough demanded that BCA accept fees 40% below the lowest fees in the industry (including those previously offered to BCA); directed that fees be charged only on invested capital, rather than committed capital as was standard in the industry; and continued to demand 10% of BCA's platform's gross revenues. *Id.* ¶ 117. Taken together, these terms meant that DOI would retain a complete veto over any investment proposed by BCA, that BCA would be earning pennies on the dollar for its work, and that even if DOI never approved a single investment, it would still be entitled to 10% of all fees BCA earned. *Id.*

Left without an alternative, BCA was forced to accept the DOI's non-commercial terms. *Id.* ¶¶ 118-119. In January 2017, more than a year and a half after McDonough first committed to investing with BCA, the SIC finally approved a much smaller mandate for BCA. *Id.* ¶ 120.

In typical scenarios, such as those for BlackRock and Owl Rock, initial investments are closed between three and four months after SIC approval. *Id.* ¶ 122. Yet the DOI delayed executing the investment agreement with BCA for more than 18-months after the mandate was first approved. [10] *Id.* ¶¶ 122-123. Among other things, the DOI demanded BCA secure other funding to satisfy its 20% regulatory threshold as a prerequisite to commencing the legal review process. *Id.* ¶¶ 124-126. When BCA complied with the DOI's demands, McDonough again "moved the goalposts," putting BCA in line behind 12 other investments for legal review (*id.* ¶ 129), and materially changing the terms of the parties' agreement. *Id.* ¶¶ 136-139. DOI also made

---

[10] Plaintiff references another manager Crayhill, approved by the SIC on the same day as BCA, closed its first investment on May 1, 2017, approximately 4 months after SIC approval. Am. Compl. ¶ 122.

repeated pretextual requests for BCA's detailed financial and accounting records, even though these records had nothing to do with the investment vehicles in which the DOI and BCA would be involved and were not sought from any other similarly situated fund. *Id.* ¶ 130.

In addition to these pretextual delays, and the reinforcing collateral impairment they caused, BCA's credibility was further damaged by direct attacks the DOI, particularly Rosenstock, widely disseminated to potential investors with whom BCA was actively in discussions. *Id.* ¶¶ 131-132. Rosenstock regularly communicated to many market participants, including Bank of New York, Connecticut Trust Funds, the State of Maryland, and the State of New York that the BCA mandate would never be approved. *Id.* ¶ 131. Walsh personally reneged on a previously agreed investment in BCA because he said he had heard the same from Rosenstock. *Id.* ¶ 132. Stern also widely reported to Cliffwater's clients that "Blueprint should not be taken seriously," and had ongoing problems with New Jersey. *Id.* ¶ 131.

Ultimately, 34-months after BCA first approached the DOI and McDonough and MacDonald committed to invest with BCA, on May 7, 2018, the DOI executed the investment agreement with BCA. *Id.* ¶¶ 144-147, 211. The fees had been reduced by 60% to far below market. *Id.* ¶ 144. The contract required DOI approval for any investment. *Id.* Funds not invested earned no fees. *Id.* And the DOI was entitled to a perpetual 10% share of gross revenues even if it never authorized the investment of a single dime. *Id.*

After the DOI and BCA finally executed the contract in May 2018, McDonough and his successor, Defendant Cory Amon, have taken every step to frustrate BCA's performance. *Id.* ¶ 147, *see also* ¶¶ 148-173. They have systematically rejected virtually every single investment idea proposed by BCA, regardless of merit, even those previously vetted and approved by the DOI prior to execution of the contract. *Id.* ¶¶ 148-173. The DOI persistently refused to discuss the reasons

for rejections or the evaluation criteria (*id.* ¶¶ 149, 151, 156, 158, 160, 163-69) and also refused multiple requests to provide guidance on the investments it wants to target. *Id.* ¶¶ 149, 151-52, 156-57, 166. In October 2018, BCA pointed out the harm it was suffering, how the DOI had unilaterally modified its mandate, forcing BCA into an "uneconomic, off-market and fundamentally inequitable" position, and requested that the DOI adjust its fees. *Id.* ¶ 156. This request was ignored for two months, and then summarily rejected without explanation. *Id.*

It was only when BCA presented documented evidence of disparate treatment that deals were approved. In July 2018, BCA proposed investing $75 million in Capital Springs based on significant investment analysis. *Id.* ¶ 150. In response, the DOI requested a massive fee structure change, which BCA managed to achieve. *Id.* Despite this success, DOI reversed course and declined the investment. *Id.* Only when BCA presented an audit trail that demonstrated DOI's abusive and disparate treatment did, DOI finally acquiesce to the investment. *Id.* ¶¶ 158-59. Similarly, in early 2019, BCA sent DOI a proposal for Cordiant, an agricultural debt investor. *Id.* ¶ 160. DOI summarily rejected the investment without conducting any diligence, claiming that DOI members had read negative articles about the agricultural sector, and were thus not interested in the investment strategy. *Id.* A few days later, however, DOI announced a $100 million investment in a different agricultural fund. *Id.* ¶ 161. After BCA exposed the DOI's pretext, the DOI approved a smaller, $50 million investment in Cordiant. *Id.* ¶ 162. Nevertheless, during this period, the DOI rejected at least seven investment proposals, the vast majority of which, it never responded to. *Id.* ¶¶ 163-169.

The DOI further retaliated against BCA by subjecting it to punitive audits that had no rational basis and were not imposed on any other manager in the State. *Id.* ¶¶ 170-71. On March 23, 2020, days after Governor Murphy shut down all non-essential businesses and ordered that

non-essential workers shelter in place to prevent the spread of coronavirus, Daniel Stern of Cliffwater, at the direction of the DOI, informed BCA that the DOI would be conducting an "update'"due diligence review" and requested information on a number of topics, including the names of managers approved by BCA in due diligence and in its pipeline. *Id.* ¶ 170. In response to BCA's pushback, Amon informed Walthour that the request was "entirely consistent with normal business practices," (*id.*) although it first, came days after the Governor declared a state of emergency, (*id.*) and second, there DOI had no need to update its due diligence on BCA less than one year after execution of its mandate and the completion of a three-year due diligence investigation, which exceeded others the DOI had done for similarly situated investments. *Id.* Third, the information sought was not typical of routine audits which do not normally require the disclosure of managers. *Id.* Fourth, and most egregious, the DOI designated Cliffwater to conduct the investigation, including review of BCA's confidential information, despite the history of Cliffwater's prior misappropriation of BCA's confidential information and BCA's public complaints regarding the same. *Id.* Ultimately, in response to BCA's request, the DOI reassigned the audit to another consultant, but refused to forego or delay the punitive and retaliatory due diligence update. *Id.* Plaintiff alleges that acts were done with the full knowledge of the Governor, his chief of staff, former general counsel, and advisors, all of whom refused to take action or investigate. *Id.* ¶¶ 173-194.

## II.   LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Rule 8(a) provides in pertinent part, "A pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . [and] (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . ."

A party moving to dismiss under Rule 12(b)(6) "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In considering a 12(b)(6) motion, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the pleader. *Carter v. Bentley Motors Inc.*, 489 F. Supp. 3d 316, 320–21 (D.N.J. 2020) (citing *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)); *see also Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court does not decide "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims[.]'" *Twombly*, 550 U.S. at 562 n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'") (citations omitted). While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. *Iqbal,* 556 U.S. at 664. The facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Stated differently, the

18

allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis to state a facially plausible claim for relief. *Iqbal*, 556 U.S. at 662.

In order to determine whether a complaint is sufficient under these standards, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must assume the veracity of well-pleaded factual allegations and ascertain whether they plausibly give rise to a right to relief. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

## III.    DISCUSSION

In its 102-page Amended Complaint, Plaintiff asserts 22 separate causes of action. For ease of reference, the Court lists each Count as it is asserted by Plaintiff in the Amended Complaint:

1. COUNT ONE - Permanent Injunction Pursuant to 42 U.S.C § 1983 and § 1981
   (Against Governor Murphy, Corey Amon, Dini Ajmani, and George Helmy)
2. COUNT TWO - Violation of the Fifth Amendment Takings Clause
   (Against DOI)
3. COUNT THREE - Breach of Contract
   (Against the DOI)
4. COUNT FOUR - Discrimination and Retaliation in Violation of Section 1981
   (Against McDonough, Amon, Ajmani, Helmy in their individual capacities)
5. COUNT FIVE - Violation of 42 U.S.C. § 1983
   (Against McDonough, Amon, Ajmani, and Helmy in their individual capacities)
6. COUNT SIX - Violation of 42 U.S.C. §1985
   (Against Cliffwater and BlackRock)
7. COUNT SEVEN - Discrimination in Violation of the New Jersey Civil Rights Act
   (Against McDonough, Amon, Ajmani, and Helmy in their individual capacities)

8.  COUNT EIGHT - Retaliation in Violation of the New Jersey Civil Rights Act

    (Against McDonough, Amon, Ajmani, and Helmy in their individual capacities)

9.  COUNT NINE - Racketeering Violation of 18 U.S.C. § 1962(c)

    (Against the DOI, McDonough, Rosenstock, Dini Ajmani, BlackRock and Walsh)

10. COUNT TEN - Racketeering in Violation of 18 U.S.C. § 1962(d)

    (Against the DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock)

11. COUNT ELEVEN - Racketeering in Violation of N.J.S.A. 2C:41-2(c)

    (Against the DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock)

12. COUNT TWELVE - Racketeering in Violation of N.J.S.A. 2C:41-2(d)

    (Against the DOI, McDonough, Rosenstock, Ajmani, Walsh and BlackRock)

13. COUNT THIRTEEN - Aiding and Abetting Racketeering in Violation of N.J.S.A. 2C:41-2(c) and (d)

    (Against Cliffwater and Owl Rock)

14. COUNT FOURTEEN - Fraud

    (Against McDonough, MacDonald, Rosenstock, Amon, Cliffwater, and Walsh)

15. COUNT FIFTEEN - Aiding and Abetting Fraud

    (Against BlackRock and Owl Rock)

16. COUNT SIXTEEN - Unfair Competition

    (Against BlackRock, Cliffwater, and Owl Rock)

17. COUNT SEVENTEEN - Breach of Contract

    (Against Cliffwater)

18. COUNT EIGHTEEN - Breach of Contract

    (Against Walsh)

19. COUNT NINETEEN - Breach of Fiduciary Duty

    (Against Walsh)

20. COUNT TWENTY - Tortious Interference with Prospective Economic Advantage

    (Against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Greene and Platkin in their individual capacities)

21. COUNT TWENTY-ONE - Commercial Disparagement

    (Against Rosenstock, Greene, Platkin, and Cliffwater)

22. COUNT TWENTY-TWO - Civil Conspiracy

    (Against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Cliffwater, Walsh, and Owl Rock)

*See* Am. Compl., ECF No. 78.

Defendants have each moved to dismiss various Counts of the Amended Complaint. The Court will first address the State Defendants' sovereign immunity argument. The Court will then address the remaining arguments seeking to dismiss Plaintiff's claims.

## A.  Sovereign Immunity under the Eleventh Amendment

The State Defendants argue that the Eleventh Amendment bars all claims seeking monetary damages against them in their official capacities, with the state of New Jersey being the real party in interest.[11] *See* ECF No. 128-1 at 31. The Eleventh Amendment affords states and state agencies immunity from suits brought by citizens in federal court. *MCI Telecom. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 503–04 (3d Cir. 2001); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). It bars a suit against state officials when the State is the real, substantial party in interest, regardless of whether the suit seeks damages or injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 89 (1984). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is <u>not</u> a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (emphasis in original). "[S]tate law claims—including state constitutional claims—against the State regardless [of] the type of relief it seeks," are similarly barred by the Eleventh Amendment. *King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984)). Such immunity is subject to three primary exceptions, however, which limit the scope of the Eleventh Amendment: (1) congressional abrogation; (2) waiver by the state; and (3) suits

---

[11] Defendants specifically reference all claims for monetary damages and state law claims within Counts 3, 7, 8, 14, 20, 21 and 22 (*see* ECF No. 128-1 at 16, *et. seq.*); state and federal RICO claims at Counts 9, 10, 11, 12 (*id.* at 18, *et. seq*); permanent injunction claims at Count 1 (*id.* at 20, *et. seq*); and the Fifth Amendment Takings claim at Count 2 (*id.*, *et. seq*).

against individual state officers for prospective injunctive relief and declaratory relief. *MCI*, 271 F.3d at 503.

Each exception warrants elaboration. As to the first exception, Congress may only abrogate sovereign immunity where Congress' authority to act arises under § 5 of the Fourteenth Amendment, and only where its intent to abrogate is unequivocal and textual. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst*, 465 U.S. at 99. Congress cannot abrogate the States' Eleventh Amendment immunity through legislation enacted under Article I of the Constitution, including the Commerce Clause. *See also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003). Under the second exception, a state may waive sovereign immunity by consenting to suit. *See College Savings*, 527 U.S. at 670 (citing *Clark v. Barnard*, 108 U.S. 436, 447 (1883)). The decision to waive immunity must be an "intentional relinquishment or abandonment of a known right or privilege." *College Savings*, 527 U.S. at 681–82; *MCI Telecomm. Corp.*, 271 F.3d at 503–04. In other words, to waive sovereign immunity the state either must voluntarily invoke federal jurisdiction by bringing suit or make a clear declaration that it intends to submit itself to jurisdiction. *See College Savings*, 527 U.S. at 676 (citing *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 54 (1944)). The third exception is the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), under which individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law. *See id.*

In *Ex Parte Young*, the Supreme Court held that when a state officer violates a constitutional right, he is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct," without the cover of sovereign immunity. 209 U.S. at 159-60. Thus, immunity defenses have no application when a plaintiff

seeks prospective relief through an order requiring state officials to "refrain from violating federal law," and in such case the state is not the "real, substantial party in interest." *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011); *Verizon Md, Inc. v. Pub. Serv. Com'n of Md*, 535 U.S. 635, 645 (2002) (to determine whether *Ex Parte Young* applies, courts consider "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."); *MCI Telecomm. Corp.*, 271 F.3d at 507 (*Ex Parte Young* "appl[ies] when an action against a state officer alleges an ongoing violation of federal law and seeks prospective relief"). The relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages that must be paid from public funds in the state treasury. *See Pennhurst II*, 465 U.S. at 102–03; *Quern v. Jordan,* 440 U.S. 332, 337 (l979) (citing *Edelman v. Jordan,* 415 U.S. 651 (1974)). Accordingly, official capacity suits by their very nature do not fall within the exception. *MCI Telecomm. Corp.,* 271 F.3d at 506, citing *Pennhurst II*, 465 U.S. at 101.

As part of the *Young* analysis, a court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Pennsylvania Fed. of Sportsmen's Clubs v. Hess,* 297 F.3d 310, 323–24 (3d Cir. 2002) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see also Torrey v. New Jersey*, No. CIV.A. 13-1192 PGS T, 2014 WL 941308, at *6 (D.N.J. Mar. 11, 2014). The doctrine applies both to violations of the United States Constitution and to violations of federal statutes. *See Balgowan v. New Jersey*, 115 F.3d 214, 218 (3d Cir. 1997) (holding that suit for declaratory relief against state officer under Fair Labor Standards Act is permissible under *Young*); *see also Allegheny County Sanitary Auth. v. U.S.E.P.A.*, 732 F.2d 1167, 1174 (3d Cir. 1984).

The Third Circuit has determined that litigation brought to enjoin New Jersey's Governor from carrying out legislation operates against the state itself and is therefore barred by the Eleventh Amendment. *Waterfront Comm'n of New York Harbor v. Governor of New Jersey,* 961 F.3d 234, 240 (3d Cir. 2020), (petition for cert. filed Dec. 8, 2020) (the Waterfront Commission of New York Harbor sought to enjoin New Jersey's Governor from carrying out legislation under which New Jersey would withdraw from the Waterfront Commission Compact with the State of New York).

> **1. Whether the Eleventh Amendment Bars all Federal Law Claims for Monetary Damages and State Law Claims for Breach of Contract (Count Three), NJCRA (Counts Seven and Eight), Fraud (Count Fourteen), Tortious Interference (Count Twenty), Commercial Disparagement (Count Twenty-One) and Civil Conspiracy (Count Twenty-Two)**

State Defendants contend that this Court has no jurisdiction over the claims asserted against the DOI and State Defendants in their official capacities that seek monetary damages. *See* ECF No. 128-1 at 31. At bar, Plaintiff names as defendant "PHILIP MURPHY, in his official capacity as Governor of the State of New Jersey," and after listing each of the remaining Defendants, adds the qualifying language "in their individual and professional capacities[.]" Am. Compl., ECF No. 78 at 1. The Court will construe "professional" capacity as their official capacity to the degree the qualifying language refers to the State Defendants.

In the Amended Complaint, Plaintiff seeks "an award of damages" (*see* ECF No. 78 ¶¶ 214 (Count Three), 238 (Count Seven) and 244 (Count Eight)); "a sum to be determined at trial" (*see id.* ¶ 311 (Count Fourteen)); "an award of punitive damages" (*see id.* ¶ 348 (Count Twenty)); "reputational and punitive damages" (*see id.* ¶ 356 (Count Twenty-One)); and "punitive damages in an amount to be determined at trial" (*see id.* ¶ 362 (Count Twenty-Two)).[12]   As previously stated, the Eleventh Amendment bars suits in federal court by private parties seeking damages

---

[12] Plaintiffs indicate "individual capacities" in certain Count headings without further elaboration within the body of such Counts. *See, e.g.*, Counts 7, 8, 20, *but see, e.g.,* Counts 14, 21 and 22.

that must be paid from public funds in the state treasury. *Quern*, 440 U.S. at 337 (1979) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). Accordingly, to the degree that any of the damage claims are brought against the State Defendants in their official capacity, such claims are barred unless they fall within another exception. *MCI Telecomm. Corp.*, at 506 (citing *Pennhurst II*, 465 U.S. at 104).

There is no evidence in the record that Congress has abrogated or that the state has waived sovereign immunity as to any of the following claims: breach of contract (Count Three), NJCRA (Counts Seven and Eight), fraud (Count Fourteen), tortious interference (Count Twenty), commercial disparagement (Count Twenty-One) or civil conspiracy (Count Twenty-Two). Accordingly, the **breach of contract claim** within **Count Three against DOI**, as an agency or instrumentality of the State of New Jersey, is **DISMISSED WITH PREJUDICE**. *See MCI Telecom. Corp.,* 271 F.3d at 503–04; *Edelman*, 415 U.S. at 663. The claims within **Counts Seven, Eight, Fourteen, Twenty, Twenty-One and Twenty-Two are DISMISSED WITH PREJUDICE *only to the degree* that they are brought against the remaining State Defendants seeking damages in their official capacities.** The Counts otherwise remain viable against Defendants subject to the decisions issued below.

### 2. Whether the Eleventh Amendment Bars State and Federal RICO Claims (Counts Nine, Ten, Eleven, and Twelve)

The State Defendants argue that the Eleventh Amendment bars Plaintiff's RICO claims. In support of their argument, the State Defendants note that Congress may only abrogate sovereign immunity where Congress's authority to act arises under § 5 of the Fourteenth Amendment, and only where its intent to abrogate is unequivocal and textual. *See* ECF No. 128-1 at 33 (citing *Seminole Tribe of Florida*, 517 U.S. at 54; *Pennhurst State School Hosp.*, 465 U.S. at 99). The State Defendants contend that because RICO was enacted pursuant to Congress's Commerce Clause

authority, *see, e.g., United States v. Nascimento*, 491 F.3d 25, 43 (1st Cir. 2007), "Congress did not abrogate the States' Eleventh Amendment immunity with RICO[.]"  *See* ECF No. 128-1 at 34-35 (citing *Banks v. ACS Educ.*, 638 Fed. Appx. 587, 589 (9th Cir. 2016) ("Congress has not abrogated state immunity under RICO"); *Cuccia v. Cyrus*, 1995 WL 377073, at *2 (E.D. La. June 22, 1995); *Vierra v. California Highway Patrol*, 644 F. Supp. 2d 1219, 1232 (E.D. Cal. 2009) (holding Eleventh Amendment barred a RICO claim against the California Highway Patrol); *Kashelkar v. MacCartney*, 79 F. Supp. 2d 370, 372 (S.D.N.Y. 1999)). The State Defendants further contend that the same principles apply to the state RICO claims. More specifically, the State Defendants argue that sovereign immunity applies because there is no express consent to suit.  *See* ECF No. 128-1 at 34-35 ("Since the New Jersey RICO statute is silent as to asserting a claim in federal court, there is no express consent to suit, and thus sovereign immunity applies."); *see also* N.J.S.A. 2C:41-1, *et. seq.*[13]

It is well settled that "New Jersey is . . . immune from suit under its own laws in federal court. [Federal Courts have] no jurisdiction to hear supplemental state-law claims against sovereign entities absent consent by the entity to suit in federal court." *Garcia*, 210 F. Supp. at 550; *Pennhurst State Sch. & Hosp.,* 465 U.S. at 100-01, 121-23; *College Savings Bank*, 527 U.S. at 676.

Plaintiff has not opposed Defendants' argument as to the dismissal of the state and federal RICO claims against the state and the State Defendants in their official capacities. **Accordingly, these claims within Counts Nine, Ten, Eleven, and Twelve** are **DISMISSED WITH**

---

[13] Rosenstock asserts that she is entitled to qualified immunity on the BCA's RICO claims. (ECF No. 130-1, at 11-13.)  However, BCA's RICO claims are brought against Rosenstock in her official capacity, (*see* Am. Compl., at ¶¶ 246-298), and qualified immunity is not available to such claims.  *See Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 731 (3d Cir. 1989). *See* Pl.'s Opp'n Br., ECF No. 138 at 37, n.13.

PREJUDICE *only to the degree* that they are brought against the State Defendants in their official capacities.

The Court will address the State Defendants' remaining Eleventh Amendment arguments when addressing the viability of Plaintiff's claims.

### B.  Claims Pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 (Counts One, Four, Five and Six)

#### 1.  Whether the Eleventh Amendment Bars Plaintiff's Claim for a Permanent Injunction Pursuant to 42 U.S.C. §§ 1983 and 1981 against Governor Murphy, Corey Amon, Dini Ajmani, and George Helmy (Count One)

In Count One, Plaintiff seeks a permanent injunction enjoining the State Defendants' ongoing and future violations of §§ 1981 and 1983, which among other alleged illegal discrimination includes: (i) ongoing interference with the DOI's investment agreement with BCA (*see* ECF No. 138, Pl.'s Opp'n Br. at 38; Am. Compl. ¶¶ 153-155); (ii) subjecting BCA to punitive audits and other discriminatory terms of contract (*see id.* ¶¶ 170-172); (iii) threatening that if BCA continues to complain about its discriminatory treatment, the DOI will redeem its investment and put BCA out of business (*see id.* ¶¶ 167, 178, 186); (iv) tortiously interfering with BCA's other investors (*see id.*); and (v) disparaging BCA in the marketplace (*see id.*). The State Defendants seek to dismiss this Count, arguing that the *Ex Parte Young* exception does not apply to Plaintiff's claim for a permanent injunction. As a result, the State Defendants contend that Count One is barred by the Eleventh Amendment because it seeks retroactive relief and would require the state to expend money.

#### a.  Plaintiff Has Sufficently Pled Claims under 42 U.S.C. §§ 1983 and 1981

42 U.S.C. § 1981 forbids all racial discrimination in the making of private as well as public contracts. *Carter v. Bentley Motors Inc.*, 489 F.Supp.3d 316, 322 (D.N.J. 2020) (citing *Saint*

*Francis College v. Al-Khazraji,* 481 U.S. 604, 609 (1987)). To state a claim under § 1981, a plaintiff must allege that (1) plaintiff is a member of a racial minority; (2) intent to discriminate based on race by the defendant; (3) discrimination concerning one or more of the activities enumerated in § 1981, which include the right to make and enforce contracts. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001). Section 1981 defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." *Rivers v. Roadway Express*, 511 U.S. 298, 301 (1994).

Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). For a § 1983 claim to survive a motion to dismiss, the plaintiff must plead that: "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under the color of state or territorial law." *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). A governmental entity or an individual governmental official may be held liable under § 1983. *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir. 1989). For liability to attach to an individual defendant, however, he or she must have been personally involved with the alleged constitutional violations. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). A defendant's "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* However, allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity. *Id.* A state official may be held responsible for exercising or failing to exercise supervisory authority, however, only if that official "has exhibited deliberate indifference to the plight of the person deprived." *C.H. ex rel. Z.H. v.*

*Oliva,* 226 F.3d 198, 202 (3d Cir. 2000) (citing *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir. 1989)). Accordingly, a plaintiff asserting a failure to supervise claim must identify a specific supervisory practice that the defendant failed to employ and "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir. 1997) (quoting *Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3d Cir. 1988)).

In support of its discrimination claims, Plaintiff alleges that Defendant Ajmani "repeatedly and persistently opposed the hiring of African-American fund managers and staff, including [Plaintiff];" that "such hiring would be unethical (presumably because African-American fund managers by definition are not otherwise capable of managing investments); and has aggressively defended her turf and position by threatening or filing ethics complaints against anyone advocating for such hiring." Am. Compl. ¶ 47. Plaintiff further alleges that Defendant McDonough admitted that DOI "would not want to have money managed by a firm founded and run by a Black male and female." *Id.* ¶ 55. Plaintiff details the disparate terms and treatment that BCA received in the years-long contract negotiation as compared to its non-minority counterparts. *Id.* ¶¶ 122-23. Plaintiff further alleges that since executing the investment agreement in 2018, that the State Defendants have discriminated and retaliated against BCA by, among other means, rejecting nearly every investment proposal on pretextual grounds, imposing disparate terms of contract (*id.* ¶¶ 153-155), subjecting BCA to punitive audits (*id.* ¶¶ 170-172), tortiously interfering with BCA's critical market constituents, and disparaging BCA in the marketplace (*id.* ¶¶ 131-32). Plaintiff alleges that Defendants Helmy and Ajmani participated in this discriminatory scheme by directing Amon to summarily reject all BCA proposals (*id.* ¶¶ 167, 192), threatened that if BCA did not refrain from

publicizing the disparate treatment it was receiving, they would direct the DOI to redeem its

investment (*id.* ¶¶ 167, 178, 186), and orchestrated a misinformation campaign to discredit BCA's

claims of discrimination (*id.* ¶ 186).

Plaintiff has sufficiently alleged that it was subjected to "intentional discrimination solely

because of ancestry or ethnic characteristics" in support of the § 1981 claim. *See Al-Khazraji*, 481

U.S. at 614. The Amended Complaint also sufficiently addresses the § 1981 factors:  Plaintiff's

status as a racial minority; intent to discriminate based on race; and discrimination concerning an

enumerated activity, namely the making and performance of a contract. *Brown*, 250 F.3d 789, 797

(3d Cir. 2001).

Plaintiff has also sufficiently pled a § 1983 claim, which constitutes the "exclusive federal

remedy for violation of the rights guaranteed in § 1981 by state governmental units." *McGovern

v. City of Philadelphia*, 554 F.3d 114, 120–21 (3d Cir. 2009) (citing *Jett v. Dallas Independent

School District*, 491 U.S. 701, 733 (1989)).[14]

### b.  Whether the Eleventh Amendment Bars Plaintiff's request for Injunctive Relief (Count One)

Defendants assert that the Eleventh Amendment bars the permanent injunctive relief sought

in Count One of the Amended Complaint and that the relief sought fails to satisfy *Ex parte Young*

for various reasons. In support, the State Defendants cite *Puerto Rico Aqueduct & Sewer Auth. v.

Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), wherein the Supreme Court narrowed the *Ex parte

Young* exception, holding that it "applies only to prospective relief, [and] does not permit

judgment against state officers declaring that they violated federal law in the past . . . ."

506 U.S. at 146. Defendants further assert that unless an ongoing violation of federal law

---

[14] Accordingly, Plaintiff's claims under § 1981 are not independently cognizable and merge with Plaintiff's § 1983 claims. *McGovern v. City of Philadelphia,* 554 F.3d 114, 120-21 (3d Cir. 2009).

is established, the *Ex parte Young* exception does not apply. *Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002).

Defendants contend that the injunction sought by BCA would force the State to expend monies and interfere with public administration by seeking to compel the DOI to increase its level of investment of pension funds with BCA (Def.s' Supp. Br., ECF No. 128-1 at 38; *see* Am. Compl., Prayer for Relief, ¶ B (seeking "enjoinment of the discriminatory and retaliatory conduct against BCA in the performance of that contract")). Further, it seeks to compel the DOI to agree to modify the Blueprint Cap I/Common Fund E Contract to allow BCA enhanced fees. *See id.* (seeking "adjustment of the discriminatory and retaliatory terms of the BCA's contracts with the DOI"). Further, BCA seeks an injunction based upon an alleged *past* breach of an unidentified legal duty that has resulted in an alleged monetary loss to BCA. Further, if established, the alleged taking of BCA's FAIR program would be a single act that has continuing ill-effects, which does not satisfy the "ongoing violation" required by *Ex parte Young*. Further, the Eleventh Amendment bars retroactive relief even if the alleged past act has continuing ill-effects. BCA is seeking to obtain "formal credit" for something allegedly taken in the past. Defendants further assert that sovereign immunity bars the referenced relief and any relief sought by BCA to the extent it seeks specific performance. ECF No. 128-1 at 38-39.

Plaintiff counters that it seeks "[i]njunctive relief . . . necessary to *reverse* the defendants' unlawful actions and the harm associated with them, including . . . a return of all of BCA's confidential information, [and] formal credit to be afforded to BCA with regard to BlackRock's FAIR program with DOI." Am. Compl., Prayer for Relief, ¶ B. Plaintiff further asserts that Courts have long recognized that "suits seeking prospective . . . relief, may be brought against state officials in federal court challenging the constitutionality of official conduct enforcing

state law." *Puerto Rico Aqueduct and Sewer Auth.*, 506 U.S. 139, 145 (1993); *see also MCI Telecomm. Corp.*, 271 F.3d at 506.

Congress' enactment of § 1983 did not abrogate states' immunity, *see Quern,* 440 U.S. at 340–41, and New Jersey has neither consented to nor waived its immunity. Moreover, New Jersey and its state agencies are not considered "persons" for purposes of § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989).

Accordingly, Count One of Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE** insofar as it is asserted against the DOI.[15] *See Pennhurst*, 465 U.S. at 101 (stating that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Betts v. New Castle Youth Dev. Center,* 621 F.3d 249, 253–54 (3d Cir. 2010) (stating that "[s]tate governments and their subsidiary units are immune from suit in federal court").

As to Plaintiff's suit against the individually named Defendants, the *Ex Parte Young* doctrine allows for individual state officers to be sued in their official capacities for prospective injunctive relief and declaratory relief to end ongoing violations of federal law. *MCI*, 271 F.3d at 506. In Count One of the Amended Complaint, Plaintiff seeks a permanent injunction asserting that "defendants' wrongful conduct persists, and unless and until enjoined and restrained by order of this Court will continue to impede BCA's ability to operate its business and cause great and irreparable injury to BCA." Am. Compl. ¶ 201. Plaintiff further seeks to "enjoin the unlawful discriminatory and retaliatory conduct." *Id.* ¶ 203. Plaintiff contends that the alleged "institutional

---

[15] Plaintiff does not identify the state or the DOI within Count One, however, Plaintiff "repeats and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein." *See* Am. Compl., ECF No. 78 ¶ 196. The preceding paragraphs of the Am. Compl. contain references to the state and DOI throughout.

misconduct is ongoing and inflicting daily harm on [Plaintiff]." Pl.'s Opp'n Br. at 8, ECF No. 138, *et seq.*

The Third Circuit has found that this "is the type of injunctive, 'forward-looking' relief cognizable under *Ex Parte Young.*" *Koslow*, 302 F.3d at 179 (finding that a plaintiff's request to have his employment reinstated by state officials was permissible relief under the Eleventh Amendment); *Melo v. Hafer*, 912 F.2d 628, 635–36 (3d Cir. 1990) (finding that a plaintiff's request for reinstatement was prospective relief and not barred by the Eleventh Amendment), *aff'd by* 502 U.S. 21 (1991); *see also Torrey*, 2014 WL 941308, at *7. A state official against whom prospective injunctive relief is sought, then, does not partake of the State's sovereign immunity under the Eleventh Amendment, and is considered a "person" for purposes of § 1983.

The Supreme Court has found that the expenditure of funds incidental to injunctive relief to end a continuing federal law violation does not convert the claim to one for damages prohibited by the Eleventh Amendment. *See Edelman*, 415 U.S. at 651. Addressing *Ex Parte Young*, the Court stated,

> The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues[…]. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*. [Citation and footnote omitted] But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence[…].

*Id.* at 667–68.

As to Defendant Governor Murphy, Plaintiff has not sufficiently alleged personal

involvement through personal direction, "participation or actual knowledge and acquiescence with appropriate particularity," *Rode,* 845 F.2d at 1207, or "deliberate indifference to the plight of the person deprived." *Oliva,* 226 F.3d 198, 202 (3d Cir. 2000) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Moreover, the allegations do not support "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997) (quoting *Colburn v. Upper Darby Township*, 838 F.2d 663, 673 (3d Cir. 1988)). Rather, the allegations against Governor Murphy are conclusory.[16]

In this context, litigation brought to enjoin New Jersey's Governor as to the effectuation of the terms of Plaintiff's agreement with the State of New Jersey "operates against the state itself and is therefore barred by the Eleventh Amendment." *Waterfront Comm'n of New York Harbor,* 961 F.3d 234, 240 (3d Cir. 2020), (petition for cert. filed Dec. 8, 2020). Accordingly, **Count One is DISMISSED WITHOUT PREJUDICE**, as to Defendant Governor Murphy.

Plaintiff's claim at Count One for a permanent injunction pursuant to § 1983 as to the individual State Defendants falls within an *Ex Parte Young* exception. Accordingly, Defendants' motion to dismiss Count One in its entirety is **DENIED.**

Because Plaintiff has sufficiently pled § 1981 and § 1983 claims, Defendants' motion to dismiss Count Five is **DENIED**.

As § 1983 constitutes the "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," *McGovern,* 554 F.3d 120–21, Plaintiff's claims under §

---

[16] *See e.g.,* "There is no question that Governor Murphy knew and authorized this attack given it was high-profile[…]" Am. Compl. ¶187; "Governor Murphy has taken no meaningful steps to address that problem […] he has stood by, and continues to stand-by, while that DOI continues to try to destroy the only African-American asset management firm in New Jersey, BCA." *Id.* ¶ 5.

1981 are not independently cognizable and merge with Plaintiff's § 1983 claims. Accordingly, Defendants' motion to dismiss Count Four is **GRANTED**, and Count Four is **DISMISSED WITH PREJUDICE** as those claims merge with Count Five. To summarize, Counts One and Five are allowed to proceed as to the remaining State Defendants in their **individual capacities**.

### 2.   Section 1985 against Cliffwater and BlackRock (Count Six)

In Count Six, Plaintiff brings claims against Defendants Cliffwater and BlackRock for violation of 42 U.S.C. § 1985. Plaintiff alleges that these Defendants' actions were motivated by racial animus against Plaintiff BCA, an African-American and minority-owned firm. *See* Am. Compl. ¶¶ 226-232. Defendants move to dismiss Count Six, asserting that Plaintiff has not sufficiently alleged the existence of a conspiracy or discriminatory animus. The Court disagrees.

Section 1985 does not create any substantive rights by itself, rather, it is used to vindicate federal rights and privileges that are enumerated in the Constitution or in other federal statutes. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979). "In general, the conspiracy provision of § 1985(3) provides a cause of action under rather limited circumstances against both private and state actors." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 805 (3d Cir. 2001). For a Section 1985 claim to survive a motion to dismiss a plaintiff must allege: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 91 (1971)); *see also United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29 (1983); *Farber v. City of Paterson,* 440 F.3d 131, 134 (3d Cir. 2006).

The Third Circuit has explained that a § 1985(3) plaintiff must establish: "(a) that a racial or other class-based invidious discriminatory animus lay behind the co-conspirators' actions, (b) that the co-conspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that the right was consciously targeted and not just incidentally affected." *Brown,* 250 F.3d at 805 (quoting *Spencer v. Casavilla,* 44 F.3d 74, 77 (2d Cir. 1994)). [17] After establishing that the object of the conspiracy was the deprivation of a federally protected right, a plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action[.]" *Capogrosso v. The Supreme Ct. of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009) (citing *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)); *Ramziddin v. Onfri,* No. CV1917578, 2022 WL 4354837, at *5 (D.N.J. Sept. 20, 2022) (Quraishi, J.).

Here, Plaintiff alleges for example, Cliffwater was acting as the DOI's due diligence consultant while pursuing BlackRock to joint venture with Cliffwater on the FAIR program. Am. Compl. ¶ 52. Cliffwater worked with the State Defendants to find a replacement firm after learning all the details of the FAIR program. *Id.* ¶ 75. Cliffwater falsely assured Plaintiff that it had not and would not share proprietary FAIR program information. *Id.* ¶ 78. Cliffwater worked with

---

[17] 42 U.S.C. §1985(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

BlackRock directly to implement Plaintiff's FAIR program. *Id.* ¶ 100. At Count Six, which incorporates all prior allegations, Plaintiff states that "defendants BlackRock and Cliffwater conspired with the DOI Defendants to deprive BCA of equal protection and equal privileges under the laws in violation of Sections 1981 and 1983." *Id.* ¶ 228. Further, "Cliffwater aided and abetted the DOI in its punitive due diligence process designed to delay and impede the execution of BCA's mandate with the DOI. [F]ollowing the execution of the BCA investment agreement in May 2018, Cliffwater continues to conspire with the DOI in its performance of that contract, including most recently in March 2020 subjecting BCA to punitive audits that serve no legitimate purpose than to discriminate and retaliate against a Black-owned investment firm." *Id.* ¶ 229.

Plaintiff's allegations against Defendant Cliffwater, taken as true at this stage of the litigation, infer that Defendant Cliffwater worked with the State Defendants to misappropriate Plaintiff's FAIR program, divest Plaintiff of a significant business opportunity and interfere with Plaintiff's agreement with the State. The allegations do not, however, infer that Cliffwater was motivated by racial or discriminatory animus. The allegations against Cliffwater regarding racial or discriminatory animus are conclusory at best. *See id.* ¶¶ 228-29. As to the State Defendants, alleged co-conspirators, Plaintiff specifically alleges discriminatory animus, a clear intent to deprive Plaintiff of a right guaranteed by the Constitution against private impairment, and "that the right was consciously targeted and not just incidentally affected." *Brown*, 250 F.3d at 805 (quoting *Spencer v. Casavilla,* 44 F.3d 74, 77 (2d Cir.1994)). *See, e.g.,* Am. Compl. ¶¶ 123, 138, 145, 146, 147, 156. Section 1985(3) requires a plaintiff to allege that invidious racial or otherwise class-based discriminatory animus lay behind the defendants' actions, and he must set forth facts from which a *conspiratorial* agreement between the defendants can be inferred. *Brookhart v. Rohr*, 385 F. App'x 67, 70 (3d Cir. 2010) (emphasis added); *see Bray v.*

*Alexandria Women's Health Clinic,* 506 U.S. 263, 267–68 (1993). At this stage of the litigation, Plaintiff has alleged sufficient facts to raise such an inference.

As to Defendant BlackRock, Plaintiff alleges BlackRock interacted with Cliffwater to redirect the FAIR program implementation to BlackRock. Am. Compl. ¶¶ 52, 77. Plaintiff outlines BlackRock's interactions with the State Defendants, *id.* ¶ 74; and Defendant Walsh, *id.* ¶¶ 75, 89, 90; and Cliffwater, *id.* ¶ 87. Plaintiff further alleges that BlackRock was fully familiar with the proprietary nature of the FAIR program information to provide it with inside information to take over the implementation. *Id.* ¶ 91. Plaintiff claims that "[a]mong other things, BlackRock misappropriated, and to this day has continued to profit from, the FAIR program, despite its knowledge that the DOI had the investment model from another fund, had presented to BlackRock that they wished to pursue the misappropriated model with a different firm; the essential proprietary elements of that program; and the identity, background, and reasons the DOI did not want to proceed with BCA." *Id.* ¶ 230. Furthermore, "BlackRock did not hesitate to leverage its DOI relationship to exploit for its own benefit the proprietary sweat equity of a newly founded African-American firm when the DOI offered it the opportunity to do so." *Id.* Further, that "[W]hile denying it ever intended to benefit from the racist abuse and unfair treatment of BCA when [BlackRock] agreed to manage this investment, it has taken no steps to remedy the wrong from which it has and continues to greatly benefit from to this day and divert opportunities away from BCA." *Id.*

Plaintiff's allegations against Defendant BlackRock, taken as true at this stage of the litigation, infer that BlackRock worked with Cliffwater and the State Defendants to misappropriate Plaintiff's FAIR program, divest Plaintiff of a significant business opportunity and interfere with Plaintiff's agreement with the State. Similar to Cliffwater, the allegations against BlackRock in

the Amended Complaint at paragraphs 228-230 as to racial or discriminatory animus are conclusory statements. Again, as to the State Defendants, alleged co-conspirators, Plaintiff's allegations are sufficient. *See, e.g.,* Am. Compl. ¶¶ 123, 138, 145, 146, 147, 156.  These allegations are sufficient to infer a 1985(3) violation.

Accordingly, Defendants' motion to dismiss Count Six is **DENIED**.

### 3.  Qualified Immunity

The State Defendants assert that they are protected from civil liability by the doctrine of qualified immunity. Government officials are entitled to qualified immunity provided that they do not "violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Having concluded that the Complaint alleges a constitutional violation, the relevant question becomes whether reasonable officials in the Defendants' positions could have believed their conduct to be lawful. *Bounds v. Taylor,* 77 Fed.Appx. 99, 105 (3d Cir. 2003); *Porter v. Pa. Dep't of Corrs.,* 974 F.3d 431, 449 (3d Cir. 2020).

The Third Circuit has held that racially based discrimination and retaliation violates clearly established rights and renders qualified immunity defenses unavailable.  *See In re Montgomery County*, 215 F.3d 367, 377 (3d Cir. 2000) (rejecting qualified immunity defense to § 1981 retaliation claim).  Courts have been reluctant to grant officials qualified immunity against Fourteenth Amendment equal protection claims. *See Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety—Division of State Police*, 411 F.3d 427, 441 (3d Cir. 2005) (denying state troopers qualified immunity because "it has long been a well-settled principle that the state may not selectively enforce the law against racial minorities").

The right to be free from racial discrimination is a clearly established Constitutional right.

Assuming Plaintiff's allegations to be true, reasonable officials in the State Defendants' positions could not have believed that their intentional, discriminatory acts or maintenance of and acquiescence to racially discriminatory policies were lawful. The Court concludes that the allegations in the Amended Complaint, viewed in the light most favorable to Plaintiff, sufficiently support assertions of clearly established constitutional rights, and thus the State Defendants are not entitled to qualified immunity.

Therefore, Defendants' motion to dismiss based on qualified immunity is **DENIED**.

### C.  Fifth Amendment Takings Clause (Count Two)

In Count Two of the Amended Complaint, Plaintiff requests "just compensation" for the alleged "taking" of BCA's trade secret and depriving BCA of the economic benefit derived therefrom. Am. Compl. ¶¶ 208-209. Defendants move to dismiss this count, contending that BCA effectively seeks monetary relief against the DOI, a state agency, and such relief is barred by the Eleventh Amendment. Defendants rely on *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020), which held that the Eleventh Amendment barred a takings claim for damages, and that *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), did not require a different conclusion. *See* ECF No. 128-1, at 43-44.

The Third Circuit has held that the Fifth Amendment's Takings Clause prohibits the government from "taking private property for public use without providing just compensation." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151–52 (3d Cir. 2018) (citing *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012)). The Clause applies to state and local governments through the Fourteenth Amendment. *Id.* To succeed on a takings claim, "the plaintiff[s] must first show that a legally cognizable property interest is affected by the Government's action in question." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428

(3d Cir. 2004); *see also In re Trs. of Conneaut Lake Park, Inc.*, 855 F.3d 519, 526 (3d Cir. 2017) ("Without a legally cognizable property interest, [a plaintiff] has no cognizable takings claim."). Such property interests, in turn, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Newark Cab Ass'n*, 901 F.3d at 151–52 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Accordingly, we look to New Jersey law to determine the property interest at issue. *Id.*

BCA's trade secret is a protectable property right under New Jersey law that is protected by the Taking Clause of the Fifth Amendment. [18] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984). Thus, Plaintiff has alleged sufficient facts to establish a "legally cognizable property interest" in the FAIR program, and entitlement to trade secret protection under New Jersey Law. This accordingly provides protection under the takings clause. *See Ruckelshaus,* 467 U.S. at 1003–04.

Nevertheless, Defendants assert that Eleventh Amendment immunity is available where the plaintiff is afforded a remedy in state court. In support of this argument, Defendants rely on *Zito v. N. Carolina Coastal Res. Comm'n*, 449 F. Supp. 3d 567, 580 (E.D.N.C. 2020), which held that "a state court must remain available to hear a takings claim in order for a state to enjoy sovereign immunity in federal court." Defendants also point to *Hutto v. S.C. Ret. Sys.*, 773 F.3d 552 (4th Cir. 2014), which held "that the Eleventh Amendment bars Fifth Amendment Taking Claims against States in federal court when the state courts remain open to adjudicate such claims."

---

[18] *See* N.J.S.A. § 56:15-1, *et seq.*
"Trade secret" means information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that:
(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. N.J.S.A.§ 56:15-2.

Plaintiff counters that in *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2172 (2019), the Supreme Court reaffirmed its prior holding that "in the event of a taking, the compensation remedy is required by the Constitution," and is "self-executing" without reliance on any other statutory authority. *Id.* at 2171; *see also Jacobs*, 290 U.S. at 16 (claims "based on the right to recover just compensation for property taken" do not require "[s]tatutory recognition."). Plaintiff further contends that the *Knick* decision obviated any requirement that a plaintiff first exhaust state court remedies before claiming a violation of the Takings Clause, (citing *Helen v. Turner*, No. 13-7269, 2020 WL 4582018, at *22 (D.N.J. Aug. 10, 2020) (rejecting defendants' argument that plaintiffs must first exhaust state remedies before claiming a violation of the Takings Clause) (citing *Knick*, 139 S.Ct. at 2167-68)). In *Knick*, the Supreme Court cast doubt on the notion that the availability of state-law relief should determine whether federal courts may hear takings claims. *Id.* at 2169 - 71 (stating that the existence of a state-law remedy "cannot infringe or restrict the property owner's federal constitutional claim," and that to hold otherwise would "hand[ ] authority over federal takings claims to state courts") (internal quotations omitted).

Plaintiff brings its takings claim against the DOI, a state agency.[19] In *Knick*, the Supreme Court did not decide whether the Takings Clause overrides other constitutional provisions like the Eleventh Amendment. The *Knick* decision accordingly does not compel the conclusion that the Takings Clause overrides state sovereign immunity. As previously stated, there are limits to state sovereign immunity. It can be abrogated by Congress, but "Congress' intent to abrogate ... must be obvious from 'a clear legislative statement.'" *Seminole Tribe*, 517 U.S. at 55 (citing *Blatchford v. Native Village of Noatak & Circle Village*, 501 U.S. 775, 786 (1991)). States can also waive sovereign immunity by action or by law. *See Lapides v. Bd. of Regents of Univ.*

---

[19] *See* Am. Compl. at Count 3. ECF No. 78.

*Sys. of Ga.*, 535 U.S. 613 (2002). An individual may also sue a state official under *Ex parte Young* "when that suit seeks only prospective injunctive relief to 'end a continuing violation of federal law.'" *Seminole Tribe*, 517 U.S. at 73 (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)); *see also Ex parte Young*, 209 U.S. 123 (1908); *Pennhurst State Sch. & Hosp.*, 465 U.S. at 89; *Wojak v. Borough of Glen Ridge,* No. 2:16-CV-1605-KM-JBC, 2018 WL 901717, at *11 (D.N.J. Feb. 15, 2018).

Sovereign immunity does not protect the government from a Fifth Amendment Takings Clause claim because the constitutional mandate is "self-executing." *See United States v. Clarke,* 445 U.S. 253, 257 (1980); *Hendler v. United States,* 952 F.2d 1364, 1371 (Fed. Cir. 1991) *Hair v. United States,* 350 F.3d 1253, 1257 (Fed. Cir. 2003). The Eleventh Amendment provides that each State is a sovereign entity in our federal system; and that "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent . . . [F]ederal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." *Seminole Tribe,* 517 U.S. at 54 (internal citations and quotation marks omitted). The purpose of sovereign immunity "is to accord States the dignity that is consistent with their status as sovereign entities." *Fed. Maritime Comm'n v. S.C. State Ports. Auth.*, 535 U.S. 743, 760 (2002) (internal quotations omitted). There is no evidence of Congressional abrogation or waiver by the state.

Accordingly, Defendants' motion to dismiss Plaintiff's Takings Clause claim against the DOI, as an agency of the State of New Jersey, at Count Two of the Amended Complaint is **GRANTED** and **Count Two is DISMISSED WITH PREJUDICE.**

**D. New Jersey Civil Rights Act Claims (Count Seven, Discrimination; Count Eight, Retaliation)**

In Counts Seven and Eight, respectively, the Amended Complaint alleges retaliation and discrimination in violation of the NJCRA against Defendants McDonough, Amon, Ajmani, and Helmy in their individual capacities, Am. Compl. ¶¶ 233-239; ¶¶ 240-245.

Because the Court has already determined that Plaintiff has sufficiently stated a discrimination claim under the federal Constitution, and because courts interpret the New Jersey Constitution analogously to the federal Constitution, *see Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 444 (D.N.J. 2011), the Court will permit the NJCRA claims to proceed as well. Plaintiff has sufficiently alleged a specific violation of a clearly established statutory or Constitutional right under 42 U.S.C. § 1983 and the NJCRA.

Accordingly, Defendants' motion to dismiss Counts Seven and Eight is **DENIED**.

**E. Racketeering, Violation of 18 U.S.C. § 1962 (Counts Nine and Ten) and N.J.S.A. 2C:41-2 (Counts Eleven, Twelve, and Thirteen)**

Plaintiff alleges that Defendants DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock engaged in racketeering activities in violation of 18 U.S.C. § 1962(c) and (d) **(Counts Nine and Ten)**; and the NJRICO statute, N.J. Stat. Ann. § 2C:41-29(c) and (d) **(Counts Eleven and Twelve)**. Plaintiff further alleges that Defendants Cliffwater and BlackRock engaged in aiding and abetting racketeering in violation of N.J.S.A. 2C:41-2(c) and (d) **(Count Thirteen)**. Defendants seek to dismiss Plaintiff's substantive federal and state RICO claims as being time barred by the Eleventh Amendment,[20] deficient because Plaintiff failed to meet the RICO distinctiveness requirement, and that Plaintiff failed, both substantively and under Fed. R. Civ. P. 9(b), to plead actionable predicate offenses of racketeering activity as to each

---

[20] The Court addressed the Eleventh Amendment bar at section **III.A.2.**, *supra*.

Defendant. *See Banks v. Wolk*, 918 F.2d 418, 421 (3rd Cir. 1990); *State v. Ball*, 141 N.J. 142, 163, 661 A.2d 251 (N.J. 1995). The Court disagrees.

To plead a violation of 18 U.S.C. § 1962(c), Plaintiff must allege: 1) the conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985) (quoted in *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 289 (3rd Cir. 1996)). To make out a prima facie case under N.J.S.A. 2C:41–2c, plaintiffs must allege "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." *State v. Ball*, 141 N.J. 142, 181 (1995); *Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC,* No. CIV. 12-7242 KSH, 2013 WL 5467093, at *20 (D.N.J. Sept. 30, 2013).

In support of its RICO claims, Plaintiff alleges that Defendants knowingly and intentionally: (a) used the mails in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1341, [21] which is incorporated as "racketeering activity" under 18 U.S.C. § 1961(1), directly injuring BCA; (b) used the wires in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343,[22] which is incorporated as "racketeering activity" under 18 U.S.C. § 1961(1), directly injuring BCA; and (c) misappropriation of trade secrets and proprietary information and trade theft in violation of 18 U.S.C. § 1832(a), which is incorporated as "racketeering activity" under 18 U.S.C. § 1961(1),[23] directly injuring BCA. Am. Compl. ¶ 251. Plaintiff further alleges that it was the purpose of the Enterprise to enrich themselves and their

---

[21] The Court addresses the fraud allegations at section **III. F.**, *infra.*

[22] *Id.*

[23] The Court addresses the allegations of misappropriation of trade secret at section **III. C.**, *supra.*

preferred business partners through a scheme to defraud and induce minority-owned firms and individuals to share their trade secrets, ideas, and business relationships, which the Enterprise then stole, misappropriated, redirected, and implemented with preferred non-minority investment firms. *Id.* ¶ 253.

### 1. The State and Federal RICO Claims are not Time Barred

Both the federal and state civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 146, 156 (1987); *Forbes v. Eagleson,* 228 F.3d 471, 483 (3d Cir. 2000); *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 510 (3d Cir. 2006); *In re Liquidation of Integrity Ins. Co.*, 245 N.J. Super. 133, 137 (Law Div. 1990). To succeed on a motion to dismiss on the basis of statute of limitations, the defendant must demonstrate that "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas,* 770 F.3d 241, 249 (quoting *Robinson v. Johnson,* 313 F.3d 128, 134-35 (3d Cir. 2002)). The Third Circuit has held that "a RICO claim accrues when plaintiffs knew or should have known of their injury." *Cetel v. Kirwan Financial Group, Inc.,* 460 F.3d at 507 (quoting *Mathews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001)). "[T]his rule has 'both subjective and objective' components and, with respect to the subjective, 'a claim accrues no later than when the plaintiffs themselves discover their injuries.'" *Id.* at 507 (quoting *Mathews*, 260 F.3d at 252). However, the objective components of the inquiry require the court to "determine when plaintiffs should have known of the basis of their claims, which depends on whether [and when] they had sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm warnings of culpable activity." *Id.*

The Third Circuit follows the "injury discovery rule" as the governing standard for determining statute of limitations issues in civil RICO claims. *Forbes v. Eagleson,* 228 F.3d 471, 484 (3d Cir. 2000). This approach requires the court to "determine when the plaintiffs knew or

should have known of their injury." *Prudential Insurance Co. v. United States Gypsum Co.,* 359 F.3d 226, 233 (3d Cir. 2004) (quoting *Forbes,* 228 F.3d at 484). "In addition to the injury, the plaintiffs must also have known or should have known of the source of their injury." *Id.* Nothing more is required to trigger the running of the four-year limitations period governing a civil RICO claim. *Id.*

Pointing to the Notice of Claim ("NOC"), the State Defendants assert that BCA learned of the facts that form the basis for its RICO claims, and its purported RICO injury in April 2016, when BCA learned of the DOI's decision to award the FAIR program mandate to BlackRock, which BCA claims incorporated its proprietary information into its FAIR program. (NOC at 2; Am. Compl. ¶¶ 95-101, 105). Defendants conclude that BCA's RICO claims thus accrued more than four years before the filing of the Original Complaint on June 23, 2020. *See id.*; *see also* ECF No. 128-1 at 62. Defendants further assert that BCA's alleged RICO injuries emanate from the DOI's decision to invest with BlackRock in an investment vehicle with a FAIR program mandate, which was communicated to BCA in April 2016. *Id.* at 64.

Plaintiff counters, which Plaintiff alleges Defendants concede, (ECF No. 125-1, at 15), that RICO claims accrue upon discovery of the RICO injury. *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006); *see also Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 214 (3d Cir. 2008) ("potential plaintiff cannot discovery his injury before it has occurred."); *Margolis v. Warner Chilcott (US) LLC*, No. 17-4550 (JMV) (JBC), 2018 WL 2455925, at *4 (D.N.J. May 31, 2018). Plaintiff further asserts that Defendants first informed BCA that the DOI chose not to pursue the FAIR mandate with BCA in April 2016. BCA did not learn that the DOI, Cliffwater, and BlackRock misappropriated BCA's proprietary program until July 28, 2016, when the DOI announced in a press release its proposed BlackRock investment and the terms of that

investment, which were identical in name and elements to BCA's FAIR program.  Am. Compl. ¶

101.  The BlackRock mandate was ultimately approved on August 5, 2016, with an initial $500

million investment and authority to invest another $500 million.  *See id.* ¶ 102. Further,

Defendants' contentions about what BCA might have known, or should have known, are

insufficient to meet their high burden to establish a statute of limitations defense at the pleadings

stage.  *See Dimartino v. BMW of N. Am., LLC*, No. 15-8447 (WJM), 2016 WL 4260788, at *2

(D.N.J. Aug. 11, 2016) (determination of when a party should know he has been injured "is one

of fact and best left to the fact-finder"); *Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254 (3d Cir.

2007).

New Jersey's RICO statute is treated co-extensively with its federal counterparts for

timeliness purposes.  *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678

F. 3d 235, 245 (3d Cir. 2012); *Bank of Am. Corp.*, 153 F. Supp. 3d 831, 842 (W.D. Pa. 2015)

(noting that the Third Circuit holds that "tolling inquiries are generally fact-intensive," and that

"reasonable diligence is a fact-specific inquiry"); *see also Van Buskirk v. Carey Canadian Mines,

Ltd.*, 760 F.2d 481, 487 (3d Cir. 1985) (finding that "statute of limitations is an affirmative defense,

and the burden of establishing its applicability to a particular claim rests with the defendant.").

While a plaintiff is required to exercise diligence, the injury's occurrence is still the critical turning

point in the accrual analysis.  *See William A. Graham Co. v. Haughey*, 568 F.3d 425, 438-39 (3d

Cir. 2009) (noting that the Third Circuit has "rejected the proposition that the discovery rule places

a duty on prospective plaintiffs to inquire into possible future wrongful conduct"). Plaintiff further

contends that even if it knew in April that something was wrong, it lacked knowledge concerning

the extent of that injury, including the misappropriation of its proprietary information, who else

was involved, and what that might ultimately mean for its own deal. ECF No. 138 at 72. The Court

agrees.

Ultimately, questions of accrual and timeliness are highly-fact specific, and generally not appropriate for dismissal at the pleadings stage. *See Dimartino v. BMW of North America, LLC*, No. 15-8447 (WJM), 2016 WL 4260788, at *2 (D.N.J. Aug. 11, 2016). Accordingly, Plaintiff's allegation that the BlackRock mandate was ultimately approved on August 5, 2016, with an initial $500 million investment and authority to invest another $500 million, *see* Am. Compl. ¶ 102, was the source of injury, is sufficient to defeat dismissal based on the statute of limitations.

### 2.   Plaintiff Has Met the RICO Distinctiveness Requirement

The Supreme Court and the New Jersey Supreme Court have held that RICO is to be interpreted broadly. "The statute does not specifically define the outer boundaries of the 'enterprise' concept but states that the term 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' § 1961(4). This enumeration of included enterprises is obviously broad, encompassing 'any ... group of individuals associated in fact.'" *Boyle v. United States,* 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (citations omitted.) "[T]he term 'enterprise' is derived from the extensive legislative history and decisional law dealing with both the State and federal RICO statutes. . . . [T]he RICO statute itself in using the term 'enterprise' contains no express or implied requirement for a distinct ascertainable structure; rather, it is framed broadly to include any group of persons 'associated in fact.' . . . [T]he term 'enterprise' was meant to be construed broadly. The statute itself, N.J.S.A. 2C:41–6, commands the liberal construction of 'enterprise.'" *State v. Ball*, 141 N.J. 160 -61, *see also Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n,* 14 F. Supp. 3d 591, 613 (D.N.J. 2014).

Defendants contend that BCA has failed to adequately meet the pleading requirement of distinctiveness under § 1962(c), which provides: "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). *See also Zavala v. Wal-Mart Stores, Inc.,* 447 F. Supp. 2d 379, 382 (D.N.J. 2006) ("If the members of the enterprise are the same as the persons, the distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical."). Defendants argue that Plaintiff alleges that "[e]ach of Defendants DOI, McDonough, Rosenstock, Ajmani, Walsh and BlackRock (hereinafter the "RICO Defendants"), at all relevant times, is and has been a "person" within the definition of 18 U.S.C. § 1961(3)...," that "[t]he RICO Defendants comprise an association, associations and/or are associated-in-fact Enterprise (the "Enterprise")," and that "[t]he Enterprise was operated, managed, and controlled by the [RICO Defendants]." Am. Compl. ¶¶ 248-49. BCA also alleges that the "RICO Defendants" participated in "racketeering activity" by engaging in certain predicate acts and that they committed the predicate acts. *Id*. ¶¶ 248-49, 262; ECF No. 128-1 at 67. Defendants take the position that New Jersey does not recognize a purely intra-corporate enterprise, devoid of individuals or foreign entities and under federal RICO, "a violation ... by a corporate entity requires an association with an enterprise that is not the same corporation." *B.F. Hirsch v. Enright Ref. Co., Inc.,* 751 F.2d 628, 634 (3d Cir. 1984). Thus, "[i]n the Third Circuit, RICO plaintiffs cannot evade the distinctiveness requirement by pleading a corporate 'enterprise' composed of a defendant's subsidiaries, employees and agents." *Longmont United Hosp. v. St. Barnabas Corp.,* No. 06–2802, 2007 WL 1850881, at *9 (D.N.J. June 26, 2007) (Cavanaugh, J .), *aff'd,* 305 F. App'x 892 (3d Cir. 2009).

Plaintiff counters that it alleges that the DOI, McDonough, Rosenstock, Ajmani, Walsh, and BlackRock formed an association-in-fact for the purpose of defrauding minority-owned firms and individuals, including BCA, into disclosing their trade secrets, proprietary plans, and business relationships, which the RICO enterprise misappropriated and redirected to its preferred non-minority investment firms for their collective personal gain. To effect this scheme, each of the enterprise's members engaged in predicate acts, including mail and wire fraud, and misappropriation of trade secrets. Plaintiff argues that the federal RICO statute defines an "enterprise" as "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated-in-fact although not a legal entity. *See* 18 U.S.C. § 1961(4). *U.S. v. Bergrin*, 650 F.3d 257, 266 (3d Cir. 2011).   Relying on *Boyle v. United States*, Plaintiff argues that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may be the same. 556 U.S. 938, 947 (2009) (rejecting the argument that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010) (recognizing *Boyle*'s abrogation of prior case law and holding that where "defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact *enterprise's* affairs, and not [simply] their *own* affairs"). ECF No. 138 at 76-77.

Citing *Boyle,* Plaintiff asserts that that an association-in-fact enterprise need only have three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946. Moreover, although distinctiveness and a pattern of racketeering activity are separate elements, the evidence used to prove them may overlap. *Id.*; *see also State v. Ball ("Ball II")*,141 N.J. 142, 163-64 (1995)

(holding same under New Jersey law). ECF No. 138 at 77. Plaintiff further alleges that these allegations of purpose, relationships, and longevity satisfy the pleading standards under federal or New Jersey law. *Id.* at 78.

Plaintiff contends that it is not required to identify individual participation in the RICO enterprise by pleading that each Defedant directed, participated, or had knowledge of every aspect of the scheme. Plaintiff relies on *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), for the proposition that participation in an enterprise "is not limited to those with primary responsibility for the enterprise's affairs." ECF No. 138 at 78 (citing *Reves*, 507 U.S. at 179 ("RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.")).

At this point in the litigation, the Court is satisfied that it may be inferred from the allegations that Defendants through their concerted actions engaged in a pattern of racketeering activity.

Accordingly, Plaintiff has met the distinctiveness requirement and the Court will not dismiss the RICO claims on distinctiveness grounds.

### 3. Plaintiff Has Adequately Pled a Predicate Act

Defendants contend that BCA fails to allege a pattern of racketeering activity. ECF No. 125-1 at 21-23; ECF No. 130-1 at 22-24. Defendants further contend that with regard to both the state and federal RICO claims, BCA alleges in conclusory fashion that the State Defendants' alleged conduct amounts to acts of mail fraud, 18 U.S.C. §1341, wire fraud, 18 U.S.C. §1343, and trade secret theft, 18 U.S.C. §1832(a), and Plaintiff has failed to adequately plead such claims with particularity. *See, e.g., Fimbel v. Fimbel Door Corp.*, 2014 WL 6992004 (D.N.J. Dec. 10, 2014) ("Courts have held that a claimant pleading a New Jersey RICO violation must comport with Rule 9(b)'s heightened pleading requirements for fraud."); *Construcciones Haus Soceidad v. Kennedy*

*Funding Inc.*, 2008 WL 1882857, at *5 (D.N.J. Apr. 24, 2008); *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) ("Where acts of mail and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading requirement of Rule 9(b).") (citing *Rolo*, 155 F.3d at 657-58). Defendants argue that under Fed. R. Civ. P. 9(b), the circumstances of fraud must be pled with particularity to provide Defendants with notice of the "precise misconduct" of which they are accused. *Seville Industrial Machinery,* 742 F.2d at 791. Defendants further argue "[g]iven the routine use of mail and wire communications in business operations . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000), cert. denied, 532 U.S. 905 (2001)); *see also Gross v. Waywell,* 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009) (noting the ordinary use of the mails and wires in business transactions, which are not "inherently criminal," and warning against "the potential for transforming garden-variety common law actions into federal cases is greater" when predicate acts are based on mail and wire fraud).

To allege mail or wire fraud, a plaintiff must describe with particularity (1) the existence of a scheme to defraud, (2) the use of the mails or the wires in furtherance of the fraudulent scheme, and (3) culpable participation by the defendants. *Emcore Corp. v. Pricewaterhouse Coopers LLP*, 102 F. Supp. 2d 237, 245 (D.N.J. 2000) (citing *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir. 1994)).

Defendants argue that group or shotgun pleadings in the Amended Complaint, wherein BCA generally alleges that all of the "RICO Defendants" committed mail and wire fraud, do not comply

with the requirements of RICO or the particularity standards of Rule 9(b). *See, e.g., Murray v. Cty. of Hudson*, 2018 WL 3000333, at *7 (D.N.J. June 15, 2018). Defendants assert that   the particularity requirements demand more details regarding the alleged predicate acts as well as information concerning exactly where, when and by which defendant any representations involved in the alleged fraudulent scheme were communicated and how such statements actually deceived BCA., ECF No. 128-1 at 73-74.

Plaintiff counters that "Racketeering activity" consists of a list of enumerated crimes, including theft of trade secrets, mail fraud, and wire fraud. 18 U.S.C. § 1961(1) (citing 18 U.S.C. §§ 1832, 1341, 1342). ECF No. 138 at 78-79. Plaintiff has alleged the following:

- The DOI, McDonough, and Rosenstock used the mails and wires to communicate with BCA and other minority funds to fraudulently induce BCA and Powell Capital Markets, among others, to share trade secrets and propriety information and ideas; (*see e.g.* Am. Compl. ¶¶ 51, 61, 63-64, 66) (DOI induced BCA to provide information); (*id.* ¶¶ 48-51) (Walsh induced BCA to work with DOI); (*id.* ¶ 91) (Rosenstock involved in due diligence);

- The DOI, McDonough, and Rosenstock used the mails and wires to perpetuate sham negotiations for the purpose of obtaining their targets proprietary ideas and trade secrets; (*see e.g. id.* ¶¶ 51, 61) (DOI assured investment); (*id.* ¶ 63) (McDonough provided false promises of confidentiality); (*id.* ¶) (Rosenstock assuring commitment);

- The DOI, McDonough, Rosenstock, BlackRock, 41 Walsh, and Ajmani misappropriated BCA's and/or Powell Capital Markets' trade secrets and proprietary ideas; (*see e.g. id.* ¶¶ 255-58) (DOI misappropriating Powell idea); (*id.* ¶¶ 91, 100) (McDonough backchanneled FAIR details); (*id.* ¶ 91) (Rosenstock backchanneled FAIR details); (*id.* ¶ 100) (BlackRock learning BCA confidential information); (*id.* ¶¶ 88-92) (Walsh backchannled FAIR details to BlackRock);

- The DOI, McDonough, Rosenstock, BlackRock and Walsh, used the mails and wires to disseminate the misappropriated trade secrets and proprietary information among themselves and to their preferred non-minority business partners; (*see e.g. id.* ¶¶ 255-58) (DOI misappropriating Powell idea); (*id.* ¶¶ 91, 100) (McDonough backchanneled FAIR details); (*id.* ¶ 91) (Rosenstock backchanneled FAIR details); (*id.* ¶ 100) (BlackRock learning BCA confidential

information); (*id.* ¶¶ 88-92) (Walsh backchannled FAIR details to BlackRock);

- The DOI, McDonough, Rosenstock, and BlackRock used the mails and wires to compensate its preferred non-minority partners for fees earned through the misappropriated programs, trade secrets, ideas, and information; (*see e.g. id.* 101, 102) (DOI approving $500M FAIR program with BlackRock and $600M program with Owl Rock); (*id.* ¶ 100) (McDonough worked to approve FAIR with BlackRock); (*id.* ¶ 91) (Rosenstock aiding BlackRock FAIR proposal); (*id.*. ¶102) (BlackRock receiving $500M investment);

- The DOI, Walsh, and BlackRock used the mails and wires to misappropriate the evergreen deal from a minority member of BlackRock's team that facilitated the deal and the relationship in favor of Donald Perrault who was part of the "old-boys" network of political patronage, and bureaucratic "pay to play," *quid pro quo* schemes; 42 (*see e.g. id.* ¶ 254) (DOI misappropriated evergreen deal); (*id.* ¶ 254) (Walsh replaced black representative); (*id.* ¶ 254) (BlackRock aided misappropriation); and

- The DOI, BlackRock, McDonough, Rosenstock and Walsh used the mails and wires to publicly disclose information concerning the misappropriated programs, trade secrets, ideas, and information; (*See e.g. id.* ¶¶ 255-58) (DOI misappropriating Powell idea); (*id.* ¶¶ 91, 100) (McDonough backchanneled FAIR details); (*id.* ¶ 91) (Rosenstock backchanneled FAIR details); (*id.* ¶ 100) (BlackRock learning BCA confidential information); (*id.* ¶¶ 88-92) (Walsh backchanneled FAIR details to BlackRock).

ECF No. 138 at 79-81.

Plaintiff argues that the Amended Complaint alleges two predicate acts by each RICO Defendant. The Court agrees. There are limits to what can be sorted out at this stage of the litigation and as a practical matter, enough has been pleaded about each Defendant's role for the RICO claims to survive.

### 4. Plaintiff Has Adequately Pleaded a RICO Conspiracy Claim

Defendants contend that Plaintiff's RICO conspiracy claims fail on the basis that Plaintiff has failed to properly allege RICO claims. Defendants contend that "[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *29 Magnum v. Archdiocese of Phila.*, 253 Fed.

Appx. 224, 229 (3d Cir. 2007); *see also Lightning Lube v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.

1993); *Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, 2019 WL 5541410,

at \*10 (D.N.J. Oct. 28, 2019); *Arunachalam v. Pazuniak,* 2017 WL 3978000, at \*7 (D. Del. Sept.

11, 2017) ("Finally, because all the substantive RICO claims are deficient, the claim for

racketeering conspiracy pursuant to §1962(d) also fails.").  Plaintiff counters that it properly

alleges that the RICO Defendants conspired to commit racketeering activity.

A claim under § 1962(d) requires "an (1) agreement to commit the predicate acts" and "(2)

knowledge that those acts were a part of a pattern of racketeering activity conduct in such a way

as to violate section 1962(a), (b), or (c)." *See Aliperio v. Bank of Am., N.A.*, 764 F. App'x 236, 239

(3d Cir. Feb. 26, 2019). Further, a defendant in a racketeering conspiracy need not personally

commit or agree to commit predicate acts. Rather, "all that is necessary for such a conspiracy is

that the conspirators share a common purpose." *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001).

Further, that it is entirely possible that "[a] defendant may be guilty of a RICO conspiracy" even

if the Court were to find they had not committed a substantive RICO violation. *Ball II*, 141 N.J. at

177-180.

Having found that Plaintiff has sufficiently alleged RICO claims, the Court additionally

finds that Plaintiff has sufficiently alleged a common purpose among Defendants at this stage of

the litigation.

Accordingly, Defendants' motion to dismiss Counts Nine, Ten, Eleven and Twelve is

**DENIED.**

### 5.  Aiding and Abetting RICO Conspiracy against Cliffwater and Owl Rock (Count Thirteen)

Defendant Owl Rock contends that BCA does not adequately allege that Owl Rock

knowingly and substantially assisted any underlying New Jersey RICO violation. Owl Rock argues

first that BCA fails to allege that Owl Rock knew of the alleged RICO violations with any particularity. Second, BCA ignores the issue of whether Owl Rock substantially assisted any underlying RICO violation. Owl Rock Reply Br. at 12-13, ECF No. 144. Further, that BCA pleads no facts showing any affirmative conduct by Owl Rock—as opposed to Walsh, a RICO defendant himself—never mind substantial assistance. *Id.* at 15.

Defendant Cliffwater cites the legal proposition that aiding and abetting liability requires that: (1) an independent wrong exists; (2) the aider or abettor knows of that wrong's existence; and (3) substantial assistance must be given in effecting that wrong. *Landy*, 486 F.2d 162-163. Further, "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006). Cliffwater contends that there are no such allegations in the Amended Complaint. Cliffwater argues that the predominant basis for BCA's aiding and abetting claim is that Cliffwater represented that the DOI intended on partnering with BCA—which BCA admits the DOI in fact did. Cliffwater contends that it makes no sense for BCA to argue that a truthful representation "substantial[ly] assist[ed]" an independent wrong perpetrated by the other defendants. BCA also alleges that Cliffwater subjected BCA to "punitive audits" in March 2020 that "serve[d] no legitimate purpose than to discriminate and retaliate against a Black-owned investment firm." Am. Compl. ¶ 300(b). Cliffwater argues that this conclusory allegation contradicts BCA's earlier admission (which is also true) that Cliffwater did not in fact conduct a due diligence update because the DOI designated a different consultant to conduct the review. *Id.* ¶ 171. Thus, Cliffwater did not "substantial[ly] assist"—let alone assist at all—in punitive audits performed in March 2020. Cliffwater further contends that BCA states in conclusory fashion that Cliffwater disclosed confidential information to BlackRock, but never once describes the nature

of the confidential materials distributed, the date of the disclosure, or the names of any of the distributors of the confidential information. Further, that BCA fails to allege any confidential or employment relationship between it and Cliffwater and that Cliffwater was merely following the DOI's instructions as to its various duties as the DOI's non-discretionary, outside consultant, which conduct cannot plausibly be characterized as substantial assistance in two or more predicate wrongdoings.

To state a claim for civil conspiracy, the necessary proofs must show "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Morgan v. Union Cty. Bd. of Chosen Freeholders,* 268 N.J. Super. 337, 364 (App. Div. 1993) (internal quotations omitted). A purported conspirator must have understood "the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do your part to further them." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988)). The "gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" *Morgan,* 268 N.J. Super. at 364 (quoting *Bd. of Educ. v. Hoek*, 38 N.J. 213, 238 (1962)); *see also Weil v. Express Container Corp.,* 360 N.J. Super. 599, 614 (App. Div.), certif. denied, 177 N.J. 574 (2003). A plaintiff must plead an intentional tort underlying the civil conspiracy claim. *Lewis v. Airco, Inc.,* No. A-3509-08T3, 2011 WL 2731880, at *33 (N.J. Super. Ct. App. Div. July 15, 2011); *Portes v. Tan,* No. A-3940-11T3, 2014 WL 463140, at *10 (N.J. Super. Ct. App. Div. Feb. 6, 2014) (affirming dismissal of conspiracy count where underlying fraud and consumer fraud claims were inadequately pled.").

Plaintiff argues that the Amended Complaint alleges aiding and abetting claims against both Cliffwater and Owl Rock. Liability for aiding and abetting extends to anyone who "knew of the commission of the substantive offense and acted with the intent to facilitate it[,] however, the defendant need not have been present during, or known the details of, the commission of the act." *Shulton, Inc. v. Optel Corp.*, No. Civ. A. 85-2925, 1986 WL 15617, at *13 (D.N.J. Sept. 29, 1986); *see also United States v. Pungitore*, 910 F.2d 1084, 1132 (3d Cir. 1990) (aiding and abetting RICO liability extends to any defendant who "associates [themselves] with the criminal venture as something [they] wished to bring about" and sought by their actions to help succeed.)

Here, BCA alleges that both Cliffwater and Owl Rock had full knowledge of the RICO Defendants' scheme and did their part to bring about its success, which provided them with new business opportunities in the form of a potential joint venture with BlackRock (Am. Compl. ¶¶ 86, 88-89), an unprecedented anchor investment with the DOI approved in record time (*id.* ¶ 102), and continued business opportunities with the DOI. *Id.* ¶ 302. Cliffwater served as DOI's due diligence consultant, and in that role assisted with the misappropriation of BCA's proprietary information. *Id.* ¶¶ 114, 123, 132. Cliffwater also helped to broker DOI's deal with BlackRock in the hopes of securing its own joint venture opportunity with BlackRock and continued work with the DOI. Am. Compl. ¶¶ 52, 86, 95. Finally, Cliffwater demonstrated its knowledge of the scheme when it disclosed to BCA before the deal commenced that DOI would not be proceeding with the BCA mandate. *Id.* ¶¶ 76-77. Similarly, Owl Rock, on its own and through its then-undisclosed Managing Director, Walsh, also facilitated the misappropriation of the FAIR program as a quid pro quo for its own investment mandate. *Id.* ¶¶ 89-90.

BCA has pled significant and detailed allegations about Cliffwater and Owl Rock's involvement with the RICO conspiracy. Accordingly, Defendants' motion to dismiss Count Thirteen is **DENIED.**

### F. Fraud (Count Fourteen), Aiding and Abetting Fraud (Count Fifteen)

In Count Fourteen of the Amended Complaint, Plaintiff alleges fraud claims against Defendants McDonough, MacDonald, Rosenstock, Amon, Cliffwater and Walsh, upon which the claims for aiding and abetting fraud (Count Fifteen)[24], and conspiracy (Count Twenty-Two)[25] rely. Plaintiff claims that Defendants McDonough, MacDonald, Rosenstock, Amon, Cliffwater, and Walsh committed fraud by making "a series of material misrepresentations and omissions to induce [BCA] to disclose its trade secret and proprietary FAIR program, which the DOI then misappropriated and exploited for its own personal gain to the exclusion of [BCA], and to forego investment opportunities with other anchor partners." Am. Compl. ¶ 313. In Count Fifteen, BCA alleges that BlackRock aided and abetted this supposed fraud through "misappropriating [BCA]'s trade secrets" to implement the FAIR program. *Id.* ¶ 315. Defendants contend that Plaintiff's allegations contain general characterizations, lack specifics, provide no factual allegations that any promises were misrepresentations, or sufficient factual allegations as to the BCA proprietary information that BlackRock supposedly used in developing its FAIR program. Defendants further assert that Plaintiff fails to allege Defendants' motives for alleged misrepresentations, particularly based on DOI's eventual investment in BCA, and engages in "group pleading," violative of Fed. R. Civ. P. 9(b), which requires specific allegations against each defendant. The Court disagrees.

---

[24] Plaintiff specifies in the Count Fifteen heading as being against Defendants Blackrock and Owl Rock. Am. Compl., ECF No. 78 at 91 ¶¶ 312-318.
[25] At Count Twenty-two of the Am. Compl., Plaintiff lists Counts Fourteen (Fraud) and Fifteen (Aiding and Abetting Fraud), among the Counts that serve as the basis for claims of civil conspiracy. *See* ECF No. 78 ¶ 358.

The elements of a claim for common-law fraud under New Jersey law are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 492 (D.N.J. 1998); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 174 (2005) (citing *Gennari,* 148 N.J. at 610). Defendants challenge Plaintiff's pleading of each element. Pursuant to  Rule 9(b) requires that "fraud must be pled with particularity in all claims based on fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 220 (3d Cir. 2004).

To establish fraud under New Jersey law, a plaintiff must prove that "the defendant made . . . a material misrepresentation of present or past fact." *Read v. Profeta*, 397 F. Supp. 3d 597, 635 (D.N.J. 2019) (citing *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir. 1993)). To be a basis for an action for fraud, "the alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled . . . [t]he 'mere proof of nonperformance does not prove a lack of intent to perform.'" *Read*, 397 F. Supp. 3d at 636 (quoting *Lightning Lube,* 4 F.3d at 1186). While the particularity requirement for claims of fraud does not mandate that plaintiffs prove their case in the complaint, and a defendant's state of mind may be averred generally, plaintiffs must still allege facts that are the basis for inferring that the defendants acted with the requisite intent. *See Burlington*, 114 F.3d at 1418; *Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n,* 14 F. Supp. 3d 591, 607-608 (D.N.J. 2014). A plaintiff must "either (a)...alleg[e] facts to show that defendants had both motive and opportunity to commit fraud, or (b)...alleg[e] facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." *Burlington,* 114 F.3d at 1418; *see also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F. Supp. 2d 589, 604 (D.N.J. 2001).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement for allegations of fraud, over and above that required by Rule 8(a). *Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 WL 2976839 at *10 (D.N.J. July 21, 2011).  "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give defendants an opportunity to respond meaningfully to the complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City of Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (citing *Seville Indust. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)). "[B]oilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418. Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The Rule also "requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276 (3d Cir. 2006) (citing *In re Rockefeller Center Prop. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir. 2002)).

"Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotation and citation omitted). "[S]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not

constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 435 (D.N.J. 1998). However, "[a]n opinion or projection, like any other representation, will be untrue if it has no valid basis." *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 38 (D.N.J. 2020) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985)); *Kline v. First Western Gov't Servs., Inc.*, 24 F.3d 480, 486 (3d Cir. 1994).

The plaintiff need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants. *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)) (citing *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983)). Thus, courts have relaxed the application of Rule 9(b) prior to discovery when factual information is peculiarly within the defendant's knowledge or control. *Caspersen,* 441 F. Supp. 3d at 35–36, (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989); *DiMare v. MetLife Ins. Co.*, 369 Fed. App'x 324, 330 (3d Cir. 2010).

Plaintiff's claims for conspiracy, aiding and abetting fraud, and constructive fraud rely on successfully pleading the underlying fraud claim. *See Am. Corporate Soc. v. Valley Forge Ins. Co.,* 424 Fed. Appx. 86, 90 (3d Cir. 2011) (listing elements of conspiracy); *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P. C.*, 331 F.3d 406, 415 (3d Cir. 2003) (listing elements of aiding and abetting fraud); *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619

(N.J. 1981) (listing elements for constructive fraud); *Inventory Recovery Corp. v. Gabriel,* No. 2:11-CV-01604 WJM, 2012 WL 2990693, at *3 (D.N.J. July 20, 2012).

Plaintiff argues[26] that it sufficiently alleges fraud and provides the following examples from the Amended Complaint: (i) throughout the spring and summer of 2015, McDonough and MacDonald misrepresented that the DOI was committed to investing approximately $500 million with BCA, and that securing the SIC's approval for the BCA mandate was a formality even though McDonough and MacDonald knew that the SIC would never approve the FAIR mandate with a minority and female-owned firm (Am. Compl. ¶ 51); (ii) McDonough and MacDonald misrepresented that the DOI intended to approve the mandate prior to year-end, even though they had no intention of proceeding with BCA but merely sought to misappropriate its proprietary business model so that it could pursue the FAIR mandate with a preferred partner (*id.* ¶ 51-53); (iii) Rosenstock likewise misrepresented the DOI's commitment to proceeding with BCA (*id.* ¶ 74); (iv) McDonough directed that BCA need not pursue a partnership with another financial institution because the DOI intends to serve as BCA's anchor investor, even though the DOI had no intention of investing with BCA (*id.* ¶ 54); (v) McDonough, MacDonald, and Cliffwater each misrepresented that BCA's proprietary information would be kept confidential (*id.* ¶¶ 63-66); (vi) Walsh misrepresented that he could assist in brokering and negotiating a deal between BCA and the DOI even though Walsh knew that the DOI would never pursue the FAIR mandate with BCA because it was not part of its preferred network of "old-boy" Wall Street firms, and Walsh was simultaneously brokering a deal between the DOI and BlackRock to do BCA's FAIR program as a *quid pro quo* for the DOI's investment in Owl Rock (*id.* ¶¶ 57-59); (vii) McDonough, Amon, and Rosenstock continually mispresented the DOI's intent to invest with BCA and treat it like

---

[26] Pl.'s Opp'n Br., ECF No. 138 at 56.

similarly situated investment managers (*id.* ¶ 111); and (viii) after the Investment Agreement was finally executed, Defendants, including McDonough and Amon continued to misrepresent that they were evaluating each of BCA's proposed investments on fair, customary and market terms, when in fact they rejected each investment (despite previously vetting and approving them) on pretextual grounds and in retaliation for BCA's complaints about the discriminatory and racial abuses it was subjected to.

At this early stage of the litigation, Plaintiff attributes precise misconduct and states with particularity the Defendants' actions that constitute fraud or mistake. *See* Fed. R. Civ. P. 9(b). Plaintiff meets the pleading standard by generally alleging that Defendants' "[m]alice, intent, knowledge, and other conditions of [] mind." *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The allegations within the Amended Complaint sufficiently "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico*, 507 F.3d at 200 (internal quotation and citation omitted). The specific statements attributed to Defendants "inject precision or some measure of substantiation" for the fraud allegations. *Id.* Plaintiff has alleged "who made the misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006). Plaintiff has further provided enough detail to provide an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges.

Plaintiff's allegations go much further than being predicated simply upon a promise to perform "that subsequently is unfulfilled." *Read,* 397 F. Supp. 3d at 636 (quoting *Lightning Lube,*

4 F.3d at 1186). Plaintiff has sufficiently pled that the failure to perform was based upon discriminatory motives. As to state law, Plaintiff has sufficiently pled that "the defendant made . . . a material misrepresentation of present or past fact." *Read*, 397 F. Supp. 3d at 635 (citing *Lightning Lube*, 4 F.3d at 1182). Plaintiff further alleges that Defendants made material misrepresentations based on discriminatory motives and not predicated "simply upon a promise to perform that subsequently is unfulfilled....'" *Read,* 397 F. Supp. 3d at 636 (quoting *Lightning Lube,* 4 F.3d at 1186).

Plaintiff alleges that Defendants made representations of their intent to reach an agreement with Plaintiff and invest in Plaintiff's FAIR program, advised Plaintiff of an anticipated start date, with no intention of pursuing such a venture with Plaintiff. These were "false state of mind" representations, which are actionable as fraud at common law. *Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 N.J. Super. 369, 380 (App. Div. 1960). Plaintiff alleges that Defendants represented that they needed Plaintiff to provide the proprietary information regarding the FAIR program and that Defendants reasonably foresaw that Plaintiff would rely on this representation. As a result, Plaintiff alleges that it suffered damages in the form of Defendants acquiring Plaintiff's proprietary FAIR program information without compensation. These facts as alleged in Plaintiff's Amended Complaint establish the elements of common law fraud. *See Impact Protective Equip., LLC v. XTech Protective Equip., LLC,* No. A-0879-19, 2021 WL 1395618, at *8 (N.J. Super. Ct. App. Div. Apr. 14, 2021).

The particularity requirement does not mandate that Plaintiff prove its case in the complaint. Rather, particularity is required "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d

786, 791 (3d Cir. 1984); *see also Lum,* 361 F.3d at 223–24. "Thus, the question of whether the allegations are sufficiently particular is not the same question as whether Plaintiff's allegations are bulletproof. Rather, the question is whether plaintiffs have provided a detailed description of what the alleged misrepresentations are and what materials support Plaintiff's contentions." *Prudential Ins. Co. of Am.*, 2013 WL 5467093, at *8.

Plaintiff has the burden to plead generally that Defendants knew that the alleged statements were false or misleading. Fed. R. Civ. P. 9(b); *Gennari,* 148 N.J. at 610. Assuming the facts alleged by Plaintiff are true, and affording them all reasonable inferences, the Court concludes that Plaintiff adequately pled a cause of action for common law fraud.

Accordingly, Defendants' motion to dismiss Count Fourteen is **DENIED**.

### G. Whether Plaintiff Has Sufficiently Pled Aiding and Abetting Fraud against Defendants BlackRock and Owl Rock (Count Fifteen)

In Count Fifteen, Plaintiff asserts a claim for aiding and abetting fraud, alleging that Defendants BlackRock and Owl Rock assisted the State Defendants by misappropriation of Plaintiff's FAIR program. Defendants move to dismiss this claim, arguing that the Amended Complaint does not allege that they were aware that these were confidential, proprietary, or subject to any obligation by DOI to keep them confidential such that they were "misappropriated" or had been procured months earlier by any alleged fraud. The Court disagrees.

To establish liability for aiding and abetting fraud, (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation. *State Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l,* 387 N.J. Super. 469, 483 (App. Div. 2006) (quoting *Tarr v. Ciasulli,* 181 N.J. 70, 84 (2004)) (finding that the New Jersey Supreme

Court's adoption of the Restatement definition of aiding and abetting liability in the context of another tort applies with equal force to a claim for aiding and abetting a fraud); *see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d. Cir. 2003); *Prudential Ins. Co. of Am.*, 2013 WL 5467093, at *19 (applying the elements recognized by *McCormac v. Qwest, supra*, to a claim for aiding and abetting fraud); *DeFazio v. Wells Fargo Bank Nat'l Ass'n*, No. CV 20-375 (SRC), 2020 WL 1888252, at *5 (D.N.J. Apr. 16, 2020); *Bachner & Co. v. White Rose Food, Inc.*, No. 09 Civ. 2640, 2010 WL 3210689, at *6 (D.N.J. Aug. 11, 2010). A person will be liable for aiding and abetting if he knows that another person's "conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." *Prudential Ins. Co. of Am.*, 2013 WL 5467093, at *19 (citing *State of N.J., Dep't of Treasury, Div. of Inv. ex rel. McCormac,* 387 N.J. Super. 469, 481 (App. Div. 2006)) (citation omitted). "A claim for aiding and abetting fraud also requires proof of the underlying tort...." *Id.* at 484.

Plaintiff contends that the Amended Complaint details how Defendants Walsh, Cliffwater, and McDonough provided the misappropriated and proprietary FAIR model to BlackRock, that BlackRock understood that this was an investment model that another firm had presented to the DOI, that the DOI wished to pursue with a different firm; the essential proprietary elements of that program; and the identity, background, and reasons the DOI did not want to proceed with BCA. Am. Compl. ¶ 91. BCA also alleges that its sensitive documents were watermarked and stamped as confidential and thus, BlackRock would know that they had been provided without BCA's permission. *Id.* ¶¶ 38, 65, 206. The deal that the DOI and BlackRock announced in July 2016 also mirrored exactly the confidential plan provided by BCA to BlackRock. *Id.* Finally, that BlackRock furthered the fraudulent scheme by reaching out to a key BCA vendor to try and use their services

and further educate themselves about the elements of BCA's proprietary program. *Id.* ¶ 100. These allegations – which must be accepted as true on this motion – are more than sufficient to establish BlackRock's knowledge and participation at the pleading stage. The Amended Complaint alleges that Walsh, while purporting to serve as an advisor to BCA, with full access to all of BCA's confidential information, was secretly working for Owl Rock without disclosing the relationship. *See* Am. Compl. ¶¶ 57, 60. The Amended Complaint further alleges that Walsh, on Owl Rock's behalf, leveraged his relationships at the DOI and BlackRock to recruit and broker the deal between BlackRock and the DOI as *a quid pro quo* for an investment mandate for his new firm. In recognition of Walsh's substantial assistance, the DOI approved an unprecedented $600 million mandate to Owl Rock on the same day it approved the BlackRock FAIR mandate. The Amended Complaint further alleges that Walsh "kept Owl Rock apprised of every move," and brokered these deals "with the knowledge and direction of Owl Rock . . ." *Id.* ¶ 90.

Defendants assert that this is insufficient.  Even if provided with "presentations and materials," for example, the Complaint does not allege that BlackRock was aware that these were confidential, proprietary, or subject to any obligation by DOI to keep them confidential such that they were "misappropriated."  Nor does the Complaint allege that BlackRock was aware that these "presentations and materials" or the "investment model" had been procured months earlier by any alleged fraud.  *See McMullin v. Casaburi*, No. A-3411-16T3, 2018 WL 3673256, at *5 (N.J. Super. Ct. App. Div. Aug. 3, 2018) (affirming dismissal where plaintiff "alleged no details to prove any defendant had knowledge that another's 'conduct constitutes a breach of duty'").

Defendants further contend that BlackRock is not adequately alleged to have "knowingly and substantially assist[ed] the principal violation."  Just as it could not have had knowledge of the fraud, BlackRock could not have knowingly assisted in committing fraud without knowledge

of any misrepresentations. *McMullin*, 2018 WL 3673256, at *5. Further, Blueprint expressly alleges that DOI did not approach BlackRock until January or February 2016 (Am. Compl. ¶ 85), largely after the allegedly false representations and omissions that occurred between June 2015 and January 2016 (*id.* ¶¶ 49-51, 53-56, 76), and does not allege that BlackRock was informed of any purportedly false statements to procure the materials at issue. Further, BCA fails to explain how BlackRock's alleged misappropriation from January or February 2016 onward could have possibly assisted or encouraged the other Defendants in misleading it six months earlier.

Plaintiff sufficiently alleges that Defendants were generally aware of their role as part of an overall illegal or tortious activity at the time that they allegedly provided the assistance. Plaintiff also sufficiently alleges that Defendants knowingly and substantially assisted the principal violation because the "violation" was not complete until the FAIR program was launched and each Defendant benefited therefrom. Am. Compl. ¶ 102.

Accordingly, Defendants' motion to dismiss Count Fifteen is **DENIED.**

## H. Unfair Competition-against BlackRock, Cliffwater, and Owl Rock (Count Sixteen)

In Count Sixteen, Plaintiff asserts claims for unfair competition against Defendants BlackRock, Cliffwater and Owl Rock. Am. Compl. ¶¶ 319-325. Defendants move to dismiss, arguing that Plaintiff fails to allege a sufficient relationship between the parties to support an unfair competition claim. The Court disagrees.

A claim for unfair competition under New Jersey law is not defined by strict elements, but arises upon "the misappropriation of one's property by another—or property which has some sort of commercial or pecuniary value." *Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592, 600 (D.N.J. 2000) (unfair competition claims "know[] of no clear boundaries," and are "elastic as the evolving standards of commercial morality demand"). But while "[t]he amorphous nature of unfair

competition makes for an unevenly developed and difficult area of jurisprudence," at heart it "seeks to espouse some baseline level of business fairness." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 386 (3d Cir. 2016) (citing *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F.Supp. 747, 786 (D.N.J. 1995)) (interpreting New Jersey law) (citations omitted). "New Jersey courts have deliberately kept the standard of liability somewhat adaptable, so that it may fit changing circumstances: 'the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world. Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand.'" *Avaya Inc.,* 838 F.3d at 386 (citing *Ryan v. Carmona Bolen Home for Funerals*, 341 N.J. Super. 87 (N.J. Super. Ct. App. Div. 2001) (internal quotation marks and citations omitted) (quoting *N.J. Optometric Ass'n v. Hillman–Kohan*, 144 N.J. Super. 411 (N.J. Super. Ct. Ch. Div. 1976)).

In New Jersey, unfair competition is commonly invoked for claims similar to misappropriation of trade secrets or commercial identity. An unfair competition claim, however, protects more information than a traditional trade secret claim. *Avaya Inc., RP*,838 F.3d at 386–87; *see also Torsiello v. Strobeck*, 955 F.Supp.2d 300, 314 (D.N.J. 2013) ("Under New Jersey law, to be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available." (quoting *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274 (N.J. Super. Ct. Law Div. 1995))). "[A]n agent must not take 'unfair advantage of his position in the use of information or things acquired by him because of his position as agent or because of the opportunities which his position affords." *Avaya Inc.,* 838 F.3d at 387. (citation ommitted.) What constitutes misappropriation is somewhat vague. Generally, however, "'[i]mproper' means of acquiring a trade secret include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other

means either wrongful in themselves or wrongful under the circumstances of the case.'" *Id.* (citing Restatement (Third) of Unfair Competition § 43 cmt c. (1995)). Even a legitimate business purpose will not excuse otherwise tortious conduct if the means used are improper. *Avaya Inc.,* 838 F.3d at 387.

Thus, whether a party misappropriates another's confidential idea or some other type of property, the law will imply an obligation that the party pay the other restitution for its improper use of that property if (1) the idea was novel; (2) it was made in confidence [to the defendant], and (3) it was adopted and made use of [by the defendant in connection with his own activities]." *Duffy,* 123 F. Supp. 2d at 807–08 (citing *Flemming,* 107 N.J. Super. at 317). Courts in this District have recognized unfair competition claims at the pleading stage where the complaint alleges the misappropriation of one's property, with commercial or pecuniary value, by another, and some evidence of bad faith or malicious conduct. *See Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. 09-3125 (FLW), 2011 WL 773034, at *9 (D.N.J. Feb. 28, 2011) (recognizing that "it is impossible to categorize all acts which constitute unfair competition" but identifying "fundamental elements that are definite.").

The Court finds that Plaintiff has sufficiently alleged an unfair competition claim. The Court previously addressed Plaintiff's misappropriation allegations in detail and found that Plaintiff has alleged sufficient facts to establish a "legally cognizable property interest" in the FAIR program, and entitlement to trade secret protection under New Jersey Law,[27] thereby satisfying the first element "the idea was novel." As to the second element, the disclosure was "made in confidence," Plaintiff sufficiently alleges that both the DOI and Cliffwater affirmatively represented to BCA that Cliffwater was contractually bound to protect the confidentiality of BCA's

---

[27] *See supra* note 4; section **III.C.**; and Am. Compl., ECF No. 78 ¶¶ 31-32, 205, 208, 258, 260.

proprietary information provided as part of the due diligence review. Am. Compl. ¶ 64. As to the third element, "it was adopted and made use of [by the defendant in connection with his own activities]," Plaintiff sufficiently alleges that the DOI, Cliffwater, and Walsh (at the direction and control of Owl Rock) misappropriated the FAIR program by providing confidential, proprietary information related to the FAIR program to BlackRock. *Id.* ¶ 321. Further, BlackRock and Cliffwater then used BCA's confidential and proprietary information to realize millions of dollars of profits and cost savings, and as a result were enriched at BCA's expense. *Id.* ¶ 323. Further, Defendants Walsh and Owl Rock traded on this information and the deal Walsh facilitated between BlackRock and the DOI to negotiate an unprecedented $600 million anchor investment from the DOI. *Id.*

Accordingly, Defendants' motion to dismiss Count Sixteen is **DENIED.**

## I. Breach of Contract against Cliffwater (Count Seventeen) and against Walsh (Count Eighteen);[28] Breach of Fiduciary Duty against Walsh (Count Nineteen)

### 1. Breach of Contract against Cliffwater (Count Seventeen)

At Count Seventeen, Plaintiff alleges that Cliffwater breached its contractual duties to the DOI by disclosing confidential, proprietary information related to the FAIR program to BlackRock, Am. Compl. ¶ 329.  Plaintiff, as an intended third party beneficiary, suffered and continues to suffer economic damages. *Id.* ¶ 330.

To state a claim for breach of contract under New Jersey law, a plaintiff must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations. *Frederico*, 507 F.3d at 203. A party contending it is a third-party beneficiary of a contract must "show that the contract

---

[28] The Breach of Contract claim at Count Three against the DOI was dismissed based on sovereign immunity. *See supra* pp. 24-25.

was made for the benefit of that third party within the intent and contemplation of the contracting parties." *Grant v. Coca-Cola Bottling Co. of New York, Inc.*, 780 F. Supp. 246, 248-49 (D.N.J. 1991) (citing *First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Assoc.*, 610 F.2d 164, 170 (3d Cir. 1980)). "A third-party who merely stands to benefit from a contract is no more than an incidental beneficiary who incurs no contractual right to enforce the contract." *Id.* (citing Restatement (Second) of Contracts § 315 at 477 (1979)). "[T]he intention of the parties to recognize a right of performance in the third party is the critical factor that governs the characterization of the beneficiary." *Berel Co. v. Sencit F/G McKinley Assoc.*, 710 F. Supp. 530, 537 (D.N.J. 1989); *Villegas v. Correctional Med. Servs., Inc.,* No. 14-7337, 2016 WL 3708218 (D.N.J. July 12, 2016) (dismissing third-party beneficiary claim where plaintiff had not provided supporting facts "[o]ther than his conclusory allegation that he is an intended third-party beneficiary); *Reider Communities, Inc. v. N. Brunswick Twp.*, 227 N.J. Super. 214, 222 (App. Div.), certif. denied, 113 N.J. 638 (1988) (incidental third-party beneficiaries have no cause of action to enforce contractual promises). This Court need not reach the breach of contract analysis because BCA does not allege sufficient facts that establish its status as a third-party beneficiary of any contract between Cliffwater and the DOI. Rather, the Amended Complaint states only that the DOI retained Cliffwater as a nondiscretionary consultant to perform due diligence into investment firms with which the DOI negotiates. Am. Compl. ¶¶ 51, 52, 61, 76, 327. The Amended Complaint confirms that Cliffwater performed due diligence into BCA, BlackRock, and Owl Rock at the DOI's direction with ultimate decisionmaking authority resting solely with the DOI. *Id.* ¶¶ 85, 88, 99, 102. Thus, the contract between Cliffwater and the DOI was not "made for the benefit" of BCA. *Grant*, 780 F. Supp. at 248-49 (internal citations omitted). BCA also does not even make a cursory attempt to allege a valid contract between Cliffwater and the DOI, full performance of the

contractual obligations by the DOI, a breach by Cliffwater, or resulting damages. Instead, BCA contradictorily alleges that the DOI requested that BCA provide Cliffwater with its corporate materials and that the DOI then disclosed BCA's confidential and proprietary information to BlackRock. Am. Compl. ¶ 314 ("[T]he DOI provided BlackRock with [BCA's] proprietary presentations and materials."); *see also id.* ¶¶ 101, 329. Cliffwater contends that it could not breach a contract with the DOI based on the actions of the DOI. As a result, Cliffwater contends that Count Seventeen should be dismissed because it neither alleges that BCA was an intended third-party beneficiary of any contract between Cliffwater and the DOI nor that Cliffwater breached that contract in any way.

Plaintiff counters that a third-party beneficiary may sue for breach of an agreement, even though they are not a party to the contract. *See* N.J.S.A. § 2A: 15-2; *Harmon v. Borough of Belmar*, No. 17-cv-02437 (PGS) (ZNQ), 2020 WL 833061, at *4 (D.N.J. Feb. 20, 2020). Plaintiff further argues that to determine whether a third party was an intended beneficiary, courts (1) look to the pertinent provisions in the agreement, and (2) the surrounding circumstances to determine whether the parties intended to confer a legally enforceable right. *Broadway Maint. Corp. v. Rutgers, State Univ.*, 90 N.J. 253, 260 (1982). As described in the Amended Complaint, Cliffwater was retained as a consultant to the DOI to conduct statutorily required due diligence on proposed investments, and BCA was directed to work with Cliffwater as part of the DOI approval process. Am. Compl. ¶ 51. Both the DOI and Cliffwater affirmatively represented to BCA that Cliffwater was contractually bound to protect the confidentiality of BCA's proprietary information. *Id.* ¶ 64. Cliffwater's contractual obligations to facilitate BCA's diligence process conferred a benefit on BCA. *See Anthem Worldwide Lines, Inc. v. Colgate-Palmolive Co.*, No. 04-6243 (JLL), 2005 WL 8175119, at *3 (D.N.J. Sept. 30, 2005) (third-beneficiary relationship can be established through

course of dealings between parties). Plaintiff asserts that Cliffwater breached the contract by failing to protect BCA's confidential materials and disclosing BCA's proprietary information to, among others, BlackRock. Plaintiff further asserts that these allegations are sufficient to state a claim for breach of contract at this stage of the proceedings and BCA's failure to point to a specific provision of the contract that Cliffwater breached is not fatal at the pleadings stage. *See e.g.*, *760 New Brunswick Urb. Renewal Ltd. Liab. Co. v. Navigators Specialty Ins. Co.*, No. 20-5877 (FLW), 2021 WL 287876, at \*5 (D.N.J. Jan. 28, 2021). The Court agrees.

Accordingly, Defendant Cliffwater's motion to dismiss Plaintiff's breach of contract claim at Count Seventeen is **DENIED.**

### 2. Breach of Contract against Walsh (Count Eighteen) and Breach of Fiduciary Duty against Walsh (Count Nineteen)

At Count Eighteen, Plaintiff asserts a claim for breach of contract against Defendant Walsh, alleging that Defendant Walsh contracted with Plaintiff to serve as a member of BCA's advisory board, thereby owing a duty of confidentiality to Plaintiff. Am. Compl. ¶ 332. Plaintiff further alleges that it provided proprietary information related to its FAIR program to Walsh as part of his duties as a member of its advisory board. *Id.* ¶ 334. Further, that Walsh breached his duties to BCA by, among other things, disclosing proprietary confidential information related to the FAIR program to BlackRock. *Id.* ¶ 335.

Defendant Walsh moves to dismiss this claim, arguing that Plaintiff never identifies or defines the contract, bases its claim on a non-existent advisory board agreement, and fails to indicate which contractual provisions were breached. The Court agrees.

To establish a claim for breach of contract under New Jersey law, a claimant must show: (1) the existence of a valid contract; (2) a breach of that contract; (3) resulting damages; and (4) that the claimant performed its own contractual obligations. *Frederico*, 507 F.3d at 203. As to the

first element, Plaintiff alleges that Walsh contracted with BCA to serve as a member of BCA's advisory board. *Id.* ¶ 332. As to the second element, Plaintiff alleges that Walsh breached his duties to BCA by, among other things, disclosing proprietary confidential information related to the FAIR program to BlackRock. *Id.* ¶ 335. To support the third element, Plaintiff alleges as a direct and proximate result of Walsh's breach of his contractual obligations to BCA pursuant to his advisory board agreement, BCA has suffered, and continues to suffer, economic harm, *id.* ¶ 336, and the egregious five-year pattern of blatant discrimination against BCA has inflicted tens of millions of dollars in damages, and continues more aggressively today. *Id.* ¶ 7. As to the fourth element, Plaintiff asserts at all times, BCA performed its own obligations pursuant to its agreement with Walsh.

Walsh contends that Plaintiff's common-law claims against Walsh are all premised on an alleged contract that BCA never identifies or defines. ECF No. 123-1, Walsh Supp. Br., at p. 17. Walsh further asserts that rather than engage with the Transaction Agreement that governs the parties' relationship, BCA appears to base its contract claim—and even its tort claims—on a nonexistent advisory board agreement. *Id.* While it is unclear whether BCA alleges an express or implied-in-fact contract, neither "is enforceable . . . without the flow of consideration—both sides must 'get something' out of the exchange." *Bernetich, Hatzell & Pascu, LLC v. Med. Records Online, Inc.,* 136 A.3d 955, 961 (N.J. Super. Ct. App. Div. 2016) (citations omitted).

Walsh asserts that BCA fails to allege any facts showing that a contract governing Walsh's role as an advisor ever existed. Further, that Plaintiff does not identify the nature of the agreement entered (whether oral, written, or implied), when or where it was formed, how it was negotiated, the length of its duration, the law that governs its formation and breach, or any of its provisions. BCA does not even allege the existence or nature of the contractual provision giving rise to

Walsh's alleged duty of confidentiality. ECF No. 123-1, pp. 26-27. In addition, BCA fails to identify any bargained-for consideration for Walsh's alleged service on BCA's advisory board. BCA has not suggested, for example, that Walsh received any compensation for these services. *Cf. Maples v. SolarWinds, Inc.,* 50 F. Supp. 3d 1221, 1224 (N.D.Cal. 2014) (advisory board agreement supported by consideration of "5000 shares" of stock); *Market Platform Dynamics, Inc. v. Grimes,* No. 11-11386, 2013 WL 3864267, at *3 (D.Ma. July 23, 2013) (service on advisory board provided in exchange for "option grant" to purchase stock). Walsh contends that, too, is a separate and sufficient basis for dismissing its claim. *See Bernetich,* 136 A.3d at 961 (no enforceable contract can exist absent consideration) (citations omitted); *Sipko v. Koger, Inc.,* 70 A.3d 512, 522 (N.J. 2013) (same).

Plaintiff counters that although Walsh never entered into a written agreement to serve on BCA's Advisory Board, he nonetheless entered into a binding agreement, which included implied duties of confidentiality and good faith. By breaching his duties of confidentiality and good faith and fair dealings to BCA, Walsh failed to comply with his contractual obligations. While Walsh claims that no contract existed, New Jersey courts have found implied contractual duties, such as confidentiality, when the circumstances surrounding the parties' relationship so demand. For example, in *Smithkline Beecham Corp. v. Ranbaxy Laboratories, Ltd.*, No. 03-2158 (MLC), 2005 WL 8176917, at *7 (D.N.J. Mar. 2, 2005), the Court held that the facts surrounding development of a new invention gave rise to an implied agreement of confidentiality between the inventor and her colleagues. *See also Company v. Sutherland*, No. 15-7373, 2016 WL 3585515, at *4 (D.N.J. June 30, 2016). Similarly here, Walsh agreed to serve in an official capacity on BCA's Advisory Board. In that capacity, he had access to all of BCA's confidential information, creating an implied duty. Am. Compl. ¶¶ 57, 62. By passing the information along to others, deceiving BCA about its

relationship with DOI, and helping those seeking to harm BCA, he violated the duties implied in his agreement, and is liable for breach of contract. Am. Compl. ¶¶ 7, 53, 119-20, 336; *see also supra* Background Section C. Plaintiff further alleges that Walsh breached his fiduciary duties to BCA by subordinating BCA's interests to those of his own by, *inter alia*, (i) concealing from and misrepresenting to BCA, that the DOI would work with BCA only as long as necessary to divert the FAIR program and business plan to an established old-boy Wall Street firm; (ii) misappropriating BCA's confidential information and sharing it with BlackRock; and (iii) aiding and abetting the DOI and Cliffwater in their search for a replacement fund.

In Count Nineteen, Plaintiff asserts a claim against Walsh for breach of fiduciary duty, arguing that as an advisory board member, defendant Walsh was a fiduciary and owed duties of care and loyalty to BCA. Am. Compl. ¶ 338. Here, BCA alleges that Walsh was appointed to BCA's advisory board and in that role purported to serve as an advisor to BCA in its negotiations with the DOI. In that capacity, BCA disclosed to Walsh confidential information about its proprietary FAIR program, drafts of emails to the DOI, the status of BCA's discussions with the DOI and other potential counterparties, and other sensitive and proprietary business and strategy information, and sought his advice and counsel on how to advance its relationship with the DOI. Am. Compl. ¶¶ 53, 57-58, 62. Plaintiff alleges that Walsh breached his fiduciary duties to BCA by subordinating BCA's interests to those of his own by, *inter alia*, (i) concealing from and misrepresenting to BCA, that the DOI would work with BCA only as long as necessary to divert the FAIR program and business plan to an established old-boy Wall Street firm; (ii) misappropriating BCA's confidential information and sharing it with BlackRock; and (iii) aiding and abetting the DOI and Cliffwater in their search for a replacement fund. *Id.* ¶ 339. Plaintiff alleges damages as a result. *Id.* ¶ 340. Walsh moves to dismiss this claim, arguing that BCA has

not plausibly alleged that Walsh owed it a fiduciary duty. Walsh contends that BCA's sole reference to a fiduciary duty is one imposed by a contractual relationship and therefore barred by the economic loss doctrine. *See* ECF No. 123-1 at p. 20 (citing Am. Compl. ¶ 338). Walsh further contends that BCA fails to allege that Walsh had any kind of "dominant and controlling" power over it to give rise to an extracontractual fiduciary duty. *Alexander*, 991 F. Supp. at 437. Further, BCA is a "sophisticated investor" that made its own business decisions, Am. Compl. ¶ 128, and "Walsh had no discretionary role in [BCA's] business," *id.* ¶ 72. Walsh's role as an informal advisor for someone he considered a friend is itself insufficient to give rise to a fiduciary duty. *See, e.g.*, *Alexander,* 991 F. Supp. at 437–38 (holding that parties bound together by a common business interest in an "ordinary contractual relationship" did not give rise to a fiduciary relationship, particularly when they "made their own business decisions"); *Crestwood Farm Blookstock v. Everest Stables, Inc.,* 751 F.3d 434, 443 (6th Cir. 2014) (holding that a "trusted advisor, agent and friend" was not a fiduciary as "[m]any friends do business together. But not all friends are fiduciaries, and in the world of arms-length commercial negotiations few are.").

To prove a breach of fiduciary duty, the plaintiff must prove: (1) the existence of a fiduciary relationship between the parties, (2) the breach of a duty imposed by that relationship, and (3) harm to the plaintiff. *ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc.,* No. 08–4369, 2008 WL 4630486, *6 (D.N.J. Oct.17, 2008) (citing *McKelvey v. Pierce,* 173 N.J. 26, 57 (2002)); *Inventory Recovery Corp. v. Gabriel,* No. 2:11-CV-01604 WJM, 2012 WL 2990693, at *4 (D.N.J. July 20, 2012). The duties of a fiduciary to a dependent party include the duty of loyalty and the duty to exercise reasonable skill and care. *McKelvey*, 173 N.J. at 57.

The New Jersey Supreme Court has defined the elements of a claim for breach of fiduciary duty as follows:

> The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *Restatement (Second) of Torts* § 874 cmt. a (1979)....

*McKelvey v. Pierce*, 173 N.J. at 57 (quoting *F .G. v. MacDonell,* 150 N.J. 550, 563–64 (1997)).

The Court will address both the breach of contract (Count Eighteen) and breach of fiduciary duty (Count Nineteen) claims collectively. Plaintiff's Amended Complaint does not sufficiently allege a breach of contract claim because Plaintiff has not sufficiently alleged "the existence of a valid contract." Plaintiff concedes that Walsh did not enter into a written agreement. Plaintiff argues that Walsh owed BCA a duty of confidentiality associated with his agreement to serve as a member of the advisory board. Am. Compl. ¶ 332. Specifically, Plaintiff states that "Walsh breached his duties to BCA by, among other things, disclosing proprietary confidential information related to the FAIR program to BlackRock." *Id.* ¶ 335. In the absence of any additional allegations of breach that go beyond the alleged violations of Walsh's fiduciary duty, the Court finds that the breach of contract claim is duplicative of Plaintiff's breach of fiduciary duty claim. *See Amboy Bancorporation v. Bank Advisory Grp., Inc.*, 432 Fed.Appx. 102, 111 (3d Cir. 2011); *Lopez-Siguenza v. Roddy*, No. 13-2005, 2014 WL 4854452, at *7 (D.N.J. Sept. 30, 2014); *Motamed v. Chubb Corp.,* No. 15-7262, 2016 WL 4581409, at *5 (D.N.J. Sept. 1, 2016).  Accordingly, Defendant Walsh's motion to dismiss Count Eighteen is **GRANTED** and Count Eighteen is **DISMISSED WITHOUT PREJUDICE**.

As to the breach of fiduciary duty claim, Plaintiff's alleges the following: (1) Defendant Walsh was an advisory board member and fiduciary that owed a duty of care and loyalty to BCA (Am. Compl. ¶ 338); (2) Walsh purported to serve as an advisor to BCA in its negotiations with the DOI; (3) BCA disclosed to Walsh confidential information about its proprietary FAIR program

and other sensitive and proprietary business and strategy information; and (4) BCA sought Walsh's advice and counsel on how to advance its relationship with the DOI (Am. Compl. ¶¶ 53, 57-58, 62).

Construing the facts in favor of Plaintiff, Plaintiff sufficiently alleges the existence of a fiduciary relationship between the parties thereby satisfying the first element. As to the second element, the breach of a duty imposed by that relationship, Plaintiff sufficiently alleges that Walsh breached his fiduciary duty to BCA by subordinating BCA's interests to those of his own by, *inter alia*, (i) concealing from and misrepresenting to BCA, that the DOI would work with BCA only as long as necessary to divert the FAIR program and business plan to an established old-boy Wall Street firm; (ii) misappropriating BCA's confidential information and sharing it with BlackRock; and (iii) aiding and abetting the DOI and Cliffwater in their search for a replacement fund. *Id.* ¶ 339. To support the third element, harm to the Plaintiff, Plaintiff sufficiently alleges as a direct and proximate result of Walsh's breach of the fiduciary relationship, BCA has suffered, and continues to suffer, economic harm, *id.* ¶ 336.

Accordingly, Defendant Walsh's motion to dismiss Count Nineteen is **DENIED.**

### a. Dismissal Based on Arbitration Provision

Defendant Walsh contends that the only contract between Plaintiff and Walsh is the Transaction Agreement pursuant to which Walsh made a $75,000 personal contribution to BCA. ECF No. 123-1, at p. 11. Walsh asserts that BCA's claims against Walsh are subject to mandatory arbitration pursuant to Section 12.05 of the Agreement, wherein the parties agreed that "[a]ny controversy arising out of or relating to this Agreement or the breach thereof, that cannot be settled between the Parties, shall be settled by arbitration." Walsh Decl., Ex. A § 12.05(a). Walsh asserts that the agreement requires Walsh to keep BCA's proprietary information confidential and

accordingly, the Court should order arbitration of BCA's claims against Walsh and dismiss them from the case pursuant to 9 U.S.C. § 4.

In response, Plaintiff contends that the arbitration clause only applies if the allegedly improper activity has a sufficient nexus to the Transaction Agreement. *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 (3d Cir. 2014) ("[T]he arbitrability of a given dispute depends not on the particular cause of action pleaded, but on the relationship of the arbitration clause at issue to the facts underpinning a plaintiff's claims."). Platintiff asserts that Walsh's liability under the Amended Complaint arises from his role as a member of BCA's Board of Advisors in 2015 and 2016, which predates the 2017 Transaction Agreement. As a result, Plaintiff contends that there is no nexus between the Transaction Agreement and BCA's claims against Walsh. In support of its argument, Plaintiff points to several cases where courts have refused to retroactively apply arbitration provisions. *See, e.g., TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31 (2d Cir. 2011) (collecting cases); *see also CardioNet*, 751 F.3d at 176; *Sec. Watch, Inc.v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (refusing to retroactively apply arbitration clause absent some temporal language of the parties' intentions).

The Third Circuit has held that "the fact that the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties, since "[u]nder the FAA, 'parties are generally free to structure their arbitration agreements as they see fit.' " *CardioNet, Inc.*, 751 F.3d at 172 (citing *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 458 (2003) (Rehnquist, J., dissenting) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.,* 489 U.S. 468, 479 (1989)). Accordingly, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute.*" *Id.* (citing *Granite Rock*, 130 S.Ct. at 2856 (emphasis in original)).

Ultimately, then, whether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim. *Id.* Courts must resolve any doubts concerning the scope in favor of arbitration, *id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (noting that "federal policy favors arbitration"). The Supreme Court has repeatedly warned, however, against "overread[ing its] precedent [ ]" concerning the presumption of arbitrability. *See, e.g., Granite Rock*, 130 S.Ct. at 2857. The presumption in favor of arbitration does not "take [ ] courts outside [the] settled framework" of using principles of contract interpretation to determine the scope of an arbitration clause. *Id.* at 2859.

The court begins its review by "carefully analy[zing] the contract language" in the arbitration clause. *CardioNet, Inc.*, 751 F.3d 172 (citing *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 888 (3d Cir. 1992). The agreement contains the following sections:

> Section 5.01. Confidential Information. The Investor confirms and agrees that (i) he or it has not and shall not; and (ii) his or its Affiliates have not and Investor shall cause his or its Affiliates not to, directly or indirectly, disclose(d) to any Person or use(d) for Investor's own benefit any BCA Party Confidential Information (as defined below) concerning the business, contacts, finances or operations of the BCA Parties or their respective Affiliates. "BCA Party Confidential Information" includes, without limitation, (a) any information concerning the BCA Parties or their respective Affiliates and their respective businesses, including, without limitation, investment strategies, positions, confidential information concerning portfolio companies or other third parties with whom or with which the BCA Parties or their respective Affiliates have conducted or conduct business (including, without limitation, any information that is subject to a confidentiality agreement between any BCA Party and any Affiliate or other third party), investor lists, prospective investor lists, marketing materials, and financial information, and (b) any other information of a non-public, proprietary or restricted nature disclosed to or obtained by the Investor as a result of the relationship evidenced by this

Agreement, including but not limited to the Company's (or its Affiliates) contacts, relationships or other industry connections. BCA Party Confidential Information does not include any information that (i) is or becomes generally available to the public, other than as a result of disclosure by Investor in violation of this Agreement or by disclosure by any other Person in violation of any contractual legal, or fiduciary obligation; or (ii) Investor is legally compelled to disclose by law, rule, regulation (including regulations of self-regulatory organizations) or court order.

Section 12.05. Arbitration; Governing Law; Equitable Relief (a) Any controversy or claim arising out of or relating to this Agreement or the breach thereof, that cannot be settled between the Parties, shall be settled by arbitration in accordance with AAA and pursuant to the AAA Rules; provided, that each Party shall retain his or its right to commence an action to obtain specific performance or other equitable relief from any court of competent jurisdiction.

Section 12.09. Entire Agreement, Conflicts. (a) This Agreement, the LLC Agreement, and the Definitive Documents constitute the entire agreement and understanding among the Parties hereto and supersede all other prior agreements and understandings, whether oral, written, or electronic, among the Parties hereto and their respective Affiliates with respect to the subject matter hereof or thereof, which documents shall specifically include the Term Sheet related to this transaction, which may previously have been executed. (b) To the extent possible, each provision of this Agreement, the LLC Agreement, and each of the Definitive Documents shall be enforced to its fullest extent. If this Agreement specifically contradicts any provision of the LLC Agreement, then the provisions of the LLC Agreement shall control. If this Agreement specifically contradicts any provision of any other Definitive Document, then the provisions of this Agreement shall control.

ECF No. 123-3.

Walsh argues that BCA's claims against Walsh are subject to mandatory arbitration because they "aris[e] out of or relat[e] to" the Transaction Agreement. ECF No. 123-3, § 12.05(a). Walsh further asserts that BCA's claims against Walsh are *all* premised on an alleged contractual obligation to maintain confidentiality of its proprietary information. ECF No. 123-1, at p. 37 (emphasis added). Further, that "[t]he Transaction Agreement's arbitration provision squarely

encompasses any dispute Blueprint may assert against Walsh that arises out of his alleged access to Blueprint's proprietary information." *Id.*

At § 12.05(a), the clause governs  any "controversy or claim arising out of or relating to this Agreement or the breach thereof" but the parties also reserved the right to to "obtain specific performance or other equitable relief from any court of competent jurisdiction." This language makes clear that the parties not only anticipated potential court action but also expressly reserved the right to pursue such court action outside of an arbitration proceeding.  The Court therefore concludes that the parties limited the potential scope of the arbitration clause.

The Court must next consider whether the claims at issue fall within the scope of the arbitration clause.  *CardioNet, Inc.*, 751 F.3d 175. "Again, in determining whether these claims at issue relate to the performance and interpretation of the Agreement, we focus on the factual underpinnings of the claim rather than the legal theories asserted in the Complaint." *Id.*  BCA's claims against Walsh include federal and state law claims of racketeering (Counts Nine – Twelve); fraud (Count Fourteen); breach of contract (Count Eighteen)[29] breach of fiduciary duty (Count Nineteen); and civil conspiracy (Count Twenty-Two).  The factual assertions supporting these claims are well beyond the mere assertion that Walsh breached his duty of confidentiality arising under the Transaction Agreement.  Although these claims may relate to the Transaction Agreement in some manner, they are well beyond Walsh's obligation to maintain confidentiality.  There are multiple parties alleged to have divulged BCA's confidential information and whether Walsh in fact did so is not dispositive of BCA's claims of fraud, racketeering and civil conspiracy against Walsh. Thus, these claims do not necessarily relate to or fall within the arbitration clause and BCA may pursue them in court.

---

[29] The Court dismissed without prejudice Count Eighteen as being duplicative of Count Ninteen.  *See supra.*

Accordingly, Defendant Walsh's motion to dismiss on the basis of arbitrability is **DENIED**.

### J. Tortious Interference with Prospective Economic Advantage against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Greene and Platkin in their individual capacities (Count Twenty)

In Count Twenty of the Amended Complaint, Plaintiff asserts claims for tortious interference with prospective economic advantage under New Jersey common law. Defendants seek to dismiss these claims on procedural grounds, arguing that the claims are barred because Plaintiff failed to timely file a Notice of Claim. Defendants provide no substantive arguments in support of dismissal. [30]

Under New Jersey law, in a claim of tortious interference with prospective business advantage, "[w]hat is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another.'" *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739 (1989) (quoting *Louis Kamm, Inc. v. Flink*, 113 N.J. 582 (1934)). To sustain a tortious interference claim, Plaintiff must show that (1) it had a reasonable expectation of economic advantage, (2) which was lost as a result of malicious interference, and (3) that it suffered losses. *Avaya Inc.,* 838 F.3d at 382 (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140 (N.J. Super. Ct. App. Div. 1995)).

In terms of the first element, reasonable expectation of economic advantage or protectable economic expectations, "[i]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract," and that such prospective relations include "the opportunity . . . leading to potentially profitable contracts." *Avaya Inc.,* 838 F.3d at 382 (citing *Printing Mart*, 563 A.2d at at 39) (quoting Restatement (Second) of Torts § 766B cmt. c (1979)). Courts have

---

[30] The Court reviews the adequacy of Plaintiff's Notice of Claim in section **III.M.**, *infra*.

found "a reasonable expectation of economic gain in as slight an interest as prospective public sales." *Printing Mart*, 563 A.2d at 38 (collecting cases).

The second element—malicious interference—requires only "the intentional doing of a wrongful act without justification or excuse." *Avaya Inc., RP*, 838 F.3d at 383 (citing *Printing Mart*, 563 A.2d at 39) (quoting *Louis Schlesinger Co. v. Rice*, 4 N.J. 169 (1950)). "[T]aking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiff['s] clients, is contrary to the notion of free competition that is fair." *Avaya Inc.,* 838 F.3d at 383 (citing *Lamorte Burns & Co. v. Walters* 167 N.J. 285 (2001)).

For a plaintiff to establish the third element, loss and causation, there must be "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383 (citing *Printing Mart*, 563 A.2d at 41) (quoting *Leslie Blau Co. v. Alfieri*, 157 N.J. Super. 173 (App. Div. 1978)). "It is sufficient that plaintiff prove facts which, in themselves or by the inferences which may be legitimately drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business relationship with [another party], plaintiff would have consummated the sale and made a profit." *Avaya Inc., RP,* 838 F.3d at 383 (citing *McCue v. Deppert*, 21 N.J.Super. 591 (App. Div. 1952).

Here, as to the first element, the Amended Complaint outlines the allegations as to Defendants' misappropriation of Plaintiff's FAIR program, which has been addressed *supra*. *See* Am. Compl. ¶¶ 48-102. Plaintiff's allegations that its FAIR program was eventually launched by Defendant BlackRock (*id.* ¶¶ 100-102), satisfies the reasonable expectation of economic advantage or protectable economic expectation, "[i]t is not necessary that the prospective relation be expected

to be reduced to a formal, binding contract," and that such prospective relations include "the opportunity . . . leading to potentially profitable contracts." *Avaya Inc.,* 838 F.3d at 382.

The second element—malicious interference—requires only "the intentional doing of a wrongful act without justification or excuse," (*Avaya Inc.,* 838 F.3d at 383) (citing *Printing Mart*, 563 A.2d at 39)), which Plaintiff satisfies through the alleged actions of Defendants' misappropriation of the FAIR program and the eventual FAIR program launch through BlackRock. *See* Am. Compl. 48-102. "[T]aking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiff['s] clients, is contrary to the notion of free competition that is fair." *Avaya Inc.*, 838 F.3d 383 (citing *Lamorte Burns & Co.*,167 N.J. at 285).

To establish the third element, loss and causation, there must be "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383 (citing *Printing Mart*, 563 A.2d at 41) (quoting *Leslie Blau Co.*, 157 N.J.Super. at 173). Plaintiff allegations that Defendants' misappropriated Plaintiff's FAIR program and launched it with BlackRock with an initial $500 million investment and authority to invest an additional $500 million (Am. Compl. ¶ 102) is sufficient to establish that "except for the tortious interference by the defendant with the plaintiff's business relationship with [another party], plaintiff would have consummated the sale and made a profit." *Avaya Inc., RP,* 838 F.3d at 383 (citing *McCue v. Deppert*, 21 N.J. Super. 591 (App. Div. 1952).

Accordingly, Defendants' motion to dismiss Count Twenty is **DENIED.**

### K.  Commercial Disparagement against Rosenstock, Greene, Platkin, and Cliffwater (Count Twenty-One)

In Count Twenty-One, Plaintiff asserts a claim for commercial disparagement, arguing that Defendants published false and injurious statements about Plaintiff's business and its abilities.

Defendants Greene and Platkin argue that these claims are barred for Plaintiff's failure to timely file a Notice of Claim and provide no further substantive argument.[31] Defendants Rosenstock and Cliffwater assert that these claims fail because the Amended Complaint does not adequately plead "special damages" and that the disparaging statements were protected opinions that are not actionable. The Court disagrees.

In *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), the Supreme Court held that an individual has a protectable interest in his reputation. The Third Circuit has subsequently clarified, however, that "reputation alone is not an interest protected by the Due Process Clause." *Versarge v. Twp. of Clinton,* 984 F.2d 1359, 1371 (3d Cir. 1993) (internal quotations and citation omitted). "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Hill,* 455 F.3d at 236; *see also McCarthy v. Darman,* 372 Fed. Appx. 346, 351 (3d Cir. 2010). In other words, damage to reputation "is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Twp. of Falls,* 890 F.2d 611, 619 (3d Cir. 1989) (citing *Paul v. Davis,* 424 U.S. 693 (1976)); *Torrey v. New Jersey,* No. CIV.A. 13-1192 PGS T, 2014 WL 941308, at *9 (D.N.J. Mar. 11, 2014).

Here, Plaintiff has not pled commercial disparagement in connection with any federal claim.  Accordingly, the Court now considers whether Plaintiff has adequately stated a claim for commercial disparagement under New Jersey state law. While the New Jersey Constitution "does not explicitly enumerate the right to possession or protecting reputation[,][t]hat right . . . was understood to be guaranteed by Article I, paragraph 1 of the Constitution of 1844." *Doe v.*

---

[31] The Court reviews the adequacy of Plaintiff's Notice of Claim in section **III.M.**, *infra*.

*Poritz,* 142 N.J. 1, 104 (1995). The New Jersey Supreme Court, has concluded, that "[w]here a persons's [*sic*] good name or reputation are at stake because of what the government is doing to that person ... sufficient constitutional interests are at stake ." *Id.* at 105. In *Doe,* the New Jersey Supreme Court explained how its reputational liberty interest analysis differs from that under the Federal Constitution. The Court stated: "Our analysis differs from that under the Federal Constitution only to the extent that we find a protectible [*sic*] interest in reputation without requiring any other tangible loss." *Id.* at 104. In essence, the Court "found 'protectible [*sic*] interests in both privacy and reputation' that were more expansive than federal precedent by concluding that injury to reputation alone sufficed, i.e., that the stigma-plus test did not apply." *Filgueiras v. Newark Pub. Schs.,* 426 N.J. Super. 449, 473 (App. Div. 2012). The Court noted, however, that it has " 'generally been more willing to find State-created interests that invoke the protection of procedural due process than have [the Court's] federal counterparts.'" *Doe,* 142 N.J. at 104 (*citing New Jersey Parole Bd. v. Byrne,* 93 N.J. 192, 208 (1983)); *see also Torrey v. New Jersey,* No. CIV.A. 13-1192 PGS T, 2014 WL 941308, at *15 (D.N.J. Mar. 11, 2014).

Under New Jersey law, "[t]rade libel identifies the tort addressing aspersions cast upon one's business operation. The tort is also known as injurious falsehood, disparagement of property, or commercial disparagement." *Patel v. Soriano,* 369 N.J. Super. 192, 246, (App. Div. 2004) (citing *Prosser & Keeton on Torts* § 128 at 963 (5th ed. 1984) (*Prosser & Keeton* )). "[T]he tort is broader in scope than any of those terms would indicate, and is probably as broad as any injurious falsehood which disturbs prospective advantage." *Pate*l, 369 N.J. Super. at 246 (citing *Prosser & Keeton, supra,* § 128 at 963, 967. "It is similar to the tort of intentional interference with one's economic relations, rather than a branch of the general harm to reputation involved in libel and slander." *Patel,* 369 N.J. Super. at 246, (citing *Prosser & Keeton, supra,* § 128 at 964; *see Henry*

91

*V. Vaccaro Constr. Co. v. A.J. DePace, Inc.,* 137 N.J. Super. 512, 514 (Law Div. 1975) (noting that "the tort of trade libel is but one part of a rather amorphous concept" consisting of communication to a third person of false statements concerning the plaintiff, his property, or his business).

A plaintiff alleging trade libel must prove publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others. *Patel v. Soriano*, 369 N.J. Super. 246–47; *Prosser & Keeton, supra,* § 128 at 967. The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff. *Ibid.*; *Enriquez v. W. Jersey Health Sys.*, 342 N.J. Super. 501, 524 (App. Div.), *certif. denied*, 170 N.J. 211(2001).

Under New Jersey law, an utterance couched as "opinion" or "fair comment" will support a claim based on falsehood if that utterance (a) constituted an express statement of verifiably false facts; (b) implied statements of verifiably false facts; or (c) was based on incorrect or incomplete facts. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 13-20 (1990); *Ward v. Zelikovsky*, 136 N.J. 516, 531 (1994); *Mayflower Transit, L.L.C. v. Prince*, 314 F. Supp. 2d 362, 372 (D.N.J. 2004) (opinions "trigger liability when they imply false underlying objective facts"). The determination of whether a statement is actionable is a question of fact and not a basis for dismissal on the pleadings. *See Romaine v. Kallinger*, 109 N.J. 282, 290 (1988).

With respect to its claim, Plaintiff alleges the following:

- In or around March 2019, Platkin misrepresented that BCA's allegations concerning the misappropriation of its proprietary FAIR program and the discriminatory and retaliatory treatment it received were untrue and had been found baseless after a formal investigation, when in fact no formal investigation had been conducted and Platkin was merely implying that there were other bases for the DOI's refusal to do business with BCA.

- Greene misrepresented that BCA had not been successful because it "could not handle the business of the DOI and that the firm didn't have the resources to manage the current relationship."
- Greene misrepresented in text blasts that Walthour had been removed as Chair of the Ebony Media Holdings for insider trading;
- Rosenstock communicated to BCA's potential investors that BCA's New Jersey mandate would never be approved; and
- Daniel Stern of Cliffwater misrepresented to BCA's prospective investors and others that "BCA should not be taken seriously" and had ongoing problems with New Jersey that indicated it was a bad actor.

Am. Compl. ¶ 350. Plaintiff further alleges that these "falsehoods" were communicated to third parties in order to prevent others from doing business with Plaintiff; directly harmed Plaintiff through lost business opportunities, increased costs of capital and operations and reduced enterprise value. *Id.* ¶¶ 351-355.

Accordingly, Plaintiff has sufficiently alleged a claim for commercial disparagement/trade libel and Defendants' motion to dismiss Count Twenty-One is **DENIED**.

### L. Civil Conspiracy against McDonough, MacDonald, Rosenstock, Amon, Ajmani, Cliffwater, Walsh, and Owl Rock (Count Twenty-Two)

In Count Twenty-Two, Plaintiff brings a claim for civil conspiracy against Defendants McDonough, MacDonald, Rosenstock, Amon, Ajmani, Cliffwater, Walsh, and Owl Rock, arguing that they conspired with respect to Counts Fourteen-Fraud; Fifteen-Aiding and Abetting Fraud; Sixteen-Unfair Competition; Nineteen-Breach of Fiduciary Duty; Twenty-Tortious Interference with Prospective Economic Advantage; and Twenty-One-Commercial Disparagement,[32] to deprive Plaintiff of its constitutional rights and to commit unlawful acts. Defendants argue that these claims are barred for Plaintiff's failure to timely file a Notice of Claim, that Plaintiff fails to

---

[32] The Court has addressed the viability of Counts Fourteen, at **III.F.**; Fifteen, at **III.F.1**; Sixteen, at **III.G.**; Ninteen, at **III.H.2.**; Twenty, at **III.I.**; and Twenty-One, at **III.J.**, *supra*.

state a claim as to the Counts underlying the conspiracy, and that Plaintiff has not alleged the existence of an agreement between the parties.  The Court disagrees.

To state a claim for civil conspiracy, Plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) (citing *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div. 1993) (holding conspirators "'must share the general conspiratorial objective, but . . .need not know all of the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.' . . .To establish conspiracy, 'it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person who is held responsible for its consequences."); *Galicki v. New Jersey*, No. 14-169 (JLL), 2016 WL 4950995, at *18-19 (D.N.J. Sept. 15, 2016).

A plaintiff must plead an intentional tort underlying the civil conspiracy claim. *Lewis v. Airco, Inc.*, No. A-3509-08T3, 2011 WL 2731880, at *33 (N.J. Super. Ct. App. Div. July 15, 2011); *Portes v. Tan*, No. A-3940-11T3, 2014 WL 463140, at *10 (N.J. Super. Ct. App. Div. Feb. 6, 2014) (affirming dismissal of conspiracy count where underlying fraud and consumer fraud claims were inadequately pled."). The "gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" *Morgan*, 268 N.J. Super. at 364 (quoting *Bd. of Educ. v. Hoek*, 38 N.J. 213, 238 (1962)); *see also Weil v. Express Container Corp.*, 360 N.J. Super. 599, 614 (App. Div.), certif. denied, 177 N.J. 574 (2003). Although an agreement between the parties is an element of civil conspiracy, direct evidence of the agreement is not required to be pled in a complaint. *See Eli Lilly and Co. v.Roussel Corp.*, 23 F.Supp.2d 460,

496 (D.N.J. July, 1998) (holding plaintiff need not prove that the unlawful agreement was "express" or that everyone involved knew the conspiracy's full contours, so long as they are all alleged to have "shared in the general conspiratorial objective."); *see also Bondi v. Citigroup, Inc.*, No. BER-L-10902-04, 2005 WL 975856, at *22 (L. Div. Feb. 28, 2005), *aff'd*, 185 N.J. 32 (2005) (refusing to dismiss civil conspiracy claim where complaint "specifically identifies the constituent members of the putative conspiracy and asserts their purpose as constituting a deception, resulting in damages to [plaintiff] . . . [l]ittle more is required at this stage of the proceedings").

The Court has already found that Plaintiff has sufficiently pled the underlying wrongs set out in Counts Fourteen-Fraud; Fifteen-Aiding and Abetting Fraud; Sixteen-Unfair Competition; Nineteen-Breach of Fiduciary Duty; Twenty-Tortious Interference with Prospective Economic Advantage; and Twenty-One-Commercial Disparagement. Plaintiff has also sufficiently pled that Defendants acted in concert to commit the acts set out in the aforementioned Counts, the wrong, which included the misappropriation of the FAIR program, and the harm, which included awarding the FAIR program to Defendant BlackRock. *See e.g.,* Am. Compl. ¶¶ 40-102.

Accordingly, Defendants' motion to dismiss Count Twenty-Two is **DENIED**.

### M. Plaintiff's Notice of Claim as to the State Law Claims[33]

The State Defendants seek dismissal of Plaintiff's state law claims on the grounds that Plaintiff has failed to comply with the notice requirements of N.J.S.A. 59:8–8(a).

Defendants contend that an October 17, 2019 meeting, wherein BCA made the DOI aware of the "substance and nature" of its potential claims, including claims based on "discriminatory actions and statements, misrepresentations of factual information and other breaches of fiduciary responsibility," was the operative date to trigger the 90-day filing requirement. *See* ECF

---

[33] The Notice of Claim filed for Breach of Contract as to the DOI is not addressed herein. The Court dismissed this claim on Eleventh Amendment grounds. *See* section **III.A.1.**, *supra.*

No. 128-1 at 51. According to the State Defendants, since the NOC was filed more than 90 days after the October 17, 2019 meeting, all of the tort claims BCA asserted during the course of the meeting are barred. Those claims include "unjust enrichment and usurpation of business opportunity; breach of confidentiality agreement and Treasury Department Ethics Code; breach of fiduciary duty; misappropriation of trade secrets; fraudulent inducement and/or concealment; intentional and/or negligent misrepresentation; undue influence/duress; civil conspiracy; tortious interference with contractual relations or prospective economic advantage; and a violation of the New Jersey Law Against Discrimination and the New Jersey Civil Rights Act." *Id.*; NOC at p.3. The State Defendants assert the following as to each individual Defendant:

**Defendants McDonough and MacDonald**

The state tort claims of Fraud, Tortious Interference, and Civil Conspiracy, alleged against individual State Defendants McDonough and MacDonald in their individual capacities are barred because the NOC was not filed within 90 days of their alleged wrongful conduct. Both McDonough and MacDonald left the DOI's employment no later than July 2018. Am. Compl. ¶¶ 85, 151. Neither the Amended Complaint nor the NOC refer to any conduct by McDonough or MacDonald that occurred within 90 days of January 24, 2020. ECF No. 128-1 at 52.

**Defendants Greene and Platkin**

Defendants contend that BCA has failed to file the required notice of claim as to the Counts Twenty and Twenty-One alleged against Defendants Greene and Platkin.[34] *Id.* at 53. The NOC describes transactions or occurrences alleged to have been committed by DOI or its employees (NOC at 3-4), identifies Defendants Greene and Platkin as members of the Governor's

---

[34] *See* n.3, *supra.*

staff but is devoid of any factual allegations related to the Tortious Interference and Commercial Disparagement claims that allegedly took place prior to the January 24, 2020 filing of the Notice of Claim.

### Defendants Amon and Ajmani

Defendants contend that the NOC does not identify Defendants Amon or Ajmani as individuals who caused any alleged injuries. Therefore, Plaintiff's state tort claims of fraud, tortious interference, and civil conspiracy against Amon, and tortious interference and civil conspiracy claims against Ajmani are barred. In addition, the NOC fails to describe any claims against Defendants Amon and Ajmani that correlate to tortious interference as alleged in Count Twenty of the Amended Complaint. The Amended Complaint alleges in paragraph 172 that "in or around July 2020, the DOI, including defendant Amon, began been[sic] contacting Blueprint's other investors for the purpose of tortiously interfering with the Company's business relationships." The NOC was filed before these events occurred, and no Notice of Claim has been filed since then. *Id.*

Defendants further contend that as to Defendant Ajmani, the Notice of Claim asserts no occurrence or transaction involving Ajmani that can be reconciled with the basis for a tortious interference claim as alleged in the Amended Complaint. The only allegations set forth in the Amended Complaint involving Ajmani relate to directions alleged to have been provided to DOI after the date of the NOC. *Id.* at 54. Count Twenty against Defendants Amon and Ajmani is therefore barred.

### Review of Plaintiff's NOC

Plaintiff submits that at a minimum BCA's notice substantially complied with the law, which is sufficient to sustain a cause of action, particularly at the motion to dismiss phase. *See*

*Lebaron v. Sanchez*, 407 N.J. Super. 204, 215 (App. Div. 2009); *D'Costa v. Plaza*, No. 15-5310 (MCA), 2017 WL 2213141, at *7 (D.N.J. May 18, 2007) (adequacy of notice was a factual issue better suited for determination at summary judgment). *See Brown v. Arrayo,* No. 08-2661 (RMB/KMW), 2012 WL 4506550, at *5 (D.N.J. Sept. 28, 2012) (substantial compliance avoids the "inflexible application of the statute[s].").   BCA's Notice substantially complied with the CLA's and TCA's requirements, because it detailed the history of BCA's relationship with the DOI, the misappropriation of BCA's FAIR program, the misstatements by DOI employees during the negotiation process, the pretextual diligence delays imposed by the DOI and Cliffwater, and the DOI's retaliation when BCA stood up for its rights through the end of October 2019, which was, within the 90 day statutory period.   *See* NOC at 1-4.   To the extent the Notice omitted an individual or a potential claim, such an omission is not fatal.   *Henderson v. Herman*, 373 N.J. Super. 625, 630, 635 (App. Div. 2004) (notice with descriptions, rather than names of employees, was sufficient); *Lebaron*, 407 N.J. Super. at 215.   Any injuries not specifically mentioned were included by reference because, as discussed above, BCA's injuries constitute a continuing violation. *See Wilson v. Wal-Mart Stores*, 158 N.J. 263, 272 (1999).

The statute requires that a notice of claim include:

> a. The name and post office address of the claimant;
> b. The post-office address to which the person presenting the claim desires notices to be sent;
> c. The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;
> d. A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;
> e. The name or names of the public entity, employee or employees causing the injury, damage or loss, if known; and
> f. The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the

> time of the presentation of the claim, together with the basis
> of computation of the amount claimed.

N.J.S.A. § 59:8–4.

As to a contractual breach "[a] notice of claim shall include the following information: the name of the claimant, the nature of the claim, specific reasons for making the claim, and the total dollar amount of the claim if known." N.J.S.A. § 59:13-5.

The NJTCA sets forth certain procedural requirements that a plaintiff must satisfy prior to filing suit against a public entity or public employee for damages. N.J.S.A. § 59:8–3. Notice is one such requirement whereby a plaintiff must serve a notice of claim with a public entity within ninety days from when the cause of action accrues. N.J.S.A. § 59:8–8. Failure to serve a notice of claim forever bars a claimant from recovering against that public entity or public employee. *Id.; see also Karczewski v. Nowicki,* 188 N.J. Super. 355, 357 (App. Div. 1982); *Saldana v. City of Camden,* 252 N.J. Super. 188, 198 (App. Div. 1991). N.J.S.A. § 59:8–8 only requires that notice be given to the public entity. *Velez v. City of Jersey City,* 180 N.J. 284, 296 (2004).

To prosecute a tort claim against a public entity, a plaintiff must not only file the claim within the applicable limitations period, the plaintiff must also "file a notice of claim within ninety days of the accrual of the cause of action." *Special Police Org. of New Jersey v. City of Newark,* No. A-4168-19, 2022 WL 2912038, at *6–7 (N.J. Super. Ct. App. Div. July 25, 2022) (citing *Ben Elazar v. Macrietta Cleaners, Inc.,* 230 N.J. 123, 133 (2017)); *see also* N.J.S.A. § 59:8-8. A court must determine the date of accrual "in accordance with existing law in the private sector." *Id.* at 134 (quoting *Beauchamp v. Amedio,* 164 N.J. 111, 116 (2000)).

The primary task of a court considering whether a claim is filed within the applicable limitations period is when the cause of action accrued. *The Palisades at Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC*, 230 N.J. 427, 442 (2017). "Accrual of an action is the trigger that

commences the statute-of-limitations clock." *Ibid.* Generally, a cause of action accrues "when 'the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another.'" *Id.* at 443 (quoting *Caravaggio v. D'Agostini,* 166 N.J. 237, 246 (2001)). The same standard applies to the court's determination of the timeliness of the service of notice of a tort claim under the TCA. *Special Police Org. of New Jersey*, 2022 WL 2912038, at *5; *see also J.P. v. Smith,* 444 N.J. Super. 507, 524-29 (App. Div. 2016).

"[A]scertaining the timeliness of a [TCA] notice requires a simple, three-step sequential analysis that never changes." *McNellis-Wallace v. Hoffman,* 464 N.J. Super. 409, 416 (App. Div. 2020) (citing *Beauchamp*, 164 N.J. 111, 118). "The first step is to determine when the cause of action accrued in accordance with N.J.S.A. 59:8-1." *Ibid.* "Once the date of accrual is ascertained, one can proceed to the second step, which 'is to determine whether a notice of claim was filed within ninety days' as required by N.J.S.A. 59:8-8." *Ibid.*

The "continuing tort doctrine," also known as the "continuing violation theory," provides that when an individual is subjected to a "continual, cumulative pattern of tortious conduct," the limitations period begins only when the wrongful action ceases. *Special Police Org. of New Jersey*, 2022 WL 2912038, at *7; *Wilson v. Wal–Mart Stores,* 158 *N.J.* 263, 272 (1999); *Rooster Bar LLC v. Borough of Cliffside Park,* No. A-1022-12T1, 2013 WL 5852758, at *3 (N.J. Super. Ct. App. Div. Nov. 1, 2013); *Fox v. Millman,* 210 N.J. 401, 416 (2012); *Roa v. Roa,* 200 N.J. 555, 568 (2010) (quoting *Wilson,* 158 N.J. at 272).

At bar, Defendants seek to impose a specificity requirement upon Plaintiff's filing of a notice of claim that would require specific reference to any conduct by Defendants McDonough or MacDonald within 90 days of January 24, 2020 (ECF No. 128-1 at 52); specific factual allegations identifying Defendants Greene and Platkin related to the Tortious Interference and Commercial

Disparagement claims that allegedly took place prior to the January 24, 2020 filing of the Notice of Claim; specific reference to Defendants Amon and Ajmani that correlate to specific claims; and subsequent notices of claim for alleged DOI actions occurring after January 24, 2020. N.J.S.A. § 59:8–4 does not, by its terms, impose such a heightened standard.

Here, Plaintiff's notice of claim notified the Defendants of the "date . . . and other circumstances . . . which gave rise to the claim[s] asserted[,]" provided a "general description of the injur[ies]'"known at the time of presentation of the claim" allegedly sustained by the Plaintiff, and listed the "name . . . of the public entity . . . causing [those] injur[ies.]" *See Guerrero v. City of Newark,* 216 N.J. Super. 66 (App. Div. 1987). As such, Plaintiff's notice of claim complied with the notice requirements of the NJTCA. Moreover, Plaintiff has sufficiently pled a continual, cumulative pattern of tortious conduct.

Accordingly, the Court finds that Plaintiff's state law claims are not barred by the NJTCA's notice of claim provisions. In addition, the Court finds that Plaintiff's notice of claim satisfied the pleading requirements imposed by N.J.S.A. § 59:8–4.

As to Defendants McDonough and MacDonald, Plaintiff does not allege any wrongdoing within 90 days of filing the Notice of Claim. Accordingly, Defendants' motion to dismiss Counts Fourteen, Twenty and Twenty-Two are **GRANTED, and Counts Fourteen, Twenty and Twenty-Two are DISMISSED WITH PREJUDICE as to Defendants McDonough and MacDonald.**[35]

As to Defendant Rosenstock, Rosenstock separated from State employment following a turnover to a new State administration under Governor Murphy, which took place more than two years prior to the filing of Plaintiff's Complaint. *See* Compl. ¶¶ 172-73. Because all of Plaintiff's

---

[35] Plaintiff conceded this point at oral argument on the motions.

claims against Ms. Rosenstock are based on her conduct as Head of Alternatives at DOI, a position she no longer held as of March 2, 2018, and all claims necessarily accrued more than two years prior to the filing of Plaintiff's Complaint in June 2020, Plaintiff's claims are barred by the statute of limitations.[36]

Accordingly, Defendants' motion to dismiss Counts Fourteen, Twenty and Twenty-Two are **GRANTED, and Counts Fourteen, Twenty and Twenty-Two are DISMISSED with prejudice as to Defendant Rosenstock.**

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (ECF Nos. 123, 125, 126, 128, 129, and 130) are **GRANTED in part and DENIED in part,** and Plaintiff's Appeals (ECF Nos. 115, 170) are **DENIED AS MOOT** based on the Court's rulings on Defendants' motions.  An appropriate Order accompanies this Opinion.

DATED: December 23, 2022

s/ Julien Xavier Neals
**JULIEN XAVIER NEALS**
United States District Judge

---

[36] Plaintiff similarly conceded this point at oral argument.