UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BLUEPRINT CAPITAL ADVISORS, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF NEW JERSEY, et al.,**<br><br>Defendants. | Civil Action No. 20-7663 (JXN) (MAH)<br><br>**OPINION** |

This matter comes before the Court upon Plaintiff Blueprint Capital Advisors LLC's ("BCA") motion to disqualify Connell Foley, LLP ("Connell Foley") as counsel for Defendants Jason MacDonald, Christopher McDonough, Corey Amon, Dini Ajmani, Derrick Green, George Helmy, and Matthew Platkin (together, the "State Defendants"). Mot. to Disqualify, Dec. 10, 2024, D.E. 368. Pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1, the Court decided this motion without oral argument.

At the core of this motion is whether Elnardo J. Webster II, who is now an attorney at Connell Foley, previously represented BCA or one of its principals, Jacob Walthour. Because the Court concludes that BCA has not carried its burden to prove that attorney-client relationship existed, or the disqualification is warranted, the Court will deny the motion.

**I.  BACKGROUND**

**A. The Instant Litigation**

On June 23, 2020, BCA filed its Complaint against various State officials, public and private entities, and individuals. Compl., D.E. 1. On November 23, 2020, BCA filed an Amended Complaint asserting allegations against Governor of New Jersey Phil Murphy in his official capacity, as well as the State of New Jersey Division of Investment ("DOI"); the State

Defendants; BlackRock, Inc. and BlackRock Alternative Advisors (the "BlackRock Defendants"); Cliffwater, LLC ("Cliffwater"); Owl Rock Capital Corporation ("Owl Rock"); Samantha Rosenstock ("Rosenstock"); and Timothy Walsh ("Walsh") (collectively "Defendants"). Am. Compl., Nov. 23, 2020, D.E. 78. On December 23, 2022, the Honorable Julien X. Neals granted, in part, and denied, in part, Defendants' motions to dismiss BCA's Amended Complaint. Op., D.E. 201. BCA's remaining clams include declaratory, injunctive and equitable relief, and monetary damages for violations of 42 U.S.C. § 1981 and § 1983, the New Jersey Civil Rights Act, racketeering in violation of 18 U.S.C. § 1962 and N.J.S.A. 2C:41-2, breach of contract, fiduciary duty, and claims for unfair competition, civil conspiracy, fraud, commercial disparagement, and tortious interference. *See* Op., D.E. 201; Order, Dec. 23, 2022, D.E. 202. The remaining defendants are the State Defendants, the BlackRock Defendants, Cliffwater, Owl Rock, Walsh, and Rosenstock. *See* Op., D.E. 201; Order, D.E. 202.

BCA describes itself as an "African-American asset management firm in New Jersey. Am. Compl., Nov. 23, 2020, D.E. 78, ¶ 5. Its principals, Jacob Walthour and Carrie Pickett, founded BCA after decades at various esteemed financial services firms. *Id.* ¶ 29. BCA alleges that it was subject to racial discrimination by State of New Jersey officials and the victim of a years-long effort to thwart BCA's efforts to provide investment services to the State. *See* Am. Compl., D.E. 78. BCA alleges that DOI officials conspired with other public officials and private actors to misappropriate BCA's proprietary investment model (FAIR Program) and implement it with a different private investment firm. BCA also alleges that DOI officials ignored BCA's attempts to manage DOI funds, unnecessarily dragged out the negotiations for an investment contract between the State and BCA, insisted on unfair contract terms inconsistent

with industry standards, refused to approve any investment BCA pitched, and, after BCA complained of the alleged misconduct, State officials retaliated and disparaged BCA in the investment market.  *Id.* ¶ 3.

For a majority of this lawsuit, BCA has been represented by attorneys Ms. Tabaksblat and Mr. Bowe of the law firm Brown Rudnick, LLP.  *See* Substitution of Counsel, Oct. 5, 2020, D.E. 64.  The State Defendants have had prior counsel but have been represented by the law firm Connell Foley and attorneys Mr. Lacey and Ms. Iannaccone since June 13, 2024.  *See* Substitution of Counsel, June 13, 2024, D.E. 334; Substitution of Counsel, June 13, 2024, D.E. 335.  Connell Foley's substitution into this case brought forth the instant dispute.

### B. Elnardo J. Webster II's Professional Relationship with Jacob Walthour

BCA and the State Defendants each submit multiple affidavits attesting to their respective version of events prompting this motion to disqualify.[1]  BCA's contends that an attorney-client

---

[1]  For clarity, certain citations to the record are abbreviated as follows:

Jacob Walthour's December 10, 2024 Affidavit in Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 368-2 is referred to as Walthour Aff. I, D.E. 368-2.

Michael J. Bowe, Esq.'s December 10, 2024 Affidavit in Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 368-3 is referred to as Bowe Aff., D.E. 368-3.

Lauren Tabaksblat, Esq.'s December 10, 2024 Affidavit in Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 368-4 is referred to as Tabaksblat Aff. I, D.E. 368-4.

John P. Lacey, Esq.'s January 21, 2025 Declaration in Opposition to BCA's Motion to Disqualify Connell Foley LLP, D.E. 384-1 is referred to as Lacey Decl., D.E. 384-1.

Elnardo Webster II, Esq.'s January 21, 2025 Declaration in Opposition to BCA's Motion to Disqualify Connell Foley LLP, D.E. 384-2 is referred to as Webster Decl. I, D.E. 384-2.

Lauren F. Iannaccone, Esq.'s January 21, 2025 Declaration in Opposition to BCA's Motion to Disqualify Connell Foley LLP, D.E. 384-3 is referred to as Iannaccone Decl. I, D.E. 384-3.

Jacob Walthour's February 11, 2024 Affidavit in Further Support of BCA's Motion to Disqualify

relationship previously existed between one of BCA's principals, Jacob Walthour, and a Connell Foley Partner, Elnardo J. Webster II. Walthour Aff. I, D.E. 368-2, ¶ 6. Mr. Webster vehemently disagrees with Mr. Walthour's characterization of the relationship and Mr. Walthour's description of the events leading to this motion. *See* Webster Decl., D.E. 384-2, ¶¶ 4-6.

That Mr. Walthour and Mr. Webster knew each other before this litigation is not in dispute. They lived in the same town, have children around the same age, and are social acquittances. *Id.* Sometime in 2016, the two met to discuss issues BCA had in its working relationship with the DOI and the State. Walthour Aff., D.E. 368-2, ¶ 6. At this point, Messrs. Walthour's and Webster's versions of events diverge. According to Mr. Walthour, Mr. Webster facilitated meetings with various New Jersey officials, assisted on strategic decisions, and provided legal advice about next steps towards a potential lawsuit. *Id.* ¶¶ 7-9. However, Mr. Webster maintains that he did not provide BCA or Mr. Walthour legal advice during this conversation. Webster Decl. I, D.E. 384-2, ¶ 28. Instead, Mr. Webster avers that Mr. Walthour

---

Connell Foley LLP, D.E. 397-1 is referred to as Walthour Aff. II, D.E. 397-1.

Lauren Tabaksblat, Esq.'s February 11, 2024 Affidavit in Further Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 397-2 is referred to as Tabaksblat Aff. II, D.E. 397-2.

Valerie Martin's February 11, 2024 Affidavit in Further Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 397-3 is referred to as Martin Aff., D.E. 397-3.

Dwayne Warren Jr.'s February 11, 2024 Affidavit in Further Support of BCA's Motion to Disqualify Connell Foley LLP, D.E. 397-4 is referred to as Warren Aff., D.E. 397-4.

Elnardo Webster II, Esq.'s February 26, 2025 Supplemental Declaration in Opposition to BCA's Motion to Disqualify Connell Foley LLP, D.E. 401-1 is referred to as Webster Decl. I, D.E. 384-2.

mentioned he and BCA had an issue with the DOI, and asked Mr. Webster if he knew of anyone with political connections. *Id.* ¶ 27.

Mr. Walthour contends that after BCA retained trial counsel and filed the instant litigation, he continually kept Mr. Webster up to date on the status of the litigation. Walthour Aff. I, D.E. 368-2, ¶¶ 11-12; *see also* Walthour Aff. II, D.E. 397-1, Exhibits B-D. Mr. Walthour attaches three emails to Mr. Webster purportedly seeking legal advice about this litigation—one from 2016, one from 2017, and one from 2021. Walthour Aff. II, D.E. 397-1, Exhibits B-D. However, none of these emails indicates whether Mr. Webster responded to them. *See id.* Mr. Webster declares that any updates or conversations concerning the litigation were "not substantive." Webster Decl. I, D.E. 384-2, ¶ 31. Mr. Webster states that his "communications with Mr. Walthour were sporadic in general, and any discussion we ever had concerning his Complaint was in an informal setting," and did not involve Mr. Webster providing legal advice to Mr. Walthour. *Id.* ¶ 32. Further, Mr. Walthour attaches his phone records from April 2016 to July 2016. Walthour Aff. II, D.E. 397-1, Exhibit A. Those records indicate that there were ten phone calls between the two. *Id.* All but one lasted one minute. *Id.* The longer call was an eleven-minute phone conversation on April 30, 2016, more than four years before the Complaint in this matter was filed. *Id.* Mr. Webster maintains that he provided no legal advice during this phone call, and he vaguely recalls referring Mr. Walthour to a "Mo" Butler. Webster Decl. II, D.E. 401-1, ¶¶11-14.

According to Mr. Walthour, in or around June 2023 he and Mr. Webster met to discuss the lawsuit and potential avenues to settlement. Walthour Aff. I, D.E. 368-2, ¶¶ 12-13. Mr. Walthour states that the two discussed new issues concerning claims in a separate state court

5

action.  *Id.* ¶ 13.  Mr. Webster states that the purpose of this meeting was not to discuss the litigation.  Instead, Mr. Webster represents that he was visiting one of his clients who was the landlord for BCA's office space.  Webster. Decl. I, D.E. 384-2, ¶ 38.  After Mr. Webster concluded the meeting with his client, he stopped by BCA's office to say hello to Mr. Walthour, and to say hello to Dwayne Warren Jr., who is the son of a friend.  *Id.*; *see also* Warren Aff., D.E. 397-4, ¶¶ 2-6.

Mr. Walthour states that in June 2024, he met with Mr. Webster to again discuss this litigation.  Walthour Aff. I, D.E. 368-2, ¶ 14.  However, Mr. Webster does not recall meeting with Mr. Walthour and states only that "if I did see him it was most likely at a social function[.]" Webster Decl. I, D.E. 384-2, ¶ 40.  Mr. Webster adds that that the meeting Mr. Walthour references likely was a party they both attended on June 2, 2024 but Mr. Webster does not recall speaking to or even seeing Mr. Walthour at that party.  Webster Decl. II, D.E. 401-1, ¶ 29.

### C. Connell Foley Substitutes as Counsel for the State Defendants

On June 13, 2024, Connell Foley entered the case by way of a substitution as counsel for the State Defendants.  *See* Substitution of Counsel, June 13, 2024, D.E. 334; Substitution of Counsel, June 13, 2024, D.E. 335; *see also* Lacey Decl., D.E. 384-1, Exhibit A.  According to Mr. Walthour, he learned in July 2024 that Mr. Webster had joined Connell Foley in April 2023. Walthour Aff. I, D.E. 368-2, ¶ 17.  Mr. Webster, however, states that his transition to Connell Foley was posted on LinkedIn, where Mr. Walthour is one of Mr. Webster's connections, and was publicized in various legal media.  Webster Decl. I, D.E. 384-2, ¶ 33.

In any event, on June 16 and 18, 2024, Mr. Walthour texted Mr. Webster.  *Id.*, Exhibit B. According to Mr. Webster, Mr. Walthour and Mr. Webster discussed Connell Foley's and Mr. Lacey's substitution as counsel.  *Id.*, ¶¶ 44-46.  Mr. Webster represents that the exchange was

6

not a substantive discussion of the case. *Id.* However, Mr. Walthour states that Mr. Webster "advised that [BCA] should move to disqualify Connell Foley based on the conflict arising from his provision of legal advice to" BCA. Walthour Aff. I, D.E. 368-2, ¶ 19.

In the months from Connell Foley's substitution as counsel to date, Connell Foley has actively participated in this litigation. Specifically, Connell Foley has engaged in numerous meet-and-confer conferences regarding various discovery disputes that have arisen during this litigation. *See* Iannaccone Cert., D.E. 384-3, ¶ 10; *see e.g.*, State Defs.' Letter, Aug. 5, 2024, D.E. 350 (regarding executive privilege); Joint Letter, Dec. 24, 2024, D.E. 371 (regarding an attorney-client privilege issue); State Defs.' Letter, Jan. 3, 2025, D.E. 373 (seeking leave to file a motion to quash). And as detailed in Ms. Iannaccone's certification, Ms. Iannaccone and Mr. Lacey have had numerous client meetings and interviews and have spent significant time preparing for depositions in this case. *See* Iannaccone Cert., D.E. 384-3, ¶¶ 10-13. According to the record, Mr. Webster has not done anything on this case.

### D. BCA's Motion to Disqualify Connell Foley

In September 2024, BCA's counsel contacted Connell Foley "to arrange a meeting to discuss, among other things, [Connell Foley's] conflict." Bowe Aff., D.E. 368-3, ¶¶ 5-6, Exhibit A. Counsel met on October 3, 2024 and discussed the alleged conflict and any steps taken to "wall off" Mr. Webster from the matter. *Id.* ¶ 8. According to Mr. Lacey, they also discussed a potential resolution of the matter. Lacey Decl., D.E. 384-1, ¶ 13. At the end of the discussion, BCA counsel mentioned the potential conflict. *Id.* ¶ 14. Mr. Lacey states that he informed Mr. Bowe that if BCA pursued a motion to disqualify, Mr. Lacey would not be able to assist in pursuing the settlement strategy discussed during the meet. *Id.* ¶ 15. Therefore, Mr. Bowe advised Mr. Lacey that Mr. Bowe would need to speak to his client and get back to Mr.

7

Lacey about both. *Id.* ¶¶ 15-16. On October 22, 2024, Mr. Bowe contacted Mr. Lacey and confirmed that BCA was not going to pursue the settlement strategy discussed. *Id.* ¶ 17.

On November 19, 2024, BCA emailed the State Defendants a letter concerning the alleged conflict. *Id.* ¶ 18, Exhibit C. On December 2, 2024, the State Defendants responded to the letter and maintained that Connell Foley did not believe there was any conflict. *Id.*, Exhibit D. Further, Connell Foley requested BCA produce materials relating to the conflict. *Id.* Thereafter, BCA filed its motion to disqualify Connell Foley.

## II. LEGAL STANDARD

### A. Motion to Disqualify

On a motion for attorney disqualification, the movant bears the burden of proving that an attorney has violated a Rule of Professional Conduct. *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819, 2008 WL 2937415, at *6 (D.N.J. Jul. 29, 2008). The movant further bears the burden of proving the existence of an attorney-client relationship. *Alexander v. Primercia Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993). The movant carries a heavy burden and must satisfy a high standard of proof. *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 242, 246 (D.N.J. 1998). The burden is considered especially heavy because, in the District of New Jersey, motions to disqualify counsel are generally disfavored and considered a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Alexander*, 822 F. Supp. at 1114 (quoting *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983)). Such disfavor derives from the reality that motions to disqualify are sometimes made solely for "tactical reasons." *Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996). Even when a motion to disqualify is made in good faith, it causes inevitable delay in the underlying proceedings and creates added hardships to the opposing party. *Id.*

8

(citing *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218 (1988)); *see also Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994) (warning that the Rules of Professional Conduct are not intended to be used as a "procedural weapon").

In determining whether to disqualify counsel, the Court "must balance the hardships to the client whose lawyer is sought to be disqualified against the potential harm to the adversary should the attorney be permitted to proceed," while considering the Court's "obligation to preserve high professional standards and the integrity of the proceedings." *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 242, 254 (D.N.J. 1998). As such, the Court must carefully scrutinize the facts giving rise to the alleged conflict. *High 5 Games, LLC v. Marks*, No. 13-7161, 2018 WL 2278103, at *2 (D.N.J. May 18, 2018).

### B. Rules of Professional Conduct

Issues of professional ethics in this District are governed by Local Civil Rule 103.1(a). *See Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 344 (D.N.J. 1996). Local Civil Rule 103.1(a) provides that "the Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court." Thus, the Court turns to New Jersey's Rules of Professional Conduct ("RPC") and the American Bar Association Model Rules of Professional Conduct ("Model Rules") to determine issues concerning professional ethics. *In re Congoleum Corp.*, 426 F.3d 675, 688 (3d Cir. 2005); *Carlyle Towers Condo.*, 944 F. Supp. at 345.

Here, BCA moves to disqualify Connell Foley pursuant to RPC 1.9 and 1.10, which concern duties of counsel to their former client. Pertinent here, RPC 1.9(a) prevents "[a] lawyer who has represented a client in a matter" from "represent[ing] another client in the same or a

9

substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." RPC 1.10(a) states that:

> When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7 or RPC 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

RPC 1.10(a) goes on to prescribe that:

> (c) When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless:
> (1) the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility;
> (2) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
> (3) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

RPC 1.10(c).

### III.   Analysis

Disqualification under RPC 1.9 arises when three elements are met: (1) a prior attorney-client relationship; (2) the attorney's current client interests are materially adverse to the attorney's prior client interests; and (3) the current representation involves the same matter or a substantially related matter to the prior representation. *Fragoso v. Zhejun Piao*, 433 F. Supp. 3d 623, 629 (D.N.J. 2019) (citing *City of Atl. City v. Trupos*, 201 N.J. 447, 463-65 (2010)). Here, BCA contends that Mr. Walthour formed an attorney-client relationship with Mr. Webster, and that over the course of eight years, BCA and Mr. Walthour sought legal advice from Mr.

10

Webster about this matter.  Br. in Supp., Dec. 10, 2024, D.E. 368-1, at 18-20.  The State Defendants vehemently disagree that there was a prior attorney-client relationship between Mr. Webster and Mr. Walthour.  *See* Br. in Opp'n, Jan. 21, 2025, D.E. 382, at 21-28.  Further, the State Defendants argue that Mr. Webster did not receive information that a former client might reasonably assume he would withhold from his present client, and that BCA cannot satisfy the substantially related matter element.[2]  *Id.* at 28-34.  Finally, the State Defendants argue that BCA's delay in raising this dispute and in filing this motion amounts to waiver.  *Id.* at 37-38.[3]

---

[2]  The State Defendants do not appear to deny that the materially adverse element is met.  *See* Br. in Opp'n, Jan. 21, 2025, D.E. 382, at 21-28.

[3]  Because the Court concludes that BCA has not established the existence of an attorney-client relationship between BCA and Mr. Webster, the Court need not reach the issue of waiver. However, for the sake of completeness, the Court concludes that this motion to disqualify was not untimely.  In determining whether the moving party has waived its right to object to the opposing party's counsel, a court should consider: (1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party.  *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1208 (E.D. Pa. 1992)

In his declaration, Mr. Walthour attests that he learned that Mr. Webster joined Connell Foley in July 2024.  Walthour Aff. I, D.E. 368-2, ¶ 17.  Mr. Walthour claims that he raised the alleged conflict with Mr. Webster shortly thereafter.  *Id.* ¶ 19.  In September 2024, BCA's counsel contacted the State Defendants' counsel and set up a meeting to discuss this matter.  Bowe Aff., D.E. 368-3, ¶¶ 5-6, Exhibit A.  The two met in October 2024 to discuss the alleged conflict and any steps to screen Mr. Webster from the matter.  *Id.* ¶ 8.  On October 22, 2024, Mr. Bowe contacted Mr. Lacey and confirmed that BCA was not going to pursue the settlement terms previously discussed.  On November 19, 2024, BCA counsel emailed the State Defendants a letter concerning the alleged conflict.  *Id.* ¶ 18, Exhibit C.  On December 2, 2024, the State Defendants responded to the letter, and maintained that Connell Foley did not believe there was any conflict.  *Id.*, Exhibit D.  Further, Connell Foley requested that BCA counsel produce materials relating to the conflict.  *Id.*

Given that Connell Foley only entered an appearance in this matter in June 2024, and the parties' respective filings establish that they, through counsel, discussed the issue from September to November, the motion to disqualify was not untimely.  The delay in filing the motion is adequately explained by the parties' discussion of the issue, and efforts to resolve it before

### A. Prior Representation

First, the Court must assess whether there existed an attorney client relationship between BCA and/or Mr. Walthour and Mr. Webster. As the party seeking disqualification, BCA bears the burden to prove its existence. *Alexander*, 822 F. Supp. at 1114. If BCA meets that showing, the Court must then consider whether the matters are "substantially related." *See id.*

Under New Jersey law, "an attorney-client relationship may be express or implied." *Speeney v. Rutgers*, 673 F. App'x 149, 153 (3d Cir. 2016). An implied attorney-client relationship exists if "'a person manifests to a lawyer the person's intent that the lawyer provide legal services to the person,' 'the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.'" *Id.* (quoting *Dixon Ticonderoga v. Est. of O'Connor*, 248 F.3d 151, 169 (3d Cir. 2001)). New Jersey courts have found that:

> The creation of an attorney-client relationship does not rest on whether the client ultimately decides not to retain the lawyer or whether the lawyer submits a bill. When . . . the prospective client requests the lawyer to undertake the representation, the lawyer agrees to do so and preliminary conversations are held between the attorney and client regarding the case, then an attorney-client relationship is created.

*Herbert v. Haytaian*, 292 N.J. Super. 426, 436 (App. Div. 1996). However, an implied attorney-client relationship must be based upon more than a subjective belief. *Oestreicher v. Rutgers*, No. 02-959, 2015 WL 6460423, at *6 (D.N.J. Oct, 26, 2015). There must be an objectively reasonable belief that the relationship has been formed "under the totality of the circumstances." *Id.* "[S]urmise alone cannot support an order of disqualification" and the motion must be based

---

resorting to motion practice.

upon fact. *City of Atl. City*, 201 N.J. at 462.

BCA has not established an express attorney-client relationship. BCA appears to concede as much, and focuses on the existence of an implied relationship. *See* Br. in Supp., D.E. 368-1, at 20 ("At all times, Mr. Walthour understood [Mr.] Webster to be representing himself and [BCA] as their attorney."). BCA presents no evidence to find an express attorney-client relationship and Mr. Webster denies having formed one. Webster Decl. I, D.E. 384-2, ¶¶ 16-17 (stating there is no engagement or retainer letter between the two and that Mr. Webster never received any legal fees in connection with this matter). Therefore, the Court finds there was no express attorney-client relationship. *See Speeney*, 673 F. App'x at 153 (finding no express relationship where no payments were sent to the attorney nor any written agreement between the two parties).

BCA also has failed to establish the existence of an implied attorney-client relationship. BCA contends that it and Mr. Walthour "routinely sought [Mr.] Webster's guidance and legal advice concerning [BCA]'s dispute with the State Defendants[.]" Br. in Supp., D.E. 368-1, at 19. BCA further contends that this counseling continued after this lawsuit began, "regarding exit strategies, settlement postures and other strategic decisions." *Id.* However, a few important facts undermine BCA's contentions.

First, the record does not support Mr. Walthour's contention that he "routinely" consulted with Mr. Webster, whether about this matter or otherwise. According to Mr. Walthour, from 2016 to 2024, the two met in person a total of three times. Walthour Aff. I, D.E. 368-2, ¶¶ 6, 12, 14. Further, according to Mr. Walthour, they spoke on the phone for eleven minutes in 2016, and had a series of one-minute phone calls around that time. Walthour Aff. II, D.E. 397-

13

1, ¶ 3, Exhibit A, at 11.  And Mr. Webster avers that in 2016, any communications between them were to connect Mr. Walthour to someone with contacts in the State government.  Webster Decl. I, D.E. 384-2, ¶¶ 27, 29.  Mr. Walthour has presented only three emails he sent Mr. Webster.  There is no evidence before the Court to suggest that Mr. Webster responded to any of them.  Walthour Aff. II, D.E. 397-1, Exhibits B-D.  Similarly, the two briefly texted in March 2022 and June 2022, and did not communicate again until June 2024.  *See* Webster Decl. I, Exhibit A-B.

Second, it is difficult to square BCA's belief that it had an attorney-client relationship with Mr. Webster, with its engagement of other law firms to initiate and litigate this action.  Even as BCA and Mr. Walthour were actively seeking outside legal advice and retaining attorneys for this matter, there is no evidence that they retained, or made any effort to retain, Mr. Webster and his firm.  *See In re Silverman*, 113 N.J. 193, 219 (N.J. 1988) (finding claim of attorney-client relationship could be rebutted by client's decision to retain independent counsel and other outside legal advice).  Courts in this District have similarly found a movant's retention of other attorneys to be highly relevant in determining whether an implied attorney client relationship was formed.  *See FMC Corp. v. Guthery*, No. 01-5409, 2009 WL 485280, at *6 (D.N.J. Feb. 25, 2009) ("[T]he fact that [Defendant] had personal attorneys is relevant to the question of whether it was reasonable for him to believe that [the attorney] was acting as his attorney.").  In a privilege log that BCA produced, BCA claimed privilege for communications between it and eight law firms, none of which included Mr. Webster or his law firm.  *See* Iannaccone Decl. I, D.E. 385, ¶ 16, Exhibit C.  Mr. Walthour and BCA clearly engaged legal representation with numerous attorneys, which they documented.

Finally, BCA's contention that it sought Mr. Webster's guidance concerning "exit strategies, settlement postures and other strategic decisions" is particularly implausible in view of Mr. Webster's legal expertise. Br. in Supp., D.E. 368-1, at 19. Mr. Webster has primarily practiced in real estate and land use regulation for the last thirty years. Webster Decl. I, D.E. 384-2, ¶ 20. Although he has some litigation experience, he has not personally represented individuals in litigation since at least 2016. In any event, he professes to have no expertise involving securities law or investments. *Id.* ¶¶ 21-22. Mr. Webster also declares that he would advise any potential client that he does not have experience in litigation. *Id.* ¶ 23. Clearly, Mr. Walthour himself is a sophisticated professional, and it strains credulity that he would seek the advice of a real estate lawyer about settlement strategies for litigation that alleges, *inter alia*, discrimination and racketeering. Further establishing this implausibility, Mr. Walthour apparently did not know that Mr. Webster, who Mr. Walthour claims was his attorney, had changed law firms until July 2024—nearly a year after Mr. Webster joined Connell Foley. Walthour Aff. I, D.E. 368-2, ¶17; Webster Decl. I, D.E. 384-2, ¶33.

BCA relies on *United States v. Costanzo*, 625 F.2d 465 (3d Cir. 1980), for the proposition that the absence of formalities such as a retainer agreement or payment of legal fees does not preclude the existence of an attorney-client relationship. That may be true, but the circumstances of *Costanzo* diverge considerably with the record in this case. In *Costanzo*, the defendant alleged that he had formed an attorney-client relationship with an attorney who furnished information to Federal Bureau of Investigation agents regarding the defendant. *Costanzo*, 625 F.2d at 466. It was undisputed that the attorney had previously been the defendant's lawyer and communicated with the defendant during his trial. *Id.* at 470. The

15

defendant specifically alleged he sought the attorney's legal advice about how his trial attorney was litigating his case. *Id.* at 468-69. The Third Circuit did not take a position on the validity of defendant's factual claims. *Id.* at 368. The Third Circuit determined only that if defendant's allegations were proven true, "they would represent a serious incursion by the Government in [defendant's] Sixth Amendment Rights." *Id.* Therefore, the Third Circuit remanded the matter for an evidentiary hearing to resolve factual issues concerning whether the defendant had sought legal advice from the attorney, and whether there was a breach of the alleged attorney-client relationship. *Id.* at 469.

Here, unlike in *Costanzo*, there is no showing that Mr. Walthour or BCA had an express or implied attorney-client relationship. Further, BCA has had a full opportunity to present to the Court evidence forming the basis for an attorney-client relationship. As set forth above, BCA has presented only vague assertions that find little support in the record, and a spattering of conversations between Mr. Walthour and Mr. Webster that demonstrate that the two rarely spoke.

BCA also relies upon *Carreno v. City of Newark*, 834 F. Supp. 2d 217 (D.N.J. 2011), for the unremarkable proposition that an attorney's conduct could form an attorney-client relationship. The court in *Carreno* found that there was an attorney-client relationship between a municipality's attorney and the defendant. *Id.* at 225. The defendant was a police officer, and the municipal attorney was previously the City of Newark's chief civil litigator. *Id.* In a separate civil rights matter against Newark and the defendant, the municipal attorney oversaw an associate counsel's representation of the defendant. *Id.* That representation included assessing the case against the defendant, making "specific strategy recommendations how to proceed,

16

discuss[ing] affirmative defenses and discovery demands, and comment[ing] on the [defendant's] conduct." *Id.* at 226. Notably, the attorney "had access to [the defendant's] confidential employment and internal affairs files." *Id.* BCA fails to present evidence of Mr. Webster's direct, or even indirect, involvement in this case beyond a few passing conversations over the span of eight years. Unlike in *Carreno*, Mr. Webster never oversaw or directed any attorneys associated in this matter. Nor is there any evidence that Mr. Webster ever performed any work on this matter. As Mr. Webster stated, he read BCA's Amended Complaint only while preparing his declaration. Webster Decl. I, 384-2, ¶¶ 8-9. And there is no evidence before the Court that Mr. Walthour or BCA provided Mr. Webster confidential or privileged information.

At bottom, BCA falls well short of its burden to establish the existence of an attorney-client relationship between Mr. Walthour or BCA and Mr. Webster. BCA has provided only vague assertions from Mr. Walthour that he considered Mr. Webster his attorney, while attaching multiple exhibits that demonstrate Mr. Walthour and Mr. Webster rarely spoke. Based on the record before it, the Court cannot conclude that Mr. Walthour or BCA formed a reasonable belief that Mr. Webster was acting as BCA's attorney.

### B. Same or Substantially Related

Although the Court does not find an attorney-client relationship between BCA and Mr. Webster, the Court will nonetheless address whether the alleged prior representation is substantially related to the controversy at issue here. Matters are "substantially related" under this RPC if:

> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties

17

> adverse to the former client, or (2) facts relevant to the prior
> representation are both relevant and material to the subsequent
> representation.

*Trupos*, 201 N.J. at 467. Whether matters are substantially related is a fact-intensive inquiry. *Id.*

The Court is not convinced that Mr. Walthour or BCA provided confidential information to Mr. Webster. There is only one instance where BCA specifically claims confidential information was disclosed to Mr. Webster. That is a 2016 email with attachments from Mr. Walthour to John Inglesino (whom Mr. Walthour misidentified as "James") and Mr. Webster, to which there is no evidence that Mr. Inglesino or Mr. Webster ever responded. The attachments appear to describe BCA, its personnel, and its services in fairly broad terms. Iannaccone Decl. I, D.E. 385, Exhibit D. The Court cannot conclude that the email or its attachments that are confidential for purposes of *Trupos*, given that they were disclosed to DOI and produced in discovery in this matter. *Id.*; Walthour Aff. II, D.E. 397-1, ¶ 4. Moreover, one of the attachments is quoted at length in the Amended Complaint filed on November 23, 2020. Am. Compl., Nov. 23, 2020, D.E. 78, ¶ 97.

Mr. Walthour also attests, in vague terms, that he shared confidential information concerning BCA's litigation strategies and objectives, and he fears that information will be used against him. Walthour Aff. I, D.E. 368-2, ¶¶ 6, 10, 12, 25. Such broad and conclusory statements, devoid of any specificity, are insufficient. *See FMC Corp.*, 2009 WL 485280, at *5 (finding conclusory statements from defendant that he disclosed confidential information regarding "general advice about patent law as well as specific legal advice such as the type of questions" did not amount to "the rendering of legal advice or the formation of an attorney client

relationship").

The Court thus concludes BCA has not established that Connell Foley should be disqualified as counsel for the State Defendants under RPC 1.9. Because the Court concludes that Mr. Webster and Connell Foley are not disqualified under RPC 1.9, the Court need not consider whether Connell Foley is disqualified under RPC 1.10.[4]

### IV. CONCLUSION

For the foregoing reasons, the Court will **deny** BCA's motion to disqualify. An appropriate Order will follow.

*s/Michael A. Hammer*
**United States Magistrate Judge**

---

[4] Although Mr. Webster did not need to be screened off from this matter because he never formed an attorney-client relationship with Mr. Walthour or BCA, Connell Foley has confirmed that Mr. Webster has never accessed, printed, viewed, or downloaded any materials related to this matter. Iannaccone Decl., D.E. 385, ¶ 2. Further, Mr. Webster has been screened from the matter in accordance with a written procedure issued by Connell Foley. *Id.* ¶ 3. Mr. Webster has confirmed that he has not, nor has he ever been, apportioned any fees Connell Foley has received regarding this matter. Webster Decl. I, D.E. 384-2, ¶ 51.