**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

BLUEPRINT CAPITAL ADVISORS, LLC,

           *Plaintiff,*

v.

STATE OF NEW JERSEY, *et al.*,

           *Defendants.*

Civil Action No. 20-7663 (JXN) (MAH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

**I.    Introduction**

This matter is before the Court[1] on the appeal filed by plaintiff Blueprint Capital Advisors, LLC ("plaintiff") from Magistrate Judge Hammer's April 8, 2025 opinion and order denying plaintiff's motion to disqualify the Connell Foley firm from representing certain defendants. For the reasons set forth below, Judge Hammer's ruling is affirmed.

**II.    Background**

This case arises from plaintiff's efforts, described in their complaint, to provide investment services to the state of New Jersey. Plaintiff asserts that state and private actors were involved in denying it opportunities, racially discriminating against it, and misappropriating its proprietary investment program to implement it with a different firm, among other wrongs. (*See generally* D.E. 78, Am. Compl.) The original complaint was filed on June 23, 2020 (D.E. 1), and the operative amended complaint was filed five months later, on November 23, 2020 (D.E. 78). The parties' motion practice has since narrowed the claims (D.E. 201, 202 (December 23, 2022

---

[1] Judge Neals referred this appeal to the undersigned by order dated August 7, 2025. (D.E. 464.)

opinion and order partially granting defendants' motions to dismiss)). Discovery is well underway, with Judge Hammer and an appointed special master managing the parties' numerous and ongoing discovery disputes.

On June 13, 2024, Connell Foley, LLP appeared on behalf of the State Defendants,[2] substituting for the attorneys who had represented them since the case's inception. (D.E. 334, 335.) On December 10, 2024, plaintiff moved to disqualify Connell Foley, arguing that an attorney from the firm, Elnardo Webster II, had "represented and advised" plaintiff in the dispute at the center of this case. (D.E. 368-1, Pl. Moving Br. 1.)

While they briefed the disqualification motion, the parties continued to litigate the underlying case. The motion papers set forth their respective versions of the facts through a series of affidavits and declarations that accompanied the briefs. From plaintiff were affidavits from its CEO, Jacob Walthour (D.E. 368-2, Walthour Aff., and D.E. 397-1, Walthour Reply Aff.), two of its attorneys of record in this case, Michael Bowe (D.E. 368-3, Bowe Aff.) and Lauren Tabaksblat (D.E. 368-4, Tabaksblat Aff., and D.E. 397-2, Tabaksblat Reply Aff.), Valerie Martin, plaintiff's chief compliance officer (D.E. 397-3), and Dwayne Warren Jr., a vice president with plaintiff (D.E. 397-4). From the State Defendants were the declarations of two Connell Foley attorneys who appeared in the case, John Lacey (D.E. 384-1, Lacey Decl.) and Lauren Iannaccone (D.E. 384-3, 385, Iannaccone Decl.), and two declarations from Webster (D.E. 384-2, Webster Decl., and D.E. 401-1, Webster Supp. Decl.).

Stated briefly, plaintiff's case for disqualification was that Walthour had discussions with Webster in 2016, June 2023, and June 2024 about plaintiff's dispute with the state Division of

---

[2] The State Defendants are Jason McDonald, Dini Ajmani, Christopher McDonough, Derrick Greene, Corey Amon, George Helmy, and Matthew Platkin.

2

Investment and that Webster supplied legal and strategic advice that Walthour or plaintiff acted on. On unidentified other dates, Walthour purportedly kept Webster apprised of developments relative to the dispute and received guidance from him. (D.E. 368-2, Walthour Aff. ¶¶ 6-15; D.E. 397-1, Walthour Reply Aff. ¶¶ 3-6, 11, 15-17; D.E. 397-3, Martin Aff. ¶¶ 3-4, 7.) Warren's and Martin's affidavits were offered to corroborate Walthour's account of the June 2023 meeting, although neither of them actually attended it, and Martin asserts that afterwards Walthour shared with her Webster's "legal recommendation" on the then three-year-old lawsuit. (D.E. 397-4, Warren Aff.; D.E. 397-3, Martin Aff. ¶ 7.) Webster disputes the substance, context, and setting of the communications Walthour described in his affidavits. (D.E. 384-2, Webster Decl.; D.E. 401-1, Webster Supp. Decl.).

How Walthour and Webster interpret and characterize their interactions differs, but the following chronology of how the motion to disqualify unfolded is undisputed. The Connell Foley attorneys entered their appearances on June 13, 2024. Walthour states that in July 2024 he learned that Webster had joined Connell Foley back in April 2023 and "immediately" reached out to Webster to ask about that firm's representation of the State Defendants. (D.E. 368-2, Walthour Aff. ¶¶ 17, 19.) He further claims that Webster advised him to have plaintiff move to disqualify Connell Foley. (*Id.* ¶ 19.) But he did not tell the attorneys representing plaintiff – again, his own company – until September 2024, stating that he had expected Connell Foley to itself withdraw or to notify him about how it was protecting plaintiff. (*Id.* ¶¶ 20-24; D.E. 368-3, Bowe Aff. ¶ 5.) After Walthour told plaintiff's counsel, Bowe, of the purported conflict with Webster, Bowe contacted Lacey on September 23 to raise this issue, among others, and they discussed it on October 3. (Bowe Aff. ¶¶ 6, 7-8.)

3

On November 8, 2024, Connell Foley, representing the New Jersey Department of the Treasury, Division of Investment (previously a defendant in this case) and a pension fund, filed a complaint against Walthour, the Blueprint entity that is the plaintiff here, and several other Blueprint entities in New Jersey state court. (D.E. 368-4, Tabaksblat Aff. ¶ 14 & Ex. F.)

On November 19, 2024, Bowe sent a letter to Lacey demanding that he and Connell Foley withdraw as counsel to the State Defendants. (D.E. 368-3, Bowe Aff. ¶ 10 & Ex. B.) The letter claimed that Webster had served as counsel to and advised plaintiff and Walthour on the dispute that prompted this federal case "as well as the subject of the state action recently filed . . . in state court." (*Id.*, Ex. B, at 1.) Lacey responded on December 2, 2024, that based on the facts as he knew them he did not believe a conflict existed and, reiterating an earlier request his partner, Iannaccone, had made, Lacey asked that plaintiff provide any materials or documents that would show the prior representation Walthour and plaintiff were claiming existed. (*Id.* ¶ 11 & Ex. C.) The response to Iannaccone's earlier request had been that "[i]t is not our burden to provide you with the evidence, it is Connell Foley's burden to conduct an appropriate conflicts check." (D.E. 385, Iannaccone Decl. ¶ 9 & Ex. B.) Lacey's December 2 letter also asked for a list of attorneys and firms that plaintiff and Walthour had used beginning in 2015 in connection with their dealings with the state. (D.E. 368-3, Bowe Aff. ¶ 11 & Ex. C.) Plaintiff did not provide this information, but in discovery, it produced a privilege log listing numerous attorneys, none of whom were Webster. (D.E. 384-1, Lacey Decl. ¶ 28; D.E. 385, Iannaccone Decl. ¶ 16.)

As noted, plaintiff filed its motion to disqualify on December 10, 2024. Connell Foley continued to press plaintiff's counsel thereafter to produce records or information to support the attorney-client relationship plaintiff was claiming, and plaintiff's counsel continued to respond

4

that this was not their burden and that Webster should be asked for that information. (D.E. 384-1, Lacey Decl. ¶¶ 33-35 & Ex. E.)

On April 8, 2025, Magistrate Judge Hammer denied the motion to disqualify, reasoning that plaintiff had not shown that an attorney-client relationship had existed between either it and Webster, or between Walthour and Webster. (D.E. 408, 409.) Plaintiff has appealed, arguing that Judge Hammer applied an incorrect standard in evaluating whether an implied attorney-client relationship existed between plaintiff and Webster and resolved material factual and credibility disputes without an evidentiary hearing. (D.E. 412-1 (appeal brief); D.E. 439 (reply).) The State Defendants counter that plaintiff has established no error, factual or legal, and that no evidentiary hearing was required. (D.E. 428.)

**III.     Standard of Review**

On appeal from a magistrate judge's order on a non-dispositive matter, which includes an order denying a motion to disqualify counsel, *see, e.g.*, *Gillespie v. Newark Bd. of Educ.*, 2025 WL 1837555, at *3 (D.N.J. July 3, 2025) (Salas, J.), the Court may only set aside the ruling if it is "clearly erroneous or contrary to law." L. Civ. R. 72.1(c)(1)(A); *see also* Fed. R. Civ. P. 72(a) (same); 28 U.S.C. § 636(b)(1)(A) (same). "The 'contrary to law' standard entails a *de novo* review whether the magistrate judge's ruling 'misinterpreted or misapplied applicable law.'" *Sabinsa Corp. v. HerbaKraft, Inc.*, 2020 WL 1503061, at *4 (D.N.J. Mar. 30, 2020) (Kugler, J.) (quoting *Doe v. Hartford Life Acc. Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006)). The "clear error" standard is met if the Court is left "'with the definite and firm conviction that a mistake has been committed,' even if there is evidence to support the fact-finding." *Id.* at *4 (citation omitted).

5

**IV.    Discussion**

The framework for the issues raised on appeal is not in dispute.  Plaintiff's position is that it is a former client of Webster, such that N.J. RPC 1.9(a) bars Webster's representation of the State Defendants in this action and N.J. RPC 1.10 imputes Webster's alleged conflict to Connell Foley, requiring the whole firm to be disqualified.[3]  The threshold question is whether plaintiff and Webster formed an implied attorney-client relationship (there being no argument on appeal that an express relationship existed).  As noted, Judge Hammer concluded that plaintiff had not shown that they did.  Plaintiff argues that this was (i) legally erroneous because Judge Hammer impermissibly considered certain information (including the timing and frequency of contacts, Webster's area of practice, and plaintiff's representation by other attorneys), and (ii) factually erroneous because no hearing was held to resolve purported factual disputes.

**A.  The Ruling Applied the Correct Legal Standard**

On motions for disqualification of counsel, the movant's burden is heavy and the standard of proof is high, though doubts are resolved in favor of disqualification.  *HP Ingredients Corp. v. Sabinsa Corp.*, 2022 WL 3363231, at *3 (D.N.J. Aug. 10, 2022) (Singh, Mag. J.) (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993)).  Disqualification motions, which are "often made for tactical reasons," are disfavored, with the remedy considered "drastic" owing to the delay and hardship that disqualification often imposes

---

[3] New Jersey's Rules of Professional Conduct apply here by virtue of L. Civ. R. 103.1(a).  RPC 1.9(a) provides that "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."  RPC 1.10(a) precludes other lawyers in a firm from representing a client as to whom any of them would be conflicted from doing so under RPC 1.7 (which governs concurrent conflicts of interest) or RPC 1.9, with certain exceptions, and RPC 1.10(c) imputes the former-client conflicts of an attorney joining a firm to other attorneys at that firm, again with certain exceptions.

even when the motion is made in good faith.  *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996) (Chesler, Mag. J.) (cleaned up).

These considerations are balanced against the need to hold attorneys to the highest standard of the profession, including with respect to the "sacrosanct" privilege between attorney and client, and the risk of hardship to a former client if its attorney is allowed to proceed against it.  *Id.* (cleaned up).  *See HP Ingredients*, 2022 WL 3363231, at *3 ("Resolution of a motion to disqualify requires the court to balance the need to maintain the highest standards of the legal profession against a client's right to freely choose his counsel." (citation omitted)).  Given these competing concerns, and the "intensely fact-specific" questions these motions raise, courts must have "a keen sense of practicality as well as a precise picture of the underlying facts" in ruling on the motion.  *Carlyle*, 944 F. Supp. at 345 (cleaned up).

These background principles guide the analysis here, where Walthour has claimed that he and/or his company formed an eight-year-long attorney-client relationship with Webster through a handful of contacts over the years while plaintiff had other attorneys.  To go any further in the disqualification analysis, plaintiff must first establish the existence of such a relationship because the trigger for RPC 1.9(a)'s limitations is that the lawyer in question "has represented" the client whose interests are now claimed to be adverse to those of the new client.  N.J. RPC 1.9(a).  For any analysis of material adversity or relatedness of the matters to be necessary, and for any issue about conflict imputation to become relevant, a prior attorney-client relationship must have existed.  *See City of Atl. City v. Trupos*, 201 N.J. 447, 462 (2010); *see also, e.g.*, *Jingoli & Son, Inc. v. Beal*, 2025 WL 711604, at *6 (D.N.J. Mar. 5, 2025) (Pascal, Mag. J.) ("Before a court can consider disqualification . . . a prior or current attorney-client relationship must exist.").

It was plaintiff's burden to establish that it had formed such a relationship with Webster. *Trupos*, 201 N.J. at 462. That could be done by proof of an express attorney-client relationship, which exists when "with respect to a particular matter . . . a person manifests to a lawyer that person's intent that the lawyer provide legal services and the lawyer manifests to the person consent to do so." *Speeney v. Rutgers*, 673 F. App'x 149, 153 (3d Cir. 2016) (cleaned up). Plaintiff has not claimed such a relationship, and it has not offered any indicia of one. There are no retainer agreements, no bills, and no payments. *See, e.g.*, *HP Ingredients*, 2022 WL 3363231, at *5 (discussing factors that indicate express relationship) (citing *Speeney*, 673 F. App'x at 153)).

Plaintiff also had the option of showing an implied attorney-client relationship arose. Showing an implied relationship does not require the same formalities. It arises when a putative client manifests an intent to receive legal services; a lawyer, in response "fails to manifest lack of consent to do so"; and the lawyer, under the circumstances, "knows or reasonably should know that the person reasonably relies on the lawyer to provide the services." *Speeney*, 673 F. App'x at 153 (cleaned up); *accord Herbert v. Haytaian*, 292 N.J. Super. 426, 437 (App. Div. 1996). The inquiry is an objective one that looks at the totality of the circumstances, and the putative client's subjective belief that an attorney-client relationship was formed is not enough. *Ozavar v. Loutit*, 2025 WL 3012908, at *6 (D.N.J. Oct. 28, 2025) (Espinosa, Mag. J.). Relevant circumstances can include, among others, whether the putative client has other lawyers and the area of practice or competence of the attorney. *Speeney*, 673 F. App'x at 154; *Haytaian*, 292 N.J. Super. at 436.

Here, plaintiff's argument is based entirely on how Walthour saw the relationship and how he now characterizes his occasional conversations with Webster. He has not offered any

8

evidence that would establish that Webster actually understood, or should have understood, the relationship the same way. There is no indication, for example, that Webster held himself out to anyone as representing plaintiff or Walthour. The closest Walthour comes to that is his assertion that Webster gave him an "introduction" to a consultant, which led to meetings being "facilitated" or connections with others. (D.E. 368-2, Walthour Aff. ¶¶ 8-10; D.E. 397-1, Walthour Reply Aff. ¶ 6.) Walthour does not say Webster attended or had any involvement with those subsequent meetings, and he does not dispute Webster's statement that when he made the introduction, he knew Walthour "generally used the Genova Burns law firm for his and/or his company's legal work." (D.E. 384-2, Webster Decl. ¶ 29.)

There is no dispute that plaintiff had other lawyers throughout the course of the ongoing dispute with the state, including, of course, plaintiff's counsel of record in this case since 2020. There is also no dispute that Webster is not a litigator nor practices in the areas relevant to this lawsuit. Walthour has offered random indications reflecting his outreach to Webster over the years, including phone call records and brief emails. Critically, there is nothing objective reflecting that any of this outreach was under circumstances that would put Webster on notice that getting legal advice was Walthour's aim in making the outreach. Although plaintiff steadfastly rejected, both before and after the filing of the disqualification motion, that it bears the burden to support its claims of a conflict of interest, the governing law states otherwise. Indeed, the burden is a heavy one, for good reason—disqualifying a party's chosen attorney can cause delay and hardship to that party and disadvantage it in the litigation. A court asked to impose such potentially drastic consequences must be equipped with a record that justifies doing that and allows it to distinguish scenarios where the request is made for strategic reasons.

9

Viewing this record with the required practical lens, this Court reaches the same conclusion Judge Hammer did, using the same objective, totality-of-the-circumstances test he correctly used. This record does not support plaintiff's assertion that an implied attorney-client relationship existed between Webster and either plaintiff or its principal, Walthour. Contrary to plaintiff's argument on appeal, the "number of communications" and (non)"exclusivity of the relationship" are not *per se* disqualifiers (and Judge Hammer did not consider them to be), but neither are they irrelevant. (D.E. 412-1, at 14.) At bottom, plaintiff has not shown any objective indicia reflecting that Webster understood the relationship the way Walthour did. While there was no one way plaintiff had to make that showing, the law is that plaintiff did have to make it. Plaintiff has not done so and Judge Hammer made no error of law in reaching that conclusion.

**B. The Ruling Did Not Impermissibly Find Facts**

Plaintiff next asserts that Judge Hammer resolved factual disputes by crediting Webster's version of events over Walthour's, which it argues was clear error.

As an initial matter, Judge Hammer was careful to acknowledge right away that the parties' versions of events diverged and that Walthour disputed various assertions and characterizations in Webster's declarations. But harking back to the burden on plaintiff, this record did not require Judge Hammer to resolve a swearing contest. Even crediting in its entirety Walthour's version of his communications with Webster, the Court would still be left with only Walthour's *subjective* view of their relationship, and the meaning he *subjectively* affixes to their interactions. For an implied attorney-client relationship to arise, plaintiff needed to show that Webster actually knew that Walthour and/or plaintiff viewed him as their attorney (and there is no evidence offered for that), or that Webster reasonably *should* have known that Walthour/plaintiff viewed him that way. And missing was evidence to establish that it would

10

have been objectively reasonable for Webster to understand that Walthour viewed him as providing, specifically, legal advice and counsel as Walthour's or his company's lawyer. The question for the Court was what to do about the absence of that objective evidence, the failure of the totality of circumstances to add up to a representation – not to decide which witness was more credible. *Cf. Trupos*, 201 N.J. at 463. Lining up a subjective belief by a putative client against an attorney interpreting their interactions differently – exactly the dispute before Judge Hammer – without more that raises the belief into a reasonable conclusion, tosses the test aside and opens the door to mischief and unfairness.

### V.     Conclusion

Plaintiff's appeal is denied (D.E. 412), and Judge Hammer's April 8, 2025 order is affirmed. An appropriate order will issue.

Date: December 11, 2025

*s/ Katharine S. Hayden*
Katharine S. Hayden, U.S.D.J.